**23-2226, 23-2234**

# United States Court of Appeals for the Federal Circuit

MARK A. BARRY,

*Plaintiff-Appellant,*

– v. –

DEPUY SYNTHES COMPANIES,

*Defendant,*

DEPUY SYNTHES SALES, INC., trading as DePuy Synthes Spine, MEDICAL DEVICE BUSINESS SERVICES, INC., DEPUY SYNTHES PRODUCTS, INC.,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the Eastern District of Pennsylvania in Civil Action No. 2:17-cv-03003-PD*

## BRIEF FOR PLAINTIFF-APPELLANT

DARIO A. MACHLEIDT
KATHLEEN R. GEYER
KILPATRICK TOWNSEND
& STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, Washington 98101
(206) 467-9600
dmachleidt@kilpatricktownsend.com
kgeyer@kilpatricktownsend.com

D. CLAY HOLLOWAY
COURTNEY S. DABBIERE
MITCHELL G. STOCKWELL
KILPATRICK TOWNSEND
& STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
cholloway@kilapatricktownsend.com
cdabbiere@kilpatricktownsend.com
mstockwell@kilpatricktownsend.com

*Counsel for Plaintiff-Appellant*

*(For Continuation of Appearances See Inside Cover)*

DECEMBER 1, 2023

COUNSEL PRESS (800) 4-APPEAL • (325819)

ANDREW W. RINEHART
KILPATRICK TOWNSEND
& STOCKTON LLP
1001 West Fourth Street
Winston-Salem, North Carolina 27101
(336) 607-7300
arinehart@kilpatricktownsend.com

JONATHAN L. COCHRAN
LEVAN STAPLETON SEGAL
COCHRAN LLC
1760 Market Street, Suite 403
Philadelphia, Pennsylvania 19103
(215) 561-1500
jcochran@levanstapleton.com

*Counsel for Plaintiff-Appellant*

**U.S. Patent No. 7,670,358 (Claim 1)**

1. A method for aligning vertebrae in the amelioration of aberrant spinal column deviation conditions comprising the steps of:
Selecting a first set of pedicle screws, said pedicle screws each having a threaded shank segment and a head segment**;**

selecting a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having first handle means and a first group of pedicle screw engage-ment members which are mechanically linked with said first handle means, each pedicle screw engagement member being configured for engaging with, and trans- mitting manipulative forces applied to said first handle means to said head segment of each pedicle screw of said first set of pedicle screws,

implanting a each pedicle screw in a pedicle region of each of a first group of multiple vertebrae of a spinal column which exhibits an aberrant spinal column deviation condition;

engaging each pedicle screw engagement member respectively with said head segment of each pedicle screw of said first set of pedicle screws; and

applying manipulative force to said first handle means in a manner for simultaneously engaging said first group of pedicle screw engagement members and first set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said first group of multiple vertebrae in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition;

selecting a first length of a spinal rod member; wherein one or more of said pedicle screws of said first set of pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of said pedicle screw and sized and shaped for receiving passage of said spinal rod member there through; and

spinal rod engagement means for securing said pedicle screw and said spinal rod member, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation;

extending said first length of said spinal rod member through said spinal rod conduits of one or more of said pedicle screws of said first set of pedicle screws; and

after applying said manipulative force to said first handle means, actuating said spinal rod engagement means to secure said vertebrae in their respective and relative positions and orientations as achieved through application of said manipulative force thereto.

Appx120

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-2226, 2023-2234

**Short Case Caption** Barry v. DePuy Synthes Companies

**Filing Party/Entity** Mark A. Barry

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/1/2023

Signature: /s/D. Clay Holloway

Name: D. Clay Holloway

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Mark A. Barry | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| April Elizabeth Isaacson<br>Kilpatrick Townsend & Stockton LLP | Christopher P. Damitio<br>Kilpatrick Townsend & Stockton LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page(s)**


STATEMENT OF RELATED CASES ....... 1

JURISDICTIONAL STATEMENT ....... 1

INTRODUCTION ....... 1

STATEMENT OF ISSUES ON APPEAL ....... 3

STATEMENT OF THE CASE ....... 4

A. The Parties. ....... 4

B. Barry's Invention. ....... 4

C. Aware of Barry's Invention, DePuy and its Surgeon Consultants Developed and Promoted Infringing Products. ....... 8

D. Barry Conducted a Survey to Assess Infringement. ....... 12

E. Procedural History. ....... 15

1. The Court Construed "Handle Means." ....... 15

2. The District Court Further Addressed "Handle Means" in Denying Summary Judgment. ....... 16

3. Finding DePuy's Critiques of Barry's Experts Issues of Weight the District Court Denied DePuy's *Daubert* Motions. ....... 17

a) Yassir. ....... 18

b) Neal. ....... 18

F. One Day Before Scheduled Close of the Jury Trial, the District Court Excluded the Survey and Granted JMOL. ....... 20

1. After Barry's Survey Expert Testified, the Court Excluded the Survey on New Grounds. ....... 20

2. Resolving Factual Disputes Against Barry, the Court Held No Direct Infringement. ....... 23

SUMMARY OF ARGUMENT ........................................................................24

STANDARD OF REVIEW ........................................................................25

ARGUMENT ........................................................................26

I. The District Court Erred Granting JMOL. ........................................26

A. Barry Presented Substantial Evidence from Which a Reasonable Jury Could Find Infringement. ........................................26

B. The District Court Erred in Taking Barry's Infringement Case From the Jury. ........................................33

1. The District Court Erred in Granting 50(a) Judgment Based on Yassir's "Handle Means" Testimony ........................................33

2. The Court Granting 50(a) Based on a Rejected Claim Construction Was Error. ........................................44

3. Exclusion of the Survey Did Not Warrant Rule 50(a) Judgment. ........................................46

II. The District Court Erred in Excluding the Survey. ........................................48

A. Excluding the Survey for Alleged Failures in Demonstrating Reliability was Error. ........................................48

1. Barry Presented Sufficient Evidence that Neal's Method For Obtaining Representative Responses Was Reliable. ................49

2. The District Court's Reasons for Finding Lack of Representativeness Fail a "Hard Look." ........................................55

B. Any Alleged Question Defects Go to Weight not Admissibility........63

1. Questions Regarding Type 1's Definition Are Technical and Not Sufficient for Exclusion. ........................................65

2. Exhaustiveness of the Questions Goes to Weight, Not Admissibility. ........................................68

C. Permitting New *Daubert* Grounds After Neal Testified and Holding No Hearing Was Error........................................70

CONCLUSION .......................................................................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Software, Inc. v. Steath Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011) ....................45

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................41

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
561 F.3d 199 (3d Cir. 2009) ....................25

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) (en banc) ....................33, 47

*Asia Vital Components Co. v. Asetek Danmark A/S*,
377 F. Supp. 3d 990 (N.D. Cal. 2019)....................42

*In re Autozone, Inc.*,
No. 3:10-MD-02159-CRB, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ....................60

*Barry v. Medtronic*,
914 F.3d 1310 (Fed. Cir. 2019), *cert. denied,* 140 S. Ct. 869 (2020) .........*passim*

*Barry v. Seaspine*,
No. 1:20-cv-01787-RGA-SRF-consolidated ....................1

*C.R. Bard Inc. v. AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020) ....................36, 40, 41

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
No. 09-290, 2012 WL 6562221 (W.D. Pa. Dec. 15, 2012)....................71

*Centrak, Inc. v. Sonitor Techs., Inc.*,
915 F.3d 1360 (Fed. Cir. 2019) ....................25

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) ....................49, 57, 58, 64, 69

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ....................................................................61

*Crown Packaging Tech., Inc. v. Belvac Prod. Mach., Inc.*,
No. 6:18-CV-70, 2022 WL 821440 (W.D. Va. Mar. 17, 2022) ..........................34

*Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*,
650 Supp. 2d 387 (E.D. Pa. 2009) ........................................................................71

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)..............................................................................*passim*

*Eon–Net LP v. Flagstar Bancorp*,
249 F. App'x. 189 (Fed. Cir. 2007) ......................................................................45

*In re FCA US LLP Monostable Elec. Gearshift Litig.*,
No. 16-MD-02744, 2022 WL 3928377 (E.D. Mich. Aug. 31, 2022) ................64

*Fortune Dynamic, Inc. v. Victoria's Secret Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010) ..............................................................................64

*Freedom Mortg. Corp. v. LoanCare, LLC*,
No. 16-02569, 2023 WL 2570201 (D.N.J. Mar. 20, 2023) ....................50, 51, 53

*GlaxoSmithKline LLC v. Glenmark Pharm. Inc.*,
No. 14-877-LPS-CJB, 2017 WL 8948975 (D. Del. May 30, 2017) ......50, 54, 58

*Hartle v. FirstEnergy Generation Corp.*,
No. 08-109, 2014 WL 1317702 (W.D. Penn. Mar. 31, 2014)....................*passim*

*Hostetler v. Johnson Controls, Inc.*,
No. 3:15-CV-226 JD, 2017 WL 3700345 (N.D. Ind. Aug. 28, 2017) ..............................................................................................................60

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) ..........................................................34, 35, 39

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
336 F.3d 1308 (Fed. Cir. 2003) ..........................................................................39

*Ironburg Inventions Ltd. v. Valve Corp.*,
No. C17-1182 TSZ, 2021 WL 2137868 (W.D. Wash. May 26, 2021), *aff'd*, 64 F.4th 1274 (Fed. Cir. 2023)....................42, 44

*J&J Snack Foods, Corp. v. Earthgrains Co.*,
220 F. Supp. 2d 358 (D.N.J. 2002)....................68

*Kannakeril v. Terminix Int'l, Inc.*,
128 F.3d 802 (3d Cir. 1997)....................56

*Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*,
No. 06 Civ. 550 (JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)....................68

*Keith v. Volpe*,
858 F.2d 467 (9th Cir. 1988)....................64

*Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*,
No. 11-3684 (SRC)(CLW), 2016 WL 3545529 (D.N.J. June 29, 2016)....................48, 49

*Koninklijke Philips N.V. v. ZOLL Lifecor Corp.*,
No. 2:12-CV-1369, 2017 WL 11631173 (W.D. Pa. Sept. 12, 2017)....................42

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................49

*Lee v. Mike's Novelties, Inc.*,
543 F. App'x 1010 (Fed. Cir. 2013)....................42, 44

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993)....................26

*Marlo v. United Parcel Serv., Inc.*
251 F.R.D 476, 485 (C.D. Cal 2008) (emphasis added)....................61

*Marra v. Phila. Hous. Auth.*,
497 F.3d 286 (3d Cir. 2007)....................26, 27

*Mascenti v. Becker*,
237 F.3d 1223 (10th Cir. 2001)....................70

*MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*,
731 F.3d 1258 (Fed. Cir. 2013) ....................................................................40

*Medtonic, Inc. v. Barry*,
891 F.3d 1368 (Fed. Cir. 2018) ......................................................................1

*Merisant Co. v. McNeil Nutritionals, LLC*,
242 F.R.D. 315 (E.D. Pa. 2007)...............................................................64, 65

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986), overruled on other grounds.......................42, 47

*Nat'l Football League Prop., Inc. v. New Jersey Giants, Inc.*,
637 F. Supp. 507 (D.N.J. 1986) ....................................................................50

*Not Dead Yet Mfg., Inc. v. Pride Solutions*,
LLC, 222 F. Supp. 3d 657 (N.D. Ill. 2016) ........................................34, 36, 39

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000) .........................................................................48

*Padillas v. Strork-Gamco, Inc.*,
186 F.3d 412 (3d Cir. 1999) ....................................................................70, 71

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ......................................................................*passim*

*Parallel Networks Licensing, LLC v. Microsoft Corp.*
No. 13-2072 (KAJ), 2017 WL 11557655, at *4-5 (D. Del. Feb. 22, 2017) ..............................................................................................................61

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
655 F. Supp. 3d 1002 (S.D. Cal. 2023).........................................................40

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................43

*Pittsburg Press Club v. United States*,
579 F.2d 751 (3d Cir. 1978) .........................................................................49

*Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*,
599 F.3d 1308 (Fed. Cir. 2010) ....................................................................45

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
No. 17-189-LPS-CJB, 2019 WL 5310220 (D. Del. Oct. 21, 2019) .......50, 53, 61

*Scott Fetzer Co. v. House of Vacuums Inc.*,
381 F.3d 477 (5th Cir. 2004) ............................................................................68

*Simpson Strong-Tie Co. v. MiTek, Inc.*,
No. 20-CV-06957-VKD, 2023 WL 137478 (N.D. Cal. Jan 9, 2023) .........*passim*

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
No. 13-MD-2445, 2020 WL 6887885 (E.D. Penn. Nov. 24, 2020)...................58

*TechSearch, L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002) ........................................................................40

*Tinnus Enter., LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) ........................................................................47

*TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*,
629 F. App'x 916 (Fed. Cir. 2015) ....................................................................45

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012) ........................................................................47

*United States v. Gissantaner*,
990 F.3d 457 (6th Cir. 2021) ............................................................................56

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004) ..............................................................................56

*Wallace v. Countrywide Home Loans Inc.*,
No. SACV 08-1463-JST, 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ..............................................................................................................60

*Wi-LAN, Inc. v. Apple, Inc.*,
811 F.3d 455 (Fed. Cir. 2016) ..........................................................................45

*In re Zoloft Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017) ........................................................................55, 56

**Statutes**

28 U.S.C. § 1295(a)(1) .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 1338 .......... 1

**Rules & Regulations**

Fed. R. Civ. P. 50(a) .......... 33, 44, 46

Fed. R. Civ. P. 403 .......... 40

Fed. R. Civ. P. 702 .......... 48

## STATEMENT OF RELATED CASES

No appeal in this case was previously before this Court or any other Court. Dr. Mark Barry ("Barry") asserts infringement of U.S. Patent Nos. 7,670,358, 8,361,121, and 9,668,787 against DePuy Synthes et al. ("DePuy") in Case No. 2:17-cv-3003-PD (consolidated with Case No. 2:17-cv-2998-PD) in the United States District Court for the Eastern District of Pennsylvania. These patents are also asserted in the District of Delaware in *Barry v. Seaspine*, No. 1:20-cv-01787-RGA-SRF-consolidated. Previously, this Court affirmed a jury verdict of willful infringement Barry brought against Medtronic on two of the patents at issue here. *Barry v. Medtronic*, 914 F.3d 1310 (Fed. Cir. 2019), *cert. denied,* 140 S. Ct. 869 (2020) ("*Medtronic*"). Related to the *Medtronic* matter were IPRs with final written decisions confirming all claims appealed to this Court. *Medtonic, Inc. v. Barry*, 891 F.3d 1368 (Fed. Cir. 2018). The IPRs were later dismissed while on remand addressing what constitutes prior art.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338. Barry timely appealed. Appx112. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

Pretrial, the district court adopted and reaffirmed Barry's construction and application of a critical patent claim term, denied DePuy's *Daubert* challenges, and

found the landscape involved genuine factual disputes for trial. But the day before the case was to be submitted to the paneled jury, the court invaded the jury's province, making credibility determinations and resolving factual disputes itself. The court excluded Barry's experts after they testified and granted DePuy judgment as a matter of law ("JMOL") of no direct infringement based on those exclusions and without considering the remaining evidence, much less viewing it in the light most favorable to Barry. In doing so, the court made four related errors.

First, the court ignored evidence, testimony, and all inferences favorable to Barry, sufficient for a reasonable jury to find for Barry on direct infringement. Barry presented physical exhibits (brochures, manuals, guides, and tools) demonstrating DePuy's accused tools incorporate all the claimed features and DePuy promotes infringing uses. Testimony from surgeons who helped design the accused tools and Barry's expert, Dr. Yassir ("Yassir"), confirmed DePuy's infringement.

Second, the court ***required*** expert testimony to determine whether DePuy's surgical tools possessed "a part that is designed especially to be grasped by the hand"—the court's straightforward construction of the term "handle means." Based on this erroneous requirement, the court then wrongly disregarded testimony from lay surgeons that the accused tools were designed to create handles for surgeons to grasp when performing spinal derotation, and physical evidence

showing DePuy teaches surgeons its tools have parts especially designed to be grasped by the hand, finding insufficient evidence of infringement.

Third, the court then excluded Yassir's testimony on "handle means," faulting Yassir's ***application*** of the construction to the evidence. As the court held pretrial, however, Yassir's application of the construction is a factual question.

Fourth, the court abused its discretion by excluding evidence of direct infringement from Dr. Neal's ("Neal") survey ("Survey"), after Neal left the stand. The court excluded the Survey on waived grounds, raised for the first time in a "renewed" *Daubert* motion, without giving Barry proper opportunity to be heard. The exclusion was procedurally improper and substantively contrary to precedent holding the purported flaws—lack of reliability based on representativeness of the sample and question design—are weight issues for evaluation by the jury, as the court held pretrial.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court erred in granting JMOL by: a) failing to properly credit the evidence in Barry's favor; b) requiring expert testimony on a question easily within the ken of lay jurors; and c) abusing its discretion either in excluding Barry's expert's testimony on "handle means" as allegedly contradicting the court's construction or changing the construction after Barry's case rested.

2. Whether the district court's *Daubert* exclusion of the Survey and Neal's testimony, based on purported methodological flaws, survives a "hard look."

## STATEMENT OF THE CASE

### A. The Parties.

Barry invented surgical techniques and tools for treating spinal deformity conditions where vertebrae are twisted out of alignment, like scoliosis. Appx1028-29 (112:24-114:24); Appx1031-32 (124:20-127:1); Appx24.

DePuy "manufactures and sells medical instruments allowing surgeons to perform linked en bloc derotation (the EXPEDIUM® Vertebral Derotation System and VIPER® 3D MIS Correction Set)" ("accused tools"). Appx26.

In 2017, Barry sued DePuy, alleging DePuy induced infringement of five patents by selling and marketing the accused tools. Appx15012-25 (¶¶ 59-135). To simplify the issues for trial, Barry reduced the claims to three patents. Appx15646.

### B. Barry's Invention.

Barry patented instruments and techniques to re-align vertebrae where surgeons link two or more derotation levers attached to screws implanted in a patient's vertebrae and apply manipulative force to the linked levers to de-rotate the linked vertebrae (en bloc) back into alignment safely and simultaneously. Appx47; Appx1080 (54:23-55:15); Appx119 (3:54-63).




One embodiment[1] of Barry's invention, shown in Figure 1 above (annotated), is a "pedicle cluster derotation tool" (30), constructed by attaching pedicle screw wrenches (32) (derotation levers) to pedicle screws that have been implanted in two or more vertebrae and linking together handle regions of the pedicle screw wrenches to create "a common handle or linked handle array" (34). Appx119 (3:48-52). To use the tool, surgeons grasp the tool and apply manipulative force to de-rotate the linked vertebrae back into alignment. Appx1238 (126:2-128:15). Surgeons grab near the top of the linked levers to get the best mechanical advantage and most force. Appx1103-04 (147:21-149:6); Appx1238 (126:2-127:6). Because the tools are linked and "[t]he engagement between the pedicle screw cluster derotation tool and the individual pedicle screws," the force is "transferred and dispersed simultaneously among the engaged

[1] Surgeons call specific arrangements of surgical tools "constructs." Appx1237-38 (124:9-125:20).

vertebrae," and "a practitioner may, in a single motion, simultaneously and safely derotate multiple vertebrae." Appx119 (3:54-63).

As the district court found, the asserted claims are not limited to Figure 1. *E.g.*, Appx120 (5:19-29); Appx15159-68; Appx15637-39. Generally, they claim (1) structures that engage pedicle screws implanted in the vertebrae and transfer derotative force to pedicle screws—the "pedicle screw engagement [mean/member]" or "lever" elements; and (2) a structure that links engagement members to which the surgeon applies derotative force—the "handle means," "mechanically linked," and "linking" elements. Appx120 (6:15-18); Appx135 (8:5-9); Appx160 (8:33-39). This design, the patents explain, "[h]owever configured," is meant to "facilitate simultaneous application of manipulative forces to multiple pedicle screws 10 which are implanted in a like number of vertebra (a 'cluster')." Appx120 (5:25-33).

Importantly, the engagement members/levers do not need handles separate and distinct from the shafts. Appx15163-65. Indeed, DePuy recognized the prior art (right) shows a derotation lever itself has a handle. Appx16076 (23:14-20); Appx15349. The claims, however, require "handle



means" or "linking" levers, not just handles; they require parts designed especially to be grasped by the hand ***created when surgeons link together multiple derotation tools***. Appx16099 (46:3-21); Appx16102 (49:4-20). For example, as shown in the image below, three derotation levers have been linked together and a surgeon grasps the top end of the tool to move the three vertebrae at once:

FIGURE 8



Lifting the concave side out of the chest is effectively done with the Quick Sticks locked on the TOP NOTCH feature of EXPEDIUM implants. This feature provides 360° control of the anchor point without the need for additional instrumentation.

In addition, using the EXPEDIUM Derotation Frame and/or Alignment Fork multiple Quick Sticks can be linked together and rotated in unison. (Figure 8)

Appx6358; Appx16080 (27:1-10); Appx1245 (153:19-156:11).

The court recognized this is Barry's invention: "Plaintiff's innovation is not 'handles,' but a method of linking derotation tools to administer simultaneous force, thus facilitating *en bloc* spinal correction." Appx15642. Accordingly, the court determined the scope of the invention "contemplates an embodiment of Plaintiff's invention in which the ***surgeon grasps the shaft or lever rather than a separate part strictly designed for handling***." Appx15642 (emphasis added) (citing Appx15163).

### C. Aware of Barry's Invention, DePuy and its Surgeon Consultants Developed and Promoted Infringing Products.

Barry licensed his invention to Biomet, a medical device company, and together they developed commercial embodiments of his invention. Appx1031 (121:10-18); Appx1081 (59:25-60:13). Before that, however, Barry met with DePuy to discuss his ideas and "the future potential for linkage of multiple derotation levers and how we could potentially work together to develop something that was showing…a good advance at that point." Appx1084-85 (71:23-75:1).

DePuy never followed-up with Barry (*id.*); instead, DePuy enlisted surgeons to design surgical tools to permit the simultaneous derotation of linked sets of derotation levers Barry had shared. Appx1335 (174:15-176:7). Specifically, DePuy and its surgeon designers "work[ed] through prototypes on how to make a system for DePuy that does linked en bloc derotation." Appx1393 (95:22-96:10); Appx1394-95 (98:25-101:17). In 2007, DePuy's design (shown right) was still "[n]ot optimized for bilateral use at multiple



levels," so a surgeon could use DePuy's tools to "link it one way but you couldn't link it both ways." Appx1394-95 (100:22-101:17); Appx7065.

DePuy's development engineer explained the prototypes at that time had a handle that "provides a user a convenient area to grip the instrument [] and apply force for manipulating the vertebra." Appx1414-15 (177:15-184:12); Appx7071 (right). During development, DePuy modified its derotators to be knurled at the top and longer to make them easier to grasp and allow surgeons more leverage. Appx1333 (166:25-167:11); Appx1341 (199:3-200:1); Appx1399 (118:8-119:4).




During this development in 2007, DePuy was monitoring Barry's patent application, filed on December 30, 2004, that led to the patents-at-issue. Appx5749 (right); Appx1395 (101:18-102:5). DePuy's marketing witness explained if DePuy did not provide tools surgeons desired, surgeons would use a different company's tools, and DePuy would lose sales of



associated implants. Appx8558 (36:12-25); Appx8580 (162:23-163:09).[2]

Eventually, DePuy released the accused tools, which included Quick Sticks and linking frames for its Expedium systems, shown below.

FIGURE 5A



EN BLOC VERTEBRAL BODY DEROTATION (MULTIPLE APICAL LEVELS)

After the concave rod is engaged in all anchors, attach VBD instruments: EXPEDIUM Derotation Quick Sticks, Facilitators, Flex-Clip with Rotation Tube or VIPER 2 Screw Extensions, (Figure 5A-D) to apical screw heads on both concave and convex sides. (Figure 6)

*A) Quick Stick*
*B) Facilitator*
*C) Flex-Clip with Rotation Tube*
*D) VIPER 2 Screw Extension*

Appx6356.

---

[2] For depositions played at trial, the court entered the testimony as exhibits instead of the court's reporter transcribing.



Appx6005.



| | | |
|---|---|---|
| 2797-88-935 | Derotation Quick Stick | |
| 2797-88-955 | Derotation Quick Stick Frame | |
| 2797-88-960 | Derotation Frame Handle | |
| 2797-88-965 | Derotation Modular Clamp | |

Appx6346.

Through DePuy's heavy investment in surgeon education (Appx1387-88 (71:18-73:25)), DePuy teaches surgeons to assemble the accused tools and perform en bloc derotation in infringing ways:

- Surgeon-authored surgical technique guides: images and descriptions for surgeons to understand how to use tools and techniques.

Appx1252 (181:22-183:4); Appx1245 (153:19-156:11); Appx1388 (74:4-75:1); Appx8589 (98:11-15);

- Highly trained sales representatives: "assist the OR staff in necessary needs" and "go out into the field and talk to doctors about potential uses of the DePuy" tools. Appx8591-92 (103:12-104:6); *see also* Appx1339 (190:9-16); Appx5618; Appx1252 (184:2-23); Appx1253 (185:13-187:10); Appx1254 (189:25-192:8); Appx6169-91;
- Surgeon-led instruction: teaching surgeons techniques using DePuy tools. Appx8592 (104:17-105:1); Appx8587 (92:7-12); Appx1387 (70:22-72:4); Appx1388 (75:10-76:9);
- Demonstrations of tools and techniques: cadaver labs, where at least once, surgeons created infringing constructs using accused tools. Appx1157-58 (32:12-34:1); Appx8602-04 (46:20-50:17).

Through this education, DePuy promotes continued infringing uses of the accused tools. *E.g.*, Appx1254 (192:17-23); Appx1176-77 (108:4-112:25).

### D. Barry Conducted a Survey to Assess Infringement.

DePuy does not track how or how often the accused tools are used. Appx8579-80 (152:19-155:14). Thus, as in *Medtronic*, Barry enlisted Neal, a survey expert in over forty litigations and whose opinions have survived nine *Daubert* motions, including one reviewed by this Court in *Medtronic* (914 F.3d at

1335), to design and conduct the Survey to assess the amount of infringement by DePuy. Appx1163 (54:11-56:3). The district court was involved with the Survey from inception as, on defendants' request, it ordered any survey be done "in a manner that allows the identities of *all* respondents to be discovered upon Order of Court." Appx16404.

The Survey followed best practices for a peer reviewed survey, except, per the court's order, responses were not anonymous. Appx1178 (113:1-24). Neal detailed the accepted practices and methodology he used. Appx1164-66 (59:5-67:1); Appx1169 (78:17-79:9); Appx1172 (91:23-92:4). Neal explained working with Barry's technical expert, Yassir, to prepare the Survey's instructions and questions to surgeons (Appx1165 (64:1-20)), improving upon his *Medtronic* survey (Appx1165-66 (64:21-65:8); Appx1173 (94:3-9)). The Survey went to a broad universe of surgeons most likely to have performed spinal deformity surgeries, including relevant derotation procedures. Appx1166-67 (67:18-69:18).

The Survey was the only measure of infringing surgeries the jury heard in this case and both parties exclusively relied on it in calculating damages. Appx1328 (147:6-12). The Survey asked respondents to estimate, for a two-year period, spinal deformity surgeries performed, estimate how many of those surgeries involved derotation, and then classify those derotation surgeries. Appx1165-66 (64:21-66:19); Appx1172 (91:7-92:18). The Survey design allowed

for extrapolation to a known number of U.S. spinal deformity surgeries set forth in third-party market reports relied on by DePuy in the ordinary course of business—MRG reports. Appx8554 (27:10-28:9); Appx8557 (33:21-34:4); Appx1313-14 (85:20-89:24).

Specifically, the percentage of U.S. spinal deformity procedures that involved using DePuy's accused tools in infringing ways could be determined by extrapolating the Survey's representative responses to the total number of spinal deformity procedures. Appx1169-76 (77:20-105:3); Appx1313 (85:20-87:19). Neal explained this to the jury, using the demonstrative below, showing how the Survey's questions funneled data to remove non-infringing surgeries from the reported total deformity surgeries. Appx1169-72 (78:1-91:22).



## E. Procedural History.

### 1. The Court Construed "Handle Means."

The asserted claims in the '358 and '121 Patents require "pedicle screw engagement [members/means]" which are "mechanically linked" with "handle means." Appx120 (6:14-18); Appx135 (8:5-9). To avoid infringement, DePuy tried at claim construction to limit the claims to tools with handles ***separate and distinct*** from "engagement members." Appx15163. The court rejected this argument, agreeing with Barry the plain and ordinary meaning of "handle means" is "a part that is designed especially to be grasped by the hand." Appx15162-65. The court in the *Medtronic* litigation (Appx15162) and PTAB (Appx16300) adopted the same construction.[3]

The court recognized Barry's claims were not limited to Figure 1 and thus not limited to handles separate from the shafts. Appx15163-65. The court agreed "handle means" encompasses an individual handle within it (Appx15163 (citing Appx16134-37)) and do not require "handles" separate and distinct from "shafts"

[3] Medtronic argued to the PTAB straight ***unlinked*** prior art levers satisfied the "handle means" limitation. Appx15349. The PTAB agreed with Barry and Yassir that the prior art "discloses a group of handles that are grasped by the surgeon but does not show a first handle means." Appx16555-57; Appx16568. The issue was not whether levers are designed to be grasped—that was undisputed; rather, the issue was whether the handles were ***linked*** so as to create "handle means." Appx16555-57.

(derotation levers). Appx15163 ("There is no language in either specification that *requires* the shaft and handle to be 'separate' or 'distinct' objects.").

The court agreed with Barry that the "claims support different embodiments for a 'handle means' that includes [sic] both a single handle from which multiple shafts extend or multiple handles (each attached to individual shafts) linked together." Appx15164. The court confirmed the claims do not require handle elements and engagement member elements (e.g., derotation levers) to be separate and distinct before being joined, finding the limitation "pedicle screw engagement members" "mechanically linked" with the "handle means" "encompasses any physical connection that allows force to be transmitted or transferred from one object to another." Appx15167-70. The court adopted its constructions despite DePuy's alarm these constructions lead to infringement as the construed claims encompassed "anything that is designed to be grasped by a hand—even the end of a shaft." Appx16429.

#### 2. The District Court Further Addressed "Handle Means" in Denying Summary Judgment.

At summary judgment, the court reaffirmed the claimed "handle means" and "engagement members" need not be separate and distinct. DePuy moved for summary judgment that claims ***not*** reciting "handle means" were invalid for lack of written description and enablement. Appx15215-23. In denying DePuy's motion, the court reiterated "[a]t claim construction, I rejected DePuy's argument

that 'a handle must be a separate and distinct object from a shaft'" and "[b]ecause the specification does not require such a separation, I concluded that a handle or handle means refers to 'a part that is designed especially to be grasped by the hand,' and left open the possibility that the vertical shafts might be so designed." Appx15638-39.

The court rejected DePuy's argument that Barry's positions in the *Medtronic* IPRs contradicted the court's construction. Appx15644-45. During IPR, Barry distinguished the prior art DePuy admitted had ***handles*** shown above (*supra* pp. 6-7), not because they lacked ***handles***, but because the handles were not linked, which as DePuy admitted, is required to create the claimed "handle means." The PTAB agreed. Appx16555-57. The court found Barry's positions consistent with his IPR position and recognized "Plaintiff maintains that all the 'significant variations' of linking derotators ***necessarily require some part designed to be grasped by the surgeon*** to apply manipulative force." Appx15643 (emphasis added).

### 3. Finding DePuy's Critiques of Barry's Experts Issues of Weight the District Court Denied DePuy's *Daubert* Motions.

Before trial, DePuy moved to exclude testimony from Yassir and Neal. Appx15227-59; Appx15263-92. The court denied both motions. Appx15647-59.

**a) Yassir.**

DePuy sought to exclude Yassir's opinions applying "handle means," asserting Yassir failed to follow the construction. Appx15246-52. The court rejected DePuy's arguments finding they "involve Yassir's conclusions," and "[a]ny arguments that, contrary to Yassir's opinions, DePuy's derotation tools do not have a 'part that is designed especially to be grasped by the hand' goes to the weight of Yassir's testimony, not its admissibility." Appx15649-52.

The court determined Yassir applied its "designed especially to be grasped by the hand" construction. Appx15650-51. The court rejected DePuy's contention that Yassir's deposition testimony stating "'any one of [several] portions' of DePuy's derotation tool can be considered a handle means according to the claim construction" and "things can be especially designed for more than one thing at the same time" demonstrates Yassir "reads out the requirements of the Court's construction that the handle means is just a part and is designed especially—above all other functions—for grasping by the hand." Appx15650. The court found DePuy's arguments "are not the proper subject of a Daubert motion." Appx15651.

**b) Neal.**

DePuy sought to exclude Neal's opinions and the Survey, arguing the Survey was unreliable for violating accepted survey principles and failing to survey the proper universe. Appx15290-92. Denying DePuy's motion, the court

held "any alleged defects in the [survey] go to the weight, not the admissibility of the survey." Appx15657-59.

DePuy argued the Survey violated accepted principles because the six Types of tool assemblies used were not exhaustive and did not give surgeons "other" or "I do not recall" options. Appx15290-91. In rejecting this, the court held "[a]ny alleged error in the formatting of this question is a 'mere technical unreliability [that] goes to the weight accorded a survey, not its admissibility'" and "DePuy is free to cross examine Neal on any alternatives to the six derotation instrument assemblies that should have been included in the survey." Appx15657-58.

The court likewise rejected DePuy's argument that Neal did not survey the proper universe. Appx15658-59. Pretrial, the court found the Survey sampled the relevant universe holding "the respondents were not in fact, exclusively scoliosis surgeons—they were 'orthopedic surgeons (including general orthopedic surgeons, orthopedic spine surgeons, pediatric orthopedic surgeons) and neurosurgeons.'" Appx15658-59 (finding Neal's sample population was "relevant to the…amount of infringement in this case.").

### F. One Day Before Scheduled Close of the Jury Trial, the District Court Excluded the Survey and Granted JMOL.

#### 1. After Barry's Survey Expert Testified, the Court Excluded the Survey on New Grounds.

Neal took the stand without objection. After Barry moved to admit Neal as a survey expert, DePuy did not object, but the court ordered sidebar to express skepticism as to Neal's expertise because he did not have a degree in statistics. Appx1162 (49:24-51:11). Despite DePuy's willingness to stipulate to Neal's expertise, the court provisionally accepted Neal as a survey expert. Appx1162 (50:1-51:11). Thereafter, Neal testified to his substantial education in statistics and was further accepted as an expert in statistics. Appx1162-63 (52:21-54:8).

Throughout his testimony, the court repeatedly pressed Neal on issues of representativeness.[4] For example, when Neal was explaining 164 surgeons responded to the Survey, the court suggested impropriety, asking "Well, presumably, [Neal's assistants] found a lot more than 164. How did you know which surgeons to pick?" Appx1166-67 (67:18-70:19). In response, Neal explained

[4] From day one of trial, the court repeatedly asked cross-examination questions of Barry and his witnesses, to which Barry objected. Appx1039-40 (153:7-155:2; 157:6-16); Appx1067-68 (3:22-6:19). Counsel would, per the court's request (Appx1070 (14:16-15:8)), object, but such objections were consistently overruled. *See, e.g.*, Appx1100 (135:11-13); Appx1103 (146:12-14); Appx1121 (218:20-23); Appx1300 (33:8-10); Appx1341 (200:10-12). The court never engaged in adversarial examination of DePuy's witnesses, as Barry noted when moving for mistrial. Appx1411 (166:18-23).

he did not "pick" the surgeons for the Survey; rather, he sent about 4000 invitations to surgeons from three different sources and 164 completed the Survey. Appx1166-67 (68:18-70:4). Neal provided undisputed testimony explaining that non-response, even in the 90% range, is normal and not indicative of whether the respondents are representative of the target population. Appx1167 (69:22-70:19). Neal explained how he used accepted methodology to ensure a representative sample. Appx1164 (57:18-59:19). He also testified he looked at the cross-section of respondents after the Survey was completed to ensure the obtained sample was representative. Appx1165 (61:20-62:25); Appx1167 (69:22-70:19).

Ignoring Neal's uncontradicted explanation, the court continued its cross-examination: "if you don't know what the universe of surgeons is, how do you know that 164 is a fair sample?" Appx1164 (58:6-11). Responding to the court's request that he "put it in English for the jury," Neal explained "[y]ou don't need to know the total population of people out there who might be relevant. All you need to know is, can you go out and in a fair, systematic way, find a large enough subset that you can draw an inference about that bigger population." Appx1164 (58:12-59:19); Appx1167 (71:5-72:10).

Neal's exhibits, including tables reporting data from the Survey, were admitted without objection. Appx1185 (144:10-23). DePuy's first mention of a *Daubert* challenge to Neal's methodology was at the court's sidebar. Appx1162

(50:23-51:1). After Neal concluded, the court asked the parties about the impact of sustaining a *Daubert* challenge to Neal. Appx1225 (74:8-25). Barry's counsel replied "I believe the case could go to the jury," and DePuy's counsel stated "there may be enough or there to [sic]– be an issue for the jury to decide." Appx1225 (75:1-18). The court then offered unsolicited opinions on Neal and the Survey, not related to DePuy's pretrial challenges, recognizing "[it] is going to be the jury's decision how to assess his credibility." Appx1225 (76:1-17).

DePuy filed its renewed motion which, contrary to its representation to the court that it "may actually be more focused" (Appx1262 (221:22-222:5)), added numerous arguments raised for the first time ***after*** Neal testified, including failure to analyze non-response bias/response rate and demographic analysis, lack of pretest and follow-up with respondents, definitional flaw in Survey Types, and exhaustiveness of the Survey's Types. *Compare* Appx15874-86 *with* Appx15290-92. Barry responded within the one day provided (Appx1262 (222:1-223:17); Appx15857-87), which the court espoused was "ample opportunity to respond to any new reasoning DePuy offered" (Appx33). No hearing was held.

The court granted DePuy's *Daubert* motion, relying on the grounds first raised at trial, finding "Neal's methodology was flawed and that no reliable conclusions could be drawn from his survey." Appx30.

### 2. Resolving Factual Disputes Against Barry, the Court Held No Direct Infringement.

DePuy orally moved for JMOL on six grounds when Barry rested his case-in-chief. Appx1328 (147:17-148:21). Barry opposed, and the court, taking the motion under advisement, told Barry he did not need to respond to DePuy's written 50(a) motion in writing. Appx1329 (149:2-25). The court then changed its tune and requested Barry respond in writing. Appx1371 (6:11-8:22). Barry responded to all six grounds, explaining how he presented evidence consistent with the landscape the court created pretrial which was sufficient for jury resolution of the issues. Appx15919-70. The court then requested DePuy reply and specifically provide "discussion of whether Dr. Yassir's testimony respecting 'handle means' contradicted the claim construction in my Markman order." Appx108-109. Two days later, the court granted JMOL. Appx18-21. Reasons followed. Appx45-66.

The court found no direct infringement for the claims of the '358 and '121 Patents because it found "legally insufficient evidence to support a finding that DePuy's accused products met the 'handle means' limitation." Appx51. The court provided three related rationales. First, the court believed "[a]lthough Yassir paid lip service to testifying in accordance with my Claim Construction Order, in fact, he contradicted it," so it excluded Yassir's testimony on "handle means" as purportedly "contradictory, unhelpful, and unreliable." Appx61-62. Second, the court found expert testimony was required to show DePuy's tools had "a part that

is designed especially to be grasped by the hand" because the technology—methods and systems for correcting spinal deformity by derotating the spine—was complex. Appx62-63. Third, the court found "[a]bsent Dr. Yassir's testimony, the jury heard only insufficient lay evidence during Barry's case-in-chief regarding the 'handle means' claim limitation" because testimony about handles and where surgeons grasp derotation tools from surgeon designers of the accused tools and surgeons who perform derotation procedures "had no bearing on the existence of a part *especially designed* to be grasped by the hand." Appx63-64.

The court granted JMOL regarding claim 6 of the '787 Patent—no "handle means" limitation—based on excluding the Survey. Appx65. The court ruled Barry failed to provide evidence beyond the Survey that surgeons perform the required "cross-linking" step without acknowledging non-expert evidence. Appx65.

## SUMMARY OF ARGUMENT

1. The district court erred in granting JMOL because the record reasonably supported a jury finding direct infringement. The court failed to view the record evidence in the light most favorable to Barry, and instead, improperly, required expert evidence to show infringement. Compounding that error, the court then excluded Barry's technical expert's testimony applying the "handle means" construction consistent with his prior application which, pretrial, the court repeatedly held followed the proper construction. Further, the court's JMOL was

based on a previously rejected exposition on the court's construction ***after*** Barry's affirmative case closed. These errors require reversal.

2. The district court abused its discretion in excluding the Survey as unreliable because it ignored the "good grounds" supporting Neal's proffered methodology. A "hard look" at the court's justification reveals the court required Barry to prove his case twice—first to it and then to the jury—and made findings about the weight and correctness of Neal's opinions, despite such matters being the exclusive province of the jury. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749-50 (3d Cir. 1994). This error requires reversal.

**STANDARD OF REVIEW**

The Third Circuit reviews JMOL grants de novo. *Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 211 (3d Cir. 2009). This Court reviews such judgments under regional circuit law, applying its own law to issues unique to patent law. *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019).

When a district court's exclusion of an expert under *Daubert* results in summary judgment or JMOL, the Third Circuit prescribes a ***less*** deferential abuse of discretion review known as a "hard look at (more stringent review of) the district court's exercise of discretion." *Paoli*, 35 F.3d at 749-50. This is because "there is a significant risk that district judges will set the threshold too high" and

"[r]educing this risk is particularly important because the Federal Rules of Evidence display a preference for admissibility." *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587-89 (1993)).

## ARGUMENT

### I. The District Court Erred Granting JMOL.

District courts must deny JMOL unless "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). In determining whether evidence is sufficient for jury resolution, the court may not weigh evidence, determine the credibility of witnesses, or substitute its version of facts for the jury's. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). This is not one of the "sparingly" few cases where the court, rather than the jury, should decide liability. *Marra*, 497 F.3d at 300.

#### A. Barry Presented Substantial Evidence from Which a Reasonable Jury Could Find Infringement.

The jury was presented with ample testimony, documents, and physical evidence to reasonably support finding DePuy's tools were used to directly infringe. The jury saw brochures, manuals, instructional materials, and technique guides demonstrating DePuy's tools incorporate all the claimed features and DePuy promotes infringing uses of DePuy's tools. *See, e.g.,* Appx6181; Appx1254

(190:3-192:23); Appx6358; Appx1230 (95:9-22). Yassir assisted the jury by explaining how surgeons, following DePuy's instructions and promotion, assemble and use the accused tools in infringing ways—including creating and using the claimed "handle means" as construed by the court. Appx1229-55 (90:21-194:14). Simple application of the construed terms to the testimony, documents, and physical evidence concerning DePuy's tools could reasonably support a jury finding direct infringement. *Marra*, 497 F.3d at 300.

Asserted claims 4 and 5 of the '358 Patent require "handle means and [] pedicle screw engagement members which are mechanically linked with said [] handle means," (Appx120 (6:15-18)), asserted claim 2 of the '121 Patent requires "pedicle screw engagement members which are mechanically linked with said [] handle means" (Appx135 (8:5-8)), and asserted claim 6 of the '787 Patent requires "linking together the first, second, third, and fourth elongated levers" (Appx160 (8:33-34)).

Barry presented undisputed evidence demonstrating the accused tools include "pedicle screw engagement members" and "elongated levers"—DePuy's Quick Sticks. *E.g.*, Appx6356; Appx6005; Appx6346; Appx1238 (125:10-127:24). Barry also presented evidence demonstrating DePuy's derotation frames link together Quick Sticks along and across the spine to create the claimed "handle means." *E.g.*, Appx1238 (127:25-128:18); Appx6358; Appx6214; Appx6150;

Appx6005. Barry presented DePuy's surgical technique guides where DePuy promotes the "long handle" of the Quick Sticks and frames that link the Quick Sticks across multiple vertebrae to be grasped by a surgeon:

FIGURE 8



Lifting the concave side out of the chest is effectively done with the Quick Sticks locked on the TOP NOTCH feature of EXPEDIUM implants. This feature provides 360° control of the anchor point without the need for additional instrumentation.

In addition, using the EXPEDIUM Derotation Frame and/or Alignment Fork multiple Quick Sticks can be linked together and rotated in unison. (Figure 8)

Appx6358; Appx1338 (187:4-188:25).

The court recognized, "[a] surgeon who performs linked *en bloc* derotation—i.e., linking levers 'vertically' along each side of the spine," which, as shown above, DePuy promotes in its surgical technique guide, "could infringe claims 4 and 5 of the '358 Patent so long as all other limitations of the claims are also met." Appx49.

Asserted claim 2 of the '121 Patent and asserted claim 6 of the '787 Patent further require linking tools across the spine. The court recognized "[a] surgeon who performs derotation using a "box" construct—i.e., linking levers vertically along each side of the spine and linking the top levers and bottom levers together horizontally across the spine," a construct shown below DePuy promotes for performing derotation procedures using the accused tools, "could infringe *all*

Asserted Claims in this case, provided that all other claim limitations are also met."

Appx49-50.




Appx6214.




Appx6150.




Appx6005.

Yassir compared the construed claims to the accused tools and surgeon reported constructs/uses in surgeries, explaining how all claim limitations were met. Appx1235-51 (113:1-180:13). Yassir demostrated the accused tools have "handle means" under the court's construction of "part that is designed especially to be grasped by the hand." Appx1238-40 (125:10-133:18); Appx1252 (183:9-23) (Viper); Appx1252 (182:16-183:4) (Expedium). Yassir detailed how "handle means," in the context of the claims, requires linking together derotators "[s]o that when you grasp the handle means, you can deliver the forces to all three of the pedicle screw engagement members at the same time." Appx1238-39 (128:24-129:11). He further showed the jury DePuy's documents depicting infringing constructs and a hand grasping the top part of the accused tools, where they are linked, to perform derotation, and explained how this shows the accused tools have parts "designed especially to be grasped by the hand." Appx1240 (133:9-16); Appx1238-39 (126:8-129:14); Appx6358.

DePuy surgeon designers, Newton and Betz, confirmed the accused tools were especially designed to "make[] a long handle which [the surgeon] can grab" and "give[] you a nice handle to try and derotate the spine." Appx1338 (187:4-188:25); Appx1335 (175:3-176:7); Appx8601-02 (41:10-42:16); *supra* pp. 8-12. DePuy's engineer testified development of the accused tools included creating a

handle that "provides a user a convenient area to grip the instrument." *Supra* pp. 8-11.

Yassir showed DePuy's images relaying the features, capabilities, and intended uses of the accused tools to surgeons in manners that meet all claim limitations. Appx1232-33 (104:11-105:1) (explaining impact of technique guide descriptions on surgeons and how surgeons use promoted constructs); Appx1245 (153:19-156:11); Appx1304 (50:20-52:20) (explaining arrows used in technique guides instruct surgeons to grab and apply force). Further, Yassir presented DePuy's training materials giving sales representatives "a very detailed set of instructions" for creating and using infringing constructs with the accused tools:




Appx6189; Appx1254 (190:3-192:23); *see also* Appx6005; Appx1253-54 (188:25-189:24).

The jury heard surgeons admit using DePuy's tools to build these constructs and perform derotation procedures using such constructs. Appx1391-92 (88:3-90:18) (Betz "created constructs where you linked three or more vertebrae on the left side, three or more vertebrae on the right side and then connected them across the spine with a connector"); Appx8608-09 (85:13-86:01) (O'Brien performed infringing surgeries with three derotators linked on both sides of spine); *see also* Appx8602-04 (46:20-50:17) (O'Brien knew linking two DePuy derotation tubes on both sides and across spine was "a technique people have used").

Yassir explained how constructs Betz admitted using in surgeries met all the limitations of the asserted claims of the '358, '121, and '787 Patents and O'Brien's admitted surgeries practiced all the limitations in the asserted claims of the '358 and '787 Patents. Appx1233-34 (105:21-106:15; 108:17-109:1); Appx1254 (189:7-17); Appx6005.

Barry also presented the Survey, which evidenced surgeons used DePuy's tools to build the "linked" and "boxed" constructs shown above and perform en bloc derotation using those constructs. Appx1233-34 (105:5-111:10). Yassir explained to the jury how the Survey corresponded to each claim element and DePuy's materials demonstrated the same: "So on the left we have a question from the Neal survey. On the right, we have the claim language itself. And then in the

picture we have something from DePuy's materials which demonstrate practicing that aspect of the invention." Appx1234 (111:23-112:5).

Weighing this evidence was the jury's prerogative. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1062 (Fed. Cir. 2016) (en banc). Viewing the evidence favorably to Barry and giving him the benefit of every inference, a reasonable jury could have found infringement.

### B. The District Court Erred in Taking Barry's Infringement Case From the Jury.

In granting DePuy's Rule 50(a) motion, the court refused to credit Barry's evidence and draw inferences in Barry's favor, improperly found expert testimony was required to prove infringement, and then excluded expert evidence. Each error requires reversal.

#### 1. The District Court Erred in Granting 50(a) Judgment Based on Yassir's "Handle Means" Testimony

The district court granted judgment of no infringement on the asserted claims of the '358 and 121 Patents because it believed Yassir's testimony regarding "handle means" "varied from and contradicted my Claim Construction Order." Appx62-63. The court excluded Yassir's testimony on "handle means," and then, holding for the first time in the JMOL order that expert testimony was the only permissible infringement analysis, ruled Barry failed to muster sufficient evidence of infringement. Appx62-63. This was wrong for several reasons.

***First***, Yassir followed the court's construction of "handle means." Appx1237 (122:17-123:3); Appx1239 (131:12-132:3) ("So the derotation Quick Stick which we talked about is ***especially*** designed to be grasped by the hand to put on the pedicle screw.") (emphasis added); Appx1238 (126:8-127:6) (explaining derotation tubes are mechanical levers and thus have "parts designed especially to be grasped by the hand" towards the top); Appx1238 (127:10-24) ("[A derotator part] can do something else as well, but it has to be especially designed to be grasped by the hand.").

Experts may elaborate on a court's claim construction. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1377-78 (Fed. Cir. 2008). Experts are not required to repeat constructions verbatim because "failure to use the district court's exact words does not change the substance of his testimony or render it inapplicable." *Id.*; *see also Not Dead Yet Mfg., Inc. v. Pride Solutions, LLC*, 222 F. Supp. 3d 657, 668 (N.D. Ill. 2016). "[C]ourts regularly hold admissible expert reports that merely elaborate on or apply in good faith the courts' claim constriction, especially where the expert applied the court's claim construction in good faith." *Crown Packaging Tech., Inc. v. Belvac Prod. Mach., Inc.*, No. 6:18-CV-70, 2022 WL 821440, at *3 (W.D. Va. Mar. 17, 2022).

In applying the court's construction, Yassir explained why—as a surgeon and mechanical engineer—the top portion of DePuy's Quick Sticks, when linked

with DePuy's derotation frame, were "handle means." *E.g.*, Appx1239 (131:12-21); Appx1238 (126:2-127:6). This testimony was consistent with his report and deposition for which the court declined to exclude him. Appx15651-52.

Despite citing Yassir's testimony confirming application of the court's construction (Appx56; Appx61), the court adopted DePuy's argument that Yassir's infringement opinion was based on his own construction as fact. Appx57 (quoting Appx1256 (198:14-24)). This is incorrect. The testimony the court cites does not show Yassir applied his own construction of "handle means" (Appx57); rather, Yassir explained on cross that tools surgeons assemble into constructs to manually derotate vertebrae have multiple "parts designed especially to be grasped by the hand" because "[t]hey are parts that cannot be assembled without grasping them by the hand." Appx1256 (198:14-200:8). This was proper application of the court's construction as Yassir was explaining to the jury why a POSA would understand the accused tools have "handle means." *Innogenetics*, 512 F.3d at 1377-78.

The court's cited portion of Yassir's testimony ignores the exchange where Yassir ties this explanation of his application to the words of the court's construction, stating "the ability of the surgeon to grasp [surgical instruments] by hand is actually an integral feature, a very important [feature]. And so they have to be ***especially designed*** for that because all spine surgery is done by hand." Appx1256 (198:14-199:13) (emphasis added). He further elaborated that, in his

opinion and experience, when designing parts for ***surgical instruments*** that surgeons have to use with their hands, a part designed to be grasped by the hand is ***especially*** designed to be grasped by the hand. Appx1256 (200:5-10). Nothing in this testimony suggests Yassir disregarded the requirement of "a part that is especially designed to be grasped by the hand." *C.R. Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1378-79 (Fed. Cir. 2020) ("[A]lthough [expert] testified during cross-examination that he believed there was an intent requirement 'implied' in the court's construction…this mistake did not undermine the factual basis of his infringement opinion" as "nothing in the record suggests that this caused [the expert] to disregard the requirements of the asserted claims under the correct construction.").

Nor was Yassir's explanation a contradiction of the court's construction. *Not Dead Yet*, 222 F. Supp. 3d at 668. The court believed Yassir improperly omitted "especially" from the court's construction of "handle means" and equated "something 'designed to be grasped by the hand' with "something, 'that has to be done with your hand.'" Appx56. The court's quoted excerpt, however, omits the first half of Yassir's testimony, where he says the Quick Stick "is ***especially designed*** to be grasped by the hand," and ignores that the quoted excerpt was Yassir's explanation for why assembly of surgical tools demonstrates they have "parts especially designed to be grasped by the hand." Appx1239 (131:12-21)

(emphasis added). This testimony refutes the court's conclusion and confirms Yassir consistently applied the court's construction.

The court also mischaracterized Yassir's testimony in contending he contradicted the court's construction by testifying "something is a 'handle means' ***simply because*** it 'becomes a handle'" and "everything is a handle means." Appx56-57 (emphasis added). Suggesting Yassir's testimony was ipse dixit, the court quotes excerpts of two of Yassir's answers and ignores all the accompanying explanation. Appx1238 (127:25-128:18), Appx1240 (133:9-16); Appx1255-56 (195:8-199:19). When read in their entirety and in context, Yassir's testimony explains how ***linking*** creates a "handle means," consistent with the court's pretrial finding that "Plaintiff's innovation is not 'handles,' but a method of linking derotation tools to administer simultaneous force, thus facilitating *en bloc* spinal correction." Appx15642.

Yassir's testimony on cross, explaining how various elements in the Figure 1 embodiment meet the court's construction of "handle means" once the system is linked, confirmed his opinions were based on proper application of the court's construction. Appx1255-56 (195:11-197:16). Yassir detailed how the accused tools were just like Figure 1 when asked about a fully-linked DePuy construction: "Everything in this is a handle means? A. Well, once it's connected yes. ***The parts that are designed especially to be grasped by the hand***." Appx1257 (204:11-13)

(emphasis added). While the court points to excerpts of this testimony as purportedly misapplying the construction (Appx57), Yassir's testimony is precisely how the court described "handle means" in Figure 1 at *Markman*: "[I]tems 34 [handle], 36, and 38 represent the 'handle means.'" Appx15160 (right).

In Fig. 1 of the '358 Patent, items 34, 36, and 38 represent the "handle means":




FIG. 1

None of the court's purported problems with Yassir's testimony that the accused tools have cross-linking members show Yassir "varied from and contradicted" the court's construction of "handle means" (Appx62)—because he did not (Appx1258 (207:17-208:23)). Nor are they a proper basis for exclusion of Yassir's testimony. Appx62 (identifying problems with Yassir's "rationale," failure to explain how cross-linking member has a "handle," and failure to explain which part in Fig. 1 has a "special design" for grasping by the hand).

Yassir's "rationale" for why the accused cross-linking member is a "handle means," as construed, did not have to use the precise words of the court's

construction. *Innogenetics*, 512 F.3d at 1377-78; *Not Dead Yet*, 222 F. Supp. 3d at 668. Nor does it indicate Yassir's infringement analysis relied on a contradictory construction, as the court asserted. Appx62. The court's complaints that "Yassir did not explain how a cross-linking member encompasses a handle" or "which *part* of Figure 1 has a *special design* for grasping by the hand"[5] have no bearing on Yassir's testimony on infringement as these are not required by the claims or the court's construction of "handle means." Appx15163-64 (citing patent's explanation that "the multiple wrenches 32, ***linked by wrench cross linking members*** 40, depicted in FIG. 1 may be replaced by a single handle member from which extend the functional equivalent of multiple shafts").

Likewise, the court's erroneous supposition cross-linking members cannot be part of "handle means" because they connect "handle means" of two tools does not establish contradiction. Appx62. The cross-linking member can be part of a "handle means" if it meets the court's construction of "part that is designed especially to be grasped by the hand." *See, e.g.*, *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003) (citation omitted). Nothing in Yassir's testimony that a cross-linking member of the accused tools meets and makes up the "handle means" limitation, as

[5] To the extent such a relative importance or some heightened showing of "special design" has become part of the construction, that would be legally improper. *Infra* pp. 44-46.

construed, "varied from" or "contradicted" the construction. Appx1258 (207:17-208:23).

Because Yassir applied the proper construction, the court erred in granting JMOL. *Bard*, 979 F.3d at 1378.

***Second***, in any event, the court's suggested "deviations from the claim construction" were simply the court's disagreements with Yassir's rationale and conclusions, which the court adjudged insufficient to persuade it of direct infringement. Appx61-62. But the court's opinions on the persuasiveness of Yassir's testimony elaborating on or explaining the construction of "handle means" in his application is not a proper ground for exclusion—that is a question for the jury. *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1027 (S.D. Cal. 2023) (citing *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369-70 (Fed. Cir. 2002) ("Whether the accused device contains an element corresponding to each claim limitation or its equivalent is a question of fact.…"). While the court excluded Yassir's "handle means" opinions under *Daubert* (Appx60-61), the cited case excluded testimony as irrelevant under Rule 403, and Third Circuit law holds such exclusion under Rule 403 should be rare. *Paoli*, 35 F.3d at 747 n.16.

Indeed, as the court correctly found pretrial (Appx15649-52), disagreements with Yassir's conclusions at most would give DePuy "opportunity to cast doubt

upon his infringement conclusions;" not make his "testimony legally irrelevant." *MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1269 (Fed. Cir. 2013); Appx15649-52.

Nothing about Yassir's testimony on "handle means" indicates he failed to apply the court's construction or disregarded the claim requirements to the point of irrelevancy. *Bard*, 979 F.3d at 1378-79. As such, and as the court recognized pretrial, Yassir's conclusions and rationales, correct or not, were questions for the jury. Appx15651-52; *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (disagreements with expert's conclusions and "factual assumptions and considerations underlying those conclusions…go to the weight to be afforded the testimony and not its admissibility"). Exclusion was improper.

***Third***, even if the court properly excluded Yassir's testimony on "handle means," that would not support taking the decision of infringement from the jury. As explained (*supra* pp. 26-33), the jury saw and heard other evidence—including the accused tools, brochures, instructions, and surgeon testimony—of the tools' features, including "parts designed especially to be grasped by the hand," and how surgeons use them in infringing ways. Indeed, DePuy handed the jury the accused tools for their own "examination" from which any juror could determine surgeons create "handle means" by linking the tools together. Appx1408 (155:2-156:6); *see*

*Ironburg Inventions Ltd. v. Valve Corp*., No. C17-1182 TSZ, 2021 WL 2137868, at *4-5 (W.D. Wash. May 26, 2021), *aff'd*, 64 F.4th 1274, 1291–93 (Fed. Cir. 2023) (finding jury's inspection of accused product sufficient to support jury's finding of infringement).

Disregarding this evidence, the court wrongly decided expert testimony was the only vehicle for Barry to show DePuy's products had "a part that is designed especially to be grasped by the hand." Appx62. This Court has "never ***required*** a party to proffer expert testimony on claim interpretation or on application of claim language ***to accused devices***." *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir. 1986); *see also Koninklijke Philips N.V. v. ZOLL Lifecor Corp.*, No. 2:12-CV-1369, 2017 WL 11631173, at *19-20 (W.D. Pa. Sept. 12, 2017). Where the plain and ordinary meaning of a limitation involves simple mechanical principles, such as whether a tool was especially designed to be grasped as a handle, this Court has rejected the notion that proof requires experts. *Lee v. Mike's Novelties, Inc.*, 543 F. App'x 1010, 1015-16 (Fed. Cir. 2013). This is distinct from cases involving invalidity—like those the court cited (Appx62-63)—where, because of the complexity of the technology, expert testimony was required to provide evidence on a person of skill's ***motivation to combine***. *See Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1011-12 (N.D. Cal. 2019) (collecting cases).

Expert testimony was not necessary for a jury to determine whether DePuy's products have "a part that is designed especially to be grasped by the hand"—what the court found was the plain and ordinary meaning of "handle means," and thus readily understandable. Appx15162; *Cf. Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). DePuy even recognized this term was readily understandable to a lay juror as it compared its tools to coffee cups when arguing its tools lacked "handle means." Appx1466 (103:16-104:2).

That expert testimony was not necessary for this limitation was confirmed when the court permitted surgeons, who DePuy confirmed were not disclosed as expert witnesses (Appx1330 (154:15-20)), to opine on whether the tools were "designed especially to be grasped by the hand." Appx1341 (200:6-13); Appx1384 (58:9-15); Appx1406 (145:16-22). Without acknowledging this testimony and the resulting implication that assessing whether a tool is "designed especially to be grasped by the hand" did not require expert testimony, the court disregarded testimony from those same surgeons (*supra* pp. 30-31) the jury could have

reasonably relied on as evidence the accused tools were especially designed to have "handles." Appx63-64.

Given the straightforward nature of whether a tool has a part designed especially to be grasped by the hand—the dictionary definition of "handle"—Barry's evidence and the physical samples DePuy provided the jury were enough for a jury to find infringement without expert opinion. *See Lee*, 543 F. App'x at 1015-16 (finding "as it is written" construction of "heavier weight than the weight of said manifold, such that said turret remains in a stationary [position] upon said manifold in any particular relative rotation between said turret and said manifold" could be applied by juror without expert assistance); *Ironburg Inventions,* 2021 WL 2137868, at *4-5.

### 2. The Court Granting 50(a) Based on a Rejected Claim Construction Was Error.

For the first time in its JMOL order, the court modified its construction of "handle means," adding the requirement that it be a part with a "special design" for grasping. Appx62. In doing so, the court deviated from its pretrial rulings rejecting a construction requiring ***separate parts*** and where "especially" meant "above all other functions." Appx15649-52 (rejecting DePuy's pre-trial *Daubert* arguing "designed especially" required showing purposes above all other functions). Based on its previously unarticulated construction—mirroring DePuy's rejected one—the court determined Yassir did not show any accused tool had a "handle means."

Appx62. Granting JMOL on a construction previously rejected was error.

"[R]olling" claim construction raises "the potential for surprise and prejudice in a late adjustment to the meaning of claim terms." *Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315-16 (Fed. Cir. 2010). This is why district courts may not "alter[] the scope of the original construction" post-trial. *Wi-LAN, Inc. v. Apple, Inc.*, 811 F.3d 455, 466 (Fed. Cir. 2016). A revised claim construction adding limitations not inherent in the original construction requires a new trial. *See id.* at 465; *TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*, 629 F. App'x 916, 938-39 (Fed. Cir. 2015); *Eon–Net LP v. Flagstar Bancorp*, 249 F. App'x. 189, 198 (Fed. Cir. 2007) (vacating summary judgment because district court failed to afford notice and opportunity to present arguments).

Before trial, the court "rejected DePuy's argument that 'a handle must be a separate and distinct object from the shaft,'" and held its construction "left open the possibility that the vertical shafts might be so designed" and "contemplates an embodiment of Plaintiff's invention in which the surgeon ***grasps the shaft*** or lever rather than a separate part ***strictly designed*** for handling." Appx15638-39; Appx15642 (emphasis added). Thus, as the court held pretrial (Appx15649-52), whether the accused tools have "a part that is designed especially to be grasped by the hand" was an issue of fact. *See Absolute Software, Inc. v. Steath Signal, Inc.*, 659 F.3d 1121, 1129-30, 1132-33 (Fed. Cir. 2011).

In its JMOL order, however, the court found insufficient evidence of "handle means" because it concluded no evidence showed a "special design" for grasping. Appx62. The court's holding added, post hoc, two requirements to its construction that "handle means" is "part that is designed especially to be grasped by the hand": (1) a separate part; and (2) special design. Because the court's contrary pretrial rulings indicated a derotation lever could have the claimed "handle means," Barry introduced infringement evidence accordingly. But the court changed the playing field after Barry's affirmative case, and thus deprived Barry of notice and opportunity to address it, requiring reversal of the JMOL.

#### 3. Exclusion of the Survey Did Not Warrant Rule 50(a) Judgment.

The district court also supplanted the jury in concluding Barry produced insufficient evidence of infringement for the '787 Patent after excluding Barry's Survey and wrongly holding the Survey was the only evidence of infringement. Appx64-65. The court ignored Barry's evidence of infringement, summarized above (*supra* pp. 26-33), beyond the Survey, including surgeons admitting to performing infringing procedures using the accused tools, training younger surgeons to perform infringing procedures, and being aware of surgeons performing infringing procedures. Yassir showed the jury images in DePuy's materials of infringing constructs and testified, based on his personal experience, including receiving training and instructional materials from medical device

companies, that DePuy's materials promote using the accused tools in ways that infringe the '787 Patent, and the impact of that promotion on surgeons. *E.g.*, Appx1254 (190:3-192:23) ("This is a very detailed set of instructions, and if you assemble the system in this way, you're infringing Dr. Barry's asserted patents, and they're teaching the sales reps to do that."). The weight and credibility of this testimony was for the jury. *Apple*, 839 F.3d at 1062.

Thus, even if the court properly excluded the Survey, Barry produced substantial evidence supporting direct infringement, including DePuy's instructions, guides, and brochures. *Supra* pp. 26-33 Such evidence shows DePuy "design[ed] a product for use in an infringing way and instruct[ed] users to use the product in an infringing way," which is "sufficient evidence for a jury to find direct infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012); *cf. Moleculon*, 793 F.2d at 1263 (holding "direct evidence of a fact" not required for infringement). Barry is entitled to rely on product instructions as "at least circumstantial evidence of infringement for any claim elements taught by those materials." *Tinnus Enter., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1203-04 (Fed. Cir. 2017); *see also Moleculon*, 793 F.2d at 1272. Even absent the Survey, the district court wrongly concluded Barry lacked sufficient evidence for a reasonable jury to find infringement of the '787 Patent.

## II. The District Court Erred in Excluding the Survey.

### A. Excluding the Survey for Alleged Failures in Demonstrating Reliability was Error.

At trial, Neal demonstrated the reliability of his method to obtain a representative sample from the target universe—surgeons performing pedicle screw surgeries involving simultaneous derotation. Appx1164 (57:18-25).

The central focus of Rule 702 is whether an expert's method can be assessed for reliability, not accuracy. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000). Courts apply a preponderance of the evidence standard to an expert's methods to assess whether the expert had "good grounds" for relying on those methods, not the correctness of the conclusions. *Id*. (*citing Paoli*, 35 F.3d at 749). The Supreme Court articulated a highly permissive standard for admission of expert evidence and made clear vigorous cross examination on methodology and interpretation of results is preferred over exclusion. *Daubert*, 509 U.S. at 595-96.

Courts in the Third Circuit acknowledge liberal admission of surveys: "[A]s long as [it is] conducted according to accepted principles…survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. 11-3684 (SRC)(CLW), 2016 WL 3545529, at *4 (D.N.J. June 29, 2016) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134,

1143 n.8 (9th Cir. 1997)). Reliability inquiries of expert methods are flexible with no universal proscribed tests or factors a court must apply. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Surveys are no exception. *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004).

#### 1. Barry Presented Sufficient Evidence that Neal's Method For Obtaining Representative Responses Was Reliable.

At trial, Neal—accepted by the court as a survey and statistics expert—demonstrated the Survey's representativeness to the target population by demonstrating proper methods and confirmatory results. For litigation surveys, (i) "[a] proper universe must be examined" and (ii) "a representative sample must be chosen." *Pittsburg Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978); *see also Citizens Fin.,* 383 F.3d at 119; Diamond, Reference Manual on Scientific Evidence (Fed. Judicial Ctr., 3d ed. 2011) ("Reference Manual") at Appx16354 ("The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers.").

Neal testified the target universe was surgeons performing pedicle screw surgeries involving simultaneous derotation. Appx1164 (57:18-25). Then, Neal detailed his methodology for "get[ting] a representative cross-section" of the target population here, where there was no known list of spinal deformity surgeons containing census-like data for the target universe—a point confirmed by DePuy's

survey expert (Appx15904; Appx16004 (129:11-131:17)). Appx1164-67 (59:5-72:10). This is called a "nonprobability" survey,[6] routinely accepted in litigation. *E.g. Freedom Mortg. Corp. v. LoanCare, LLC*, No. 16-02569 (RMB/AMD), 2023 WL 2570201, at *17 (D.N.J. Mar. 20, 2023); *Nat'l Football League Prop., Inc. v. New Jersey Giants, Inc.*, 637 F. Supp. 507, 517-18 (D.N.J. 1986); *GlaxoSmithKline LLC v. Glenmark Pharm. Inc*., No. 14-877-LPS-CJB, 2017 WL 8948975, at *8-11 (D. Del. May 30, 2017); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, No. 17-189-LPS-CJB, 2019 WL 5310220, at *3 (D. Del. Oct. 21, 2019).

In the Third Circuit, proffering experts need only demonstrate "good grounds" for their methodology. *Paoli*, 35 F.3d at 749-50. As Neal explained, because a nonprobability survey has no list of the target population (spinal deformity surgeons), "you use a multi-method approach, so instead of relying on just one way of finding the surgeons, you use multiple methods." Appx1164-65 (60:23-61:16). Neal testified this is "commonly accepted in science, academic papers, [and] legal cases I have been involved with." Appx1165 (62:6-25).

Neal explained such "multi-method" approaches use "neutral and unbiased questions" to screen and obtain relevant respondents. Appx1164-65 (59:13-61:16).

---

[6] In contrast, probability surveys occur only when every eligible member of the population is known and has equal chance to be surveyed. Research Manual at Appx16357. In probability surveys, respondents are randomly selected or nonrandomly selected—nonrandom selection might require analysis to determine if the sample deviates from the target population. *Id*. at Appx16359-60.

This is an accepted technique in the industry and admissible in litigation. Research Manual at Appx16354-56; *see also Freedom Mortg.,* 2023 WL 2570201, at *17; *Simpson Strong-Tie Co. v. MiTek, Inc.*, No. 20-CV-06957-VKD, 2023 WL 137478, at *3 (N.D. Cal. Jan 9, 2023).

Neal sent 4,000 invitations to the Survey (Appx1166-67 (68:6-69:18)) through three sources: (1) IQVIA—specializing in finding health professionals for research studies (Appx1166 (67:18-68:4)); (2) searches for spine surgeons conducted by Neal's research staff (Appx1166 (68:1-14); Appx1180 (122:9-124:16)); and (3) a list of emails for members of the Scoliosis Research Society ("SRS"), a well-renowned organization for spinal deformity surgeons (Appx1180-81 (124:17-126:12)). The Survey used screening questions to ensure respondents were qualified and representative of the target population: surgeons performing infringing and non-infringing procedures as a proportion of U.S. spinal deformity surgeries. Appx1168-69 (73:20-77:19). For example, respondents confirmed they were surgeons, had the right specialty, and passed various memory checks to ensure recall of the relevant information. *Id*. If respondents were not qualified or could not pass the memory checks, they were screened out—i.e., they received the survey but were excluded as not relevant to the target population. *Id.*

Neal detailed the accepted mechanisms he used to remove bias in nonprobability sample recruitment:

- ***Double-Blind:*** "[S]urgeons…didn't know it was in the context of a lawsuit" and being administered online made it double blind—accepted means for creating non-biased surveys. Appx1165 (63:4-20).
- ***Neutral Non-Leading Questions:*** The Survey questions did not "suggest one way or the other what a good answer would be." Appx1166 (65:17-25).
- ***Randomized Response Options:*** Where possible, the Survey randomized the order of response options to remove bias. Appx1166 (66:1-9).
- ***Memory Checks:*** Recognizing surgery levels vary depending on the month, two-years "is kind of a sweet spot" to gather "a large amount of data" and "wouldn't have pushed people's memory too far." Appx1168 (76:3-21). Neal explained recall of surgeries over two years was not a concern because he "included multiple memory checks in the survey to catch anyone who felt like they couldn't recall the surgical details, and those people were exited from the survey" (Appx1166 (66:11-19)) and these surgeries are "not really single events" because they include pre-operative visits, up to eight hours operating, and years of follow-up. Appx1168-69 (76:22-77:19).

Ultimately, the final sample of 164 respondents included a mix of neurosurgeons, pediatric orthopedic surgeons, orthopedic spine surgeons, general orthopedic surgeons, which Yassir confirmed are specialists performing the relevant procedures. Appx1165 (61:12-62:5); Appx1166 (67:12-17); Appx1168 (73:20-74:19); Appx1169 (79:13-23); Appx8151. Neal's testimony about recruiting from sources relied on by the FDA and CDC and use of accepted methods in nonprobability recruitment (Appx1164-68 (59:5-74:19)) properly demonstrated his method provided a reliable sample. *See Roche*, 2019 WL 5310220, at *3 ("[Expert] provided a detailed explanation of his methodology, including the reasons for selecting a non-probability sample….It will be for the jury to assess the impact of Roche's potentially persuasive critiques of [expert's] analysis and what weight, if any, to accord" the opinions.); *Freedom Mortg.,* 2023 WL 2570201, at *17; *Simpson Strong-Tie*, 2023 WL 137478, at *3.

Neal further demonstrated "good grounds" for relying on his methodology to obtain a representative sample when repeatedly faced with the court's adversarial questions. For example, Neal explained he did not, as the court suggested, "pick" the participating surgeons—he sent about 4000 invitations, 164 surgeons completed it, and those 164 were representative based on the cross-section of relevant specialties. Appx1166-67 (68:6-70:4). Neal testified, and DePuy did not

dispute, non-response in the 90% range is normal and not indicative of non-representativeness. Appx1167 (70:5-19).

In response to court examination about whether Neal analyzed demographics or geography, Neal explained because no census-like data for the target population existed, which happens in "probably 18 out of 20 surveys," other modes of demonstrating representativeness are used. Appx1167 (71:5-72:10). In such cases, Neal explained survey practices do not require comparison of demographics of the sample to the target population to demonstrate representativeness. *Id.*

Neal testified standard survey practices do not require follow-up with each respondent to ensure the intended recipient completed the survey rather than someone else like an assistant. Appx1182 (129:19-131:5). Nor is follow-up to verify the accuracy of the results required. Appx1182 (131:6-10). DePuy offered no evidence contrary. Moreover, despite ***requesting*** and having the information for each respondent, DePuy made no effort to contact any. Appx1462 (86:23-87:12).

Independently, Neal explained the results demonstrated representativeness, supporting reliability. *E.g.*, *GlaxoSmithKline*, 2017 WL 8948975, at *8-11 (admitting survey using "non-probability sample" where, after conducting survey, proponent "checked the results against existing market research on the subject…which matched up to his survey results"). Neal explained the proportion of DePuy surgeries (3,394) of total spinal deformity surgeries (13,563) captured by

the Survey amounted to 25%,[7] and "aligns very well with [third-party] MRG [reports]," which reported DePuy's market share in the spinal deformity market was 23.1%. Appx1171-72 (86:19-89:24). This, he stated, "adds further proof that the sample is representative." Appx1171-72 (88:25-89:24).

Similarly, the Survey captured about 13% of yearly U.S. spinal deformity surgeries reported in MRG, further evidencing sample representativeness. Appx1315 (93:13-94:10). Given the cross-sectional breakdown of respondents and captured surgeries, Neal, in his expert opinion, determined the sample size sufficiently represented the target population and extrapolation. Appx1164-65 (57:15-62:5).

### 2. The District Court's Reasons for Finding Lack of Representativeness Fail a "Hard Look."

Ignoring the acceptability of Neal's methods and confirmed representativeness, the court created a list of criticisms—most of which are inapplicable to the survey type used—to justify concluding the Survey was flawed.

In taking a "hard look" at exclusions, the Third Circuit cautions district judges to not "usurp the role of the fact-finder." *In re Zoloft Prods. Liab. Litig.*,

---

[7] DePuy asserted the Survey showed a 28.9% market share for DePuy but obtained this number by dividing the number of reported DePuy surgeries by the reported surgeries performed using pedicle screws and rods, ***not*** the total spinal deformity surgeries, which Neal explained was the proper denominator. Appx1171 (86:19-88:24).

858 F.3d 787, 792-93 (3d Cir. 2017) (*citing In re TMI Litig.,* 193 F.3d 613, 665 (3d Cir. 1999)). A "judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect." *Paoli*, 35 F.3d at 746. Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* A court cannot exclude expert evidence based on other evidence that might suggest to a factfinder the opposite conclusion. *Kannakeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807-08 (3d Cir. 1997). Similarly, a court cannot exclude survey evidence simply because it believes "a better survey universe could have been selected." *Simpson*, 2023 WL 137478, *3. Instead, a court must allow expert evidence to go to the jury when the reliability of the method has been shown under the low preponderance standard. *Id.*; *see also United States v. Mitchell*, 365 F.3d 215, 238 (3d Cir. 2004); *United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021).

According to the court, the following purported defects demonstrated a lack of representativeness: allegedly undefined Survey universe (Appx34-35); not a probability survey (Appx35); unrepresented states (Appx36); no analysis of age and gender (Appx36-37); no analysis of non-response bias (Appx37); no follow-up (Appx38); and alleged lack of pre-test (Appx38).

The court's findings were wrong factually and, in any event, not proper bases for exclusion as admissibility is favored and the Third Circuit's reliability inquiry is flexible with no set rules applicable to all survey types. *See, e.g., Citizens Fin.,* 383 F.3d at 118-19; *Kannankeril*, 128 F.3d at 806-07 ("these factors are neither exhaustive ***nor applicable in every case***") (emphasis added).

***Universe***—The court incorrectly held the target universe was a "moving target." Appx34. Neal repeatedly confirmed his universe was "spine surgeons who are performing pedicle screw surgeries involving simultaneous derotation," which the court's order ignored. Appx1164 (57:18-25). The court also mischaracterizes statements in Barry's opposition to DePuy's Renewed *Daubert* Motion, asserting "Barry argued that there was 'no doubt' that the target population was 'surgeons who perform spinal deformity surgeries in the United States.'" Appx35. The court conveniently omits the second half of Barry's sentence, which identifies the same universe Neal testified to:

> Dr. Neal's methodology leaves no doubt about the target population of his survey: surgeons who perform spinal deformity surgeries in the United States, ***with additional conclusions drawn as to the cohorts that use pedicle screws and rods in performing simultaneous derotation procedures***.

Appx15870 (emphasis added).

***Nonprobability Sampling***—Contrary to the court's assertion (Appx35), Neal's use of nonprobability sampling was not a defect; nonprobability sampling is

accepted in the survey art when the entire universe of possible surgeons is not knowable. *Supra* pp. 49-53. Neal provided sufficient evidence under the preponderance standard to justify the survey type and that his results demonstrated a representative cross-section of the desired population. *Supra* pp. 49-55. The court incorrectly labels as *ipse dixit* Neal's cross-examination testimony stating his methods produced a representative sample. Appx36. As detailed above (*supra* pp. 49-55), during his direct examination, Neal detailed ***why***, based on his expertise and use of accepted methods, he concluded his efforts provided a representative sample. This was sufficient. *See In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *17 (E.D. Penn. Nov. 24, 2020) (citing *Citizens Fin.,* 383 F.3d at 121); *Hartle v. FirstEnergy Generation Corp.*, No. 08-109, 2014 WL 1317702, at *6 (W.D. Penn. Mar. 31, 2014); *GlaxoSmithKline,* 2017 WL 8948975, at *8-11.

That the court disagreed with Neal's use of a nonprobability survey and conclusions was not a proper basis for exclusion. *Paoli*, 35 F.3d at 746. "[A]nalysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Kannankeril*, 128 F.3d at 807; *Simpson*, 2023 WL 137478 at *3. Barry "needed to demonstrate by a preponderance of evidence only that [Neal's] opinion was based on 'good grounds.'" *Kannankeril*, 128 F.3d at 807. Barry did that and it was error for the court to further require he demonstrate Neal

was correct. *See Paoli*, 35 F.3d at 744 ("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are ***correct***, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.").

***Geography, Age, and Gender***—The court's criticisms of not considering residence, age, and gender of the surgeon (Appx36-37) ignore that no census-like data[8] exists for spine surgeons, much less surgeons performing screw and rod derotation procedures (Appx1167 (70:21-72:10); Appx16004 (129:11-131:17)), making such critiques inapplicable to the representativeness question here. Neal explained in the absence of census-level data or knowledge concerning the entire universe's size, geographic, age, or gender information, such inquiries are not useable for determining representativeness. Appx1167 (70:21-72:10). The court's holding would find inherently unreliable any nonprobability survey or one with an unknown universe or unknown demographic makeup. Both are untenable.

***Non-Response***—The court also wrongly concluded Neal needed to perform analysis of non-response bias and the lack thereof was a defect. Appx37. This

---

[8] Contrary to the court's suggestion that Neal said it was useless to look for a list of spine surgeons, Neal explained that "unless that list ***also identified people who performed these specific spinal deformity procedures***, it would be useless." Appx1180 (121:16-122:8) (emphasis added).

critique is inapplicable to nonprobability surveys, like the Survey, as demonstrated by the cases the court cites, all of which involve ***probability*** surveys. Appx37. As shown in the cases relied on by the court, non-response rates may be relevant for probability samples because, ***when all the class members were known***, failure to account for why certain class members did not participate precluded ensuring the respondents and target population had common characteristics—making the survey incapable of validation. *See In re Autozone, Inc.*, No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016) (excluding sample of probability survey where no indications that selected respondents were representative of class were presented); *Wallace v. Countrywide Home Loans Inc.*, No. SACV 08-1463-JST (MLGx), 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (excluding sample of probability survey when no attempt was made to account for difference between unsolicited, but known, class members and those selected for participation); *Hostetler v. Johnson Controls, Inc.*, No. 3:15-CV-226 JD, 2017 WL 3700345, at *2-3 (N.D. Ind. Aug. 28, 2017) (excluding survey because probability study could be conducted and expert's failure to account for non-random sample and relationship to known class was fatal).

Given the court's critiques are not applicable to assessing representativeness for ***nonprobability*** samples, where the universe is unknown, experts can justify their recruitment process to provide good grounds for attesting to a representative,

non-probability survey. Reference Manual at Appx16359-60. Neal did that; he explained his response rate was acceptable, why he did not perform a detailed non-response bias analysis, and offered expert testimony and other evidence demonstrating how he obtained a representative sample. Appx1167 (69:22-70:19); *supra* pp. 49-55. This is sufficient for admission. *See Roche*, 2019 WL 5310220, at *3; *Simpson Strong-Tie*, 2023 WL 137478, at *3.

None of the other cases the court relies on suggests otherwise. Appx37-39. For example, in *Marlo v. United Parcel Serv., Inc.* the survey was excluded as proffering expert "stated in her deposition that she ***did not know whether the survey sample was representative***, ***did not do anything to evaluate whether the sample was representative***, and was ***unaware of any guidelines*** for ensuring that a survey provides representative evidence." 251 F.R.D 476, 485 (C.D. Cal 2008) (emphasis added); *see also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015) (similar). Likewise, in *Parallel Networks Licensing, LLC v. Microsoft Corp.*, the survey had no way to identify any characteristics of the sampled group or how the respondents related to the target population, and "[w]ithout additional information, it is impossible to know whether the participants of the underlying panel deviate in some meaningful way from the target population." No. 13-2072 (KAJ), 2017 WL 11557655, at *4-5 (D. Del. Feb. 22, 2017).

Unlike the experts in those cases, Neal explained his methodology to obtain a representative sample of the target universe and, using information obtained from the Survey regarding respondents' characteristics—e.g., specialty—confirmed the obtained sample was representative of the target universe. *Supra* pp. 49-55. Thus, as he explained, non-response bias analysis was not necessary. Appx1167 (69:22-70:19).

***Follow-up*****—**The court erred in finding, despite direct evidence to the contrary, Neal was required to follow-up with respondents. Appx38. Regarding follow-up, Neal explained standard survey practices do not require follow-up to ensure the intended recipient completed the survey rather than someone else. Appx1182 (129:19-131:5). Nor is follow-up with respondents to verify the accuracy of the results required, and additional surveys are not required to evaluate the methods of another survey. Appx1182 (131:6-10); Appx1463 (90:24-91:4) ("[Y]ou can evaluate a survey without doing your own survey."). DePuy offered no evidence contrary to Neal's testimony. Indeed, despite ***requesting*** and having contact information for each respondent, contrary to normal survey practice, DePuy made no effort to contact any. Appx1462 (86:23-87:12).

***Pre-testing***—The court erred in finding Neal failed to pre-test the Survey. Appx38. Consistent with the Reference Manual (Appx16365-66), Neal explained pretesting is "getting feedback on your survey and making sure its functioning

properly." Appx1165 (63:21-25). Neal performed three types of pretesting: (i) Yassir took the Survey during design (Appx1165 (64:1-10); Appx1234 (109:21-24)); (ii) Neal paused the Survey after it went live to check for proper performance (Appx1165 (64:1-14)); and (iii) the *Medtronic* survey[9] (Appx1165-66 (64:1-65:8)). There was no evidence presented to support the court's conclusions these were not valid pretests. Appx38.

***

Because the court relied on inapplicable criticisms of the appropriate survey type and the preponderance of the evidence shows Neal's "good grounds" in relying on his methodology, DePuy's criticisms were for the jury to use in determining the weight and correctness of the Survey. The court's shutting of the *Daubert* gate was error.

### B. Any Alleged Question Defects Go to Weight not Admissibility.

The Survey used six Types (exemplary definitions of commonly used constructs) to classify surgeries into non-infringing and infringing groups. Appx1172-73 (91:14-95:9). The court concluded the Survey questions were flawed

[9] DePuy argued the *Medtronic* survey was not a pre-test, asserting the rate of infringement in the Survey was disproportionate to the rate in the *Medtronic* survey. Appx1220-21 (55:10-59:19). Neal exposed the fallacy in DePuy's logic, showing DePuy was making percentage calculations using incomparable numerators and denominators. Appx1223-24 (68:15-70:1).

through impermissible factual findings regarding the definitions of the Types. Appx39-44. Even if indicative of "flaws," the court's reasons do not justify exclusion because whether questions are "technically" flawed are issues of weight, not admissibility. *See Hartle,* 2014 WL 1317702, at *5-6 ("'[M]ere technical flaws' in a survey's design or execution go to the weight to be afforded to the survey, not its admissibility.") (quoting *Citizens Fin.*, 383 F.3d at 121) (citing Appx16365); *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 324 (E.D. Pa. 2007) (finding where sponsor provides evidence method is accepted in industry, technical defects in surveys are for jury to weigh); *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988) ("Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility."); *Fortune Dynamic, Inc. v. Victoria's Secret Brand Mgmt., Inc.*, 618 F.3d 1025, 1036-38 (9th Cir. 2010) (same); *In re FCA US LLP Monostable Elec. Gearshift Litig.,* No. 16-MD-02744, 2022 WL 3928377, at *3 (E.D. Mich. Aug. 31, 2022) (collecting cases).

While certain flaws might be fatal, that is rare, and requires flaws in the questions make responses inapplicable to the claims at issue. *Hartle*, 2014 WL 1317702, at *5-6. That is not the case here, where there was sufficient evidence that the purported flaws—the definition of Type 1 surgeries and exhaustiveness of the Types—did not elicit results having no bearing on the issue of infringement.

### 1. Questions Regarding Type 1's Definition Are Technical and Not Sufficient for Exclusion.

The court erred in concluding Type 1's definition was wrong. At most, Type 1's correctness would be a technical flaw for the jury to weigh. *E.g.*, *Hartle*, 2014 WL 1317702, at *5; *Merisant*, 242 F.R.D. at 324.

Accepting DePuy's ***new argument*** that surgeries involving simultaneous derotation of at least two vertebrae cannot include Type 1 surgeries (including segmental derotation surgeries), the court determined Type 1 was flawed: "[i]t was thus uncontroverted at trial that segmental derotation referred only to procedures by which vertebrae are manipulated one at a time." Appx43. This was incorrect.

Before getting to the Types, a Survey screening question narrowed relevant surgeries to those involving "simultaneously rotating 2 or more vertebral bodies." Appx7833-34 (Question 14). Type 1's definition states "[p]erform segmental derotation of two or more vertebrae, using either derotators not linked to other derotators OR derotators linked only on the same vertebrae." Appx7835-36. DePuy ***argued*** segmental derotation requires rotating only one vertebrae at a time, so "simultaneously rotating two or more vertebral bodies" cannot be a Type 1 surgery and thus the Survey was fatally flawed. Appx15686-89.

The record contained evidence refuting this—including testimony from Barry, DePuy's design surgeon, and Barry's expert—and demonstrating segmental derotation could involve rotating two, unlinked derotation instruments on two

vertebrae simultaneously. *See* Appx1039-41 (156:9-157:16); Appx1339-40 (191:16-193:25) ("We would use those tubes to put all along one side of the spine and push them all together. ***Is that considered en bloc or is that considered multiple vertebrae being segmentally realigned? And we might argue over what the terminology really is that would apply to that***.") (emphasis added); Appx15915 (citing Appx16335 (43:10-25))[10] ("You can derotate two or more vertebral bodies using your hands to push two derotators at the same time? A. You can do that, ***but that is really more simultaneous segmental*** rather than en bloc.") (emphasis added)). The admitted definitional disputes created triable issues for the jury, not the court.

Further, Neal explained how—using accepted methods—he designed the Survey so surgeons would allocate surgeries that did not involve simultaneously rotating two or more vertebrae linked along the spine into Type 1—the non-infringing bucket. Appx1173 (95:1-9); Appx1174-75 (97:10-101:10). Yassir confirmed surgeon-respondents would allocate those surgeries as Type 1. Appx1233-34 (108:2-111:10). This design, as Neal explained, allocated ***non-infringing*** surgeries in DePuy's favor.

[10] The court's post-*in limine* handling of the instant *Daubert* challenge meant Barry had to provide non-trial evidence to address new challenges. *Supra* pp. 49-50.

Thus, to the extent DePuy alleged a flaw in the Survey's questions, it does not require exclusion. *See Hartle*, 2014 WL 1317702, at *5-6 (declining to exclude survey where questions and responses were "sufficiently connected" to cause of action despite critiques including "the survey questions are inaccurate and misleading, the questionnaires were not appropriately pretested, the responses evince confusion by the respondents, the respondents were not within the proper universe and not representative, and [the expert's] statistical analysis was flawed").

Here, the Survey's questions correlated to the patent claims (Appx1233-34 (105:21-110:11); Appx1172-73 (90:3-95:9)) and were ordered so any surgeries respondents were unsure about would default to non-infringing Type 1. Appx1234 (110:12-111:10) ("[I]f your procedures fit into this category, great, include them here; if they don't, move on to the next one. Until you get down to the Type 2 where it says, if you have a Type 2 construct, put them here. If it's not a Type 2 construct, then put it in Type 1. It doesn't infringe."); Appx1173 (95:1-9); Appx1174-75 (97:10-101:10). Thus, as Neal and Yassir testified, the responses were applicable to the issue of infringement, so alleged technical flaws went to weight. *Cf. Hartle*, 2014 WL 1317702, at *5-6 (excluding "white rain" survey, aimed at claims involving contaminated water called white rain, because its questions included facts only applicable to causes of action stemming from different forms of contaminated water meaning survey results failed to relate to

underlying cause of action); *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) (excluding survey where questions improperly prodded and suggested connection between two companies in ways that made survey's results on confusion too tenuous); *J&J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 372 (D.N.J. 2002) (excluding survey where questions failed to provide context and thus elicited flawed responses that could not be applied to issue); *Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550 (JFK), 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007).

#### 2. Exhaustiveness of the Questions Goes to Weight, Not Admissibility.

Just as with its Type 1 criticism, the court also erred in excluding the Survey based on its conclusion the questions were flawed because the Types were not exhaustive and respondents were not given an "other" or "I don't know" option. Appx43-44. Whether the Types needed to be exhaustive or provide an "I don't know" option were issues of weight for the jury. *Citizens Fin.*, 383 F.3d at 121.

As Neal and Yassir testified, the Survey's Types were representative of the most common infringing and non-infringing constructs and the number of possible constructs is finite and covered by the Survey. Appx1217-18 (44:23-45:7, 45:12-17); Appx1233 (105:21-106:15); Appx1307 (61:19-62:21). Type 1 describes non-infringing constructs where surgeons "[p]erform segmental derotation of two or more vertebrae, using either derotators not linked to other derotators OR derotators

linked only on the same vertebrae (transverse the spine)." Appx7835-36. Type 2 is the simplest infringing construct. Appx1173 (93:9-94:2); Appx1233-34 (105:21-111:10). Each of Types 3-6 built upon and was more complex than the last, so a Type 6 surgery would meet all the requirements for Types 2-5. Appx1173 (94:14-95:9); Appx1233-34 (105:21-111:10).

After defining the Types, respondents allocated their reported procedures among the six Types, starting with Type 6, the most complex, because, if a surgeon made a Type 6, he or she would have met all the requirements of Types 2-5. Appx1233-34 (108:2-111:10). This avoided double counting and followed accepted survey practices. Appx1219 (51:11-25). Respondents then allocated the remaining reported surgeries among Types 5, 4, 3, 2, and 1. Appx1174-75 (98:15-101:10). Yassir confirmed that, based on the instructions, surgeons would understand the allocation was "if your procedures fit into this category, great, include them here; if they don't, move on to the next one. Until you get down to the Type 2 where it says, if you have a Type 2 construct, put them here. If it's not a Type 2 construct, then put it in Type 1. It doesn't infringe." Appx1234 (111:1-10).

The absence of an exhaustive list of surgery types, an "other" option, or an "I don't know" option were issues of weight for the jury, not admissibility, because they did not make the Survey results inapplicable to the infringement issue. *Hartle*, 2014 WL 1317702, at *5-6.

### C. Permitting New *Daubert* Grounds After Neal Testified and Holding No Hearing Was Error.

The court improperly permitted DePuy to raise new grounds after Neal left the stand and failed to conduct a hearing. Appx15901-16 (identifying waived grounds); *supra* pp. 21-22.

*Daubert* challenges must be timely raised so the proponent of the evidence may defend its proffer. *Padillas v. Strork-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999). Indeed, courts have held *Daubert* grounds waived if first made after the proffering witness's case closed. *E.g.*, *Mascenti v. Becker*, 237 F.3d 1223, 1233-34 (10th Cir. 2001). This prevents trial by ambush and errors in judgment resulting from failure to properly consider the issues. *Id.* ("By waiting until after the close of all the evidence to raise the *Daubert/Kumho* objection, basic errors occurred.").

DePuy raised new challenges in its trial *Daubert* that were waived and should not have been considered, much less relied on by the court. *Supra* pp. 21-22. The Survey and Neal's corresponding opinions had not changed since the Survey was announced during discovery and the court ordered certain requisites. Appx16404. Thus, unlike in cases where belated *Daubert* arguments were countenanced because it later became clear an expert "will offer testimony ***beyond that which the defendants—and the [c]ourt***—were led to believe based on the plaintiffs' representations," because Neal's testimony was consistent with his report and pretrial representations, DePuy should not have been permitted to raise

new grounds after Neal testified. *Compare* Appx15657-59 (explaining scope of Neal's testimony) *with Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*, 650 Supp. 2d 387, 402 (E.D. Pa. 2009); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2012 WL 6562221, at *10 (W.D. Pa. Dec. 15, 2012).

The court's failure to follow proper procedure contributed to the basic errors detailed herein. So even if not waived, the court erred in excluding the Survey without holding a hearing and instead testing Neal's methodology against a trial record developed in line with the court's pretrial findings that Neal's methods were sufficiently reliable for trial and Barry's case-in-chief was closed. *See Padillas*, 186 F.3d at 417.

## CONCLUSION

This Court should reverse the judgment and remand the case for trial.

Dated: December 1, 2023

Respectfully submitted,

/s/D. Clay Holloway
D. Clay Holloway
Courtney S. Dabbiere
Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E. ,
Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
cholloway@kilpatricktownsend.com
cdabbiere@kilpatricktownsend.com
mstockwell@kilpatricktownsend.com

Dario A. Machleidt
Kathleen R. Geyer
Kilpatrick Townsend & Stockton LLP
1420 Fifth Avenue, Suite 3700
Seattle, Washington 98101
(206) 467-9600
dmachleidt@kilpatricktownsend.com
kgeyer@kilpatricktownsend.com

Andrew W. Reinhart
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, North Carolina 27101
(336) 607-7300
arinehart@kilpatricktownsend.com

Jonathan L. Cochran
LeVan Stapleton Segal Cochran LLC
1760 Market Street, Suite 403
Philadelphia, Pennsylvania 19103
(215) 561-1500
jcochran@levanstapleton.com

*Counsel for Plaintiff-Appellant*
*Mark A. Barry*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certified that this motion complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). Exclusive of the portion exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), this motion contains 13996 words, as counted by the word-processing system used to prepare the motion.

Dated: December 1, 2023

*/s/ D. Clay Holloway*
D. Clay Holloway
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E. ,
Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
cholloway@kilpatricktownsend.com

*Counsel for Plaintiff-Appellant*
*Mark A. Barry*

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. MARK A. BARRY,**<br>**Plaintiff,**<br><br>**v.**<br>**DEPUY SYNTHES PRODUCTS, INC., ET AL.,**<br>**Defendants.** | : | **Civ. No. 17-3003** |

**O R D E R**

Plaintiff Dr. Mark A. Barry alleges that Defendants DePuy Synthes Products and related entities induced others to infringe his five Patents respecting his invented surgical technique for correcting spinal deformities. (Doc. No. 1); 35 U.S.C. § 271(b). The Parties have submitted several Motions *in Limine*. (Doc. Nos. 172, 173.) Because I am thus asked to make evidentiary trial rulings before trial, my decisions are necessarily tentative. I am prepared to revisit them during trial should any Party ask me to do so. I am also prepared to give the jury appropriate limiting instructions.

## I. BACKGROUND

Barry owns patents claiming methods and systems for *en masse* derotation of scoliotic spinal vertebrae. (DePuy Am. Compl. ¶¶ 1, 10, 14, 37); U.S. Patent Nos. 7,670,358; 8,361,121; 9,339,301; 9,668,787; 9,668,788. In 2014, Barry successfully sued Medtronic, Inc. in the Eastern District of Texas for selling a system that infringed the ’358 and ’121 Patents. See Barry v. Medtronic, Inc., No. 1:14-cv-104 (E.D. Tex.). The jury found that Medtronic infringed several claims of the asserted patents, “rejected Medtronic’s several invalidity defenses, and awarded damages.” Barry v. Medtronic, Inc., 914 F.3d 1310, 1316 (Fed. Cir. 2019). The Federal Circuit affirmed. Id.

On July 5, 2017, Barry brought the instant infringement action against DePuy, and a separate infringement action against Globus Medical, Inc. alleging that it had induced infringement of the five Patents. (DePuy Am. Compl. ¶¶ 47–59; Globus Compl. ¶¶ 43–55, Doc. No. 1, Civ. No. 17-2998.) I consolidated the two actions for pre-trial purposes and issued a Claim Construction Order. (Claim Construction Order, Doc. No. 199, Civ. No. 17-2998.) On August 29, 2019, I dismissed Barry's suit against Globus upon the Parties' settlement. (Doc. No. 225, Civ. No. 17-2998.)

Barry and DePuy have filed a total of fourteen Motions *in Limine*. (Doc. Nos. 172, 173.) The matters are fully briefed. (Doc. Nos. 172, 173, 182, 184.)

## II. LEGAL STANDARDS

In a patent case, the law of the regional circuit applies to questions not unique to patent law; Federal Circuit precedent applies to substantive questions of patent law. Info-Hold, Inc. v. Muzak LLC, 783 F.3d 1365, 1371 (Fed. Cir. 2015). Accordingly, I will apply Third Circuit law to procedural and non-substantive questions and apply Federal Circuit law where the question turns on an issue of patent law. See id.

## III. DISCUSSION

### A. DePuy's Motion *in Limine* No. 1: Medtronic Litigation

DePuy asks me to exclude any evidence or argument related to the Medtronic jury verdict and Federal Circuit decisions, urging that such evidence "is highly prejudicial to DePuy, creates a high risk of jury confusion, would usurp the jury's function, and is irrelevant to the issues to be decided in this case." (Doc. No. 172 at 2.) DePuy thus asks me to exclude PTX116 and PTX117, the Federal Circuit Medtronic Opinions. (Id.) Barry responds that evidence of DePuy's "active

involvement in and knowledge of the outcome" of the Medtronic litigation is admissible to show its willful infringement. (Doc. No. 182 at 1.)

To be admissible, "evidence of prior litigation . . . must pass muster, like any other evidence, as relevant and probative of an issue" in the case at hand. Mendenhall v. Cedarapids, Inc., 5 F.3d 1557, 1573 (Fed. Cir. 1993). "Defendants' knowledge of the prior litigation [may] be relevant to the allegation of willful infringement." Id. The substance of a particular Opinion, although "entitled to legal deference," does not "constitute substantive evidence of any facts underlying" a particular issue. Id. at 1574. Accordingly, although I will likely exclude PTX116 and PTX117, I will likely allow Barry to present evidence of Defendant's knowledge of the Medtronic verdict for the limited purpose of showing willful infringement, assuming the evidence supports such an inference. See Applied Med. Res. Corp. v. U.S. Surgical Corp., 435 F.3d 1356, 1366 (Fed. Cir. 2006).

To show willfulness, Barry also seeks to introduce evidence: (1) that DePuy compared its devices to "certain Medtronic devices that were found to have been used in an infringing manner"; and (2) that "Medtronic's infringement was found to be willful." (Doc. No. 182 at 2.) Such evidence is unfairly prejudicial to DePuy and is likely to confuse the jury. Fed. R. Evid. 403. A comparison to Medtronic's devices may lead the jury to determine that because Medtronic was found to infringe, DePuy's devices also infringe. Further, evidence of Medtronic's willfulness sheds no light on DePuy's state of mind. Rather, this evidence is likely to confuse the jury. Accordingly, I will likely exclude evidence of DePuy's comparison of its devices to Medtronic's devices and that Medtronic's infringement was found to be willful. See Fed. R. Evid. 403.

B. DePuy's Motion *in Limine* No. 2: Barry's Character/Reputation

DePuy asks me to exclude "any evidence or testimony intended to improperly bolster" Barry's character, including his charity work. (Doc. No. 172 at 6); Fed. R. Evid. 401, 402, 403. The Parties nonetheless agreed that "such testimony, so long as it is brief, is appropriate." (Doc. No. 182 at 6.) Barry has agreed to limit this testimony to one or two questions. (Id.) Accordingly, I will deny DePuy's apparent request as moot.

C. DePuy's Motion *in Limine* No. 3: Barry's Agreements with Third Parties

DePuy asks me to exclude all argument, evidence, and testimony relating the litigation-induced settlement and license agreements between Barry and Medtronic, Globus, NuVasive, Inc., and OrthoPediatrics Corp., (including Exhibits PTX 112 – PTX 116), assuming that they "have minimal, if any, probative value," and that any probative value is "substantially outweighed by the danger of unfair prejudice." (Doc. No. 172 at 8); Fed. R. Evid. 403. Barry responds that he does not intend to introduce at trial: (1) Exhibits PTX 112 – PTX 116; (2) testimony regarding the Medtronic settlement and license agreement; or (3) testimony regarding the amounts or royalty rates of any settlement agreements with Medtronic, Globus, NuVasive, or OrthoPediatrics. (Doc. No. 182 at 6.) Accordingly, I will deny DePuy's request as moot as to that evidence.

Barry does intend to offer testimony relating to the existence of third-party licenses as evidence of secondary considerations of non-obviousness. (Doc. No. 182 at 7.) DePuy has not requested that evidence of license agreements be excluded for this purpose, and I thus defer ruling on the admissibility of such evidence until trial.

D. DePuy's Motion *in Limine* No. 4: Testimony Contrary to Claim Construction

DePuy asks me to exclude the testimony of Barry's expert, Dr. Yassir, insofar as it is based on or applies a claim construction inconsistent with my July 1, 2019, Markman Order. (Doc. No.

173.) After I have construed the relevant claim terms, "that legal determination governs for purposes of trial," and "[n]o party may contradict the [my] construction to a jury." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009).

Although the Parties agree that an expert may not offer testimony inconsistent with my claim construction, Barry argues that it should be permitted to introduce Yassir's opinions that even under a different construction of the term "handle means," DePuy's products would still infringe. (Doc. No. 182 at 14.) Such testimony would be irrelevant, however, because DePuy may not contradict my claim construction of "handle means." See Exergen, 575 F.3d at 1321.

Barry further argues that because DePuy intends to defend using legal opinions regarding non-infringement, he should be permitted to show that even under the claim construction contemplated in the legal opinion, DePuy would still infringe. (Doc. No. 182 at 14.) Yet, Barry misconstrues the purpose of a legal opinion, which "does not depend upon its legal correctness" for determining willful infringement. Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 944-45 (Fed. Cir. 1992). Rather, because "[w]hether infringement is 'willful' is by definition a question of the infringer's intent," the opinion must "instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable." Id. Although the opinion must be competent, competency is not synonymous with correctness. Read Corp. v. Portec, Inc., 970 F.2d 816, 830 (Fed. Cir. 1992) ("That counsel's opinion turned out to be contrary to our judgment with respect to the [asserted] patent does not make his advice regarding that patent incompetent.") (abrogated on other grounds); see also Dunhall Pharms., Inc. v. Discus Dental, Inc., 944 F. Supp. 1202, 1209 (C.D. Cal. 1998) (collecting cases and setting out relevant factors). Moreover, any relevance of such testimony is substantially outweighed by its likelihood to confuse or mislead the jury that DePuy also knew that the non-infringement opinion was incorrect. Fed. R. Evid. 403.

Accordingly, I will grant DePuy's request to exclude testimony based on or applying a claim construction inconsistent with my Markman Order.

E. Barry's Motion *in Limine* No. 1: Evidence of Experimentation

DePuy intends to argue at trial that Barry's claimed method is invalid because it was in use or on sale before Barry filed his patent application. A patent for an invention that was "in the public use or on sale in this country, more than one year" before a patent's critical date is invalid. 35 U.S.C. 102(b) (2012). An inventor's experimental purpose can negate an otherwise invalidating public or commercial use. Honeywell Int'l v. Universal Avionics Sys. Corp., 488 F.3d 982, 997 (Fed. Cir. 2007). Although whether a use is experimental is a question of law, "the totality of the circumstances must be considered, including various objective indicia of experimentation surrounding the use." Lough v. Brunswick Corp., 86 F.3d 1113, 1120 (Fed. Cir. 1996); see also, Clock Spring, L.P. v. Wrapmaster, Inc., 560 F.3d 1317, 1327 (Fed. Cir. 2009) (factors relevant to determining whether a use is experimental).

It is undisputed that before the "critical date" of the '358 Patent, Barry performed three surgeries employing the claimed method, and now seeks to exclude all evidence related to those surgeries. (Doc. No. 104-2.) Although the Parties agree that the surgeries were not experimental in the medical sense, they dispute whether the three surgeries were 'experimental use' and thus dispute whether the surgeries were public or commercial uses. (Id. at 1, Doc. No. 184 at 3.) Barry urges that DePuy will impermissibly argue that "the 2003 surgeries were not experimental in the patent sense because they were not experimental in the medical sense.'" (Doc. No. 173 at 2.) He thus asks me to exclude all evidence that "conflates experimentation under medical standards with 'experimental use' in the patent law context." (Doc. No. 173 at 1.)

Barry urges that DePuy's argument that the three surgeries were not "experimental in the medical sense is . . . legally incorrect." This argument is misplaced. The Federal Circuit has explained "that legal standards in other contexts do not control in the patent-validity context." Barry v. Medtronic, Inc., 914 F.3d 1310, 1332 (Fed. Cir. 2019). Accordingly, whether the surgeries were "experimental in the medical sense" is not dispositive of whether the use was experimental under § 102(b). See Pennwalt Corp v. Akzona Inc., 740 F.2d 1573, 1580 (Fed. Cir. 1984) ("The fact that a sale or use occurs under a regulatory testing procedure . . . does not make such uses or sales per se experimental for purposes of 35 U.S.C. § 102(b).").

Nevertheless, aspects of whether the surgeries were "experimental in the medical sense" may be relevant to whether they were experimental under § 102(b). See Clock Spring, 560 F.3d at 1327 (factors for determining if use was experimental include, *inter alia*, "the necessity for public testing," and "whether the invention reasonably requires evaluation under actual conditions of use"). As I discussed in my October 21, 2020 Order denying summary judgment, Barry's testimony that he believed the 2003 surgeries were "scientifically validated with respect to safety and efficacy," and Yassir's testimony that "the 2003 surgeries were not "new and experimental medical procedure[s]" create triable questions of fact as to whether the surgeries were experimental under § 102(b). (Doc. No. 154 at 14.) Accordingly, I will deny Barry's Motion.

F. Barry's Motion *in Limine* No. 2: Expert Opinions Dr. Newton and Dr. Betz

DePuy intends to call spine surgeons Dr. Newton and Dr. Betz as fact witnesses at trial. (Doc. No. 175 at 8.) Barry "anticipates that DePuy will have these lay witnesses opine that his 2003 surgeries were non-experimental prior art." (Doc. No. 173 at 6.) Barry asks me to exclude their testimony because: (1) it is expert testimony, and (2) neither witness has provided an expert report. (Doc. No. 173 at 5-7.) DePuy responds that it does not intend to offer Drs. Newton and

Betz as expert witnesses, but rather as lay witnesses, who "will testify about their own experiences and surgeries, including their experiences performing derotation procedures." (Doc. No. 184 at 5.)

Lay witnesses may testify only to opinions that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." U.S. v. Savage, 970 F.3d 217, 286 (3d Cir. 2020) (quoting U.S. v. Fulton, 837 F.3d 281, 301 (3d Cir. 2016)). Nevertheless, a lay witness may not opine on "the ultimate conclusions of infringement and validity as well as to the underlying technical questions." HVLPO2, LLC v. Oxygen Frog, LLC, 949 F.3d 685, 689 (Fed. Cir. 2020).

Because neither Newton nor Betz has submitted an expert report, neither may testify as expert witnesses. Fed. R. Civ. P. 26(a)(2). Accordingly, neither Newton nor Betz may offer an exert opinion as to Barry's 2003 surgeries. Newton and Betz may, however, testify about their own experiences and surgeries, providing that testimony is based on their "personal knowledge rather than on specialized knowledge." See Savage 970 F.3d at 286.

G. Barry's Motion *in Limine* No. 3: Prior trial testimony of Dr. Lenke and Dr. O'Brien

Dr. Lenke and Dr. O'Brien are surgeons who testified for defendants in the earlier Medtronic trial regarding whether a surgical procedure would work for its intended purpose. (Doc. No. 173 at 7.) Neither Lenke nor O'Brien is included on DePuy's witness lists and only O'Brien was deposed. (Id.) Barry argues that DePuy "intends to (or at least reserve[s] the right to) read cold-record excerpts" of Lenke's and O'Brien's Medtronic trial testimony. (Id. at 7.) Barry asks

that I exclude all such testimony as inadmissible hearsay. (Id. at 10); Fed. R. Evid. 801, 804. DePuy confirms that it does not intend to introduce at trial either Lenke's or O'Brien's Medtronic testimony, but argues that a "blanket prohibition on the introduction of any of their testimony, regardless of the circumstances" is unwarranted. (Doc. No. 173 at 7.)

In these circumstances, I will defer to trial ruling on Barry's request. Leonard v. Stemtech Health Sci., Inc., 981 F. Supp. 2d 273, 276 (D. Del. 2013) (deferral is appropriate to "allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context.").

H. Barry's Motion *in Limine* No. 4: 2016 Medtronic Survey

DePuy intends to offer expert testimony to determine damages that relies in part on the "2016 Medtronic survey." (Doc. No. 173-6.) The 2016 survey is one that Barry commissioned for the Medtronic trial, where he alleged infringement of the two patents at issue here. In that survey, he used the same experts he intends to call in the instant trial. (Doc. No. 184-1.) Barry asks me to exclude any testimony or evidence of the 2016 survey because it is irrelevant, likely to cause confusion, and mislead the jury. (Doc. No. 173 at 11) Barry urges that the 2016 survey did not include questions about: (1) the DePuy Viper system (one of two accused systems in this case); or (2) systems that infringe the '787 Patent, which was issued after the 2016 survey was completed. (Id.) Barry further urges that no expert in the instant trial "can establish the scientific reliability of the 2016 Medtronic survey in the context of this case." (Id.)

Barry's own expert, Dr. David Neal, states that the 2016 Survey (which Neal conducted) was "substantively similar" to his 2018 survey, on which Neal relies in determining damages. (Doc. No. 184-1 at 7.) Indeed, the 2016 survey asked respondents to discuss surgeries using the allegedly infringing DePuy Expedium system and sought to quantify the infringement of two of the three patents at issue here, the '358 and '121 patents. (Doc. No. 184-2 at 3-5; Doc. 184-3 at

10.) The 2016 survey is thus relevant. See Fed. R. Evid. 401. Because the Parties are free to argue the differences between the 2016 survey and 2018 survey, the probative value of this evidence is not substantially outweighed by the potential of jury confusion. See Fed. R. Evid. 403. I will thus deny Barry's Motion.

I. Barry's Motion *in Limine* No. 5: Evidence of Prior-Invention

In its first invalidity contentions, DePuy alleged that Barry's patents are invalid because DePuy invented the claimed invention before the priority date of Barry's patents. (Doc. No. 169, Civ. No. 17-2998.); 35 U.S.C. § 102(g). DePuy has withdrawn this contention. (Doc. No. 202, Civ. No. 17-2998.) Barry nonetheless asks that I exclude "testimony and evidence . . . regarding any alleged prior invention by DePuy." (Doc. No. 173 at 14.) Because DePuy has confirmed that it does not intend to pursue a § 102(g) invalidity defense, Barry's Motion is moot. (Doc. No. 184 at 13-14.) Insofar as evidence of DePuy's invention or work is relevant to any other issue in dispute, I will defer to trial ruling on the admissibility of such evidence.

J. Barry's Motion *in Limine* No. 6: Disparaging Terms

Barry asks me to preclude DePuy from referring to Barry as "litigious" or "greedy," urging that any relevancy is outweighed by the danger of unfair prejudice. (Doc. No. 173 at 15.) DePuy has agreed that it will not refer to Barry at trial as a "patent troll" or "non-practicing entity." (Doc. Nos. 173 at 15, 184 at 14-16.) DePuy intends, however, to introduce evidence concerning "factual descriptions of Barry's business" as such evidence is "plainly relevant to damages." (Doc. No. 184 at 16.) I agree that the evidence is likely relevant. As to whether Defendants may describe Barry as "litigious" or "greedy," I will defer to trial ruling on this question. I will be guided by what inferences the evidence supports and the balancing of prejudice and probative value. Fed. R.

Evid. 401-403; Finjan, Inc. v. Blue Coat Sys. Inc., Civ. no. 13–cv–03999, 2015 WL 4129193, at *2 (N.D. Cal. July 8, 2015).

K. Barry's Motion *in Limine* No. 7: Evidence of Dr. Newton's Character

In response to DePuy's deposition question, Barry's expert, Dr. Yassir, testified that he regarded DePuy's expert, Dr. Newton, to be a trustworthy man of character. (Doc. Nos. 173-10, 173-11.) Similarly, at his deposition, Barry testified that Newton was a "leader in the field" of spinal derotation surgery. (Doc. No. 173-11.) Barry now asks me to preclude DePuy from eliciting such testimony at trial and any other testimony to bolster Newton's credibility. (Doc. No. 16.)

Barry's belief that Newton is a "leader in the field" appears to be admissible, especially because DePuy expects Barry to attack Newton's character—Barry has already accused Newton of lying, cheating, and stealing. I will nonetheless defer ruling to trial on the admissibility of the challenged testimony. See Fed. R. Evid. 608 ("[E]vidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.").

L. Barry's Motion *in Limine* No. 8: Patent Counsel's Opinion

Barry expects DePuy to offer an opinion of its patent counsel, Mr. Aaronson, as a defense to Barry's allegations of willful infringement. (Doc. No. 173 at 17.) Barry asks me to preclude DePuy from relying on Mr. Aaronson's opinion because it contains opinions relating to invalidity that are contrary to my July 1, 2019 Markman Order construing the terms "elongated lever." (Id. at 17-18.) DePuy has agreed that it will not rely on Mr. Aaronson's opinion for purposes of invalidity but argues that it should be permitted to introduce the opinions as non-infringement opinions on which it reasonably relied. (Doc. No. 184 at 18-19.)

Reasonable reliance on patent counsel's opinions can support a finding of no willful infringement. Ortho Pharm., 959 F.2d at 944-45. As I have already discussed, however,

"[w]hether or not an opinion was 'legally' correct is not the proper focus." Graco, Inc. v. Binks Mfg. Co., 60 F3d 785, 794-95 (Fed. Cir. 1995). "Indeed, the question arises only where counsel was wrong." Ortho Pharm., 959 F.2d at 944. Although Barry alleges that the opinion is not competent because of legal errors, any alleged errors do not negate DePuy's reliance. See Read, 970 F.2d at 830; Jurgens v. CBK, Ltd., 80 F.3d 1566, 1573 (to be competent an opinion "must be authoritative, not just conclusory, and objective.") Accordingly, even if Mr. Aaronson's non-infringement opinion is incorrect and DePuy has infringed one or more of the '358 Patent, '121 Patent, or '787 Patent, if DePuy's purported reliance on the opinion was reasonable, it may support a finding of no willful infringement.

Barry alternatively asks me to allow him to examine witnesses to show the legal errors in Mr. Aaronson's opinion, or that I instruct the Jury that Mr. Aaronson's opinion includes legal errors. (Doc. No. 173 at 21.) Any legal errors are likely irrelevant to DePuy's intent. See Read, 970 F.2d at 830. Additionally, as I have already discussed, any such testimony is likely to confuse or mislead the jury that DePuy also knew that the non-infringement opinion was incorrect. Fed. R. Evid. 403.

Accordingly, I will deny Barry's Motion.

M. Barry's Motion *in Limine* No. 9: Kids' Inpatient Database

DePuy's damages expert, Dr. Stephen Prowse, relies on the Kids' Inpatient Database (KID) in his report. (Doc. No. 173-6 at ¶¶ 63-65.) Barry asks me to preclude DePuy from relying on KID because, in his view, it violates my July 10, 2018 Order regarding the use of surveys. (Doc. No. 173 at 22-23; Civ. No. 17-2998, Doc. No. 133.)

Upon Globus' motion, I ordered Barry to disclose the identities of the respondent-surgeons in the 2016 Medtronic Survey—a survey he conducted for the Medtronic litigation. (Civ. No. 17-

2998, Doc. No. 133.) I further ordered Barry to "conduct any future surveys in a manner that allows the identities of *all* respondents to be discovered upon Order of the Court." (Id.) KID "is the largest publicly-available all-payer pediatric inpatient care database in the United States." (Doc. No. 173-6 at ¶ 63.) Accordingly, unlike the 2016 Medtronic Survey, neither Party compiled KID nor collected the underlying data. Rather, KID is based entirely on administrative data "collected by hospitals for billing." (Id.) My July 10, 2018 Order, does not address the use of publicly available information by either Party. (Civ. No. 17-2998, Doc. No. 133.) Accordingly, I will deny Barry's Motion.

N. Barry's Motion *in Limine* No. 10: Barry Deposition Transcript

Although Barry will testify at trial, DePuy intends to introduce a video of his deposition taken in this case. (Doc. No. 173 at 24.) Barry asks me to preclude DePuy from playing any portion of the deposition video during its case in chief. (Id.) "An adverse party may use for any purpose the deposition of a party." Fed. R. Civ. P. 32(a)(3). Deposition testimony is still subject to the normal evidentiary rules. Fed. R. Civ. P. 32(a)(1)(B). Within those rules, I will allow DePuy to present Barry's video deposition at trial. Fed. R. Evid. 611; Fenstermacher v. Phila. Nat'l Bank, 493 F.2d 333, 338 (3d Cir. 1974); ATD-Am. Co. v. Kruekger Intern., Inc., Civ. No. 12-32, 2014 WL 3952848, at *19 (E.D. Pa. Aug. 12, 2014) (precluding party from presenting deposition video because it was cumulative with and not contrary to the witness' live testimony). Because Barry has not yet testified, I defer ruling on the admissibility of Barry's video deposition.

## IV. CONCLUSION

**AND NOW**, this 13th day of July, 2022, upon consideration of Defendants' Motions *in Limine* 1-4 (Doc. No. 172) and Plaintiff's Responses (Doc. No. 182), and upon consideration of

Plaintiff's Motions *in Limine* 1-10 (Doc. No. 173) and Defendants' Response (Doc. No. 184) and it is **hereby ORDERED** that:

1. Defendants' Motion *in Limine* No. 1 is **GRANTED in part** and **DENIED in part**. Plaintiff may present evidence of the Medtronic verdict and DePuy's involvement but is excluded from presenting evidence that DePuy compared its devices to Medtronic's devices or that Medtronic's infringement was willful. Exhibits PTX116 and PTX117 are excluded;

2. Defendants' Motion *in Limine* No. 2 is **DENIED as moot**;

3. Defendants' Motion *in Limine* No. 3 is **DENIED as moot in part** and **DEFERED to trial in part.** I defer ruling until trial on the admissibility of the existence of third-party licenses;

4. Defendants' Motion *in Limine* No. 4 is **GRANTED**.

5. Plaintiffs' Motion in *Limine* No. 1 is **DENIED**;

6. Plaintiffs' Motion in *Limine* No. 2 is **GRANTED in part** and **DENIED in part**. Dr. Newton and Dr. Betz may not testify as experts or opine on Barry's surgeries. Dr. Newton and Dr. Betz may testify about their own experiences and surgeries.

7. Plaintiffs' Motion in *Limine* No. 3 is **DEFERRED to trial**;

8. Plaintiffs' Motion in *Limine* No. 4 is **DENIED**;

9. Plaintiffs' Motion in *Limine* No. 5 is **DENIED as moot in part** and **DEFERED to trial in part**. I defer ruling until trial on the admissibility of evidence of DePuy's invention for purposes other than invalidity under § 102(g).

10. Plaintiffs' Motion in *Limine* No. 6 is **DEFERRED to trial**.

11. Plaintiffs' Motion in *Limine* No. 7 is **DEFERRED to trial**;

12. Plaintiffs' Motion in *Limine* No. 8 is **DENIED**;

13. Plaintiffs' Motion in *Limine* No. 9 is **DENIED**; and

14. Plaintiffs' Motion in *Limine* No. 10 is **DEFERRED to trial**.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. MARK BARRY,** **Plaintiff,** | : | |
| **v.** | : | **Civ. No. 17-3003** |
| **DEPUY SYNTHES PRODUCTS, INC., *et al.*,** **Defendants.** | : | |

**ORDER**

Before trial, I denied without prejudice Defendants' Daubert Motion to exclude both the survey of spinal surgeries prepared by Dr. David Neal and his expert testimony. (Doc. No. 135, Defendants' Motion; see Doc. No. 185, Order Denying Motion, at 1 ("Because I am being asked to make evidentiary trial rulings when trial has not yet begun, my decisions are necessarily tentative. I am prepared to revisit them during trial should any Party ask me to do so.")); see Walden v. Georgia-Pacific Corp., 126 F.3d 506, 518 n. 10 (3d Cir. 1997) ("Under these and similar circumstances, if a district court makes a tentative pre-trial ruling, it has the opportunity to 'reconsider [its] *in limine* ruling with the benefit of having been witness to the unfolding events at trial.'" (quoting United States v. Graves, 5 F.3d 1546, 1552 (5th Cir. 1993))).

Trial began on June 13, 2023, and is ongoing at the time of this writing. When Plaintiff called Neal, Defendants renewed their Daubert Motion, which I took under advisement. (Day 3 Tr., 50:23-51:1; 143:25-144:7.) After hearing Neal's testimony, I asked the Parties to submit additional briefing on the Daubert issue. (Day 4 Tr., 74:8-76:17; Doc. Nos. 235, 241.)

It is plain that Neal's methodology is so flawed that both his survey and testimony—which he bases on that survey—must be excluded as unreliable. In re Zoloft (Sertraline Hydrochloride) Products Liability Litig., 858 F.3d 787, 792-93 (3d Cir. 2017) (expert evidence must be excluded

if methodological "flaw is large enough that the expert lacks the 'good ground' for his or her conclusions" (internal citation omitted)).

I will thus grant Defendants' renewed Daubert Motion. (Doc. No. 235); Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993). After trial is concluded, I will issue a written order to explain more fully the bases of my rulings.

**AND NOW**, this 26th day of June, 2023, it is hereby **ORDERED** that Defendants' Renewed Daubert Motion is **GRANTED**. (Doc. No. 235.)

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. MARK BARRY,** **Plaintiff,** | : | |
| **v.** | : | **Civ. No. 17-3003** |
| **DEPUY SYNTHES PRODUCTS, INC., *et al.*,** **Defendants.** | : | |

**ORDER**

A jury trial in this matter began on June 13, 2023. On June 19, DePuy Defendants filed a renewed Daubert Motion to exclude the survey and expert testimony of Dr. David Neal, which I took under advisement. (Doc. No. 235; Trial Day 5 Tr. at 74:12-16); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

During the fifth day of trial (June 20), Plaintiff Dr. Mark Barry rested, and DePuy orally moved for Judgment as a Matter of Law, which I also took under advisement. (Doc. No. 246; Trial Day 5 Tr. at 147:17-149:23.) That evening, DePuy filed its written 50(a) Motion. Fed. R. Civ. P. 50(a); (Doc. No. 239.) Dr. Barry filed a written response on June 23. (Doc. No. 248.)

DePuy moves for JMOL on the following grounds:

(1) Invalidity of the asserted patent claims in the '358 patent under (a) the on-sale bar of 35 U.S.C. § 102(a)(1), or (b) the written-description and enablement requirements of 35 U.S.C. § 112(a);

(2) No induced infringement;

(3) No direct infringement;

(4) No willful infringement;

(5) Failure to prove the quantity of any alleged infringement; and

(6) Defendant Medical Device Business Services, Inc. has nothing to do with this case. (Doc. No. 239 at 1-2.) The matter is fully briefed. (Doc. Nos. 248, 251.) The Parties have agreed to "drop Medical Device Business Services, Inc. from the case as it has no impact on Dr. Barry's inducement claims or direct infringement claims." (Trial Day 7 Tr. at 143:3-9.) Accordingly, I will deem DePuy's sixth JMOL ground as withdrawn.

"Rule 50(a) provides that a court may grant judgment as a matter of law in a jury trial at the close of the evidence if it determines that there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue." Rego v. ARC Water Treatment Co. of Pa., 181 F.3d 396, 400 (3d Cir. 1999); Fed. R. Civ. P. 50(a).

I have earlier granted DePuy's renewed Daubert Motion. (Doc. Nos. 235, 252.) In the absence of Dr. Neal's expert testimony and his survey on which he bases that testimony, Dr. Barry's only evidence purporting to prove direct infringement (his contrary arguments notwithstanding) is the expert testimony of Dr. Walid Yassir. I will also exclude Dr. Yassir's testimony because he impermissibly contradicted my Claim Construction Order on the "handle means" claim limitation. (Compare, e.g., Doc. No. 84 at 15 ("[The Court] agree[s] with and will adopt Plaintiff's construction, construing the term 'handle means' as: 'a part that is designed especially to be grasped by the hand.'"), with Trial Day 4 Tr. at 195:17-19, 198:14-24 ("**Q.** [DePuy's counsel] . . . And on the right, I believe I have what you said was your rational for why everything in Figure 1 is a handle means. 'They are parts that cannot be assembled without grasping them by the hand.' **A.** [Dr. Yassir] That's correct. **Q.** [DePuy's counsel] So those two, in your mind and in doing your analysis, you equated those two things. Am I right? **A.** [Dr. Yassir] Yes.").)

Expert testimony "may not be used to vary or contradict the claim language." Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1373 (Fed. Cir. 2022); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996); Ravo v. Covidien LP, 55 F. Supp. 3d 766, 769 (W.D. Pa. 2014). Accordingly, "[n]o party may contradict the court's construction to a jury." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009). "As expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact," it should be excluded under the Daubert standard. EMC Corp. v. Pure Storage, Inc., 154 F. Supp. 3d 81, 109 (D. Del. 2016).

Although Dr. Yassir paid lip service to testifying in accordance with my Claim Construction Order, in fact, he contradicted it. (See, e.g., Trial Day 4 Tr. at 131:14-18 (Dr. Yassir: "[T]he derotation Quick Stick which we talked about is especially designed to be grasped by the hand . . . . The Quick Stick derotation frame also is designed to be grasped by the hand.").) Once again, I construed the term "handle means" as "a part that is designed especially to be grasped by the hand." (Doc. No. 84 at 15; see also Doc. No. 171-3.) Indeed, that was the construction urged by Dr. Barry. (See, e.g., Doc. No. 84 at 15.) Yet, Dr. Yassir improperly based his trial testimony respecting direct infringement of "handle means" on *his* construction—"parts that cannot be assembled without grasping them by the hand." Accordingly, I will exclude that testimony. Absent Dr. Yassir's testimony, the jury heard only vague, anecdotal lay testimony during Plaintiff's case regarding direct infringement of the "handle means" claim limitation. This is insufficient. See Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1369-70 (Fed. Cir. 2004).

Even if I had not excluded Dr. Neal's survey and testimony on Daubert grounds, I would largely exclude them on a second, independent ground: Dr. Neal relied entirely on Dr. Yassir's infringement analysis, which, as I have discussed, impermissibly contradicted my claim

construction. (See Trial Day 3 Tr. at 78:13-19 ("**THE COURT**: And how did you know that they infringe? **[Dr. Neal]**: I am not offering any opinions about infringement. **THE COURT**: You say, 'DePuy procedures that infringe.' How could you know they infringe? **[Dr. Neal]**: I'm relying on Dr Yassir . . . .").) In the absence of Dr. Yassir's testimony, Dr. Neal's evidence on direct infringement must thus be largely excluded because it has no basis.

Because there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff on direct infringement, I will grant Defendants' Motion for Judgment as a Matter of Law. See Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004) (indirect infringement "can only arise in the presence of direct infringement"). I will issue a Memorandum in due course to explain the bases of my decisions more fully.

**AND NOW**, this 26th day of June, 2023, it is hereby **ORDERED** that DePuy's Rule 50(a) Motion is **GRANTED**. (Doc. No. 239.)

Judgment is entered in favor of DePuy Defendants.

**AND IT IS SO ORDERED.**

Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. MARK BARRY,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civ. No. 17-3003** |
| **DEPUY SYNTHES PRODUCTS, INC., *et al.*,** | : | |
| **Defendants.** | : | |

**ORDER**

On July 10, 2023, DePuy filed its Unopposed Motion to Extend the Deadline for Filing Its Motion for Costs and Attorneys' Fees. (Doc. No. 263). Although Plaintiff does not oppose the Motion, he "does not believe" that my June 26, 2023, Order granting Judgment as a Matter of Law for DePuy (Doc. No. 253) "is effective as an entry of judgment under Fed. R. Civ. P. 58." (Doc. No. 263.)

My standalone Order granting JMOL (Doc. No. 253) is a Rule 58 judgment. Fed. R. Civ. P. 58; see LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 224 (3d Cir. 2007); In re Cendant Corp. Sec. Litig., 454 F.3d 235, 244-45 (3d Cir. 2006); Cumberland Mut. Fire Ins. Co. v. Express Prod., Inc., 529 F. App'x 245, 250-51 (3d Cir. 2013).

**AND NOW**, this 10th day of July, 2023, it is hereby **ORDERED** that DePuy's Unopposed Motion to Extend the Deadline for Filing Its Motion for Costs and Attorneys' Fees (Doc. No. 263) is **GRANTED**.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. MARK BARRY,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civ. No. 17-3003** |
| **DEPUY SYNTHES PRODUCTS, INC., *et al.*,** | : | |
| **Defendants.** | : | |

Diamond, J. July 28, 2023

**MEMORANDUM**

Retired orthopedic surgeon Mark Barry alleges that medical device manufacturer DePuy induced surgeons to infringe his patents respecting surgical techniques and systems for correcting spinal deformities. (Am. Compl. (Doc. No. 20-2)); 35 U.S.C. § 271(b). Before trial, DePuy moved under Daubert to exclude the survey and expert testimony of Dr. David Neal. (Doc. No. 135); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). I denied the Motion without prejudice, explicitly cautioning that this pretrial ruling was "necessarily tentative." (Doc. No. 185.) At trial, DePuy renewed its Daubert Motion, which I granted after hearing Neal's testimony and reviewing the Parties' additional briefing. (Doc. Nos. 235, 241, 252). I indicated that I would issue this Memorandum in which I would explain the bases of my decision more fully.

## I. FACTUAL BACKGROUND

Because the record is voluminous and complex, I set forth only those facts necessary for resolution of DePuy's renewed Daubert Motion. (Doc. No. 235.)

**A. Patents at Issue**

Dr. Barry's three patents involve surgical techniques and systems for correcting conditions by which vertebrae (the series of bones making up the spine) twist out of alignment. (Trial Day 1 Tr. at 111:11-16.)

Each vertebra has two pedicles: short bone projections on opposite sides that join to form the hollow archway housing the spinal cord. Although spine surgeons have used "pedicle screws" (rod-housing screw systems inserted into vertebrae through the pedicles) as stabilizing forces in corrective procedures since the 1990s, only in the early 2000s did surgeons determine that they "could put tools on top of the pedicle screwhead" to manipulate, or "derotate," the underlying vertebrae directly. (Id. at 117:18-21, 119:21-23, 120:10-19.) Surgeons attached levers to these screwheads and, by applying force to individual levers, derotated misaligned vertebrae either ***one at a time*** ("segmental derotation"), or ***simultaneously*** ("*en bloc* derotation"). (Id. at 88:21-89:12, 156:19-24.)

In the early 2000s, Barry performed multiple *en bloc* derotation surgeries with unlinked levers. (Trial Day 2 Tr. at 21:10-12 (Barry: "So right from December of '02, you know, the multiple cases that I did of [*en bloc*] unlinked levers was important.").) The illustration below depicts an unlinked *en bloc* derotation procedure, showing multiple surgeons simultaneously exerting force on individual levers to manipulate several of the underlying vertebrae in unison.




(PTX223.0007; see also Trial Day 4 Tr. at 103:10-17 ("A. [Barry's expert:] So this is a picture of what's called unlinked derotation. And you can see the number of surgeon hands that are performing that procedure. And so this is what you do if your system didn't have linkages on it. The surgeons would be grasping those reduction tools with their hands and you would actually need more than two surgeons. You can see the fifth hand in that picture.").)

Barry generally preferred *en bloc* to segmental derotation because he believed that "derotating more [vertebral] levels at the same time and spreading those derotational forces amongst a greater number of pedicle screws[] was actually safer." (Trial Day 1 Tr. at 156:15-18.) He endeavored to improve the *en bloc* procedure by ***linking*** levers (or "derotators") longitudinally along multiple vertebral levels to allow derotation of "more levels at the same," while eliminating the "chance [that the] derotator would have moved abnormally with a lot of hands." (Trial Day 1 Tr. at 157:25-158:4, Trial Day 2 Tr. at 95:20-96:7; see also Trial Day 1 Tr. at 137:4-8 ("A [Barry]: Well, it was soon after that that, you know, I realized that if I linked up derotators along the sides that it would take less [sic] hands, it would be—the movement would be much more uniform. It would be safer and potentially more effective.").) He thus invented "a system of derotating vertebrae with linked levers." (Trial Day 1 Tr. at 117: 8-9.)

DePuy manufactures and sells medical instruments allowing surgeons to perform linked *en bloc* derotation (the EXPEDIUM® Vertebral Derotation System and the VIPER® 3D MIS Correction Set). Barry thus accused DePuy of inducing surgeons to infringe his patents. (Am. Compl.); 35 U.S.C. § 271(b). Barry hired a psychologist—David Neal, Ph.D.—to survey the number of infringing procedures surgeons had performed with DePuy instruments.

**B. David Neal**

Dr. Neal holds a doctorate from the University of Melbourne in psychological and behavioral sciences. He completed a postdoctoral fellowship in psychology and consumer behavior at Duke University, where he was the director of an interdisciplinary social science research laboratory until 2010. (Id. at 45:9-46:15.) Neal founded Catalyst Behavior Sciences, a consulting firm that conducts survey-based work; the chief scientist on a multiyear survey project with the Centers for Disease Control; and a consultant for the United States Army, for which he conducts soldier wellness surveys. (Id. at 46:9-48:2.) He has published twenty-six peer-reviewed papers, nearly all of which involve survey methodology. (Id. at 48:3-23.)

On the third day of trial, I designated Neal as Barry's survey expert. (Trial Day 3 Tr. at 49:21-23; 50:25-51:1; 54:7-9.)

**C. The Survey**

Neal, Barry's counsel, and Dr. Walid Yassir (Barry's infringement expert) together designed the survey at issue here. (See Trial Day 4 Tr. at 44:17-18 ("A [Neal]: It was done collaboratively. Me, Dr. Yassir, and counsel, correct.").) Neal set out, *inter alia*, to "survey a large representative cross section of surgeons" to determine how many spinal deformity procedures the surgeons performed using DePuy's equipment in a manner that infringed Dr. Barry's patents. (Id. at 54:19-55:3.)

Neal sought to survey spine surgeons, whose email addresses he had collected from three sources: (1) an unquantified list of "orthopedic surgeons, orthopedic spine surgeons, and neurosurgeons" purchased from "IQVIA"; (2) a list of 522 Scoliosis Research Society members that Barry's counsel had provided; and (3) results from a Google search performed by Neal's personal assistant for the terms "orthopedic surgeon scoliosis surgery" and "orthopedic spine surgeon email address"—which yielded 77 more names. (Trial Day 3 Tr. at 67:18-23, 124:5-125:24; Trial Day 4 Tr. at 63:23-25.) Neal could not recall how many emails he sent ("oh, several thousand"), but believed it to be "about 4,000." (Trial Day 3 Tr. at 69:7-18.) Only 164 of the 4,000 (roughly 4%) completed the survey. It thus appears that the IQVIA list provided the great bulk of names. Neal said "IQVIA . . . specializes in finding health professionals to participate in research studies," but offered no evidence as to how its list of surgeons was compiled or for what purpose. (Id. at 67:19-23.) No effort was made to determine anything about the demographics of the 4,000 respondents—*i.e.*, age, gender, geographic distribution, *etc*. Each person who completed the survey would receive a $100 Amazon gift certificate or have a $100 donation made to the Scoliosis Research Society. (Id. at 126:16-20.) Although the survey was supposed to take seven to twelve minutes to complete, the only surgeon who verified this was Barry's infringement expert, Dr. Yassir—who helped design the survey. (Trial Day 4 Tr. at 110:1-6.) As the survey's details were explained, it was apparent that completion should take considerably longer than twelve minutes, especially given the number of surgeries involved. No effort was made to determine if each person responding was, in fact, a surgeon or a support staff member. (Trial Day 3 Tr. at 131:9-10.) Indeed, neither Neal nor anyone else actually spoke to any participant. (Id.)

The first set of survey questions was intended to confirm that participants were physicians or surgeons specializing in general orthopedics, orthopedic spine surgery, pediatric orthopedic surgery, or neurosurgery who: (1) had personally performed spinal deformity procedures between 2016-2018; and (2) could approximate how many such procedures they had performed and how many of those involved pedicle screw and spinal rod implant systems. (Trial Day 3 Tr. at 73:22-24, 74:1-19; see PTX350.)

Participants were next asked to recall in how many of those surgeries they used certain models of instrumentation (such as DePuy's Expedium or Viper tools), and then to approximate the number of surgeries involving "simultaneously rotating 2 or more vertebral bodies in the axial plane." (See PTX350 (Survey Questions 12-14).) Survey participants were thus asked at the outset to consider ***only*** *en bloc* derotation procedures. Once they entered the number of *en bloc* derotation procedures they had performed, they could not later go back and change that entry. (Trial Day 3 Tr. at 135:14-22.) Each participant averaged 80 such procedures over the preceding 2 years—totaling over 13,000 procedures for the 164 respondents. (Id. at 84:6-10.)

Participants were then asked to categorize each of the eighty procedures she had performed. The participants viewed written descriptions and illustrations of six derotation surgery instrument assembly types that Yassir and Barry's counsel had created. Each respondent sorted each reported number of *en bloc* procedures into one those six categories. (Trial Day 4 Tr. at 43:11-21.) For instance, if a participant had first answered that she had performed ten *en bloc* procedures with DePuy instruments, she was required to designate each of those ten procedures as fitting one of those six categories. There was no option to answer, "I don't know," "I don't remember," or "Other." Yet, Neal himself did not know whether the six categories were exhaustive, nor had he

instructed Dr. Yassir or counsel that they *should* be exhaustive. (Trial Day 3 Tr. at 134:22-135:3; Trial Day 4 Tr. at 43:22-44:10, 44:23-45:17.)

Yassir told Neal that five of the six categories described procedures infringing Barry's patents. Neal thus concluded that 6.2% of the approximately thirteen thousand spinal deformity procedures reported by the 164 respondents directly infringed on Barry's patents, with those surgeons using DePuy's equipment. (Trial Day 3 Tr. at 104:22-105:7.)

**D. Damages**

Upon a finding of infringement, the patentee must prove damages under one of two "alternative categories of infringement compensation": the patentee's lost profits, or the "reasonable royalty he would have received through arms-length bargaining." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009); SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991); see 35 U.S.C. § 284. Here, Dr. Barry sought to prove damages based on a reasonable royalty, which "seeks to compensate the patentee . . . for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1334 (Fed. Cir. 2015); see also Oiness v. Walgreen Co., 88 F,3d 1025, 1030 (Fed. Cir. 1996) ("[D]amages may not be determined by mere speculation or guess." (internal quotations and citation omitted)).

Barry based his damages calculation on Neal's survey data. Damages expert Kimberly Schenk opined that in a hypothetical negotiation, the parties would have agreed to a reasonable royalty rate of $1,200 per infringing procedure. (Trial Day 5 Tr. 85:2-4.) She then extrapolated the survey data (once again, showing that 6.2% of reported spinal deformity procedures infringed Dr. Barry's patents) to the total spinal deformity procedures performed during the 12-year damages period (2011 to 2023) to arrive at a royalty base of 37,893 total infringing procedures. (Id. at

83:16-19.) Applying the royalty rate of $1,200 per infringing procedure to the royalty base of 37,893 infringing procedures, Schenk calculated some $45 million in damages (which Barry would ask me to treble). (Id. at 128:14-17.)

The jury's ability to determine a nonspeculative damages award thus turned entirely on the reliability of Neal's survey and the conclusions he drew from it. (Doc. No. 243 at 7 ("Dr. Neal's survey is the only measure of the amount of DePuy infringing surgeries in this case and . . . Dr. Barry exclusively rel[ies] on Dr. Neal's survey in calculating damages.").)

## II. PROCEDURAL BACKGROUND

Well before trial, I denied without prejudice DePuy's Daubert Motion to exclude Neal's survey and expert testimony. (Doc. No. 185 at 1 ("Because I am being asked to make evidentiary trial rulings when trial has not yet begun, my decisions are necessarily tentative. I am prepared to revisit them during trial should any Party ask me to do so.").)

When Barry called Neal at trial, DePuy renewed its Daubert Motion, which I took under advisement, ordering the Parties to submit additional briefing. (Trial Day 3 Tr. at 50:23-51:1, 143:25-144:7.) After considering Neal's testimony and reviewing the submissions, it was apparent that Neal's methodology was flawed and that no reliable conclusions could be drawn from his survey. In re Zoloft (Sertraline Hydrochloride) Prods. Liability Litig., 858 F.3d 787, 792-93 (3d Cir. 2017) (expert evidence must be excluded if methodological "flaw is large enough that the expert lacks the 'good ground' for his or her conclusions" (internal citation omitted)); Walden v. Georgia-Pacific Corp., 126 F.3d 506, 518 n. 10 (3d Cir. 1997) ("Under these and similar circumstances, if a district court makes a tentative pre-trial ruling, it has the opportunity to 'reconsider [its] *in limine* ruling with the benefit of having been witness to the unfolding events at trial.'" (quoting United States v. Graves, 5 F.3d 1546, 1552 (5th Cir. 1993))).

I thus granted DePuy's renewed Daubert Motion on June 26, 2023, noting that I would issue this Memorandum to explain the bases of my ruling more fully. (Doc. No. 252.)

## III. LEGAL STANDARDS

In exercising my gatekeeping function, I may admit only reliable scientific or technical testimony and evidence, and must ensure that the expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Daubert, 509 U.S. at 589; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); Fed. R. Evid. 702. To determine whether to admit expert testimony under Rule 702, I evaluate: (1) the expert's qualifications; (2) the reliability of his methodology; and (3) whether the testimony is relevant and helpful for the trier of fact. Fed. R. Evid. 702; Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003); Breidor v. Sears, Roebuck & Co., 722 F.2d 1134, 1139 (3d Cir. 1983) ("Helpfulness is the touchstone of Rule 702.").

The reliability of Neal's survey methodology was at issue here. An inquiry into reliability ensures that an expert's opinions are based upon "methods and procedures of science rather than on subjective belief or unsupported speculation." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) (internal quotations omitted). The proponent of the expert testimony must show by an evidentiary preponderance that its expert's opinion is reliable. Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000). I may assess reliability by considering whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have

been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. Daubert, 509 U.S. at 593-94; Paoli, 35 F.3d at 742 n.8.

The reliability inquiry is "flexible," however, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. 137, 141-42 (1999).

## IV. DISCUSSION

Dr. Neal's survey suffers from several defects. His stated goal notwithstanding, Neal failed to interrogate "a large representative cross section of surgeons." (Trial Day 3 Tr. at 54:19-22.) Further, the survey's design flaws ensured that any results would be meaningless. Either of these failings was sufficiently serious to preclude the survey's admission at trial. Added to these were the repeated circularity of Neal's definitions and reasoning, and his failure to perform a pretest, consider non-responsive bias, follow up with those who did respond, or allow respondents to check their surgical records. Considering all these flaws, I ruled that Barry had failed to show by an evidentiary preponderance that the survey and Neal's expert opinion were reliable, and so barred their admission. Cf. Parallel Networks Licensing, LLC v. Microsoft Corp., No. 13-2073, 2017 WL 11557655, at *2 (D. Del. Feb. 22, 2017), aff'd, 777 F. App'x 489 (Fed. Cir. 2019) ("The lack of fit between the survey and the asserted claims is, in and of itself, sufficient to exclude the survey as unreliable and prejudicial under Daubert. Nevertheless, there are additional problems with the survey that warrant discussion and that further support my decision to [exclude].").

### A. Preliminary Objections

I first will address Barry's arguments that do not bear directly on the merits of DePuy's renewed Daubert Motion.

In Barry's 2016 suit against another medical device manufacturer, the court admitted a survey Neal had prepared for Barry. Barry v. Medtronic, No. 14-104, 2016 WL 7665773 at *1 (E.D. Tex. July 19, 2016), aff'd 914 F.3d 1310 (Fed. Cir. 2019). I rejected Barry's reliance here on that discretionary ruling. As I explained, the Medtronic litigation involved a ***different*** Neal survey, which, in any event, did not suffer from the same design flaws that I discuss here. (Trial Day 3 Tr. at 75:19-25.)

Barry also asked me to deem as waived Daubert arguments that DePuy raised for the first time in its renewed Motion. Barry had ample opportunity to respond to any new reasoning DePuy offered and so could articulate no prejudice. In these circumstances, I declined to deem that reasoning "waived." Cf. Fraser v. Wyeth, Inc., 992 F. Supp. 2d 68, 97 (D. Conn. 2014) ("Daubert stressed the trial judge's obligation to act as a gatekeeper to ensure that expert testimony is reliable. The insistence on reliability helps to ensure the integrity of the judicial process. That goal is of such obvious and transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under Daubert.") (internal quotations and citations omitted)).

**B. Survey Standards**

In the Third Circuit, an admissible survey must comport with the following criteria.

> (1) a proper universe must be examined and a representative sample must be chosen; (2) the persons conducting the survey must be experts; (3) the data must be properly gathered and accurately reported; (4) the sample design, the questionnaires, and the manner of interviewing must meet the standards of objective surveying and statistical techniques; (5) the survey must be conducted independently of the attorneys involved in the litigation; and (6) the sample designers should be trained and, ideally, unaware of the purposes of the survey or the litigation.

Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978). Although a survey's methodological deficiencies generally go to its evidentiary weight rather than to its admissibility, I may nonetheless exclude a survey: (1) under Rule 702 when the deficiencies are so fundamental

that its conclusions are unreliable; or (2) under Rule 403 when the survey is insufficiently probative, unfairly prejudicial, or misleading. Citizens Fin. Grp., Inc. v. Citizens Nat. Bank, 383 F.3d 110, 121 (3d Cir. 2004); Medisim Ltd. v. BestMed LLC, 861 F. Supp. 2d 158, 167 (S.D.N.Y. 2012). Here, Neal's survey fails whether analyzed under Rule 702 or 403.

**C. Failure to Establish Sample's Representativeness**

Neal's failure to demonstrate representativeness rendered his conclusions unreliable and any resulting damages calculation speculative.

"One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe)." Shari Seidman Diamond, "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence 359, 376 (Fed. Judicial Ctr., 3d ed. 2011). The target population consists of all individuals "whose characteristics . . . the survey is intended to represent." Id.

When a sample is representative of the greater population from which it is drawn, "[d]ata from the sample can be extrapolated to describe the characteristics of th[at] population." David H. Kaye & David A. Freedman, "Reference Guide on Statistics," in Reference Manual on Scientific Evidence 211, 226-27 (Fed. Judicial Ctr., 3d ed. 2011); see id. at 217 ("Inferences from the part to the whole are justified when the sample is representative."). Representativeness is generally satisfied when the researcher "defines an appropriate population, uses a probability method for selecting the sample, has a high response rate, and gathers accurate information on the sample units." Id. at 226. "Of course, surveys may be useful even if they fail to meet these criteria. But then, additional arguments are needed to justify the inferences." Id. at 227.

Unfortunately, the target population of Neal's survey was a moving target. He first testified that the "universe of [his] survey" was "spine surgeons who are performing [specifically] pedicle

screw surgeries involving simultaneous derotation." (Compare, e.g., Trial Day 3 Tr. at 57:20-25, with id. at 62:1-5.) In opposing DePuy's Renewed Daubert Motion, however, Barry argued that there was "no doubt" that the target population was "surgeons who perform spinal deformity surgeries in the United States." (Doc. No. 243 at 14.)

Neal insisted that it was "literally impossible" to describe quantitatively his survey's universe, however Barry chose to define that universe. (See, e.g., Trial Day 3 Tr. at 118:7-16.) He dismissed as "useless" the suggestion to "determine if there w[as] a list of surgeons who were licensed to practice medicine in the United States." (Id. at 121:25-122:8.) Eventually, he reluctantly estimated that there were some 50,000 spinal surgeons in the United States. (Id. at 56:11-16.)

The reliability issues arising from Neal's failure to identify consistently or quantify his universe of surgeons were compounded by the way he chose his survey recipients. He did not use a probability method for selecting the sample, nor did he conduct the survey "independently of the attorneys involved in th[is] litigation." Pittsburgh Press Club, 579 F.2d at 758. Compare Shari Seidman Diamond, "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence 359, 380 (Fed. Judicial Ctr., 3d ed. 2011) ("The use of probability sampling techniques maximizes both the representativeness of the survey results and the ability to assess the accuracy of estimates obtained from the survey. . . . In . . . probability sampling, every element in the population has a known, equal probability of being included in the sample, and all possible samples of a given size are equally likely to be selected."), with id. at 419 (a nonprobability convenience sample is a "sample of elements selected because they were readily available"). The great bulk of survey recipients were provided by IQVIA, which purportedly "specializes in finding health professionals." (Trial Day 3 Tr. at 67:19-23.) Once again, Neal offered no evidence as to how

IQVIA's list of surgeons was compiled or for what purpose. Neal never spoke with any of the 164 respondents. Surgeons in 13 states were unrepresented. (Doc. No. 235-1 at 15.) Twelve states had only one respondent each. (Id.)

As I have discussed, to obtain the "large representative cross section" of the target population he sought, Neal drew on three sources: (1) results from a Google search by Neal's "personal assistant," using "the terms orthopedic surgeons, scoliosis surgery, and orthopedic spine surgeon email addresses"; (2) a list of Scoliosis Research Society members that Barry's counsel had provided; and (3) a list of "orthopedic surgeons, orthopedic spine surgeons, and neurosurgeons" that Neal had purchased from IQVIA. (Id. at 54:19-22, 67:18-23, 122:22-25, 124:5-125:24; Trial Day 4 Tr. at 63:23-25.) Neal sent over 4,000 emails to this group, asking them to complete the survey and either receive a $100 Amazon gift card or have a $100 donation made to the Scoliosis Research Society. (Trial Day 3 Tr. at 126:17-21.) Neal did not indicate how many respondents took the gift card and how many took the donation.

In one of his many *ipse dixit* conclusions, Neal testified that the self-selected 164 people who completed the survey was a "representative" sample:

> Q. The only support that we have for your statement that this is a representative sample is the fact that you said it, correct?
> A. [Neal:] That's correct.

(Id. at 119:17-20.) Once again, Neal made no effort to contact any respondent after the survey. (Id. at 130:24-131:10.) When asked how he could know if each respondent was in fact a spinal deformity surgeon—and not her "personal assistant"—Neal said, "I have never seen that happen." (Id. at 128:7-21.) He made no effort to ensure all states were represented in his sample, or to provide a demographic breakdown by experience or gender. (Id. at 120:1-23.) Rather, only after the fact, Barry's lawyers asked Neal to "guess" the age of each respondent based on when she had

graduated from medical school. (Id.) Neal did not "compare that age distribution to any large population of surgeons in the U.S." (Id. at 121:16-21.) When asked how he determined that the survey questions were "unbiased," Neal offered yet another circular response: "unbiased is established by looking at the evenhandedness of the questions." (Id. at 60:4-6.) Nor did Neal address non-response bias, even though the response rate to his 4,000 invitations was only 4.1%. (Id. at 127:12-18.)

Given that representativeness was thus suspect, it would have been important for Neal to determine if non-response bias tainted his survey. Marlo v. United Parcel Service, Inc., 251 F.R.D. 476, 485 (C.D. Cal. 2008) (excluding survey where proponent failed to "take measures to assure that nonresponses are random and provide analysis of the reasons of nonresponse"); Sec. Alarm Fin. Enter., L.P. v. Alder Holdings, LLC, No. 13-102, 2017 WL 5248181, at *4 (D. Alaska Feb. 21, 2017) ("[T]he Court is particularly concerned because [the expert] does not address nonresponse bias—indeed, the report itself does not even disclose how many individuals failed to respond to the survey."); In re: Autozone, Inc., 2016 WL 4208200 at *17 (excluding survey with 6% response rate); In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015) (excluding survey when, among other deficiencies, it had a 5% response rate); Wallace v. Countrywide Home Loans Inc., No. SACV 08-1463-JST (MLGx), 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (excluding survey under Daubert: "A survey that 'begins with a random sample,' but does not 'take measures to assure that the nonresponses are random and provide analysis of the reasons of nonresponse' is not 'the product of reliable principles and methods.'"). Neal failed to make such a determination because he felt that non-response bias is "not a major contributor to the quality of survey results." (Trial Day 3 Tr. at 127:15-18.)

The representativeness issue was further compounded by Neal's failure to conduct a follow-up with any of the survey's respondents. Given their small number—164 people—follow-up would not have been burdensome, and would have given Neal the opportunity to allay a number of the concerns I have discussed, as would pretesting. Cf. Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 575 (S.D.N.Y. 2007) (failure to utilize follow-up questions to prompt respondents to explain their answers was a flaw that "quelled" any doubt about a study's exclusion); BBK Tobacco & Foods LLP v. Central Coast Agriculture Inc., 615 F. Supp. 3d 982, 1004-05 (D. Ariz. 2022) (follow-up questions, intended to assess respondents' confidence and ensure that their responses were more than mere guesswork, enhance survey reliability); Capri Sun GmbH v. Am. Beverage Corp., 595 F. Supp. 3d 83, 127 (S.D.N.Y. 2022) ("[A] pretest may enhance the court's confidence in a survey's reliability."); Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc., 669 F. Supp. 1297, 1315 (E.D. Pa. 1987) ("There were numerous technical errors in the survey which damage its reliability and validity including . . . the absence of a pretest . . . ."). Once again, Neal failed to take these steps. He suggested that the survey he conducted in Medtronic years before could serve as a pretest, but that survey—with different respondents and different questions—could hardly serve as an actual pretest. (Trial Day 3 Tr. at 64:1-25.) His other suggestion—that Yassir's review of the "final version" of the *questions he wrote* "to make sure that it made sense" was a "form of pretesting"—is simply incorrect. (Id.); see Deere & Co. v. Farmhand, Inc., 560 F. Supp. 85, 93 n.13 (S.D. Iowa 1982) ("The process of pretesting is a survey technique designed to determine whether the panel members understand the question presented to them."). He also offered no reason for his refusal to conduct any follow up. (Id. at 130:15-16 ("I made no check to do that.").) Not surprisingly, Neal failed to show, except by his

own *ipse dixit* conclusions, that the survey comported with accepted "quality controls and . . . scientific rigor." (Id. at 113:15-18.)

In these circumstances, I determined that Barry had failed to show reliability by an evidentiary preponderance and so excluded Neal's survey and the testimony based on that survey. See Pittsburgh Press Club, 579 F.2d at 759 (excluding survey because the sample "was not designed to be representative"); Parallel Networks Licensing, 2017 WL 11557655, at *4-5 ("The problem is that [the expert] does not consider whether the survey respondents reflected a representative sample of the desired population."); Hostetler v. Johnson Controls, Inc., No. 15-226, 2017 WL 3700345, at *2 (N.D. Ind. Aug. 28, 2017) (striking survey evidence because expert "never considered whether the individuals they succeeded in identifying were representative of the class as a whole"); In re Autozone, Inc., Wage and Hour Employment Practices Litig., No. 10-md-2159, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016) (excluding survey because expert "offers no explanation of why the 343 responding class members adequately stand in for the class as a whole, simply because each worked at least one of the relevant shifts"), aff'd, 789 F. App'x 9 (9th Cir. 2019); Marlo, 251 F.R.D. at 485 (excluding survey evidence after the proponent of that evidence admitted that she did not know whether the survey sample was representative and did not do anything to evaluate whether the sample was representative), aff'd, 639 F.3d 942 (9th Cir. 2011).

**D. Flawed Question Design**

The survey's serious design flaws rendered its results meaningless and, again, unreliable.

Type 1 Category Definitional Problem

As I have discussed, the survey required surgeons to report a threshold number of surgeries involving "simultaneously rotating 2 or more vertebral bodies in the axial plane." (See PTX350

(survey question 14).) Survey participants were thus asked to consider and report ***only*** the total number of *en bloc* derotation procedures. Once locked into that number of reported *en bloc* derotation procedures, the survey participants were asked to study the six surgery assembly types Neal and Yassir had created before allocating their *en bloc* derotation procedures.

Yet, one of the assembly categories, Type 1, did not describe *en bloc* derotation at all. Rather, Type 1 described segmental derotation (once again, a procedure involving derotation of ***one vertebra at a time***), showing assembly variations using only unlinked derotators or derotators linked across the same vertebra. (PTX 350 (Neal Survey, Type 1).) Accordingly, a survey participant asked to categorize her *en bloc* procedures accurately would necessarily report ***zero*** Type 1 surgeries. Neal testified, however, that "the most frequently reported type of surgery was actually [Type] one," with nearly half of the survey participants reporting Type 1 surgeries. (Trial Day 3 Tr. at 104:3-7; Doc No. 235-1, Ex. B, Neal Report at 37, Table 15.) This made no sense.

Responding to this apparently fatal design flaw, Barry sought to argue that DePuy's proffered definition of segmental derotation ("rotating multiple vertebral bodies one at a time") was incorrect, urging that segmental derotation referred only "to the movement of an individual segment of the vertebrae ***unlinked*** to any other vertebrae" and thus qualified as a surgery involving "simultaneously rotating 2 or more vertebral bodies in the axial plane." (Doc No. 235-1 at 20; Doc. No. 243 at 28 (emphasis added).) Barry thus suggested that when surgeons manipulate multiple segments of vertebrae ***simultaneously***, they are performing a segmental derotation, so long as those segments are unlinked to other vertebrae. Yet, the trial evidence presented by Barry—including his own testimony—uniformly refutes this contention.

The DePuy Expedium Manual (an FDA required document authored by surgeons) is among the materials Barry alleged had induced spinal surgeons to directly infringe his patents.

Yet, the Manual explicitly describes segmental derotation as derotation of individual vertebrae ***one at a time***—a technique distinct from *en bloc* derotation, which involves ***simultaneous*** derotation of multiple vertebrae, regardless of whether the levers are unlinked or linked along multiple vertebrae. (Trial Day 4 Tr. at 23:8-10, 157:20-21.) For instance, the "Segmental Vertebral Body Derotation (Individual Vertebral Level)" instruction directs the surgeon to attach a pair of levers for manipulation of an individual vertebra (T12 in the figure below) and a pair of levers to the next proximal vertebra (L1 in the figure below) to be "held by an assistant to provide counter-rotation force," and then instructs the surgeon to derotate the vertebra, tighten the screws, and repeat the process for each vertebra requiring derotation, ***one at a time***.



(PTX223.0010, Figure 11A.)

The Manual also includes two diagrams (with accompanying instructions) for "En Bloc Vertebral Body Derotation (Multiple Apical Levels)." The first instructs surgeons on unlinked *en bloc* derotation: two sets of hands are shown rotating two vertebral levels ***simultaneously*** by applying force to unlinked levers, while a fifth hand presses down on the ribs (below on the left). The second shows that individual levers "can be linked together and rotated in unison" for linked *en bloc* derotation (below on the right).





(PTX 223.0007, 223.0008, Figures 6 and 8.) Plainly, segmental derotation is distinct from unlinked *en bloc* derotation.

Barry's suggestion that segmental derotation somehow referred to unlinked *en bloc* derotation thus contradicts not only the Manual but his ***own*** use of those terms as well. Barry testified that segmental derotation is distinct from procedures allowing derotation of multiple vertebrae at the same time:

> But, you know, the derotation was done, you know, in the past. ***Segmental, one level, two levels***. But, again, ***adding levels*** made it safer by distributing the forces and other safety things, too. You know, the efficiency of derotating ***everything at once*** dramatically cut down the length of surgeries.

(Trial Day 1 Tr. at 156:24-157:3; see also Doc. No 104-3 ¶ 128 ("Barry states as follows . . . surgeons had derotated individual vertebra one at a time – known as segmental derotation.").) Barry himself called simultaneous derotation of multiple vertebrae with levers unlinked to other vertebrae—the very procedure he now claims is encompassed by the term "segmental derotation"—unlinked *en bloc* derotation. (Trial Day 1 Tr. at 149:21-23, 152:22-23 ("Basically I was building on my existing technique of unlinked unblocked [*sic*] derotation.").) Dr. Yassir, who, once again, helped create the six survey categories, testified similarly:

> Q. [Plaintiff's counsel:] Is what we see in Figure 6 with the five hands, is that use of a DePuy instrument set infringing on Dr. Barry's patents?
> A. [Yassir:] No, it's not.
> Q. Why not?

> A. Because the derotators are not linked to each other, so this does not infringe Dr. Barry's patent.
> Q. Does this resemble the unlinked *en bloc* derotation that we've heard discussed this week?
> A. Yes.

(Trial Day 4 Tr. at 104:1-10.)

It was thus uncontroverted at trial that segmental derotation referred only to procedures by which vertebrae are manipulated ***one at a time***. Accordingly, survey participants asked to report the number of *en bloc* derotation procedures (*i.e.*, those procedures involving "simultaneously rotating 2 or more vertebral bodies in the axial plane") could not accurately categorize *any* of those procedures as Type 1 segmental derotation. That nearly half of the respondents nonetheless reported Type 1 procedures thus strongly suggests that they provided senseless responses in their 7 to 12 minute completion of a survey calling upon them to recall the details of some 80 surgeries each had performed over the previous 2 years. At the very least, this muddled result severely undermined the survey's reliability. Cf. J&J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 370 (D.N.J. 2002) ("Because the classifications were not properly-defined, the survey has no bearing on the issue it was submitted for.").

Closed-Ended Categorization with Non-Exhaustive Categories

Finally, the survey failed to include a category for unlinked *en bloc* derotation procedures, which Yassir concedes do not infringe Barry's patents. (Trial Day 4 Tr. at 104:6-7.) Rather, the remaining categories—Types 2 through 6—showed variations only of ***linked*** *en bloc* derotation procedures, all of which Yassir had determined infringed the patents. (See PTX350 (Neal survey); Trial Day 4 Tr. at 106:8-107:1.)

Because participants were not given the option to answer, "I don't know," "I don't remember," or "Other," the survey, by its design, compelled erroneous reporting: surgeons that

performed non-infringing unlinked *en bloc* derotation procedures could either categorize these procedures ***inaccurately*** as segmental derotation procedures (Type 1) or ***inaccurately*** as one of the five allegedly infringing linked *en bloc* derotation procedures (Types 2-6). (See PTX350; Trial Day 3 Tr. at 134:22-135:3; Trial Day 4 Tr. at 43:22-44:10.) This structural defect stripped the survey responses of any probative value. See Shari Seidman Diamond, "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence 359, 389 (Fed. Judicial Ctr., 3d ed. 2011) ("If the respondent is asked to choose one response from among several choices, the response chosen will be meaningful ***only if the list of choices is exhaustive***." (emphasis added)). For this reason as well, I determined that Barry had failed to show the survey's reliability by an evidentiary preponderance, and so barred its admission.

**C. CONCLUSION**

As I have discussed, flaws in an expert's methodology usually go to the weight, not the admissibility of the expert's evidence. Here, however, there was no showing of reliability. Dr. Neal's methodology was so flawed that any damages calculation based on that methodology was necessarily speculative. Moreover, because the survey was flawed and muddled, its admission would certainly have confused and misled the jury. Cf. Wing Enters., Inc. v. Tricam Indus., Inc., 829 F. App'x 508, 515-16 (Fed. Cir. 2020) (district court did not abuse its discretion in excluding testimony about a survey due to jury confusion). In these circumstances, I barred Neal's survey and testimony.

**BY THE COURT:**

*/s/ Paul S. Diamond*

Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. MARK BARRY,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civ. No. 17-3003** |
| **DEPUY SYNTHES PRODUCTS, INC., *et al.*,** | : | |
| **Defendants.** | : | |

Diamond, J. July 31, 2023

**MEMORANDUM**

On June 26, 2023, after seven days of trial in this patent infringement suit, I granted Defendants' Motion for Judgment as a Matter of Law. (Doc. No. 253.) That decision turned largely on my earlier exclusion under Daubert of the testimony of Plaintiff's survey expert Dr. David Neal. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Fed. R. Civ. P. 50(a). At that time, I indicated that I would issue Memoranda explaining my decisions more fully. (Doc. Nos. 252, 253.) I issued the Daubert Memorandum on July 28, 2023. (Doc. No. 270.) I issue this Memorandum to explain my Rule 50(a) analysis.

## I. BACKGROUND

### A. Proving Patent Infringement

A patent infringement analysis involves: (1) claim construction, and (2) the application of the construed claim to the accused method or system. Advanced Med. Optics, Inc. v. Alcon, Inc., 361 F. Supp. 2d 404, 408 (D. Del. 2005) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996)); EMC Corp. v. Pure Storage, Inc., 154 F. Supp. 3d 81, 95 (D. Del. 2016).

Claim construction, is "simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." Terlep v. Brinkmann Corp., 418 F.3d 1379, 1382 (Fed. Cir. 2005) (quoting Embrex, Inc., v. Serv. Eng'g Corp., 216 F.3d 1343, 1347 (Fed. Cir. 2000)). "Patent claims are construed from the perspective of one of ordinary skill in the art." Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1361 n.3 (Fed. Cir. 2008) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005)). In the instant case—involving systems and methods of correcting spinal deformities—a person of ordinary skill in the art would have: "(1) an undergraduate degree in Mechanical or Biomedical Engineering, or its equivalent, or a medical degree, or its equivalent; and (2) at least two to three years of experience with fixation implants and methods and systems for scoliosis or spinal deformity correction." (Doc. No. 171-4 at 2.)

Once a district court has construed the relevant claim terms, "that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009).

The second step of the infringement analysis involves a determination of whether the accused system or method contains each limitation of the properly construed claims. Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1357-58 (Fed. Cir. 2005); see Trinity Indus., Inc. v. Road Sys., Inc., 121 F. Supp. 2d 1028, 1033 (E.D. Tex. 2000) ("Claim limitations are the words in a patent claim that delineate the necessary elements of the patented invention.").

The patent owner has the burden of proving infringement by a preponderance of the evidence. EMC Corp., 154 F. Supp. 3d at 95.

**B. Patents at Issue**

Plaintiff Dr. Mark Barry is a retired pediatric orthopedic surgeon and "an inventor of the patents in this case." (Trial Day 1 Tr. at 107:23-25, 110:8-9.) Once again, the Patents-in-suit relate to the correction of spinal deformities. In severe spinal deformity cases, such as scoliosis, the vertebrae twist and rotate out of alignment. (Doc. No. 215 at 5.) Three of Dr. Barry's patents cover methods or systems to correct such deformities by using sets of *linked* tubes attached to the vertebrae to rotate *en bloc*—more than one tube at the same time—the vertebrae back into alignment (i.e., "derotating" the spine). (Id.; Doc. No. 20 ¶¶ 1, 10, 14, 15, 19, 25, 29; see Doc. No. 181); U.S. Patent No. 7,670,358; U.S. Patent No. 8,361,121; U.S. Patent No. 9,668,787. Below is an example of a construct that can be used for linked *en bloc* rotation:



(PTX140 at 58.)

Barry did not invent *unlinked en bloc* derotation: "[e]n bloc derotation worked even prior to [Dr. Barry's] investigational studies." (Trial Day 2 Tr. at 96:3-7; see Trial Day 4 Tr. at 104:6-7 (when surgeons do not link derotator tubes together, they will not infringe Dr. Barry's patents).)

In 2017, Barry brought this action against DePuy, alleging infringement of his three patents. The EXPEDIUM® Vertebral Derotation System and the VIPER® 3D MIS Correction Set, which DePuy manufactures and sells, are "used to derotate *en bloc* multiple levels of

vertebrae." (Doc. No. 20 ¶¶ 47, 49, 54.) Barry alleged that DePuy willfully induced the performance of infringing methods and construction of infringing instruments. (See id. ¶ 59; Doc. No. 215 at 4.) In Count I, Barry alleged willful infringement of (method) claims 4 and 5 of the '358 Patent, both of which depend on claims 1 and 2 of that Patent. (Doc. No. 215-2 at 2, 3); see Barry v. Medtronic, Inc., 914 F.3d 1310, 1317-18 (Fed. Cir. 2019). In Count II, he alleged willful infringement of (system) claim 2 of the '121 Patent. (Doc. No. 215-2 at 2, 3.) In Count IV, he alleged willful infringement of (method) claim 6 of the '787 Patent. (Id.) Claims 4 and 5 of the '358 Patent, claim 2 of the '121 Patent, and claim 6 of the '787 Patent thus constitute the "Asserted Claims" in this case. Below is a representative figure depicting Dr. Barry's invention:




FIG. 1

(Figure 1 of the '358 Patent, the '121 Patent, and the '787 Patent.)

1. “Linking” Requirements

A surgeon who performs linked *en bloc* derotation—i.e., linking levers “vertically” along each side of the spine—could infringe claims 4 and 5 of the ’358 Patent, so long as all other limitations of those claims are also met. (Trial Day 4 Tr. at 189:4-15; see PTX140 at 58); Freedman Seating, 420 F.3d at 1357-58.

Unlike claims 4 and 5 of the ’358 Patent, claim 2 of the ’121 Patent and claim 6 of the ’787 Patent further require linking “horizontally” across the spine. Claim 2 of the ’121 Patent requires a “linking member” (#42 in Fig. 1) and a “cross-linking member” (#40 in Fig. 1). U.S. Patent No. 8,361,121, cols. 7-8.

In 2019, after conducting a Markman hearing, I issued my Claim Construction Order and concluded that the plain and ordinary meanings of “linking member” and “cross-linking member” apply in this case. (Doc. No. 84 at 28-31; see also Doc. No. 171-3); Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). A person of ordinary skill in the art would understand “cross-linking member” to mean “going from one side of the spine to the other, so one tool to the other tool.” (Trial Day 4 Tr. at 172:17-21.) Claim 6 of the ’787 Patent requires “linking together [four] elongated levers in both a craniocaudal [head-to-tail] direction and a transverse [across the spine] direction.” U.S. Patent No. 9,668,787, col 8; (Trial Day 4 Tr. at 163:18-23.)

A surgeon who performs derotation using a “box” construct—i.e., linking levers vertically along each side of the spine *and* linking the top levers and bottom levers together horizontally across the spine—could infringe *all* Asserted Claims in this case, provided that all other claim limitations are also met. (Trial Day 4 Tr. at 106:10-15, 189:4-17; see PTX140 at 58; Doc. No. 215-3 at 3); Freedman Seating, 420 F.3d at 1357-58. Below is an example of a “box” construct:



(PTX140 at 58.)

2. Handle Means” Requirements

Claims 4 and 5 of the ’358 Patent and claim 2 of the ’121 Patent require a “first handle means” and a “second handle means.” U.S. Patent No. 7,670,358, cols. 6-8; U.S. Patent No. 8,361,121, cols. 7-8. I construed “handle means” as “a part that is designed especially to be grasped by the hand”—the construction urged by Dr. Barry. (Doc. No. 84 at 15; see also Doc. No. 171-3.) I also concluded that “handle means” encompasses both: (1) a single handle from which multiple shafts extend; and (2) multiple handles (each attached to individual shafts) linked together. (Doc. No. 84 at 14-15.)

Claim 6 of the ’787 Patent does not include “handle means.” U.S. Patent No. 9,668,787, col 8.

**C. Plaintiff’s Case-in-Chief**

The gravamen of Barry’s Complaint is that Defendants indirectly infringed the ’358 Patent, the ’121 Patent, and the ’787 Patent by inducing surgeons to directly infringe those Patents through the use of DePuy’s systems. Barry thus alleged as follows:

> DePuy induces infringement of Dr. Barry's claimed methods and systems through programs and efforts at instruction and education, with knowledge of Dr. Barry's patents. For example, DePuy uses sales representatives and training programs to detail the benefits and manner of creating surgical constructs that it knows would infringe Dr. Barry's patents.

(Doc. No. 34-1 at 2.) Barry's indirect infringement claims are not viable unless he can prove that they are based on direct infringement by surgeons. See, e.g., Takeda Pharm. USA, Inc. v. West-Ward Pharm. Corp., 785 F.3d 625, 631 (Fed. Cir. 2015) ("The mere existence of direct infringement by physicians, while necessary to find liability for induced infringement, is not sufficient for inducement."); Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993) (liability for inducing infringement "is dependent upon the existence of direct infringement").

1. Proving Direct Infringement

Dr. Barry alleged that "[n]umerous surgeons have reported using" the accused DePuy systems in a manner that infringes his patents. (Doc. No. 215 at 14.) To prove infringement of the Asserted Claims, Barry had to prove: (1) that surgeons perform every method step of claims 4 and 5 of the '358 Patent and claim 6 of the '787 Patent; and (2) that an accused DePuy system contains every limitation in claim 2 of the '121 Patent. See Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998); Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech., 709 F.3d 1348, 1362 (Fed. Cir. 2013). "If even one limitation is missing or not met as claimed, there is no literal infringement." Mas-Hamilton, 156 F.3d at 1211. Accordingly, JMOL respecting non-infringement is appropriate if no reasonable fact finder could determine that the accused systems or methods meet every limitation of the properly construed claims. Elkay Mfg. v. EBCO Mfg., 192 F.3d 973, 980 (Fed. Cir. 1999).

Here, I found legally insufficient evidence to support a finding that DePuy's accused products met the "handle means" limitation of the '358 Patent and '121 Patents. See Riles v. Shell

Exploration & Prod. Co., 298 F.3d 1302, 1308 (Fed. Cir. 2002). I also found that without Dr. Neal's survey and testimony, Barry had failed to present legally sufficient evidence to support a finding that the surgeons using the accused DePuy systems actually performed the cross-linking step of claim 6 of the '787 Patent.

2. Dr. Barry's Testimony

As I have discussed, Barry "came up with a system of derotating vertebrae with linked levers"—i.e., linked *en bloc* derotation. (Trial Day 1 Tr. at 117:8-9, 125:24-126:3; Trial Day 2 Tr. at 85:13-17.)

*Linking*

After performing a surgery in December 2002 using *unlinked* derotators on each side of the patient's spine, Dr. Barry "felt that if [he] could link up these derotation tools, one side then the other, it would work much better." (Trial Day 1 Tr. at 134:23-135:17, 141:10-13.) Barry sought to modify DePuy derotator tools to achieve that purpose, and so began working with Robert Pfefferkorn, the DePuy equipment representative in Las Vegas, Nevada. (Id. at 141:13-142:18.) Barry felt he could satisfactorily modify DePuy's rod stabilizer tool (i.e., derotator) "*because it had this composite plastic part* of it that [he] could use to link." (Id. at 142:19-24 (emphasis added); see also id. at 144:14-17 (Barry: "The handle region. This was the composite plastic area I was talking about . . . .").)

In April 2003, Barry had the handles "slimmed out" and ground flat on each side so that he could "line up" and link the handles along the spine. (Id. at 145:10-13, 146:13-19; Trial Day 2 Tr. at 101:20-23, 183:11-21.) In late July 2003, Barry had three "slots" put into the handles of the derotators so that he could link them together. (Trial Day 2 Tr. at 80:9-81:4, 121:19-22.) On August 4, 2003, Barry performed his first surgery with linked handles along the spine. (Id. at

22:24-23:1.) On November 20, 2004, he performed his first surgery with linked handles along the spine *and* a "cross-connector" linking the sets of derotators on each side of the spine. (Id. at 41:22-42:20, 44:14-45:5.)

*"Handle Means"*

Dr. Barry provided inconsistent and confusing lay testimony on the "handle means" requirement of his '358 and '121 Patents. He first testified that the derotator "shafts are linked to the handle means." (Trial Day 2 Tr. at 146:16-147:2.) He then immediately changed his testimony: "actually, the whole thing is a handle means." (Id. ("Q. [DePuy's counsel:] So you're saying, for you, the entire construct is a handle means? A. [Barry:] Yes.").) Barry then changed course again, testifying that "the handle means[,] in anything that acts as a lever[,] is at the top of the [derotator] lever." (Id. at 147:22-24.) He went on to acknowledge that in surgery he "was not grabbing the handles." (Id. at 148:1-3.)

3. Dr. Krishn Sharma's Expert Testimony

Barry called Dr. Sharma, an orthopedic surgeon, to "give [his] opinion on medical education in the United States, including the role of medical device companies and their medical education of surgeons and the adoption of new techniques and tools." (Trial Day 3 Tr. at 9:24-10:10, 14:11-15.) Dr. Sharma also testified that he does not use linked *en bloc* derotation. (Id. at 22:7-9, 38:24-39:4.) Accordingly, Dr. Sharma does not practice methods that could infringe any of the Asserted Claims.

4. Robert Pfefferkorn's Testimony

Mr. Pfefferkorn was an independent distributor for DePuy products from 1997 to 2012. (Trial Day 2 Tr. at 162:23-163:4.) He attended about one hundred scoliosis surgeries performed

by Dr. Barry in Las Vegas. (Id. at 164:5-9.) Pfefferkorn has seen only Barry use stabilizers (i.e., derotators) to perform spinal derotation. (Id. at 168:7-17.)

After Pfefferkorn had DePuy stabilizer handles modified for Barry, Pfefferkorn "only saw [Barry use] instruments where the handles were linked"—he did not see instruments where the metal tubes (shafts) themselves were linked together. (Id. at 185:6-10.) Moreover, Pfefferkorn never saw a construct "where the instruments were linked across the spine." (Id. at 185:11-14.) He thus never saw a surgeon use a construct or method that could infringe claim 2 of the '121 Patent or claim 6 of the '787 Patent.

5. Dr. Michael O'Brien's Testimony

Dr. O'Brien, another surgeon (who has since passed away), testified that when he occasionally "mechanically linked [DePuy] Expedium derotation tubes together longitudinally along the spine, it gave [him] a nice handle that allowed [him] to derotate the spine." (PTX624 at 41:10-13, 42:09-13; see Doc. No. 251 at 10.)

O'Brien also testified that he does *not* typically use both sides of the spine for derotation, however. (PTX624 at 87:05-20.) When asked if, during surgery, he has built a construct that involved at least three linked Expedium derotators on the right side of the spine, and at least three linked Expedium derotators on the left side of the spine to perform derotation (shown in the figure below), O'Brien replied, "No." (Id.)



(Doc. No. 20-2 at 13; PTX147 at 8 fig.8.)

Dr. O'Brien testified that he has *not* performed surgery in which he: (1) linked at least two Expedium derotation tubes on the right side of the spine; (2) linked at least two Expedium derotation tubes on the left side of the spine; (3) cross-connected (i.e., cross-linked) those two sets of tubes; and (4) performed derotation. (Id. at 42:17-43:01.) Accordingly, O'Brien never used a construct or method that could infringe claim 2 of the '121 Patent or claim 6 of the '787 Patent.

6. Expert Testimony and Opinions of Drs. Walid Yassir and David Neal

Dr. Yassir, a pediatric orthopedic surgeon, testified as Barry's infringement expert. (Trial Day 4 Tr. at 5:15-21, 80:18-19, 82:15-21.) Dr. Neal testified as Barry's survey expert. (Trial Day 3 Tr. at 44:15-20.)

Dr. Yassir performs linked *en bloc* derotation during his surgical procedures that could infringe claims 4 and 5 of the '358 Patent. (Trial Day 4 Tr. at 87:19-21, 189:14-15.)

*The Survey*

Barry's counsel, Yassir, and Neal designed a survey in which they asked surgeons about six types of procedures that "mirror" those that could infringe Barry's patents. (Id. at

105:21-106:19.) Dr. Neal testified that the primary goal of this survey was "to calculate how many surgeons are using DuPuy's equipment in a manner that . . . infringes Dr. Barry's patents." (Trial Day 3 Tr. at 54:24-55:3.) Neal offered no opinion on infringement; he relied entirely on Dr. Yassir's infringement analysis. (Id. at 78:13-19.)

Based primarily on the survey results, Yassir opined that surgeons used the accused DePuy systems to infringe Barry's patents. (Trial Day 4 Tr. at 90:24-91:4, 117:9-12, 123:4-8, 154:22-24, 162:1-4, 175:1-8, 180:17-23, 193:24-194:9.)

*"Handle Means"*

Yassir began his testimony respecting the "handle means" limitation by reciting my claim construction: "a part that is designed especially to be grasped by the hand." (Id. at 122:19-20; see Doc. No. 84 at 15.) He then omitted "especially," however, and proceeded to equate something "designed to be grasped by the hand" with something "that has to be done with your hand"—thus contradicting my construction. (Trial Day 4 Tr. at 131:12-132:3 ("[Yassir:] The [DePuy] Quick Stick derotation frame also is *designed to be grasped by the hand*. You clip it onto those tubes, and then you have to tighten those little nuts with your finger to get them to engage, and *so that has to be done with your hand*." (emphasis added)); see also id. at 197:4-8 ("Q. [DePuy's counsel:] The cross-linker is designed especially to be grasped by the hand? A. [Yassir:] Yes. There is no other way to put it into the patient, *so the surgeon has to grab it by their hand* to put it in." (emphasis added)).)

Yassir explained that once a surgeon links derotator tubes together, "the upper portion becomes a handle means because each one of those . . . upper portions becomes a handle and the whole thing is a handle means." (Id. at 133:9-16.) He thus further contradicted my construction by testifying (quite confusingly) that: (1) something is a "handle means" simply because it

"becomes a handle"; and (2) "the whole thing" is the "handle means." (Id.; see also id. at 195:17-19 ("Q. [DePuy counsel:] And so everything is a handle means in Figure 1 [of the '358 Patent], in your opinion? A. [Yassir:] Yeah."), 204:9-25.)




FIG. 1

Further, Yassir acknowledged that in conducting his infringement analysis *he* defined "handle means" as "parts that cannot be assembled without grasping them by the hand." (Id. at 198:14-24.) Once again, that was not my construction.

## II. PROCEDURAL HISTORY

Well before trial, DePuy moved to exclude: (1) opinions and testimony of Dr. Yassir that contradicted my Claim Construction Order; and (2) opinions and testimony of Dr. Neal, due to both his reliance on Yassir's inadmissible opinions and (invoking Daubert) significant methodological flaws in Neal's survey analysis. (See Doc. Nos. 84, 133, 135, 172.) Following my usual practice, I denied DePuy's Motions without prejudice, noting that my pre-trial

evidentiary decisions were made in an evidentiary vacuum and so necessarily were tentative, and that I was prepared to revisit them during trial. (Doc. Nos. 185, 187.)

Trial by jury began on June 13, 2023. On the third day (June 15), when Dr. Barry tendered Dr. Neal as an expert in survey methodology, DePuy renewed its Daubert Motion, which I took under advisement. (Trial Day 3 Tr. at 49:21-51:11, 144:1-7; Trial Day 4 Tr. at 74:8-20; Trial Day 5 Tr. at 74:15-17, 149:16-23.) I asked the Parties to submit additional briefing on the Daubert issue. (Trial Day 4 Tr. at 222:11-223:17; see Doc. Nos. 235, 241.)

On the fifth day of trial (June 20), Barry rested, and DePuy orally moved for Judgment as a Matter of Law, which Barry opposed. (Trial Day 5 Tr. at 147:17-150:9.) I also took the oral JMOL Motion under advisement (without objection from Barry). (Id.) That evening, DePuy filed its written 50(a) Motion. Fed. R. Civ. P. 50(a); (Doc. No. 239.) I then asked Barry to submit a written response. (See Trial Day 6 Tr. at 6:15-8:21, 189:23-190:5.) Dr. Barry requested a response deadline of Friday, June 23, which I granted. (Id. at 8:16-21, 189:23-190:5.) After Barry filed that response, I ordered DePuy to reply by the morning of June 24. (Doc. Nos. 248, 249, 250, 251.) The matter was thus fully briefed.

DePuy moved for JMOL on the following grounds:

(1) Invalidity of the asserted patent claims in the ’358 patent under (a) the on-sale bar of 35 U.S.C. § 102(a)(1), or (b) the written-description and enablement requirements of 35 U.S.C. § 112(a);

(2) No induced infringement;

(3) No direct infringement;

(4) No willful infringement;

(5) Failure to prove the quantity of any alleged infringement; and

(6) Defendant Medical Device Business Services, Inc. has nothing to do with this case.

(Doc. No. 239 at 1-2.) The Parties agreed to "drop Medical Device Business Services, Inc. from the case as it has no impact on Dr. Barry's inducement claims or direct infringement claims." (Trial Day 7 Tr. at 143:3-9.) Accordingly, I deemed DePuy's sixth JMOL ground as withdrawn. (Doc. No. 253.)

On June 26, I granted Defendants' renewed Daubert Motion and excluded Dr. Neal's survey and expert testimony. (Doc. No. 252.) I then excluded Dr. Yassir's opinion and testimony respecting the "handle means" limitation, and granted DePuy's Motion for JMOL. (Doc. No. 253.)

## III. LEGAL STANDARDS

Rule 50(a)(1) provides—

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). The Rule allows a party to challenge the sufficiency of the evidence before submission of the case to the jury. Medisim Ltd. v. BestMed, LLC, 758 F.3d 1352, 1355 (Fed. Cir. 2014); Fed. R. Civ. P. 50(a).

I apply Third Circuit law in deciding whether to grant or deny a motion for JMOL. See ClearValue, Inc. v. Pearl River Polymers, Inc., 668 F.3d 1340, 1343 (Fed. Cir. 2012). In the Third Circuit, when deciding whether to grant JMOL, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Becton, Dickinson & Co. v.

Tyco Healthcare Grp., LP, 616 F.3d 1249, 1253 (Fed. Cir. 2010) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)). "As a general matter, a party has been 'fully heard' for purposes of Rule 50(a) when the party has submitted all of its evidence on the relevant claim or issue." Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1149 (D.C. Cir. 2004) ("[A] defendant may move for judgment as a matter of law at the close of the plaintiff's evidence."); see also Marinelli v. City of Erie, 216 F.3d 354, 364 n.7 (3d Cir. 2000) (because the plaintiff did not offer doctor's deposition testimony as a part of his case-in-chief, he was not entitled to use that testimony to oppose JMOL).

In granting judgment as a matter of law after the plaintiff rests, "the plaintiff's facts must be accepted as established and all reasonable inferences from those facts must be drawn in the plaintiff's favor." Allied Colloids Inc. v. Am. Cyanamid Co., 64 F.3d 1570, 1572 (Fed. Cir. 1995). The "verdict may be directed after the plaintiff's case is presented, when it is clear that completion of the trial is unnecessary in that the only sustainable verdict could be in favor of the defendant." Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1064 (Fed. Cir. 1998) (quoting Allied Colloids, 64 F.3d at 1573).

## IV. DISCUSSION

### A. Absent Dr. Yassir's "Handle Means" Testimony, There Could Be No Finding of Infringement of the '358 or '121 Patent

Expert testimony "may not be used to vary or contradict the claim language." Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1373 (Fed. Cir. 2022); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996); Ravo v. Covidien LP, 55 F. Supp. 3d 766, 769 (W.D. Pa. 2014). Accordingly, "[n]o party may contradict the court's construction to a jury." Exergen, 575 F.3d at 1321. "As expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact," it should be excluded under Daubert.

EMC Corp., 154 F. Supp. 3d at 109; see also Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006); Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc., 197 F. Supp. 3d 837, 852 (W.D.N.C. 2016) ("District courts routinely exclude expert opinions that are inconsistent with claim construction.").

1. My Construction of "Handle Means"

Once again, I construed the term "handle means" as "a part that is designed especially to be grasped by the hand." (Doc. No. 84 at 15; see also Doc. No. 171-3.) Once again, that was the construction urged by Dr. Barry. (See, e.g., Doc. No. 84 at 15.)

At the Markman hearing, Barry's counsel explained that the "handle means is made up of a handle and a linking member." (Markman Hr'g Tr. at 81:20-21, 82:7-13, 83:6-8, 83:18-19, 84:25-85:2, 85:22-24.) In my Claim Construction Order, I noted that "handle means" encompasses a handle within it, and that the shaft and handle are not required to be separate objects. (Doc. No. 84 at 13.) I also concluded that "handle means" encompasses both: (1) a single handle from which multiple shafts extend; and (2) multiple handles (each attached to individual shafts) linked together, contemplated by the preferred embodiment shown in Figure 1. (Id. at 14-15.)

2. Dr. Yassir's Testimony Regarding "Handle Means" Was Inadmissible

Although Yassir paid lip service to testifying in accordance with my Claim Construction Order, in fact, he contradicted it. As I have discussed, Yassir improperly based his opinion and trial testimony respecting direct infringement of "handle means" on *his* construction: "parts that cannot be assembled without grasping them by the hand." (Trial Day 4 Tr. at 198:14-24.) I did not construe—and Dr. Barry did not ask me to construe—"handle means" as a part that "can" or "must" be grasped by the hand. The "handle means," which includes a handle, is a part *especially designed* to be grasped by the hand.

Yassir repeatedly varied from and contradicted my Claim Construction Order during his trial testimony. (See Trial Day 4 Tr. at 131:12-132:3, 133:9-16, 195:17-19, 197:4-8, 204:9-25.) For example, he testified that *everything* in Figure 1 is a handle means—even the cross-linking member. (Trial Day 4 Tr. at 195:17-19, 197:4-8). There are several problems with this testimony: (1) his rationale was "the surgeon has to grab [the cross-linking member] by their hand"—thus contradicting my construction; (2) Yassir did not explain how a cross-linking member encompasses a handle, as required for a "handle means"; and (3) Yassir did not explain which *part* of Figure 1 has a *special design* for grasping by the hand. (Id. at 197:4-8.) Moreover, Yassir had already testified that the cross-linking member *connects the first handle means to the second handle means*. (Id. at 169:9-11, 178:13-15.) In these circumstances, I excluded Yassir's contradictory, unhelpful, and unreliable testimony respecting "handle means." (Doc. No. 253); see, e.g., Barry v. Medtronic, Inc., 230 F. Supp. 3d 630, 643 n.10 (E.D. Tex. 2017) (opinion of the defendant's expert excluded at trial because it conflicted with the court's claim construction), aff'd, 914 F.3d 1310 (Fed. Cir. 2019).

3. Expert Testimony Was Required

In some patent cases, expert testimony is not necessary because the technology will be "easily understandable without the need for expert explanatory testimony." Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1369 (Fed. Cir. 2004) (quoting Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1573 (Fed. Cir. 1984)). This is not such a case.

Expert testimony is typically necessary in cases involving complex technology, such as methods and systems for correcting spinal deformity by derotating the spine. See id.; see also Aspex Eyewear, Inc. v. Concepts in Optics, Inc., 111 F. App'x 582, 583, 588 (Fed. Cir. 2004) (case involving patent directed to magnetically attachable lens for eyeglasses was "not one of those

rare cases where the invention is so simple that expert testimony is not required"); Automated Irrigation Controls, LLC v. Watt Stopper, Inc., 407 F. Supp. 3d 274, 294 (S.D.N.Y. 2019) (a multi-functional medical device is beyond a layperson's understanding without expert testimony); Manuli Stretch USA, Inc. v. Pinnacle Films, Inc., 749 F. Supp. 2d 764, 768, 771 (E.D. Tenn. 2010) (expert testimony required because "multi-layer stretch film" used for commercial packaging involved complex technology); cf. Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1330 (Fed. Cir. 2009) (no expert required where ordinary skill in the art "required only a high school education and limited marketing and computer experience"). Moreover, expert testimony is more reliable than the inventor's testimony. Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co., No. 4-396 TS, 2007 WL 710119, at *7 (N.D. Ind. Mar. 6, 2007).

Dr. Barry and DePuy both offered expert witnesses on infringement. (See Doc. Nos. 215, 216.) They also agreed that a person with "ordinary skill in the art"—needed to construe Barry's patents—had to have: (1) a medical degree or an undergraduate degree in Mechanical or Biomedical Engineering; *and* (2) at least two to three years of experience with implants and methods and systems for scoliosis or spinal deformity correction. (Doc. No. 171-4 at 2); Sundance, 550 F.3d at 1361 n.3.

Absent Dr. Yassir's testimony, the jury heard only insufficient lay evidence during Barry's case-in-chief regarding the "handle means" claim limitation.

4. Unreliable Lay Testimony on "Handle Means"

As I have discussed, Barry provided shifting definitions of "handle means" during his non-expert trial testimony. (See Doc. No. 248 at 26.) He first said that the derotator "shafts are linked to the handle means"; then he testified that the *entire construct* is the handle means. (Trial Day 2 Tr. at 146:16-147:2.) Having earlier testified that an example of a handle is "the composite

plastic area," Barry failed to explain how *any part* of the "entire construct" was designed especially to be grasped by the hand. (Trial Day 1 Tr. at 144:14-17.) Once again, just because "[t]he entire derotator" can be or "is grasped" does not mean it is a part *especially designed* to be grasped. (Trial Day 2 Tr. at 147:15-16.) Moreover, where a surgeon *might want* to place her hands has nothing to do with my construction of "handle means." (Id. at 148:1-3 (Barry: "I was grabbing the top and using the entire top as the handle means. I was not grabbing the handles . . . .").) Barry did not apply my claim construction; instead he offered inconsistent testimony. This kind of lay evidence is legally insufficient to support a finding that DePuy's accused products met the "handle means" limitation. See Riles, 298 F.3d at 1308; see also Lincoln Nat'l, 2007 WL 710119, at *7 ("[B]ecause of the inherent bias, the court should be careful to assign too much weight to the inventor's testimony.").

Barry also sought to rely on a passing comment by Dr. O'Brien (another non-expert witness) that linking derotators along the spine "gives you a nice handle." (See Doc. No. 248 at 27 (citing PTX624 at 41:14-18; 42:09-16); Doc. No. 215 at 19.) Yet, Dr. O'Brien's lay testimony had no bearing on the existence of a part *especially designed* to be grasped by the hand. Once again, I did not construe "handle means" as a part that "can" be grasped by the hand.

In sum, without Dr. Yassir's testimony, Dr. Barry failed to prove direct infringement of claims 4 and 5 of the '358 Patent and claim 2 of the '121 Patent, all of which require "handle means." See Mas-Hamilton, 156 F.3d at 1211. I thus granted JMOL of non-infringement with respect to the '358 Patent and the '121 Patent. See Elkay Mfg., 192 F.3d at 980.

**B. Absent Dr. Neal's Survey, There Could Be No Finding of Infringement of the '787 Patent**

Because claim 6 of the '787 Patent does not include "handle means," the exclusion of Dr. Yassir's testimony does not bear on direct infringement of this claim. See U.S. Patent No.

9,668,787, col 8. As I have discussed, claim 6 requires linking together levers in both a head-to-tail direction and an across-the-spine direction. U.S. Patent No. 9,668,787, col 8; (Trial Day 4 Tr. at 163:18-23.)

Yassir testified that a "Type 3 assembly" and a "Type 4 assembly" from the Neal survey would infringe claim 6 of the '787 Patent. (Trial Day 4 Tr. at 106:12-19, 158:10-19.) As explained in my earlier Memorandum, however, I excluded Dr. Neal's survey under Daubert. Barry provided no other evidence that surgeons perform the cross-linking step of this claim. (See Doc. No. 252.)

Remarkably, Plaintiff's other evidence shows *non-infringement* of claim 6 of the '787 Patent. Pfefferkorn never saw a construct "where the instruments were linked across the spine." (Trial Day 2 Tr. at 185:11-14.) Dr. Sharma testified that he does not use linked *en bloc* derotation. (Trial Day 3 Tr. at 22:7-9.) Dr. O'Brien also testified that he has *not* performed surgery in which he: (1) linked at least two Expedium derotation tubes on the right side of the spine; (2) linked at least two Expedium derotation tubes on the left side of the spine; (3) cross-linked those two sets of tubes; and (4) performed derotation. (PTX624 at 42:17-43:01.)

Because Barry thus failed to prove direct infringement of claim 6 of the '787 Patent, I granted JMOL. See Mas-Hamilton, 156 F.3d at 1211; Elkay Mfg., 192 F.3d at 980.

**C. Judgment as a Matter of Law on Direct Infringement**

Once again, absent proof of direct infringement, Dr. Barry could not show indirect infringement. See, e.g., Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004) (indirect infringement "can only arise in the presence of direct infringement"). As there was not a sufficient evidentiary basis for a reasonable jury to find for Barry on direct infringement, I granted Defendants' Motion for Judgment as a Matter of Law on Barry's indirect infringement claims.

## V. CONCLUSION

Without Dr. Neal's survey to prove direct infringement, and with Dr. Yassir's contradictions of my Claim Construction Order, there was insufficient "evidence upon which the jury could properly find" for Barry. Becton, Dickinson & Co., 616 F.3d at 1253. Accordingly, I granted DePuy's Motion for Judgment as a Matter of Law.

Although DePuy's other grounds for JMOL appear to be quite substantial, in light of my determination that Plaintiff did not make out direct infringement, I will not discuss them further.

**BY THE COURT:**

*/s/ Paul S. Diamond*
Paul S. Diamond, J.

US007670358B2

(12) **United States Patent**
**Barry**

(10) **Patent No.: US 7,670,358 B2**
(45) **Date of Patent: Mar. 2, 2010**

(54) **SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS**

(76) Inventor: **Mark A. Barry**, P.O. Box 60150, Las Vegas, NV (US) 89160-0150

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1157 days.

(21) Appl. No.: **11/027,026**

(22) Filed: **Dec. 30, 2004**

(65) **Prior Publication Data**

US 2006/0149236 A1 Jul. 6, 2006

(51) **Int. Cl.**
*A61B 17/88* (2006.01)

(52) **U.S. Cl.** ...................................................... **606/279**

(58) **Field of Classification Search** ............ 606/60–61, 606/279, 264, 265, 105, 86
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,102,412 | A | 4/1992 | Rogozinski |
| 5,112,332 | A | 5/1992 | Cozad et al. |
| 5,116,334 | A | 5/1992 | Bahr |
| 5,181,917 | A | 1/1993 | Rogozinski |
| 5,306,275 | A | 4/1994 | Schmidt |
| 5,498,262 | A | 3/1996 | Schmidt |
| 5,545,166 | A | 8/1996 | Howland |
| 5,630,816 | A | 5/1997 | Leonardo |
| 5,676,665 | A | 10/1997 | Leonardo |
| 5,772,661 | A | 6/1998 | Michelson |
| 5,810,817 | A | 9/1998 | Tucker |
| 5,928,232 | A | 7/1999 | Howland et al. |
| 5,947,965 | A | 9/1999 | Bryan |
| 6,015,409 | A | 1/2000 | Jackson |
| 6,090,113 | A * | 7/2000 | Le Couedic et al. ........... 606/61 |
| 6,267,765 | B1 | 7/2001 | Taylor et al. |
| 6,375,657 | B1 | 4/2002 | Doubler et al. |
| 6,440,132 | B1 | 8/2002 | Davis |
| 6,458,131 | B1 | 10/2002 | Ray |
| 6,558,390 | B2 | 5/2003 | Cragg |
| 6,652,526 | B1 | 11/2003 | Arafiles |
| 6,743,231 | B1 | 6/2004 | Gray et al. |
| 6,749,614 | B2 | 6/2004 | Teitelbaum et al. |
| 6,802,844 | B2 | 10/2004 | Ferree |
| 6,821,277 | B2 | 11/2004 | Teitelbaum |
| 6,827,719 | B2 | 12/2004 | Ralph et al. |
| 2006/0195092 | A1 * | 8/2006 | Barry .......................... 606/61 |

OTHER PUBLICATIONS

Richard P. Schlenk, M.D., Robert J. Kowalski, M.D., P.E., and Edward C. Benzel, M.D. Biomechanics of spinal deformity, Neurosurg Focus 14 (1);Article 2, 2003.

* cited by examiner

*Primary Examiner*—Eduardo C Robert
*Assistant Examiner*—Elana B Fisher
(74) *Attorney, Agent, or Firm*—Patton Boggs LLP

(57) **ABSTRACT**

A system and method for ameliorating spinal column anomalies, such as scoliosis, includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae and in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. A pedicle screw cluster derotation tool simultaneously engages multiple pedicle screws and transmits manipulative forces to multiple vertebrae to effect a whole-spine correction. Pre-contoured spinal rods are engaged post-derotation to secure the correction.

**5 Claims, 4 Drawing Sheets**






FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5



FIG. 6

# SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to methods and apparatus for management and correction of spinal deformities, such as scoliosis.

2. Background Information

A serious deficiency presently exists with respect to conventional treatment and instrumentation for treating spinal deviation anomalies, such as scoliosis.

This circumstance presents a serious medical challenge, because scoliosis, other than mild to moderate cases, is a well-recognized health risk.

If scoliosis curvature exceeds 70 degrees, severe twisting of the spine occurs. This can cause the ribs to press against the lungs, restrict breathing, and reduce oxygen levels. The distortions may also affect the heart and possibly cause dangerous changes.

Eventually, if the curve reaches more than 100 degrees, both the lungs and the heart can be injured. Patients with this degree of severity are susceptible to lung infections and pneumonia. Curves greater than 100 degrees are associated with elevated mortality rates.

Present treatment regimens for scoliosis carry their own risks and side effects, which include:

Spinal fusion disease. Patients who are surgically treated with fusion techniques lose flexibility and may experience weakness in back muscles due to injuries during surgery.

Disk degeneration and low back pain. With disk degeneration, the disks between the vertebrae may become weakened and may rupture.

Height loss.

Lumbar flatback. This condition is most often the result of a scoliosis surgical procedure called the Harrington technique, used to eliminate lordosis (exaggeration of the inward curve in the lower back). Adult patients with flatback syndrome tend to stoop forward. They may experience fatigue and back pain and even neck pain.

Rotational trunk shift (uneven shoulders and hips).

In some patients, years after the original surgery (particularly with the first generation of Harrington rods), the weight of the instrumentation can cause disk and joint degeneration severe enough to require surgery. Treatment may involve removal of the old instrumentation and extension of the fusion into the lower back.

Left untreated, or ineffectively treated, scoliosis carries long-term consequences.

Pain in adult-onset or untreated childhood scoliosis often develops because of posture problems that cause uneven stresses on the back, hips, shoulders, necks, and legs. Studies report, however, that patients with childhood scoliosis have the same incidence of back pain as the general population, which is very high (60% to 80%). In one study conducted 20 years after growth had stopped, two-thirds of adults who had lived with curvatures of 20 to 55 degrees reported back pain. In this study, most cases were mild, although other studies have reported that adults with a history of scoliosis tend to have chronic and more back pain than the general population.

Nearly all individuals with untreated scoliosis at some point develop spondylosis, an arthritic condition in the spine. The joints become inflamed, the cartilage that cushions the



disks may thin, and bone spurs may develop. If the disk degenerates or the curvature progresses to the point that the spinal vertebrae begin pressing on the nerves, pain can be very severe and may require surgery. Even surgically treated patients are at risk for spondylosis if inflammation occurs in vertebrae around the fusion site.

The consequences of scoliosis are limited to the physical realm. The emotional impact of scoliosis, particularly on young girls or boys during their most vulnerable years, should not be underestimated. Adults who have had scoliosis and its treatments often recall significant social isolation and physical pain. Follow-up studies of children with scoliosis who did not have strong family and professional support often report significant behavioral problems.

Older people with a history of scoliosis, even those whose conditions were corrected, should realize that some negative emotional events in adulthood may possibly have their roots in their early experiences with scoliosis. Many studies have reported that patients who were treated for scoliosis have limited social activities and a poorer body image in adulthood. Some patients with a history of scoliosis have reported a slight negative effect on their sexual life. Pain appears to be only a minor reason for such limitation. An early Scandinavian study reported that adults with scoliosis had fewer job opportunities and a lower marriage rate than the general population.

It is clear, then, that scoliosis treatment options are presently lacking, and untreated scoliosis (except for mild to lower-moderate cases) is not an acceptable alternative.

There are many apparatus which are designed for attachment to, and positioning adjacent the spinal column, and in many instances, these apparatus are designed for use in treating spinal column anomalies, such as scoliosis. However, all known systems are limited by their design and known implementation modes on either arresting further deleterious rotation of the involved vertebrae, or fixing individual vertebrae once, by some means, they are brought to approximate a desired orientation and position.

Significant correction of severe scoliotic curvature to the point of approximating normal spinal configuration, particularly by a single process, is simply unknown in the art. This is, it is believed, the result of focus in the field on the positioning substantially seriatim of affected vertebrae. Applying derotational force to a vertebrae in this manner cannot effect en mass spinal reconfiguration without risking vertebral fracture at the point of spinal instrumentation fixation, particularly when using conventional instrumentation. Scoliosis has classically been regarded as principally a two dimensional deformity. Early methods of surgical correction have thus focused on two dimensional straightening of the classic S-shaped deformity. Over the last decade or so, more focus has been placed on the true three dimensional deformity. The third dimension is axial plane vertebral rotational deviation maximally affecting the apex of the scoliotic curve. A complete three dimensional correction has become the perceived goal of spine surgeons. There are no existing methods which consistently and reproducibly achieve this goal. Furthermore, significant, focused force applied to any individual vertebra risks spinal cord and related injury. Thus, only force which is inadequate to effect substantial correction to the entire spinal column is thus far ever applied, and correction of scoliotic curvatures are substantially limited.

It has become clear to the present inventor that desired levels of correction of spinal column anomalies, such as scoliosis, can only be achieved if the spinal column (or an affected segment thereof) is manipulated (or "derotated") substantially as a whole into a desired configuration. To

achieve such an objective, force must be applied safely to all to-be-derotated vertebrae, and the forces necessary to reconfigure all, or at least a substantial portion of the spinal column must be dispersed throughout the affected spinal segments or regions. Nothing in the prior art satisfies these requirements, either individually or in combination.

## SUMMARY OF THE INVENTION

In view of the foregoing, it is an object of the present invention to provide an improved system of spinal instrumentation for use in ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved method for ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved system of spinal instrumentation, and a method for the use thereof, for ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of significant derotational forces to individual vertebra, with substantially reduced risk for fracture thereof upon application of such forces.

It is another object of the present invention to provide an improved system of spinal instrumentation, and associated method for use thereof, in ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of forces to vertebrae of affected spinal column segments en bloc, thereby distributing otherwise potentially injurious forces in a manner for safely achieving over-all spinal column correction or derotation.

Applicant's present invention provides a system and method for use of such system which satisfy each of these objectives. Applicant's system includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae. In the preferred mode of the present invention, such bone screws are also to be implanted in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. The pedicle implantation provides a stable foundation for the application of significant derotational forces, but without undue risk of vertebral fracture.

The system includes a pedicle screw cluster derotation tool. This tool, in the presently preferred embodiment includes shafts, extending from a common handle or linked handle array, which are oriented and configured to extend to and engage the heads of a number of implanted pedicle screws which will have been implanted in adjacent vertebrae to which derotational or balancing forces are to be applied during a spinal column derotation and alignment. The engagement between the pedicle screw cluster derotation tool and the individual pedicle screws is such that, as manipulative forces are applied to the handle means of pedicle screw cluster derotation tool, forces are transferred and dispersed simultaneously among the engaged vertebrae. Therefore, a practitioner may, in a single motion, simultaneously and safely derotate multiple vertebrae of an affected spinal segment (as well as likewise apply balancing forces to other group(s) of vertebrae which are contiguous to the effected segment(s).

The effect of practice of the present invention is three-dimensional correction which provides, not only spinal correction to near normal configuration, but corrects "rib humps."



The system of the present invention also includes, in its preferred embodiment, pedicle screws which allow for interfacing with, and fixation relative to pre-contoured spinal rods after a satisfactory derotation.

The present inventor's approach to the problems described above is certainly simple, when viewed in hindsight, but it is equally unobvious. In investigative procedures, the presently proposed system and method has achieved measure of correction of scoliotic curvature never before seen in orthopaedic practice.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be more easily understood with reference to figures, which are as follow:

FIG. **1** is a top plan view of an anatomical model of a human spinal column, with components of the system of the present invention shown engaged therewith. The event depicted is that stage of the proposed method after which derotational and balancing forces have been applied to substantially correct a scoliotic curvature.

FIG. **2** is an elevational dorsal view of the anatomical model of a human spinal column depicted in FIG. **1**, but with an unobstructed view of already-implanted pedicle screws, and configured as if preceding the derotation step of the proposed method.

FIG. **3** is an elevational side view of the anatomical model of a human spinal column depicted in FIGS. **1** and **2**, with an unobstructed view of already-implanted pedicle screws and adjacent, pre-contoured spinal rods which will be engaged with the pedicle screws through practice of the proposed method.

FIG. **4** is an example of a pedicle screw which may be used in the system of the present invention.

FIG. **5** is a depiction of the complimentary forces applied to multiple spinal column segments to achieve an over-all spinal column correction.

FIG. **6** is a three frame x-ray view showing "before and after" views of a scoliosis patient who was treated in an investigational procedure using the system and method of the present invention. The curvature correction was substantially to normal, and lumbar motion was preserved notwithstanding. Reducing the number of lumbar discs included in the fusion is another advantage of this method over others.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIGS. **1-4**, the spinal deviation correction system of the present invention includes a number of pedicle screws **10**, each implanted in respective vertebrae to which rotative forces will be applied in a spinal anomaly correction.

Pedicle screws **10** may be of a variety of designs, such as, for example, are generally depicted in U.S. Pat. Nos. 6,743,237 (Gray, et al), 6,827,719 (Ralph, et al), 6,652,526 (Arafiles), 6,375,657 (Doubler, et al), the disclosures of which are incorporated herein by reference.

With particular reference to FIG. **4**, pedicle screws **10** will include a threaded shank segment **12** and a head segment **14**. Head segment **14** will be configured with a spinal rod conduit (or channel) **16** or interfacing with a spinal rod **18** (shown in FIG. **3**). Spinal rod engagement means **20** serve to fix pedicle screw **10** and spinal rod **18** in relative position and orientation, once a spinal column derotation is complete.

Referring again, generally to FIGS. **1-4**, the system of the present invention further includes a pedicle screw cluster

derotation tool **30**. As depicted in FIG. **1**, each pedicle screw cluster derotation tool **30** is configured from a grouping of pedicle screw wrenches **32**, joined together by pedicle screw wrench linking members **42** to act in unison during use (movement to effect a derotation, or application of balancing forces being left to right, or vice versa, as viewed in FIG. **1**). Ordinarily, two tools **30** will be involved on either side of the spinal column, with two pedicle screws **10** being implanted in each vertebrae, as shown. Wrench cross linking members **40** are used to coordinate forces applied to screw clusters on either side of the spinal column.

Each pedicle screw wrench **32** includes a handle **34**, a shaft **36**, and a distal end **38** which is configured to reversibly engage the head segment **14** of a pedicle screw **10** such that, as shaft **36** is moved while shaft distal end **38** is engaged with head segment **14**, manipulative forces are transferred to the pedicle screw **10** and, in turn, to the vertebra in which such pedicle screw **10** is implanted.

Significant variations of pedicle screw cluster derotation tool **30** are contemplated by the present invention. For example, the linked, multiple wrenches **32** depicted in FIG. **1** may be replaced by a single handle member from which extend the functional equivalent of the multiple shafts **36** and shaft distal ends **38** for simultaneously engaging multiple pedicle screws **10**, as depicted. However configured, the object and design of pedicle screw cluster derotation tool **30** is to facilitate simultaneous application of manipulative forces to multiple pedicle screws **10** which are implanted in a like number of vertebra (a "cluster"). This has the effect of permitting the gross, en bloc application of sufficient derotative forces to affected segments of the spinal column in a sufficiently dispersed manner as to avoid injury to any one vertebra or isolated spinal column segment. This, in turn, facilitates a successful entire-spine, 3D derotation of a scoliosis patient to near normal parameters.

With reference to FIGS. **1**-**3** and **5**, the preferred mode of the present method usually involves, to achieve an over-all spinal column correction, application of forces to multiple spinal column segments with pedicle screw clusters being accordingly implanted. For example, as depicted in FIG. **5**, in the case of a single curvature case of scoliosis, both derotative forces (illustrated by the central force vector arrow of FIG. **5**) to vertebrae involved in scoliotic curvatures, as well as of balancing, or offsetting forces to contiguous spinal segments cephalad and caudad (illustrated by the lateral arrows of FIG. **5**) are applied.

The preferred mode of the present method involves pre-contouring spinal rods **18**, as shown in FIG. **3**. The spinal rod(s) **18** are engaged with pedicle screws **10**, and, after the manipulative forces are applied to pedicle screw cluster derotation tool(s) **30**, the spinal rod engagement means **20** is tightened to fix pedicle screw **10** and spinal rod **18** in relative position and orientation to secure the corrected spinal column configuration. Spinal rod engagement means **20** of pedicle screws **10** are tightened, using an anti-torque feature of wrenches **32** (or of their equivalent in an alternative embodiment). This feature, as is well known in the art, allows tightening of nuts and the like, without imparting undue torque to the underlying apparatus or structure.

As shown in FIG. **6**, investigative practice of the present method achieves efficacy never before seen in the orthopaedic field. The "before picture" is the left hand image of FIG. **6**, and the two remaining images are sagittal and dorsal views of the corrected spinal column.

Although the invention has been described with reference to specific embodiments, this description is not meant to be construed in a limited sense. Various modifications of the disclosed embodiments, as well as alternative embodiments of the inventions will become apparent to persons skilled in the art upon reference to the description of the invention. It is, therefore, contemplated that the appended claims will cover such modifications that fall within the scope of the invention.



I claim:

**1**. A method for aligning vertebrae in the amelioration of aberrant spinal column deviation conditions comprising the steps of:

selecting a first set of pedicle screws, said pedicle screws each having a threaded shank segment and a head segment;

selecting a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having first handle means and a first group of pedicle screw engagement members which are mechanically linked with said first handle means, each pedicle screw engagement member being configured for engaging with, and transmitting manipulative forces applied to said first handle means to said head segment of each pedicle screw of said first set of pedicle screws,

implanting a each pedicle screw in a pedicle region of each of a first group of multiple vertebrae of a spinal column which exhibits an aberrant spinal column deviation condition;

engaging each pedicle screw engagement member respectively with said head segment of each pedicle screw of said first set of pedicle screws; and

applying manipulative force to said first handle means in a manner for simultaneously engaging said first group of pedicle screw engagement members and first set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said first group of multiple vertebrae in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition;

selecting a first length of a spinal rod member; wherein one or more of said pedicle screws of said first set of pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and

spinal rod engagement means for securing said pedicle screw and said spinal rod member, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation;

extending said first length of said spinal rod member through said spinal rod conduits of one or more of said pedicle screws of said first set of pedicle screws; and

after applying said manipulative force to said first handle means, actuating said spinal rod engagement means to secure said vertebrae in their respective and relative positions and orientations as achieved through application of said manipulative force thereto.

**2**. The method of claim **1** further comprising the steps of:

selecting a second set of pedicle screws;

selecting a second pedicle cluster derotation tool, said second pedicle screw cluster derotation tool having second handle means and a second group of pedicle screw engagement members which are mechanically linked with said second handle means, each pedicle screw engagement member being configured for engaging with, and transmitting manipulative forces applied to said second handle means to said head segment of each pedicle screw of said second set of pedicle screws,

implanting each pedicle screw in a pedicle region of each of a second group of multiple vertebrae of a spinal column which exhibits an aberrant spinal column deviation condition;

engaging each pedicle screw engagement member respectively with said head segment of each pedicle screw of said second set of pedicle screws; and

applying manipulative force to said second handle means in a manner for simultaneously engaging said second group of pedicle screw engagement members and said second set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said second group of multiple vertebrae in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition.

**3**. The method of claim **2** further comprising the steps of:

selecting a second length of a spinal rod member, wherein one or more of said pedicle screws of said second set of pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of each said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and

spinal rod engagement means for securing said pedicle screw and said second spinal rod member, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation;



extending said second length of said spinal rod member through said spinal rod conduits of one or more of said pedicle screws of said second set of pedicle screws; and

after applying said manipulative force to said second handle means, actuating said spinal rod engagement means to secure said vertebrae of said second group of multiple vertebrae in their respective and relative positions and orientations as achieved through application of said manipulative force thereto.

**4**. The method of claim **3** wherein the steps of applying manipulative force to said first handle means and applying manipulative force to said second handle means are carried out substantially simultaneously to cooperatively achieve an amelioration of an aberrant spinal column deviation condition.

**5**. The method of claim **2** wherein the steps of applying manipulative force to said first handle means and applying manipulative force to said second handle means are carried out substantially simultaneously to cooperatively achieve an amelioration of an aberrant spinal column deviation condition.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



| | |
|---|---|
| PATENT NO. | : 7,670,358 B2 |
| APPLICATION NO. | : 11/027026 |
| DATED | : March 2, 2010 |
| INVENTOR(S) | : Mark A. Barry |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, item [56]

References Cited

U.S. PATENT DOCUMENTS - NAMED INVENTORS SHOULD READ AS FOLLOWS:

| | | |
|---|---|---|
| 5,116,334 | 5/1992 | Cozad, et al |
| 5,306,275 | 4/1994 | Bryan |
| 5,498,262 | 3/1996 | Bryan |
| 5,630,816 | 5/1997 | Kambin |
| 5,676,665 | 10/1997 | Bryan |
| 5,810,817 | 9/1998 | Roussouly, et al |
| 6,440,132 | 8/2002 | Jackson |

Signed and Sealed this
Eighteenth Day of September, 2012

David J. Kappos

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 7,670,358 B2
APPLICATION NO. : 11/027026
DATED : March 2, 2010
INVENTOR(S) : Mark A. Barry

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Drawings

Sheet 4 of 4, FIG. 6 should appear as shown on the attached page.

Signed and Sealed this
Twentieth Day of June, 2017

Joseph Matal

Joseph Matal
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*



FIG. 6

US008361121B2

(12) **United States Patent**
**Barry**

(10) **Patent No.: US 8,361,121 B2**
(45) **Date of Patent: Jan. 29, 2013**

(54) **SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS**

(76) Inventor: **Mark A. Barry**, Las Vegas, NV (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/857,320**

(22) Filed: **Aug. 16, 2010**

(65) **Prior Publication Data**

US 2010/0312281 A1 Dec. 9, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/202,409, filed on Aug. 10, 2005, now Pat. No. 7,776,072, which is a continuation-in-part of application No. 11/027,026, filed on Dec. 30, 2004, now Pat. No. 7,670,358.

(51) **Int. Cl.**
*A61B 17/70* (2006.01)
(52) **U.S. Cl.** ........................................ **606/265**; 606/279
(58) **Field of Classification Search** .................. 606/102, 606/104, 264, 265, 279
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 5,102,412 A | 4/1992 | Rogozinski | |
| 5,112,332 A | 5/1992 | Cozad et al. | |
| 5,116,334 A | 5/1992 | Cozad et al. | |
| 5,181,917 A | 1/1993 | Rogozinski | |
| 5,306,275 A | 4/1994 | Bryan | |
| 5,466,238 A | 11/1995 | Lin | |
| 5,498,262 A | 3/1996 | Bryan | |
| 5,545,166 A | 8/1996 | Howland | |
| 5,630,816 A | 5/1997 | Kambin | |
| 5,676,665 A | 10/1997 | Bryan | |
| 5,704,937 A | 1/1998 | Martin | |
| 5,772,661 A | 6/1998 | Michelson | |
| 5,797,910 A * | 8/1998 | Martin | 606/57 |
| 5,810,817 A | 9/1998 | Roussouly et al. | |
| 5,928,232 A | 7/1999 | Howland et al. | |
| 5,947,965 A | 9/1999 | Bryan | |
| 6,015,409 A | 1/2000 | Jackson | |
| 6,090,113 A * | 7/2000 | Le Couedic et al. | 606/914 |
| 6,235,028 B1 | 5/2001 | Brumfield et al. | |
| 6,267,765 B1 | 7/2001 | Taylor et al. | |
| 6,375,657 B1 | 4/2002 | Doubler et al. | |
| 6,440,132 B1 | 8/2002 | Jackson | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 10125717 | 12/2002 |
| EP | 0553782 | 4/1993 |

(Continued)

OTHER PUBLICATIONS

Richard P. Schlenk, M.D., et al.; "Biomechanics of spinal deformity"; Department of Neurosurgery; Neurosurg. Focus 14(1); Article 2, pp. 1-15, Jan. 2003.

(Continued)


*Primary Examiner* — Eduardo C Robert
*Assistant Examiner* — Michelle C Eckman
(74) *Attorney, Agent, or Firm* — David G. Henry; Katarzyna Brozynski

(57) **ABSTRACT**

A system and method for ameliorating spinal column anomalies, such as scoliosis, includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae and in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. A pedicle screw cluster derotation tool simultaneously engages multiple pedicle screws and transmits manipulative forces to multiple vertebrae to effect a whole-spine correction. Pre-contoured spinal rods are engaged post-derotation to secure the correction.

**4 Claims, 5 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,458,131 | B1 | 10/2002 | Ray | |
| 6,558,390 | B2 | 5/2003 | Cragg | |
| 6,652,526 | B1 | 11/2003 | Arafiles | |
| 6,743,231 | B1 | 6/2004 | Gray et al. | |
| 6,749,614 | B2 | 6/2004 | Teitelbaum et al. | |
| 6,755,828 | B2 | 6/2004 | Shevtsov et al. | |
| 6,802,844 | B2 | 10/2004 | Ferree | |
| 6,821,277 | B2 | 11/2004 | Teitelbaum | |
| 6,827,719 | B2 | 12/2004 | Ralph et al. | |
| 7,188,626 | B2 * | 3/2007 | Foley et al. | 128/898 |
| 7,776,072 | B2 * | 8/2010 | Barry | 606/265 |
| 7,794,464 | B2 * | 9/2010 | Bridwell et al. | 606/86 A |
| 7,951,175 | B2 * | 5/2011 | Chao et al. | 606/279 |
| 8,147,524 | B2 | 4/2012 | Piza Vallespir | |
| 2005/0033291 | A1 * | 2/2005 | Ebara | 606/53 |
| 2005/0245928 | A1 * | 11/2005 | Colleran et al. | 606/61 |
| 2006/0149236 | A1 * | 7/2006 | Barry | 606/61 |
| 2006/0195092 | A1 * | 8/2006 | Barry | 606/61 |
| 2008/0294206 | A1 | 11/2008 | Choi et al. | |
| 2009/0012565 | A1 | 1/2009 | Sachs et al. | |
| 2010/0249844 | A1 * | 9/2010 | Durrani | 606/259 |
| 2011/0172714 | A1 | 7/2011 | Boachie-Adjei et al. | |
| 2011/0190820 | A1 | 8/2011 | Johansson et al. | |
| 2012/0035668 | A1 | 2/2012 | Manninen et al. | |
| 2012/0083853 | A1 | 4/2012 | Boachie-Adjei et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 9410944 | 5/1994 |
| WO | WO 9505786 | 3/1995 |
| WO | WO 9829046 | 7/1998 |
| WO | WO 2005089656 | 9/2005 |
| WO | WO 2005089657 | 9/2005 |
| WO | WO 2005092218 | 10/2005 |

OTHER PUBLICATIONS

U.S. Appl. No. 12/980,737; "System and Method for Aligning Vertebrae in the Amelioration of Aberrant Spinal Column Deviation Conditions in Patents Requiring the Accommodation of Spinal Column Growth or Elongation", Dec. 29, 2010.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5



FIG. 6



4
Locking Tool
30
30
32
3
Hex Wrenches
50
2
Titanium Rods
Pedicle Screws
10
18
1
Spinal Cord
Vertabrae


*FIG. 7*

# SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS

## PRIORITY CITATION

This Patent Application is a Continuation of U.S. application Ser. No. 11/202,409, filed Aug. 10, 2005, which is a Continuation-in-Part Application of U.S. patent application Ser. No. 11/027,026, filed 30 Dec. 2004 now U.S. Pat. No. 7,670,358, issued Mar. 2, 2010, the entire contents of which are incorporated by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to methods and apparatus for management and correction of spinal deformities, such as scoliosis.

2. Background Information

A serious deficiency presently exists with respect to conventional treatment and instrumentation for treating spinal deviation anomalies, such as scoliosis.

This circumstance presents a serious medical challenge, because scoliosis, other than mild to moderate cases, is a well-recognized health risk.

If scoliosis curvature exceeds 70 degrees, severe twisting of the spine occurs. This can cause the ribs to press against the lungs, restrict breathing, and reduce oxygen levels. The distortions may also affect the heart and possibly cause dangerous changes.

Eventually, if the curve reaches more than 100 degrees, both the lungs and the heart can be injured. Patients with this degree of severity are susceptible to lung infections and pneumonia. Curves greater than 100 degrees are associated with elevated mortality rates.

A number of factors associated with scoliosis increase the risk for bone loss, which is referred to as osteopenia. People with osteopenia are at greatly increased risk of osteoporosis, a common problem in older women that can cause broken bones and is particularly dangerous for women with a history of scoliosis. Experts recommend that children with scoliosis be screened for osteopenia so that measures can be taken to help prevent osteoporosis later

Present treatment regimens for scoliosis carry their own risks and side effects, which include:

Spinal fusion disease. Patients who are surgically treated with fusion techniques lose flexibility and may experience weakness in back muscles due to injuries during surgery.

Disk degeneration and low back pain. With disk degeneration, the disks between the vertebrae may become weakened and may rupture.

Height loss.

Lumbar flatback. This condition is most often the result of a scoliosis surgical procedure called the Harrington technique, used to eliminate lordosis (exaggeration of the inward curve in the lower back). Adult patients with flatback syndrome tend to stoop forward. They may experience fatigue and back pain and even neck pain.

Rotational trunk shift (uneven shoulders and hips).

In some patients, years after the original surgery (particularly with the first generation of Harrington rods), the weight of the instrumentation can cause disk and joint degeneration



severe enough to require surgery. Treatment may involve removal of the old instrumentation and extension of the fusion into the lower back.

Left untreated, or ineffectively treated, scoliosis carries long-term consequences.

Pain in adult-onset or untreated childhood scoliosis often develops because of posture problems that cause uneven stresses on the back, hips, shoulders, necks, and legs. Studies report, however, that patients with childhood scoliosis have the same incidence of back pain as the general population, which is very high (60% to 80%). In one study conducted 20 years after growth had stopped, two-thirds of adults who had lived with curvatures of 20 to 55 degrees reported back pain. In this study, most cases were mild, although other studies have reported that adults with a history of scoliosis tend to have chronic and more back pain than the general population.

Nearly all individuals with untreated scoliosis at some point develop spondylosis, an arthritic condition in the spine. The joints become inflamed, the cartilage that cushions the disks may thin, and bone spurs may develop. If the disk degenerates or the curvature progresses to the point that the spinal vertebrae begin pressing on the nerves, pain can be very severe and may require surgery. Even surgically treated patients are at risk for spondylosis if inflammation occurs in vertebrae around the fusion site.

The consequences of scoliosis are limited to the physical realm. The emotional impact of scoliosis, particularly on young girls or boys during their most vulnerable years, should not be underestimated. Adults who have had scoliosis and its treatments often recall significant social isolation and physical pain. Follow-up studies of children with scoliosis who did not have strong family and professional support often report significant behavioral problems.

Older people with a history of scoliosis, even those whose conditions were corrected, should realize that some negative emotional events in adulthood may possibly have their roots in their early experiences with scoliosis. Many studies have reported that patients who were treated for scoliosis have limited social activities and a poorer body image in adulthood. Some patients with a history of scoliosis have reported a slight negative effect on their sexual life. Pain appears to be only a minor reason for such limitation. An early Scandinavian study reported that adults with scoliosis had fewer job opportunities and a lower marriage rate than the general population.

It is clear, then, that scoliosis treatment options are presently lacking, and untreated scoliosis (except for mild to lower-moderate cases) is not an acceptable alternative.

There are many apparatus which are designed for attachment to, and positioning adjacent the spinal column, and in many instances, these apparatus are designed for use in treating spinal column anomalies, such as scoliosis. However, all known systems are limited by their design and known implementation modes on either arresting further deleterious rotation of the involved vertebrae, or fixing individual vertebrae once, by some means, they are brought to approximate a desired orientation and position.

Significant correction of severe scoliotic curvature to the point of approximating normal spinal configuration, particularly by a single process, is simply unknown in the art. This is, it is believed, the result of focus in the field on the positioning substantially seriatim of affected vertebrae. Applying derotational force to a vertebrae in this manner cannot effect en mass spinal reconfiguration without risking vertebral fracture at the point of spinal instrumentation fixation, particularly when using conventional instrumentation. Furthermore, significant, focused force applied to any individual vertebra risks

spinal cord and related injury. Thus, only force which is inadequate to effect substantial correction to the entire spinal column is thus far ever applied, and correction of scoliotic curvatures are substantially limited.

It has become clear to the present inventor that desired levels of correction of spinal column anomalies, such as scoliosis, can only be achieved if the spinal column (or an affected segment thereof) is manipulated (or "derotated") substantially as a whole into a desired configuration. To achieve such an objective, force must be applied safely to all to-be-derotated vertebrae, and the forces necessary to reconfigure all, or at least a substantial portion of the spinal column must be dispersed throughout the affected spinal segments or regions. Nothing in the prior art satisfies these requirements, either individually or in combination.

## SUMMARY OF THE INVENTION

In view of the foregoing, it is an object of the present invention to provide an improved system of spinal instrumentation for use in ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved method for ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved system of spinal instrumentation, and a method for the use thereof, for ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of significant derotational forces to individual vertebra, with substantially reduced risk for fracture thereof upon application of such forces.

It is another object of the present invention to provide an improved system of spinal instrumentation, and associated method for use thereof, in ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of forces to vertebrae of affected spinal column segments en bloc, thereby distributing otherwise potentially injurious forces in a manner for safely achieving over-all spinal column correction or derotation.

Applicant's present invention provides a system and method for use of such system which satisfy each of these objectives. Applicant's system includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae. In the preferred mode of the present invention, such bone screws are also to be implanted in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. The pedicle implantation provides a stable foundation for the application of significant derotational forces, but without undue risk of vertebral fracture.

The system includes a pedicle screw cluster derotation tool. This tool, in the presently preferred embodiment includes shafts, extending from a common handle or linked handle array, which are oriented and configured to extend to and engage the heads of a number of implanted pedicle screws which will have been implanted in adjacent vertebrae to which derotational or balancing forces are to be applied during a spinal column derotation and alignment. The engagement between the pedicle screw cluster derotation tool and the individual pedicle screws is such that, as manipulative forces are applied to the handle means of pedicle screw cluster derotation tool, forces are transferred and dispersed simultaneously among the engaged vertebrae. Therefore, a practitioner may, in a single motion, simultaneously and safely derotate multiple vertebrae of an affected spinal segment (as well as likewise apply balancing forces to other group(s) of vertebrae which are lateral to the effected segment(s).

The effect of practice of the present invention is three-dimensional correction which provides, not only spinal correction to near normal configuration, but corrects "rib humps."

The system of the present invention also includes, in its preferred embodiment, pedicle screws which allow for interfacing with, and fixation relative to pre-contoured spinal rods after a satisfactory derotation.

The present inventor's approach to the problems described above is certainly simple, when viewed in hindsight, but it is equally unobvious. In investigative procedures, the presently proposed system and method has achieved measure of correction of scoliotic curvature never before seen in orthopaedic practice.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be more easily understood with reference to figures, which are as follow:

FIG. **1** is a top plan view of an anatomical model of a human spinal column, with components of the system of the present invention shown engaged therewith. The event depicted is that stage of the proposed method after which derotational and balancing forces have been applied to substantially correct a scoliotic curvature.

FIG. **2** is an elevational dorsal view of the anatomical model of a human spinal column depicted in FIG. **1**, but with an unobstructed view of already-implanted pedicle screws, and configured as if preceding the derotation step of the proposed method.

FIG. **3** is an elevational side view of the anatomical model of a human spinal column depicted in FIGS. **1** and **2**, with an unobstructed view of already-implanted pedicle screws and adjacent, pre-contoured spinal rods which will be engaged with the pedicle screws through practice of the proposed method.

FIG. **4** is an example of a pedicle screw which may be used in the system of the present invention.

FIG. **5** is a depiction of the complimentary forces applied to multiple spinal column segments to achieve an over-all spinal column correction.

FIG. **6** is a three frame x-ray view showing "before and after" views of a scoliosis patient who was treated in an investigational procedure using the system and method of the present invention. The curvature correction was substantially to normal, and lumbar motion was preserved notwithstanding.

FIG. **7** is a 4-frame, progressive animation of the stages of correction of scoliosis according to the present method, with descriptive text included.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIGS. **1-4** and **7**, the spinal deviation correction system of the present invention includes a number of pedicle screws **10**, each implanted in respective vertebrae to which rotative forces will be applied in a spinal anomaly correction.

Pedicle screws **10** may be of a variety of designs, such as, for example, are generally depicted in U.S. Pat. No. 6,743,237 (Gray, et al), U.S. Pat. No. 6,827,719 (Ralph, et al), U.S. Pat. No. 6,652,526 (Arafiles), U.S. Pat. No. 6,375,657 (Doubler, et al), the disclosures of which are incorporated herein by reference.

With particular reference to FIG. **4**, pedicle screws **10** will include a threaded shank segment **12** and a head segment **14**. Head segment will be configured with a spinal rod conduit (or channel) **16** or interfacing with a spinal rod **18** (shown in FIG. **3**). Spinal rod engagement means **20** serve to fix pedicle screw **10** and spinal rod **18** in relative position and orientation, once a spinal column derotation is complete.

Referring again, generally to FIGS. **1-4**, and **7**, the system of the present invention further includes a pedicle screw cluster derotation tool **30**. As depicted in FIG. **1**, each pedicle screw cluster derotation tool **30** is configured from a grouping of pedicle screw wrenches **32**, by a pedicle screw wrench linking member **42** joined together to act in unison during use.

Each pedicle screw wrench **32** includes a handle **34**, a shaft **36**, and a distal end **38** which is configured to reversibly engage the head segment **14** of a pedicle screw **10** such that, as shaft **36** is moved while shaft distal end **38** is engaged with head segment **14**, manipulative forces are transferred to the pedicle screw **10** and, in turn, to the vertebra in which such pedicle screw **10** is implanted.

Significant variations of pedicle screw cluster derotation tool **30** are contemplated by the present invention. For example, the multiple wrenches **32**, linked by wrench cross linking members **40**, depicted in FIG. **1** may be replaced by a single handle member from which extend the functional equivalent of the multiple shafts **36** and shaft distal ends **38** for simultaneously engaging multiple pedicle screws **10**, as depicted. However configured, the object and design of pedicle screw cluster derotation tool **30** is to facilitate simultaneous application of manipulative forces to multiple pedicle screws **10** which are implanted in a like number of vertebra. This has the effect of permitting the gross, en bloc application of sufficient derotative forces to affected segments of the spinal column in a sufficiently dispersed manner as to avoid injury to any one vertebra or isolated spinal column segment. This, in turn, facilitates a successful entire-spine, 3D derotation of a scoliosis patient to near normal parameters.

With reference to FIGS. **1-3**, **5** and **7** the preferred mode of the present method usually involves application of forces to multiple spinal column segments, to achieve an over-all spinal column correction. For example, as depicted in FIGS. **5** and **7** in the case of a single curvature case of scoliosis, both derotative forces (illustrated by the central force vector arrow of FIG. **5**) to vertebrae involved in scoliotic curvatures, as well as of balancing, or offsetting forces to lateral spinal segments (illustrated by the lateral arrows of FIG. **5**) are applied.

The preferred mode of the present method involves pre-contouring spinal rods **18**, as shown in FIG. **3** and frame **2** of FIG. **7**. Such a contouring operation involves bending spinal rods **18** such that, in along two axes (analogous to yaw and pitch in aviation terms), the spinal rods **18** will substantially define, in one plane, a desired post-operative correction of the affected spinal column in reference to such two axes.

The spinal rod(s) **18** are loosely engaged with pedicle screws **10**, and the pre-contoured spinal rod **18** are rotated from a first orientation, through approximately 90° to a second orientation, using hex wrenches **50** (see frame **3** of FIG. **7**), to achieve a substantial correction of the scoliosis in the first two of three axes which will be corrected according to the present methodology, through use of the present system.

The next phase, after 2-D correction as just described, involves applying manipulative forces to pedicle screw clusters (in reference to a third axis (a "roll axis", again using aviation terms) using pedicle screw clusters derotation tool(s) **30** (see, inter alia, frame **4** of FIG. **7**). After this final correction, spinal rod engagement means **20** is tightened to fix



pedicle screw **10** and spinal rod **18** in relative position and orientation to secure the corrected spinal column configuration (now corrected with reference to all three relevant axes).

Spinal rod engagement means **20** of pedicle screws **10** are tightened, using an anti-torque feature of wrenches **32** (or of their equivalent in an alternative embodiment). This feature, as is well known in the art, allows tightening of nuts and the like, without imparting undue torque to the underlying apparatus or structure.

As shown in FIG. **6**, investigative practice of the present method achieves efficacy never before seen in the orthopaedic field. The "before picture" is the left hand image of FIG. **6**, and the two remaining images are sagittal and dorsal views of the corrected spinal column.

Although the invention has been described with reference to specific embodiments, this description is not meant to be construed in a limited sense. Various modifications of the disclosed embodiments, as well as alternative embodiments of the inventions will become apparent to persons skilled in the art upon reference to the description of the invention. It is, therefore, contemplated that the appended claims will cover such modifications that fall within the scope of the invention.

I claim:

**1**. A method for aligning vertebrae in the amelioration of aberrant spinal column deviation conditions comprising the steps of:

selecting a first set of pedicle screws, each pedicle screw having a threaded shank segment and a head segment, each pedicle screw having a spinal rod engagement means for mechanically engaging with a spinal rod member and spinal rod fixation means for, upon actuation, fixing the relative orientation of each pairing of said spinal rod member and said pedicle screw;

selecting a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having a first handle means for facilitating simultaneous application of manipulative forces to said first set of pedicle screws and a first group of three or more pedicle screw engagement members which are mechanically linked with said first handle means, said first handle means having a handle linked to each pedicle screw engagement member of the first group of three or more pedicle screw engagement members and a linking member to join together the handles linked to the pedicle screw engagement members, said first handle means moving each pedicle screw engagement member simultaneously; each pedicle screw engagement member being configured for engaging respectively with said head segment of each pedicle screw of said first set of pedicle screws, and transmitting manipulative forces applied to said first handle means to said head segment of each pedicle screw of said first set of pedicle screws;

implanting each pedicle screw of said first set of pedicle screws in a pedicle region of each of a first group of vertebrae of a spinal column which exhibits an aberrant spinal column deviation condition;

contouring said spinal rod member whereby, in a first plane, said spinal rod member substantially defines, in reference to two axes, a post-operative spinal column alignment for said spinal column;

engaging said spinal rod respectively with said spinal rod engagement means of each pedicle screw of said first set of pedicle screws, while said spinal rod is in a first rotational orientation;

rotating said spinal rod substantially along its length to a second rotational orientation to effect a correction of spinal column deviation in reference to two axes;

engaging each pedicle screw engagement member of said first group of pedicle screw engagement members respectively with said head segment of each pedicle screw of said first set of pedicle screws;

selecting a second set of pedicle screws;

selecting a second spinal rod member;

selecting a second pedicle screw cluster derotation tool, said second pedicle screw cluster derotation tool having a second handle means for facilitating simultaneous application of

manipulative forces to said second set of pedicle screws and a second group of pedicle screw engagement members which are mechanically linked with said second handle means, said second handle means moving each pedicle screw engagement member simultaneously, each pedicle screw engagement member being configured for engaging respectively with said head segment of each pedicle screw of said second set of pedicle screws, and transmitting manipulative forces applied to said second handle means to said head segment of each pedicle screw of said second set of pedicle screws;

implanting each pedicle screw of said second set of pedicle screws in the pedicle region of each of a second group of vertebrae lateral to the first group of vertebrae;

contouring said second spinal rod member whereby, in a first plane, said second spinal rod member substantially defines, in reference to two axes, a post-operative spinal column alignment for said spinal column;

engaging said second spinal rod respectively with said spinal rod engagement means of each pedicle screw of said second set of pedicle screws, while said second spinal rod is in a first rotational orientation;

rotating said second spinal rod substantially along its length to a second rotational orientation to effect a correction of spinal column deviation in reference to two axes;

engaging each pedicle screw engagement member of said second group of pedicle screw engagement members respectively with said head segment of each pedicle screw of said second set of pedicle screws;

connecting with a cross-linking member the first handle means to the second handle means laterally positioned to the first handle means;

applying manipulative force to the first handle means and the second handle means in a manner for simultaneously engaging said first group of three or more pedicle screw engagement members and said first set of pedicle screws, and said second group of pedicle screw engagement members and said second set of pedicle screws laterally positioned to the first group of three or more pedicle screw engagement members and said first set of pedicle screws, thereby in a single motion simultaneously rotating said vertebrae of said first group of vertebrae and said second group of vertebrae lateral to said first group of vertebrae, in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition.

**2**. A system for aligning vertebrae in the amelioration of aberrant spinal column deviation conditions comprising:

a first set of pedicle screws, each pedicle screw having a threaded shank segment and a head segment; and



a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having a first handle means for facilitating simultaneous application of manipulative forces to said first set of pedicle screws and a first group of three or more pedicle screw engagement members which are mechanically linked with said first handle means, said first handle means having a handle linked to each pedicle screw engagement member of the first group of three or more pedicle screw engagement members and a linking member to join together the handles linked to the pedicle screw engagement members, wherein the handle means is configured to move simultaneously each pedicle screw engagement member; wherein each pedicle screw engagement member is configured to engage respectively with said head segment of each pedicle screw of said first set of pedicle screws; and wherein each pedicle screw engagement member is configured to transmit manipulative forces applied to said first handle means to said head segment of each pedicle screw of said first set of pedicle screws;

a second set of pedicle screws, each pedicle screw having a threaded shank segment and a head segment;

a second pedicle screw cluster derotation tool, said second pedicle screw cluster derotation tool having a second handle means for facilitating simultaneous application of manipulative forces to said second set of pedicle screws and a second group of three or more pedicle screw engagement members which are mechanically linked with said second handle means, said second handle means having a handle linked to each pedicle screw engagement member of the second group of three or more pedicle screw engagement members and a handle linking member to join together the handles linked to the pedicle screw engagement members, wherein the handle means is configured to move simultaneously each pedicle screw engagement member; wherein each pedicle screw engagement member is configured to engage respectively with said head segment of each pedicle screw of said second set of pedicle screws; and wherein each pedicle screw engagement member is configured to transmit manipulative forces applied to said second handle means to said head segment of each pedicle screw of said second set of pedicle screws;

a cross-linking member that links the first handle means to the second handle means.

**3**. The system of claim **2** further comprising a spinal rod member, wherein one or more of said pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of each said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and

spinal rod engagement means for securing each said pedicle screw and said spinal rod, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation.

**4**. The system of claim **3** wherein the spinal rod is precontoured.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 8,361,121 B2
APPLICATION NO. : 12/857320
DATED : January 29, 2013
INVENTOR(S) : Mark A. Barry

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In The Specification

Column 4, line 46: after "investigational procedure", delete "using the system and method" and insert --in the development of the systems and methods--.

Column 4, line 47: after "present", delete "invention" and insert --disclosure--.

Column 6, line 10: after "investigative practice" insert --of at least one--.

Column 6, line 11: before "achieves efficacy", delete "method" and insert --methods disclosed herein--.

Signed and Sealed this
Second Day of August, 2016

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

US009339301B2

(12) **United States Patent**
**Barry**

(10) **Patent No.: US 9,339,301 B2**
(45) **Date of Patent: *May 17, 2016**

(54) **SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS**

(71) Applicant: **Mark A. Barry**, Haiku, HI (US)

(72) Inventor: **Mark A. Barry**, Haiku, HI (US)

(73) Assignee: **Mark A. Barry**, Las Vegas, NV (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 552 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/645,589**

(22) Filed: **Oct. 5, 2012**

(65) **Prior Publication Data**

US 2014/0100611 A1 Apr. 10, 2014
US 2016/0081720 A9 Mar. 24, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 12/857,320, filed on Aug. 16, 2010, now Pat. No. 8,361,121, which is a continuation of application No. 11/202,409, filed on Aug. 10, 2005, now Pat. No. 7,776,072, which is a continuation-in-part of application No. 11/027,026, filed on Dec. 30, 2004, now Pat. No. 7,670,358.

(51) **Int. Cl.**
***A61B 17/70*** (2006.01)

(52) **U.S. Cl.**
CPC ......... ***A61B 17/7032*** (2013.01); ***A61B 17/7077*** (2013.01)

(58) **Field of Classification Search**
CPC ........................ A61B 17/7032; A61B 17/7077
USPC ................................................ 606/279, 265
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,102,412 | A | 4/1992 | Rogozinski |
| 5,112,332 | A | 5/1992 | Cozad et al. |
| 5,116,334 | A | 5/1992 | Cozad et al. |
| 5,181,917 | A | 1/1993 | Rogozinski |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 10125717 | 12/2002 |
| EP | 0553782 | 4/1993 |

(Continued)

OTHER PUBLICATIONS

Richard P. Schlenk, M.D., et al.; "Biomechanics of spinal deformity"; Department of Neurosurgery; Neurosurg. Focus 14(1); Article 2, pp. 1-15, Jan. 2003.

(Continued)

*Primary Examiner* — Ellen C Hammond
(74) *Attorney, Agent, or Firm* — Shay Glenn LLP

(57) **ABSTRACT**

A system and method for ameliorating spinal column anomalies, such as scoliosis, includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae and in vertebrae to which balancing forces must be applied as the spinal column is derotated en mass to achieve an over-all correction of the condition. A pedicle screw cluster derotation tool simultaneously engages multiple pedicle screws and transmits rotative forces to multiple vertebrae to effect a whole-spine correction. Precontoured spinal rods are engaged post-derotation to secure the correction.

**10 Claims, 5 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,306,275 | A | 4/1994 | Bryan | |
| 5,466,238 | A | 11/1995 | Lin | |
| 5,498,262 | A | 3/1996 | Bryan | |
| 5,545,166 | A | 8/1996 | Howland | |
| 5,630,816 | A | 5/1997 | Kambin | |
| 5,676,665 | A | 10/1997 | Bryan | |
| 5,704,937 | A | 1/1998 | Martin | |
| 5,772,661 | A | 6/1998 | Michelson | |
| 5,797,910 | A | 8/1998 | Martin | |
| 5,810,817 | A | 9/1998 | Roussouly et al. | |
| 5,928,232 | A | 7/1999 | Howland et al. | |
| 5,947,965 | A | 9/1999 | Bryan | |
| 6,015,409 | A | 1/2000 | Jackson | |
| 6,090,113 | A | 7/2000 | Le Couedic et al. | |
| 6,235,028 | B1 | 5/2001 | Brumfield et al. | |
| 6,267,765 | B1 | 7/2001 | Taylor et al. | |
| 6,375,657 | B1 | 4/2002 | Doubler et al. | |
| 6,440,132 | B1 | 8/2002 | Jackson | |
| 6,458,131 | B1 | 10/2002 | Ray | |
| 6,558,390 | B2 | 5/2003 | Cragg | |
| 6,652,526 | B1 | 11/2003 | Arafiles | |
| 6,743,231 | B1 | 6/2004 | Gray et al. | |
| 6,749,614 | B2 | 6/2004 | Teitelbaum et al. | |
| 6,755,828 | B2 | 6/2004 | Shevtsov et al. | |
| 6,802,844 | B2 | 10/2004 | Ferree | |
| 6,821,277 | B2 | 11/2004 | Teitelbaum | |
| 6,827,719 | B2 | 12/2004 | Ralph et al. | |
| 7,188,626 | B2 | 3/2007 | Foley et al. | |
| 7,670,358 | B2 * | 3/2010 | Barry | 606/279 |
| 7,776,072 | B2 * | 8/2010 | Barry | 606/265 |
| 7,794,464 | B2 | 9/2010 | Bridwell et al. | |
| 7,951,175 | B2 | 5/2011 | Chao et al. | |
| 8,147,524 | B2 | 4/2012 | Piza Vallespir | |
| 2005/0033291 | A1 | 2/2005 | Ebara | |
| 2005/0245928 | A1 * | 11/2005 | Colleran et al. | 606/61 |
| 2006/0149236 | A1 | 7/2006 | Barry | |
| 2006/0195092 | A1 | 8/2006 | Barry | |
| 2008/0294206 | A1 | 11/2008 | Choi et al. | |
| 2009/0012565 | A1 | 1/2009 | Sachs et al. | |
| 2010/0249844 | A1 | 9/2010 | Durrani | |
| 2010/0312281 | A1 * | 12/2010 | Barry | 606/264 |
| 2011/0172714 | A1 | 7/2011 | Boachie-Adjei et al. | |
| 2011/0190820 | A1 | 8/2011 | Johansson et al. | |
| 2012/0035668 | A1 | 2/2012 | Manninen et al. | |
| 2012/0083853 | A1 | 4/2012 | Boachie-Adjei et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 9410944 | 5/1994 |
| WO | WO 95/05786 | 3/1995 |
| WO | WO 9829046 | 7/1998 |
| WO | WO 2005089656 | 9/2005 |
| WO | WO 2005089657 | 9/2005 |
| WO | WO 2005092218 | 10/2005 |

OTHER PUBLICATIONS

U.S. Appl. No. 12/857,320; "System and Method for Aligning Vertebrae in the Amelioration of Aberrant Spinal Column Deviation Conditions", Aug. 16, 2010.

U.S. Appl. No. 12/980,737; "System and Method for Aligning Vertebrae in the Amelioration of Aberrant Spinal Column Deviation Conditions in Patents Requiring the Accommodation of Spinal Column Growth or Elongation", Dec. 29, 2010.

Medtronic's Motion to Disqualify, and associated Exhibits A-I, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 25, 2015 (703 pgs. total).

Order on Motion to Withdraw and Substitute Lead Counsel and Motion to Disqualify the Law firm, in *Mark Barry, M.D.* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed in the United States District Court for the Eastern District of Texas on Aug. 14, 2015.

Medtronic's Letter Brief requesting summary judgment of invalidity under 35 U.S.C. 102(b), and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 3, 2015.

Dr. Barry's Response to Medtronic's Letter Brief requesting summary judgment, and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 17, 2015.

Dr. Barry's Notice of Sur-Reply to Defendant's Reply, and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 10, 2015.

Dr. Barry's Response in Opposition to Motion to Disqualify, and associated Exhibits A-U, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 10, 2015.

Medtronic's First Amended Answer, Defenses, and Counterclaims, in *Mark A. Barry, MD* v. *Medtronic., Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 20, 2015.

Medtronic's Reply Memorandum of Law in Further Support of Its Motion to Disqualify, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 20, 2015.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3




*FIG. 4*




*FIG. 5*



FIG. 6



Locking Tool
30
30
4
32
3
Hex Wrenches
50
2
Titanium Rods
Pedicle Screws
10
18
1
Spinal Cord
Vertabrae


FIG. 7

# SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS

## PRIORITY CITATION

This patent application is a Continuation of U.S. application Ser. No. 12/857,320, filed Aug. 16, 2010, which is a Continuation of U.S. application Ser. No. 11/202,409, filed Aug. 10, 2005 now U.S. Pat. No. 7,776,072 issued Aug. 17, 2010, which is a Continuation-in-Part application of U.S. patent application Ser. No. 11/027,026, filed Dec. 30, 2004 now U.S. Pat. No. 7,670,358, issued Mar. 2, 2010, the entire contents of which are incorporated by reference.

## FIELD OF THE INVENTION

The present invention relates to methods and apparatus for management and correction of spinal deformities, such as scoliosis.

## BACKGROUND OF THE TECHNOLOGY

A serious deficiency presently exists with respect to conventional treatment and instrumentation for treating spinal deviation anomalies, such as scoliosis.

This circumstance presents a serious medical challenge, because scoliosis, other than mild to moderate cases, is a well-recognized health risk.

If scoliosis curvature exceeds 70 degrees, severe twisting of the spine occurs. This can cause the ribs to press against the lungs, restrict breathing, and reduce oxygen levels. The distortions may also affect the heart and possibly cause dangerous changes.

Eventually, if the curve reaches more than 100 degrees, both the lungs and the heart can be injured. Patients with this degree of severity are susceptible to lung infections and pneumonia. Curves greater than 100 degrees are associated with elevated mortality rates. A number of factors associated with scoliosis increase the risk for bone loss, which is referred to as osteopenia. People with osteopenia are at greatly increased risk of osteoporosis, a common problem in older women that can cause broken bones and is particularly dangerous for women with a history of scoliosis. Experts recommend that children with scoliosis be screened for osteopenia so that measures can be taken to help prevent osteoporosis later.

Present treatment regimens for scoliosis carry their own risks and side effects, which include:

Spinal fusion disease. Patients who are surgically treated with fusion techniques lose flexibility and may experience weakness in back muscles due to injuries during surgery.

Disk degeneration and low back pain. With disk degeneration, the disks between the vertebrae may become weakened and may rupture.

Height loss.

Lumbar flatback. This condition is most often the result of a scoliosis surgical procedure called the Harrington technique, used to eliminate lordosis (exaggeration of the inward curve in the lower back). Adult patients with flatback syndrome tend to stoop forward. They may experience fatigue and back pain and even neck pain.

Rotational trunk shift (uneven shoulders and hips).

In some patients, years after the original surgery (particularly with the first generation of Harrington rods), the weight of the instrumentation can cause disk and joint degeneration



severe enough to require surgery. Treatment may involve removal of the old instrumentation and extension of the fusion into the lower back.

Left untreated, or ineffectively treated, scoliosis carries long-term consequences.

Pain in adult-onset or untreated childhood scoliosis often develops because of posture problems that cause uneven stresses on the back, hips, shoulders, necks, and legs. Studies report, however, that patients with childhood scoliosis have the same incidence of back pain as the general population, which is very high (60% to 80%). In one study conducted 20 years after growth had stopped two-thirds of adults who had lived with curvatures of 20 to 55 degrees reported back pain. In this study, most cases were mild, although other studies have reported that adults with a history of scoliosis tend to have chronic and more back pain than the general population.

Nearly all individuals with untreated scoliosis at some point develop spondylosis, an arthritic condition in the spine. The joints become inflamed, the cartilage that cushions the disks may thin, and bone spurs may develop. If the disk degenerates or the curvature progresses to the point that the spinal vertebrae begin pressing on the nerves, pain can be very severe and may require surgery. Even surgically treated patients are at risk for spondylosis if inflammation occurs in vertebrae around the fusion site.

The consequences of scoliosis are limited to the physical realm. The emotional impact of scoliosis, particularly on young girls or boys during their most vulnerable years, should not be underestimated. Adults who have had scoliosis and its treatments often recall significant social isolation and physical pain. Follow-up studies of children with scoliosis who did not have strong family and professional support often report significant behavioral problems.

Older people with a history of scoliosis, even those whose conditions were corrected, should realize that some negative emotional events in adulthood may possibly have their roots in their early experiences with scoliosis. Many studies have reported that patients who were treated for scoliosis have limited social activities and a poorer body image in adulthood. Some patients with a history of scoliosis have reported a slight negative effect on their sexual life. Pain appears to be only a minor reason for such limitation. An early Scandinavian study reported that adults with scoliosis had fewer job opportunities and a lower marriage rate than the general population.

It is clear, then, that scoliosis treatment options are presently lacking, and untreated scoliosis (except for mild to lower-moderate cases) is not an acceptable alternative. There are many apparatus which are designed for attachment to, and positioning adjacent the spinal column, and in many instances, these apparatus are designed for use in treating spinal column anomalies, such as scoliosis. However, all known systems are limited by their design and known implementation modes on either arresting further deleterious rotation of the involved vertebrae, or fixing individual vertebrae once, by some means, they are brought to approximate a desired orientation and position.

Significant correction of severe scoliotic curvature to the point of approximating normal spinal configuration, particularly by a single process, is simply unknown in the art. This is, it is believed, the result of focus in the field on the positioning substantially seriatim of affected vertebrae. Applying derotational force to a vertebrae in this manner cannot effect en mass spinal reconfiguration without risking vertebral fracture at the point of spinal instrumentation fixation, particularly when using conventional instrumentation. Furthermore, significant, focused force applied to any individual vertebra risks

spinal cord and related injury. Thus, only force which is inadequate to effect substantial correction to the entire spinal column is thus far ever applied, and correction of scoliotic curvatures are substantially limited.

It has become clear to the present inventor that desired levels of correction of spinal column anomalies, such as scoliosis, can only be achieved if the spinal column (or an affected segment thereof) is manipulated (or "derotated") substantially as a whole into a desired configuration. To achieve such an objective, force must be applied safely to all to-be-derotated vertebrae, and the forces necessary to reconfigure all, or at least a substantial portion of the spinal column must be dispersed throughout the affected spinal segments or regions. Nothing in the prior art satisfies these requirements, either individually or in combination.

## SUMMARY OF THE INVENTION

In view of the foregoing, it is an object of the present invention to provide an improved system of spinal instrumentation for use in ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved method for ameliorating aberrant spinal column deviation conditions, such as scoliosis. It is another object of the present invention to provide an improved system of spinal instrumentation, and a method for the use thereof, for ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of significant derotational forces to individual vertebra, with substantially reduced risk for fracture thereof upon application of such forces.

It is another object of the present invention to provide an improved system of spinal instrumentation, and associated method for use thereof, in ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of forces to vertebrae of affected spinal column segments en bloc, thereby distributing otherwise potentially injurious forces in a manner for safely achieving over-all spinal column correction or derotation.

Applicant's present invention provides a system and method for use of such system which satisfy each of these objectives. Applicant's system includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae. In the preferred mode of the present invention, such bone screws are also to be implanted in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. The pedicle implantation provides a stable foundation for the application of significant derotational forces, but without undue risk of vertebral fracture.

The system includes a pedicle screw cluster derotation tool. This tool, in the presently preferred embodiment includes shafts or similar pedicle screw engagement members, extending from a common handle or linked handle array, which are oriented and configured to extend to and engage the heads of a number of implanted pedicle screws which will have been implanted in adjacent vertebrae to which derotational or balancing forces are to be applied during a spinal column derotation and alignment. The engagement between the pedicle screw cluster derotation tool and the individual pedicle screws is such that, as manipulative forces are applied to the handle means of pedicle screw cluster derotation tool, forces are transferred and dispersed simultaneously among the engaged vertebrae. Therefore, a practitioner may, in a single motion, simultaneously and safely derotate multiple vertebrae of an affected spinal segment (as well as likewise apply balancing forces to other group(s) of vertebrae which are lateral to the effected segment(s).

The effect of practice of the present invention is three-dimensional correction which provides, not only spinal correction to near normal configuration, but corrects "rib humps."

The system of the present invention also includes, in its preferred embodiment, pedicle screws which allow for interfacing with, and fixation relative to pre-contoured spinal rods after a satisfactory derotation.

The present inventor's approach to the problems described above is certainly simple, when viewed in hindsight, but it is equally unobvious. In investigative procedures, the presently proposed system and method has achieved measure of correction of scoliotic curvature never before seen in orthopedic practice.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be more easily understood with reference to figures, which are as follow:

FIG. **1** is a top plan view of an anatomical model of a human spinal column, with components of the system of the present invention shown engaged therewith. The event depicted is that stage of the proposed method after which derotational and balancing forces have been applied to substantially correct a scoliotic curvature.

FIG. **2** is an elevational dorsal view of the anatomical model of a human spinal column depicted in FIG. **1**, but with an unobstructed view of already-implanted pedicle screws, and configured as if preceding the derotation step of the proposed method.

FIG. **3** is an elevational side view of the anatomical model of a human spinal column depicted in FIGS. **1** and **2**, with an unobstructed view of already-implanted pedicle screws and adjacent, pre-contoured spinal rods which will be engaged with the pedicle screws through practice of the proposed method.

FIG. **4** is an example of a pedicle screw which may be used in the system of the present invention.

FIG. **5** is a depiction of the complimentary forces applied to multiple spinal column segments to achieve an over-all spinal column correction.

FIG. **6** is a three frame x-ray view showing "before and after" views of a scoliosis patient who was treated in an investigational procedure in the development of the systems and methods of the present disclosure. The curvature correction was substantially to normal, and lumbar motion was preserved notwithstanding.

FIG. **7** is a 4-frame, progressive animation of the stages of correction of scoliosis according to the embodiments of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIGS. **1-4** and **7**, the spinal deviation correction system of the present invention includes a number of pedicle screws **10**, each implanted in respective vertebrae to which rotative forces will be applied in a spinal anomaly correction.

Pedicle screws **10** may be of a variety of designs, such as, for example, are generally depicted in U.S. Pat. No. 6,743,237 (Gray, et al), U.S. Pat. No. 6,827,719 (Ralph, et al), U.S.

Pat. No. 6,652,526 (Arafiles), U.S. Pat. No. 6,375,657 (Doubler, et al), the disclosures of which are incorporated herein by reference.

With particular reference to FIG. **4**, pedicle screws **10** will include a threaded shank segment **12** and a head segment **14**. Head segment will be configured with a spinal rod conduit (or channel) **16** or interfacing with a spinal rod **18** (shown in FIG. **3**). Spinal rod engagement means **20** serve to fix pedicle screw **10** and spinal rod **18** in relative position and orientation, once a spinal column derotation is complete.

Referring again, generally to FIGS. **1-4**, and **7**, the system of the present invention further includes a pedicle screw cluster derotation tool **30**. As depicted in FIG. **1**, each pedicle screw cluster derotation tool **30** is configured from a grouping of pedicle screw wrenches **32**, by a pedicle screw wrench linking member **42** joined together to act in unison during use.

Each pedicle screw wrench **32** includes a handle **34**, a shaft **36**, and a distal end **38** which is configured to reversibly engage the head segment **14** of a pedicle screw **10** such that, as shaft **36** is moved while shaft distal end **38** is engaged with head segment **14**, manipulative forces are transferred to the pedicle screw **10** and, in turn, to the vertebra in which such pedicle screw **10** is implanted.

Significant variations of pedicle screw cluster derotation tool **30** are contemplated by the present invention. For example, the multiple wrenches **32**, linked by wrench cross linking members **40**, depicted in FIG. **1** may be replaced by a single handle member from which extend the functional equivalent of the multiple shafts **36** and shaft distal ends **38** for simultaneously engaging multiple pedicle screws **10**, as depicted. However configured, the object and design of pedicle screw cluster derotation tool **30** is to facilitate simultaneous application of manipulative forces to multiple pedicle screws **10** which are implanted in a like number of vertebra. This has the effect of permitting the gross, en bloc application of sufficient derotative forces to affected segments of the spinal column in a sufficiently dispersed manner as to avoid injury to any one vertebra or isolated spinal column segment. This, in turn, facilitates a successful entire-spine, 3D derotation of a scoliosis patient to near normal parameters.

With reference to FIGS. **1-3**, **5** and **7** the preferred mode of the present method usually involves application of forces to multiple spinal column segments, to achieve an over-all spinal column correction. For example, as depicted in FIGS. **5** and **7** in the case of a single curvature case of scoliosis, both derotative forces (illustrated by the central force vector arrow of FIG. **5**) to vertebrae involved in scoliotic curvatures, as well as of balancing, or offsetting forces to lateral spinal segments (illustrated by the lateral arrows of FIG. **5**) are applied.

The preferred mode of the present method involves pre-contouring spinal rods member **18**, as shown in FIG. **3** and frame **2** of FIG. **7**. Such a contouring operation involves bending spinal rods member **18** such that, in along two axes (analogous to yaw and pitch in aviation terms), the spinal rods member **18** will substantially define, in one plane, a desired post-operative correction of the affected spinal column in reference to such two axes.

The spinal rod(s) member **18** are loosely engaged with pedicle screws **10**, and in one of the embodiments of the present invention the pre-contoured spinal rod member **18** are rotated from a first orientation, through approximately 90° to a second orientation, using hex wrenches **50** (see frame **3** of FIG. **7**), to achieve a substantial correction of the scoliosis in the first two of three axes which will be corrected according to one of the embodiments of the present methodology, through use of the present system.



The next phase, after 2-D correction as just described, involves applying manipulative forces to pedicle screw clusters in reference to a third axis (a "roll axis", again using aviation terms) using pedicle screw clusters derotation tool(s) **30** (see, inter alia, frame **4** of FIG. **7**). After this final correction, spinal rod engagement member **20** is tightened to fix pedicle screw **10** and spinal rod **18** in relative position and orientation to secure the corrected spinal column configuration (now corrected with reference to all three relevant axes).

Spinal rod engagement member **20** of pedicle screws **10** are tightened, using an anti-torque feature of wrenches **32** (or of their equivalent in an alternative embodiment). This feature, as is well known in the art, allows tightening of nuts and the like, without imparting undue torque to the underlying apparatus or structure.

As shown in FIG. **6**, investigative practice of at least one of the present methods disclosed herein achieves efficacy never before seen in the orthopedic field. The "before picture" is the left hand image of FIG. **6**, and the two remaining images are sagittal and dorsal views of the corrected spinal column.

Although the invention has been described with reference to specific embodiments, this description is not meant to be construed in a limited sense. Various modifications of the disclosed embodiments, as well as alternative embodiments of the inventions will become apparent to persons skilled in the art upon reference to the description of the invention. It is, therefore, contemplated that the appended claims will cover such modifications that fall within the scope of the invention.

What is claimed is:

**1**. A system for aligning human vertebrae comprising:

a first set of at least three pedicle screws, each pedicle screw having a threaded shank and a head, said first set of pedicle screws adapted to be implanted in a first group of at least three vertebrae;

a first pedicle screw cluster derotation tool adapted to facilitate simultaneous application of rotative force in a single motion to said first group of at least three vertebrae, said first pedicle screw cluster derotation tool having a first set of at least three pedicle screw engagement members configured to engage the heads of the corresponding first set of at least three pedicle screws, said first set of pedicle screw engagement members being interconnected by a first linking member such that application of rotative force in the single motion to said pedicle screw engagement members simultaneously moves all of the interconnected pedicle screw engagement members;

a second set of at least three pedicle screws, each pedicle screw of said second set of pedicle screws having a threaded shank and a head, said second set of pedicle screws adapted to be implanted in said first group of at least three vertebrae;

a second pedicle screw cluster derotation tool adapted to facilitate simultaneous application of rotative force in the single motion to said first group of at least three vertebrae, said second pedicle screw cluster derotation tool having a second set of at least three pedicle screw engagement members configured to engage the heads of the corresponding second set of at least three pedicle screws, said second set of pedicle screw engagement members being interconnected by a second linking member such that application of the rotative force in the single motion to one or more of the pedicle screw engagement members of said first or second set of pedicle screw engagement members simultaneously moves all of the respectively interconnected pedicle

screw engagement members of said first and second set of pedicle screw engagement members; and

a cross-linking member interconnecting said first set of pedicle screw engagement members and said second set of pedicle screw engagement members;

wherein each pedicle screw engagement member of said first and second set of pedicle screw engagement members is configured to transmit the rotative force to said head of said pedicle screw to which said respective pedicle screw engagement member is engaged so as to be adapted to simultaneously rotate the vertebrae of the first group of at least three vertebrae.

**2**. The system of claim **1**, further comprising a handle member configured to be coupled to one or more of said pedicle screw engagement members, said handle member in cooperation with said first linking member facilitating the simultaneous application of the rotative force to each pedicle screw of said first set of at least three pedicle screws.

**3**. The system of claim **1**, wherein said simultaneous application of rotative force is adapted to be applied in a direction generally parallel to a transverse plane of an anatomy including said human vertebrae.

**4**. The system of claim **1**, further comprising a spinal rod member, wherein one or more of said pedicle screws of said set of at least three pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of each said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and a spinal rod engagement member configured to threadably engage said head segment of each said pedicle screw and for securing each said pedicle and said spinal rod, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation.

**5**. The system of claim **4** wherein the spinal rod is precontoured.

**6**. A method for aligning human vertebrae comprising:

selecting a first set of at least three pedicle screws, said pedicle screws each having a threaded shank and a head;

selecting a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having a first set of at least three pedicle screw engagement members that are interconnected by a first linking member such that application of a rotative force to any one of said pedicle screw engagement members simultaneously moves each pedicle screw engagement member of said first set of pedicle screw engagement members, each pedicle screw engagement member being configured for engaging with, and transmitting rotative forces applied to said first pedicle screw cluster derotation tool to, said head of each pedicle screw of said first set of pedicle screws;

selecting a second set of at least three pedicle screws;

selecting a second pedicle screw cluster derotation tool, said second pedicle screw cluster derotation tool having a second set of at least three pedicle screw engagement members that are interconnected by a second linking member such that application of rotative force to any one of said pedicle screw engagement members of said second set of pedicle screw engagement members simultaneously moves each pedicle screw engagement member of said second set of pedicle screw engagement members, each pedicle screw engagement member of said second set of pedicle screw engagement members being configured for engaging with, and transmitting rotative forces applied to, said second pedicle screw duster cluster derotation tool to said head of each pedicle screw of said second set of pedicle screws;



implanting each pedicle screw of said first set of pedicle screws in a pedicle region of a first group of at least three vertebrae of a spinal column;

implanting each pedicle screw of said second set of pedicle screws in a pedicle region of each of a second group of three or more vertebrae of a spinal column;

engaging each said pedicle screw engagement members, respectively, with said head of each pedicle screw of said first set of pedicle screws;

engaging each said pedicle screw engagement members, respectively, with said head of each pedicle screw of said second set of pedicle screws;

applying rotative force to said first pedicle screw cluster derotation tool in a manner for simultaneously engaging each of said first set of pedicle screw engagement members and said first set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said first group of vertebrae in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition; and

applying rotative force to said second pedicle screw cluster derotation tool in a manner for simultaneously engaging said second set of pedicle screw engagement members and said second set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said second group of at least three vertebrae in which said second set of pedicle screws are implanted to achieve the amelioration of the aberrant spinal column deviation condition.

**7**. The method of claim **6**, wherein selecting said first pedicle screw cluster derotation tool includes selecting said first pedicle screw cluster derotation tool having said first set of at least three pedicle screw engagement members and a handle member coupled to said first set of pedicle screw engagement members that are interconnected by the first linking member such that application of the rotative force to said handle member simultaneously moves each pedicle screw engagement member of said first set of pedicle screw engagement members.

**8**. The method of claim **6**, further comprising:

selecting a first length of a spinal rod member, wherein one or more of said pedicle screws of said first set of pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and

a spinal rod engagement member configured to threadably engage said head to secure said pedicle screw and said spinal rod member, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation;

extending said first length of said spinal rod member through said spinal rod conduits of one or more of said pedicle screws of said first set of pedicle screws; and

after applying said rotative force to said first pedicle screw cluster derotation tool, actuating said spinal rod engagement member to secure said vertebrae in their respective and relative positions and orientations as achieved through application of said rotative force thereto.

**9**. The method of claim **6**, wherein the steps of applying rotative force to the first pedicle screw cluster derotation tool and applying rotative force to the second pedicle screw cluster

derotation tool are carried out substantially simultaneously to cooperatively achieve the amelioration of the aberrant spinal column deviation condition.

**10**. A system for aligning human vertebrae comprising:

a first set of at least three pedicle screws, each pedicle screw having a threaded shank and a head, said first set of pedicle screws adapted to be implanted in a first group of at least three vertebrae;

a second set of at least three pedicle screws, each pedicle screw of said second set of pedicle screws having a threaded shank and a head, said second set of pedicle screws adapted to be implanted in said first group of at least three vertebrae; and

a pedicle screw cluster derotation tool adapted to facilitate simultaneous application of rotative force in a single motion to said first group of at least three vertebrae, said pedicle screw cluster derotation tool including:

a first set of at least three pedicle screw engagement members configured to engage the heads of the corresponding first set of at least three pedicle screws, said first set of pedicle screw engagement members being interconnected by a first linking member such that application of the rotative force in the single motion to said first set of pedicle screw engagement members simultaneously moves all of the interconnected pedicle screw engagement members;

a second set of at least three pedicle screw engagement members configured to engage the heads of the corresponding second set of at least three pedicle screws, said second set of pedicle screw engagement members being interconnected by a second linking member such that application of the rotative force in the single motion to one or more of the pedicle screw engagement members of said first or second set of pedicle screw engagement members simultaneously moves all of the respectively interconnected pedicle screw engagement members of said first and second set of pedicle screw engagement members; and

a cross-linking member interconnecting said first set of pedicle screw engagement members and said second set of pedicle screw engagement members;

wherein each pedicle screw engagement member of said first and second set of pedicle screw engagement members is configured to transmit the rotative force to said head of said pedicle screw to which said respective pedicle screw engagement member is engaged so as to be adapted to simultaneously rotate the vertebrae of the first group of at least three vertebrae;

wherein said application of rotative force to one or more of said pedicle screw engagement members of said first or second set of pedicle screw engagement members is adapted to be applied in a direction generally parallel to a transverse plane of an anatomy including said human vertebrae.

* * * * *

US009668787B2

(12) **United States Patent**
**Barry**

(10) **Patent No.: US 9,668,787 B2**
(45) **Date of Patent: Jun. 6, 2017**

(54) **SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS**

(71) Applicant: **Mark A. Barry**, Las Vegas, NV (US)

(72) Inventor: **Mark A. Barry**, Las Vegas, NV (US)

(73) Assignee: **Mark A. Barry**, Las Vegas, NV (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/154,703**

(22) Filed: **May 13, 2016**

(65) **Prior Publication Data**

US 2016/0249954 A1 Sep. 1, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 13/645,589, filed on Oct. 5, 2012, now Pat. No. 9,339,301, which is a (Continued)

(51) **Int. Cl.**
***A61B 17/70*** (2006.01)
***A61B 17/88*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ...... ***A61B 17/7079*** (2013.01); ***A61B 17/7002*** (2013.01); ***A61B 17/708*** (2013.01); (Continued)

(58) **Field of Classification Search**
CPC ............ A61B 17/7032; A61B 17/7077; A61B 17/708; A61B 17/7076
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,102,412 A 4/1992 Rogozinski
5,112,332 A 5/1992 Cozad et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE 10125717 A 12/2002
EP 0553782 B1 1/1993
(Continued)

OTHER PUBLICATIONS

Schlenk et al.; Biomechanics of spinal deformity; Neurosurg. Focus; 14 (1) e2; pp. 1-15; Jan. 2003.
(Continued)

*Primary Examiner* — Ellen C Hammond
(74) *Attorney, Agent, or Firm* — Shay Glenn LLP

(57) **ABSTRACT**

A system for applying a manipulative force to a target region of a spinal column during a surgical procedure is provided with at least four pedicle screws, at least four elongated levers configured to temporarily engage with the pedicle screws, a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison, and a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison. When the system is assembled, it permits an operator to move the at least four elongated levers in unison to simultaneously rotate the at least four pedicle screws about a spinal column roll axis. Related methods are also provided.

**9 Claims, 5 Drawing Sheets**



## Related U.S. Application Data

continuation of application No. 12/857,320, filed on Aug. 16, 2010, now Pat. No. 8,361,121, which is a continuation of application No. 11/202,409, filed on Aug. 10, 2005, now Pat. No. 7,776,072, which is a continuation-in-part of application No. 11/027,026, filed on Dec. 30, 2004, now Pat. No. 7,670,358.

(51) **Int. Cl.**
*A61B 17/56* (2006.01)
*A61B 17/68* (2006.01)

(52) **U.S. Cl.**
CPC ...... ***A61B 17/7032*** (2013.01); ***A61B 17/7049*** (2013.01); ***A61B 17/7077*** (2013.01); *A61B 17/7076* (2013.01); *A61B 2017/564* (2013.01); *A61B 2017/567* (2013.01); *A61B 2017/681* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,116,334 A | 5/1992 | Cozad et al. | |
| 5,281,223 A | 1/1994 | Ray | |
| 5,282,863 A | 2/1994 | Burton | |
| 5,306,275 A | 4/1994 | Bryan | |
| 5,466,238 A | 11/1995 | Lin | |
| 5,498,262 A | 3/1996 | Bryan | |
| 5,545,166 A | 8/1996 | Howland | |
| 5,591,235 A | 1/1997 | Kuslich | |
| 5,630,816 A | 5/1997 | Kambin | |
| 5,676,665 A | 10/1997 | Bryan | |
| 5,704,937 A | 1/1998 | Martin | |
| 5,707,372 A | 1/1998 | Errico et al. | |
| 5,772,661 A | 6/1998 | Michelson | |
| 5,797,910 A | 8/1998 | Martin | |
| 5,810,817 A | 9/1998 | Roussouly et al. | |
| 5,928,232 A | 7/1999 | Howland et al. | |
| 5,947,965 A | 9/1999 | Bryan | |
| 6,015,409 A | 1/2000 | Jackson | |
| 6,083,226 A | 7/2000 | Fiz | |
| 6,090,113 A | 7/2000 | Le Couedic et al. | |
| 6,113,600 A | 9/2000 | Drummond et al. | |
| 6,217,578 B1 | 4/2001 | Crozet et al. | |
| 6,235,028 B1 | 5/2001 | Brumfield et al. | |
| 6,267,765 B1 | 7/2001 | Taylor et al. | |
| 6,375,657 B1 | 4/2002 | Doubler et al. | |
| 6,440,132 B1 | 8/2002 | Jackson | |
| 6,458,131 B1 | 10/2002 | Ray | |
| 6,558,390 B2 | 5/2003 | Cragg | |
| 6,645,207 B2 | 11/2003 | Dixon et al. | |
| 6,652,526 B1 | 11/2003 | Arafiles | |
| 6,743,231 B1 | 6/2004 | Gray et al. | |
| 6,749,614 B2 | 6/2004 | Teitelbaum et al. | |
| 6,755,828 B2 * | 6/2004 | Shevtsov | A61B 17/8625 606/246 |
| 6,783,526 B1 | 8/2004 | Lin et al. | |
| 6,802,844 B2 | 10/2004 | Ferree | |
| 6,821,277 B2 | 11/2004 | Teitelbaum | |
| 6,827,719 B2 | 12/2004 | Ralph et al. | |
| 6,884,241 B2 | 4/2005 | Bertranou et al. | |
| 7,011,658 B2 | 3/2006 | Young | |
| 7,188,626 B2 | 3/2007 | Foley et al. | |
| 7,507,248 B2 | 3/2009 | Beaurain et al. | |
| 7,670,358 B2 * | 3/2010 | Barry | A61B 17/7077 606/279 |
| 7,776,072 B2 * | 8/2010 | Barry | A61B 17/7077 606/265 |
| 7,828,825 B2 | 11/2010 | Bruneau et al. | |
| 7,927,357 B2 | 4/2011 | Sacher et al. | |
| 7,931,675 B2 | 4/2011 | Panjabi et al. | |
| 7,951,175 B2 | 5/2011 | Chao et al. | |
| 8,025,679 B2 | 9/2011 | Nichols et al. | |
| 8,147,524 B2 | 4/2012 | Piza Vallespir | |
| 8,361,121 B2 | 1/2013 | Barry | |
| 9,339,301 B2 * | 5/2016 | Barry | A61B 17/7032 |
| 2002/0116001 A1 | 8/2002 | Schafer et al. | |
| 2005/0033291 A1 | 2/2005 | Ebara | |
| 2005/0085812 A1 | 4/2005 | Sherman et al. | |
| 2005/0203516 A1 | 9/2005 | Biedermann et al. | |
| 2005/0203518 A1 | 9/2005 | Biedermann et al. | |
| 2005/0203519 A1 | 9/2005 | Harms et al. | |
| 2005/0228377 A1 | 10/2005 | Chao et al. | |
| 2005/0245928 A1 * | 11/2005 | Colleran | A61B 17/708 606/90 |
| 2005/0273099 A1 | 12/2005 | Baccelli et al. | |
| 2005/0277922 A1 | 12/2005 | Trieu et al. | |
| 2006/0009767 A1 | 1/2006 | Kiester | |
| 2006/0025768 A1 | 2/2006 | Iott et al. | |
| 2006/0036240 A1 | 2/2006 | Colleran et al. | |
| 2006/0047282 A1 | 3/2006 | Gordon | |
| 2006/0173454 A1 | 8/2006 | Spitler et al. | |
| 2006/0195088 A1 | 8/2006 | Sacher et al. | |
| 2006/0195093 A1 | 8/2006 | Jahng | |
| 2006/0200130 A1 | 9/2006 | Hawkins et al. | |
| 2006/0241594 A1 | 10/2006 | McCarthy et al. | |
| 2006/0264935 A1 | 11/2006 | White | |
| 2006/0264937 A1 | 11/2006 | White | |
| 2010/0106192 A1 | 4/2010 | Barry | |
| 2010/0106193 A1 | 4/2010 | Barry | |
| 2010/0249844 A1 | 9/2010 | Durrani | |
| 2012/0271353 A1 | 10/2012 | Barry | |
| 2016/0361098 A1 | 12/2016 | Barry | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO94/10944 A1 | 5/1994 |
| WO | WO2005/089656 A1 | 9/2005 |
| WO | WO2005/089657 A1 | 9/2005 |
| WO | WO2005/092218 A1 | 10/2005 |

OTHER PUBLICATIONS

Medtronic's Letter Brief requesting summary judement of invalidity under 35 U.S.C. 102(b), and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 3, 2015.

Dr. Barry's Response to Medtronic's Letter Brief requesting summary judment, and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 17, 2015.

Medtronic's Motion to Disqualify, and associated Exhibits A-1, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 25, 2015.

Dr. Barry's Notice of Sur-Reply to Defendant's Reply, and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 10, 2015.

Dr. Barry's Response in Opposition to Motion to Disqualify, and associated Exhibits A-U, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 10, 2015.

Medtronic's First Amended Answer, Defenses and Counterclaims, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 20, 2015.

Medtronic's Reply Memorandum of Law in Further Support of its Motion to Disqualify, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 20, 2015.

Order on Motion to Withdraw and Substitute Lead Counsel and Motion to Disqualify the Law Firm, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Aug. 14, 2015.

(56) **References Cited**

OTHER PUBLICATIONS

*Medtronic, Inc*. v. *Mark A. Barry*; Final Written Decision (Paper No. 51); Case IPR2015-00780; U.S. Pat. No. 7,670,358; 40 pages; Sep. 7, 2016.
*Medtronic, Inc*. v. *Mark A. Barry*; Final Written Decision (Paper No. 51); Case IPR2015-00783; U.S. Pat. No. 7,776,072; 47 pages; Sep. 7, 2016.
*Medtronic Inc*. v. *Mark A. Barry*; Denial of Patent Owner's Motion for Certificate of Correction (Paper 50); Case IPR2015-00780; U.S. Pat. No. 7,670,358; 9 pages; Sep. 7, 2016.
*Medtronic Inc*. v. *Mark A. Barry*; Denial of Patent Owner's Motion for Certificate of Correction (Paper 50); Case IPR2015-00783; U.S. Pat. No. 7,776,072; 9 pages; Sep. 7, 2016.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5



FIG. 6



1
Spinal Cord
Vertabrae
2
Titanium Rods
Pedicle
Screws
10
18
3
Hex
Wrenches
50
4
Locking
Tool
30
30
32


*FIG. 7*

# SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/645,589, filed Oct. 5, 2012 which is a continuation of U.S. application Ser. No. 12/857,320, filed Aug. 16, 2010, now U.S. Pat. No. 8,361,121, which is a continuation of U.S. application Ser. No. 11/202,409, filed Aug. 10, 2005, now U.S. Pat. No. 7,776,072, which is a continuation-in-part of U.S. application Ser. No. 11/027,026, filed Dec. 30, 2004, now U.S. Pat. No. 7,670,358. These applications are herein incorporated by reference in its entirety.

## INCORPORATION BY REFERENCE

All publications and patent applications mentioned in this specification are incorporated herein by reference in their entirety to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

## FIELD

The present invention relates to methods and apparatus for management and correction of spinal deformities, such as scoliosis.

## BACKGROUND

A serious deficiency presently exists with respect to conventional treatment and instrumentation for treating spinal deviation anomalies, such as scoliosis.

This circumstance presents a serious medical challenge, because scoliosis, other than mild to moderate cases, is a well-recognized health risk.

If scoliosis curvature exceeds 70 degrees, severe twisting of the spine occurs. This can cause the ribs to press against the lungs, restrict breathing, and reduce oxygen levels. The distortions may also affect the heart and possibly cause dangerous changes.

Eventually, if the curve reaches more than 100 degrees, both the lungs and the heart can be injured. Patients with this degree of severity are susceptible to lung infections and pneumonia. Curves greater than 100 degrees are associated with elevated mortality rates. A number of factors associated with scoliosis increase the risk for bone loss, which is referred to as osteopenia. People with osteopenia are at greatly increased risk of osteoporosis, a common problem in older women that can cause broken bones and is particularly dangerous for women with a history of scoliosis. Experts recommend that children with scoliosis be screened for osteopenia so that measures can be taken to help prevent osteoporosis later.

Present treatment regimens for scoliosis carry their own risks and side effects, which include:

Spinal fusion disease. Patients who are surgically treated with fusion techniques lose flexibility and may experience weakness in back muscles due to injuries during surgery.

Disk degeneration and low back pain. With disk degeneration, the disks between the vertebrae may become weakened and may rupture.



Height loss.

Lumbar flatback. This condition is most often the result of a scoliosis surgical procedure called the Harrington technique, used to eliminate lordosis (exaggeration of the inward curve in the lower back). Adult patients with flatback syndrome tend to stoop forward. They may experience fatigue and back pain and even neck pain.

Rotational trunk shift (uneven shoulders and hips).

In some patients, years after the original surgery (particularly with the first generation of Harrington rods), the weight of the instrumentation can cause disk and joint degeneration severe enough to require surgery. Treatment may involve removal of the old instrumentation and extension of the fusion into the lower back.

Left untreated, or ineffectively treated, scoliosis carries long-term consequences.

Pain in adult-onset or untreated childhood scoliosis often develops because of posture problems that cause uneven stresses on the back, hips, shoulders, necks, and legs. Studies report, however, that patients with childhood scoliosis have the same incidence of back pain as the general population, which is very high (60% to 80%). In one study conducted 20 years after growth had stopped two-thirds of adults who had lived with curvatures of 20 to 55 degrees reported back pain. In this study, most cases were mild, although other studies have reported that adults with a history of scoliosis tend to have chronic and more back pain than the general population.

Nearly all individuals with untreated scoliosis at some point develop spondylosis, an arthritic condition in the spine. The joints become inflamed, the cartilage that cushions the disks may thin, and bone spurs may develop. If the disk degenerates or the curvature progresses to the point that the spinal vertebrae begin pressing on the nerves, pain can be very severe and may require surgery. Even surgically treated patients are at risk for spondylosis if inflammation occurs in vertebrae around the fusion site.

The consequences of scoliosis are limited to the physical realm. The emotional impact of scoliosis, particularly on young girls or boys during their most vulnerable years, should not be underestimated. Adults who have had scoliosis and its treatments often recall significant social isolation and physical pain. Follow-up studies of children with scoliosis who did not have strong family and professional support often report significant behavioral problems.

Older people with a history of scoliosis, even those whose conditions were corrected, should realize that some negative emotional events in adulthood may possibly have their roots in their early experiences with scoliosis. Many studies have reported that patients who were treated for scoliosis have limited social activities and a poorer body image in adulthood. Some patients with a history of scoliosis have reported a slight negative effect on their sexual life. Pain appears to be only a minor reason for such limitation. An early Scandinavian study reported that adults with scoliosis had fewer job opportunities and a lower marriage rate than the general population.

It is clear, then, that scoliosis treatment options are presently lacking, and untreated scoliosis (except for mild to lower-moderate cases) is not an acceptable alternative. There are many apparatus which are designed for attachment to, and positioning adjacent the spinal column, and in many instances, these apparatus are designed for use in treating spinal column anomalies, such as scoliosis. However, all known systems are limited by their design and known implementation modes on either arresting further deleterious rotation of the involved vertebrae, or fixing individual

vertebrae once, by some means, they are brought to approximate a desired orientation and position.

Significant correction of severe scoliotic curvature to the point of approximating normal spinal configuration, particularly by a single process, is simply unknown in the art. This is, it is believed, the result of focus in the field on the positioning substantially seriatim of affected vertebrae. Applying derotational force to a vertebrae in this manner cannot effect en mass spinal reconfiguration without risking vertebral fracture at the point of spinal instrumentation fixation, particularly when using conventional instrumentation. Furthermore, significant, focused force applied to any individual vertebra risks spinal cord and related injury. Thus, only force which is inadequate to effect substantial correction to the entire spinal column is thus far ever applied, and correction of scoliotic curvatures are substantially limited.

It has become clear to the present inventor that desired levels of correction of spinal column anomalies, such as scoliosis, can only be achieved if the spinal column (or an affected segment thereof) is manipulated (or "derotated") substantially as a whole into a desired configuration. To achieve such an objective, force must be applied safely to all to-be-derotated vertebrae, and the forces necessary to reconfigure all, or at least a substantial portion of the spinal column must be dispersed throughout the affected spinal segments or regions. Nothing in the prior art satisfies these requirements, either individually or in combination.

## SUMMARY OF THE DISCLOSURE

In view of the foregoing, it is an object of the present invention to provide an improved system of spinal instrumentation for use in ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved method for ameliorating aberrant spinal column deviation conditions, such as scoliosis. It is another object of the present invention to provide an improved system of spinal instrumentation, and a method for the use thereof, for ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of significant derotational forces to individual vertebra, with substantially reduced risk for fracture thereof upon application of such forces.

It is another object of the present invention to provide an improved system of spinal instrumentation, and associated method for use thereof, in ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of forces to vertebrae of affected spinal column segments en bloc, thereby distributing otherwise potentially injurious forces in a manner for safely achieving over-all spinal column correction or derotation.

Applicant's present invention provides a system and method for use of such system which satisfy each of these objectives. Applicant's system includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae. In the preferred mode of the present invention, such bone screws are also to be implanted in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. The pedicle implantation provides a stable foundation for the application of significant derotational forces, but without undue risk of vertebral fracture.

The system includes a pedicle screw cluster derotation tool. This tool, in the presently preferred embodiment



includes shafts or similar pedicle screw engagement members, extending from a common handle or linked handle array, which are oriented and configured to extend to and engage the heads of a number of implanted pedicle screws which will have been implanted in adjacent vertebrae to which derotational or balancing forces are to be applied during a spinal column derotation and alignment. The engagement between the pedicle screw cluster derotation tool and the individual pedicle screws is such that, as manipulative forces are applied to the handle means of pedicle screw cluster derotation tool, forces are transferred and dispersed simultaneously among the engaged vertebrae. Therefore, a practitioner may, in a single motion, simultaneously and safely derotate multiple vertebrae of an affected spinal segment (as well as likewise apply balancing forces to other group(s) of vertebrae which are lateral to the effected segment(s).

The effect of practice of the present invention is three-dimensional correction which provides, not only spinal correction to near normal configuration, but corrects "rib humps."

The system of the present invention also includes, in its preferred embodiment, pedicle screws which allow for interfacing with, and fixation relative to pre-contoured spinal rods after a satisfactory derotation.

The present inventor's approach to the problems described above is certainly simple, when viewed in hindsight, but it is equally unobvious. In investigative procedures, the presently proposed system and method has achieved measure of correction of scoliotic curvature never before seen in orthopedic practice.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be more easily understood with reference to figures, which are as follow:

FIG. **1** is a top plan view of an anatomical model of a human spinal column, with components of the system of the present invention shown engaged therewith. The event depicted is that stage of the proposed method after which derotational and balancing forces have been applied to substantially correct a scoliotic curvature.

FIG. **2** is an elevational dorsal view of the anatomical model of a human spinal column depicted in FIG. **1**, but with an unobstructed view of already-implanted pedicle screws, and configured as if preceding the derotation step of the proposed method.

FIG. **3** is an elevational side view of the anatomical model of a human spinal column depicted in FIGS. **1** and **2**, with an unobstructed view of already-implanted pedicle screws and adjacent, pre-contoured spinal rods which will be engaged with the pedicle screws through practice of the proposed method.

FIG. **4** is an example of a pedicle screw which may be used in the system of the present invention.

FIG. **5** is a depiction of the complimentary forces applied to multiple spinal column segments to achieve an over-all spinal column correction.

FIG. **6** is a three frame x-ray view showing "before and after" views of a scoliosis patient who was treated in an investigational procedure in the development of the systems and methods of the present disclosure. The curvature correction was substantially to normal, and lumbar motion was preserved notwithstanding.

FIG. **7** is a 4-frame, progressive animation of the stages of correction of scoliosis according to the embodiments of the present invention.

## DETAILED DESCRIPTION

With reference to FIGS. **1-4** and **7**, the spinal deviation correction system of the present invention includes a number of pedicle screws **10**, each implanted in respective vertebrae to which rotative forces will be applied in a spinal anomaly correction.

Pedicle screws **10** may be of a variety of designs, such as, for example, are generally depicted in U.S. Pat. No. 6,743,237 (Gray, et al), U.S. Pat. No. 6,827,719 (Ralph, et al), U.S. Pat. No. 6,652,526 (Arafiles), U.S. Pat. No. 6,375,657 (Doubler, et al), the disclosures of which are incorporated herein by reference.

With particular reference to FIG. **4**, pedicle screws **10** will include a threaded shank segment **12** and a head segment **14**. Head segment will be configured with a spinal rod conduit (or channel) **16** or interfacing with a spinal rod **18** (shown in FIG. **3**). Spinal rod engagement means **20** serve to fix pedicle screw **10** and spinal rod **18** in relative position and orientation, once a spinal column derotation is complete.

Referring again, generally to FIGS. **1-4**, and **7**, the system of the present invention further includes a pedicle screw cluster derotation tool **30**. As depicted in FIG. **1**, each pedicle screw cluster derotation tool **30** is configured from a grouping of pedicle screw wrenches **32**, by a pedicle screw wrench linking member **42** joined together to act in unison during use.

Each pedicle screw wrench **32** includes a handle **34**, a shaft **36**, and a distal end **38** which is configured to reversibly engage the head segment **14** of a pedicle screw **10** such that, as shaft **36** is moved while shaft distal end **38** is engaged with head segment **14**, manipulative forces are transferred to the pedicle screw **10** and, in turn, to the vertebra in which such pedicle screw **10** is implanted.

Significant variations of pedicle screw cluster derotation tool **30** are contemplated by the present invention. For example, the multiple wrenches **32**, linked by wrench cross linking members **40**, depicted in FIG. **1** may be replaced by a single handle member from which extend the functional equivalent of the multiple shafts **36** and shaft distal ends **38** for simultaneously engaging multiple pedicle screws **10**, as depicted. However configured, the object and design of pedicle screw cluster derotation tool **30** is to facilitate simultaneous application of manipulative forces to multiple pedicle screws **10** which are implanted in a like number of vertebra. This has the effect of permitting the gross, en bloc application of sufficient derotative forces to affected segments of the spinal column in a sufficiently dispersed manner as to avoid injury to any one vertebra or isolated spinal column segment. This, in turn, facilitates a successful entire-spine, 3D derotation of a scoliosis patient to near normal parameters.

With reference to FIGS. **1-3**, **5** and **7** the preferred mode of the present method usually involves application of forces to multiple spinal column segments, to achieve an over-all spinal column correction. For example, as depicted in FIGS. **5** and **7** in the case of a single curvature case of scoliosis, both derotative forces (illustrated by the central force vector arrow of FIG. **5**) to vertebrae involved in scoliotic curvatures, as well as of balancing, or offsetting forces to lateral spinal segments (illustrated by the lateral arrows of FIG. **5**) are applied.



The preferred mode of the present method involves precontouring spinal rods member **18**, as shown in FIG. **3** and frame **2** of FIG. **7**. Such a contouring operation involves bending spinal rods member **18** such that, in along two axes (analogous to yaw and pitch in aviation terms), the spinal rods member **18** will substantially define, in one plane, a desired post-operative correction of the affected spinal column in reference to such two axes.

The spinal rod(s) member **18** are loosely engaged with pedicle screws **10**, and in one of the embodiments of the present invention the pre-contoured spinal rod member **18** are rotated from a first orientation, through approximately 90 degree to a second orientation, using hex wrenches **50** (see frame **3** of FIG. **7**), to achieve a substantial correction of the scoliosis in the first two of three axes which will be corrected according to one of the embodiments of the present methodology, through use of the present system.

The next phase, after 2-D correction as just described, involves applying manipulative forces to pedicle screw clusters in reference to a third axis (a "roll axis", again using aviation terms) using pedicle screw clusters derotation tool(s) **30** (see, inter alia, frame **4** of FIG. **7**). After this final correction, spinal rod engagement member **20** is tightened to fix pedicle screw **10** and spinal rod **18** in relative position and orientation to secure the corrected spinal column configuration (now corrected with reference to all three relevant axes).

Spinal rod engagement member **20** of pedicle screws **10** are tightened, using an anti-torque feature of wrenches **32** (or of their equivalent in an alternative embodiment). This feature, as is well known in the art, allows tightening of nuts and the like, without imparting undue torque to the underlying apparatus or structure.

As shown in FIG. **6**, investigative practice of at least one of the present methods disclosed herein achieves efficacy never before seen in the orthopedic field. The "before picture" is the left hand image of FIG. **6**, and the two remaining images are sagittal and dorsal views of the corrected spinal column.

Although the invention has been described with reference to specific embodiments, this description is not meant to be construed in a limited sense. Various modifications of the disclosed embodiments, as well as alternative embodiments of the inventions will become apparent to persons skilled in the art upon reference to the description of the invention. It is, therefore, contemplated that the appended claims will cover such modifications that fall within the scope of the invention.

What is claimed is:

**1**. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure, the method comprising:

implanting a first pedicle screw into a first pedicle of a first vertebra;

implanting a second pedicle screw into a second pedicle of the first vertebra;

implanting a third pedicle screw into a first pedicle of a second vertebra;

implanting a fourth pedicle screw into a second pedicle of the second vertebra;

temporarily engaging a first elongated lever with the first pedicle screw;

temporarily engaging a second elongated lever with the second pedicle screw;

temporarily engaging a third elongated lever with the third pedicle screw;

temporarily engaging a fourth elongated lever with the fourth pedicle screw;

linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;

moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis, wherein leverage is generated by each of the first, second, third and fourth elongated levers during the moving step; and

disengaging the first, second, third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure such that alignment maintaining forces are sustained on the spinal column by at least some of the pedicle screws without aid from the elongated levers.

**2**. The method of claim **1**, wherein the first vertebra and the second vertebra are immediately adjacent vertebrae of the spinal column.

**3**. The method of claim **1**, further comprising:

implanting a fifth pedicle screw into a first pedicle of a third vertebra;

implanting a sixth pedicle screw into a second pedicle of the third vertebra;

temporarily engaging a fifth elongated lever with the fifth pedicle screw;

temporarily engaging a sixth elongated lever with the sixth pedicle screw;

linking together the first, second, third, fourth, fifth and sixth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third, fourth, fifth and sixth elongated levers move together in unison;

moving the linked together first, second, third, fourth, fifth and sixth elongated levers in unison to simultaneously rotate the first, second and third vertebrae through the pedicle screws about a craniocaudal roll axis; and

disengaging the first, second, third, fourth, fifth and sixth elongated levers from their respective pedicle screws before concluding the surgical procedure.

**4**. The method of claim **3**, wherein the first vertebra, the second vertebra and the third vertebra are immediately adjacent vertebrae of the spinal column.

**5**. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure, the method comprising:

implanting a first pedicle screw into a first pedicle of a first vertebra;

implanting a second pedicle screw into a second pedicle of the first vertebra;

implanting a third pedicle screw into a first pedicle of a second vertebra;

implanting a fourth pedicle screw into a second pedicle of the second vertebra;

temporarily engaging a first elongated lever with the first pedicle screw;

temporarily engaging a second elongated lever with the second pedicle screw;

temporarily engaging a third elongated lever with the third pedicle screw;

temporarily engaging a fourth elongated lever with the fourth pedicle screw;

linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;



moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis; and

disengaging the first, second, third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure,

wherein the first, second, third and fourth pedicle screws each comprise a channel configured to receive a spinal rod.

**6**. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure, the method comprising:

implanting a first pedicle screw into a first pedicle of a first vertebra;

implanting a second pedicle screw into a second pedicle of the first vertebra;

implanting a third pedicle screw into a first pedicle of a second vertebra;

implanting a fourth pedicle screw into a second pedicle of the second vertebra;

temporarily engaging a first elongated lever with the first pedicle screw;

temporarily engaging a second elongated lever with the second pedicle screw;

temporarily engaging a third elongated lever with the third pedicle screw;

temporarily engaging a fourth elongated lever with the fourth pedicle screw;

linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;

moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis; and

disengaging the first, second, third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure,

installing a spinal rod that extends in a craniocaudal direction between at least the first pedicle screw and the third pedicle screw; and

between the moving and disengaging steps, tightening spinal rod engagement mechanisms on the first and third pedicle screws to secure the spinal rod to the first and third pedicle screws.

**7**. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure the method comprising:

implanting a first pedicle screw into a first pedicle of a first vertebra;

implanting a second pedicle screw into a second pedicle of the first vertebra;

implanting a third pedicle screw into a first pedicle of a second vertebra;

implanting a fourth pedicle screw into a second pedicle of the second vertebra;

temporarily engaging a first elongated lever with the first pedicle screw;

temporarily engaging a second elongated lever with the second pedicle screw;

temporarily engaging a third elongated lever with the third pedicle screw;

temporarily engaging a fourth elongated lever with the fourth pedicle screw;

linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;

moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis; and

disengaging the first, second, third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure,

wherein the first, second, third and fourth elongated levers each extend dorsolaterally, dorsally or dorsomedially away from their respective pedicle screws.

**8**. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure the method comprising:

implanting a first pedicle screw into a first pedicle of a first vertebra;

implanting a second pedicle screw into a second pedicle of the first vertebra;

implanting a third pedicle screw into a first pedicle of a second vertebra;

implanting a fourth pedicle screw into a second pedicle of the second vertebra;

temporarily engaging a first elongated lever with the first pedicle screw;

temporarily engaging a second elongated lever with the second pedicle screw;

temporarily engaging a third elongated lever with the third pedicle screw;

temporarily engaging a fourth elongated lever with the fourth pedicle screw;

linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;

moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis; and



disengaging the first second third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure,

wherein the moving step comprises applying a manipulative force to a single handle member located on a construct formed by the linked together first, second, third and fourth elongated levers.

**9**. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure, the method comprising:

implanting a first pedicle screw into a first pedicle of a first vertebra;

implanting a second pedicle screw into a second pedicle of the first vertebra;

implanting a third pedicle screw into a first pedicle of a second vertebra;

implanting a fourth pedicle screw into a second pedicle of the second vertebra;

temporarily engaging a first elongated lever with the first pedicle screw;

temporarily engaging a second elongated lever with the second pedicle screw;

temporarily engaging a third elongated lever with the third pedicle screw;

temporarily engaging a fourth elongated lever with the fourth pedicle screw;

linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;

moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis; and

disengaging the first, second, third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure,

wherein the moving step comprises applying a manipulative force to more than one handle located on a construct formed by the linked together first, second, third and fourth elongated levers.

* * * * *

US009668788B2

(12) **United States Patent**
**Barry**

(10) **Patent No.: US 9,668,788 B2**
(45) **Date of Patent: *Jun. 6, 2017**

(54) **SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS**

(71) Applicant: **Mark A. Barry**, Las Vegas, NV (US)

(72) Inventor: **Mark A. Barry**, Las Vegas, NV (US)

(73) Assignee: **Mark A. Barry**, Las Vegas, NV (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/249,261**

(22) Filed: **Aug. 26, 2016**

(65) **Prior Publication Data**

US 2016/0361098 A1 Dec. 15, 2016

**Related U.S. Application Data**

(60) Division of application No. 15/154,703, filed on May 13, 2016, which is a continuation of application No.
(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***A61B 17/70*** | (2006.01) |
| *A61B 17/56* | (2006.01) |
| *A61B 17/68* | (2006.01) |

(52) **U.S. Cl.**
CPC ...... ***A61B 17/7079*** (2013.01); ***A61B 17/7002*** (2013.01); ***A61B 17/708*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ............ A61B 17/7076; A61B 17/7077; A61B 17/708
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,102,412 A 4/1992 Rogozinski
5,112,332 A 5/1992 Cozad et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE 10125717 A 12/2002
EP 0553782 B1 1/1993
(Continued)

OTHER PUBLICATIONS

Schlenk et al.; Biomechanics of spinal deformity; Neurosurg. Focus; 14(1) e2; pp. 1-15; Jan. 2003.
(Continued)

*Primary Examiner* — Ellen C Hammond
(74) *Attorney, Agent, or Firm* — Shay Glenn LLP

(57) **ABSTRACT**

A system for applying a manipulative force to a target region of a spinal column during a surgical procedure is provided with at least four pedicle screws, at least four elongated levers configured to temporarily engage with the pedicle screws, a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison, and a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison. When the system is assembled, it permits an operator to move the at least four elongated levers in unison to simultaneously rotate the at least four pedicle screws about a spinal column roll axis. Related methods are also provided.

**6 Claims, 5 Drawing Sheets**



### Related U.S. Application Data

13/645,589, filed on Oct. 5, 2012, now Pat. No. 9,339,301, which is a continuation of application No. 12/857,320, filed on Aug. 16, 2010, now Pat. No. 8,361,121, which is a continuation of application No. 11/202,409, filed on Aug. 10, 2005, now Pat. No. 7,776,072, which is a continuation-in-part of application No. 11/027,026, filed on Dec. 30, 2004, now Pat. No. 7,670,358.

(52) **U.S. Cl.**
CPC ...... ***A61B 17/7032*** (2013.01); ***A61B 17/7049*** (2013.01); ***A61B 17/7077*** (2013.01); *A61B 17/7076* (2013.01); *A61B 2017/564* (2013.01); *A61B 2017/567* (2013.01); *A61B 2017/681* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


5,116,334 A 5/1992 Cozad et al.
5,281,223 A 1/1994 Ray
5,282,863 A 2/1994 Burton
5,306,275 A 4/1994 Bryan
5,466,238 A 11/1995 Lin
5,498,262 A 3/1996 Bryan
5,545,166 A 8/1996 Howland
5,591,235 A 1/1997 Kuslich
5,630,816 A 5/1997 Kambin
5,676,665 A 10/1997 Bryan
5,704,937 A 1/1998 Martin
5,707,372 A 1/1998 Errico et al.
5,772,661 A 6/1998 Michelson
5,797,910 A 8/1998 Martin
5,810,817 A 9/1998 Roussouly et al.
5,928,232 A 7/1999 Howland et al.
5,947,965 A 9/1999 Bryan
6,015,409 A 1/2000 Jackson
6,083,226 A 7/2000 Fiz
6,090,113 A 7/2000 Le Couedic et al.
6,113,600 A 9/2000 Drummond et al.
6,217,578 B1 4/2001 Crozet et al.
6,235,028 B1 5/2001 Brumfield et al.
6,267,765 B1 7/2001 Taylor et al.
6,375,657 B1 4/2002 Doubler et al.
6,440,132 B1 8/2002 Jackson
6,458,131 B1 10/2002 Ray
6,558,390 B2 5/2003 Cragg
6,645,207 B2 11/2003 Dixon et al.
6,652,526 B1 11/2003 Arafiles
6,743,231 B1 6/2004 Gray et al.
6,749,614 B2 6/2004 Teitelbaum et al.
6,755,828 B2 * 6/2004 Shevtsov .......... A61B 17/8625 606/246
6,783,526 B1 8/2004 Lin et al.
6,802,844 B2 10/2004 Ferree
6,821,277 B2 11/2004 Teitelbaum
6,827,719 B2 12/2004 Ralph et al.
6,884,241 B2 4/2005 Bertranou et al.
7,011,658 B2 3/2006 Young
7,188,626 B2 3/2007 Foley et al.
7,507,248 B2 3/2009 Beaurain et al.
7,670,358 B2 * 3/2010 Barry ................ A61B 17/7077 606/279
7,776,072 B2 * 8/2010 Barry ................ A61B 17/7077 606/265
7,828,825 B2 11/2010 Bruneau et al.
7,927,357 B2 4/2011 Sacher et al.
7,931,675 B2 4/2011 Panjabi et al.
7,951,175 B2 5/2011 Chao et al.
8,025,679 B2 9/2011 Nichols et al.
8,147,524 B2 4/2012 Piza Vallespir
8,361,121 B2 1/2013 Barry
9,339,301 B2 * 5/2016 Barry ................ A61B 17/7032
2002/0116001 A1 8/2002 Schafer et al.
2005/0033291 A1 2/2005 Ebara
2005/0085812 A1 4/2005 Sherman et al.
2005/0203516 A1 9/2005 Biedermann et al.
2005/0203518 A1 9/2005 Biedermann et al.
2005/0203519 A1 9/2005 Harms et al.
2005/0228377 A1 10/2005 Chao et al.
2005/0245928 A1 * 11/2005 Colleran ............ A61B 17/708 606/90
2005/0273099 A1 12/2005 Baccelli et al.
2005/0277922 A1 12/2005 Trieu et al.
2006/0009767 A1 1/2006 Kiester
2006/0025768 A1 2/2006 Iott et al.
2006/0036240 A1 2/2006 Colleran et al.
2006/0047282 A1 3/2006 Gordon
2006/0173454 A1 8/2006 Spitler et al.
2006/0195088 A1 8/2006 Sacher et al.
2006/0195093 A1 8/2006 Jahng
2006/0200130 A1 9/2006 Hawkins et al.
2006/0241594 A1 10/2006 McCarthy et al.
2006/0264935 A1 11/2006 White
2006/0264937 A1 11/2006 White
2010/0106192 A1 4/2010 Barry
2010/0106193 A1 4/2010 Barry
2010/0249844 A1 9/2010 Durrani
2012/0271353 A1 10/2012 Barry
2016/0249954 A1 9/2016 Barry


FOREIGN PATENT DOCUMENTS


WO WO94/10944 A1 5/1994
WO WO2005/089656 A1 9/2005
WO WO2005/089657 A1 9/2005
WO WO2005/092218 A1 10/2005


OTHER PUBLICATIONS


Medtronic's Letter Brief requesting summary judement of invalidity under 35 U.S.C. 102(b), and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 3, 2015.

Dr. Barry's Response to Medtronic's Letter Brief requesting summary judment, and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 17, 2015.

Medtronic's Motion to Disqualify, and associated Exhibits A-1, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jun. 25, 2015.

Dr. Barry's Notice of Sur-Reply to Defendant's Reply, and associated Exhibits, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 10, 2015.

Dr. Barry's Response in Opposition to Motion to Disqualify, and associated Exhibits A-U, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 10, 2015.

Medtronic's First Amended Answer, Defenses and Counterclaims, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 20, 2015.

Medtronic's Reply Memorandum of Law in Further Support of its Motion to Disqualify, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Jul. 20, 2015.

Order on Motion to Withdraw and Substitute Lead Counsel and Motion to Disqualify the Law Firm, in *Mark A. Barry, MD* v. *Medtronic, Inc.*, Civil Action No. 1:14-cv-00104-RC, filed with the United States District Court for the Eastern District of Texas on Aug. 14, 2015.

(56) **References Cited**

OTHER PUBLICATIONS

*Medtronic, Inc.* v. *Mark A. Barry*; Final Written Decision (Paper No. 51); Case IPR2015-00780; U.S. Pat. No. 7,670,358; 40 pages; Sep. 7, 2016.
*Medtronic, Inc.* v. *Mark A. Barry*; Final Written Decision (Paper No. 51); Case IPR2015-00783; U.S. Pat. No. 7,776,072; 47 pages; Sep. 7, 2016.
*Medtronic Inc.* v. *Mark A. Barry*; Denial of Patent Owner's Motion for Certificate of Correction (Paper 50); Case IPR2015-00780; U.S. Pat. No. 7,670,358; 9 pages; Sep. 7, 2016.
*Medtronic Inc.* v. *Mark A. Barry*; Denial of Patent Owner's Motion for Certificate of Correction (Paper 50); Case IPR2015-00783; U.S. Pat. No. 7,776,072; 9 pages; Sep. 7, 2016.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5



FIG. 6



Locking Tool
30
30
4
32
3
Hex Wrenches
50
2
Titanium Rods
Pedicle Screws
10
18
1
Spinal Cord
Vertabrae


*FIG. 7*

# SYSTEM AND METHOD FOR ALIGNING VERTEBRAE IN THE AMELIORATION OF ABERRANT SPINAL COLUMN DEVIATION CONDITIONS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a divisional of U.S. application Ser. No. 15/154,703, filed May 13, 2016, which is a continuation of U.S. application Ser. No. 13/645,589, filed Oct. 5, 2012, which is a continuation of U.S. application Ser. No. 12/857,320, filed Aug. 16, 2010, now U.S. Pat. No. 8,361,121, which is a continuation of U.S. application Ser. No. 11/202,409, filed Aug. 10, 2005, now U.S. Pat. No. 7,776,072, which is a continuation-in-part of U.S. application Ser. No. 11/027,026, filed Dec. 30, 2004, now U.S. Pat. No. 7,670,358. These applications are herein incorporated by reference in its entirety.

## INCORPORATION BY REFERENCE

All publications and patent applications mentioned in this specification are incorporated herein by reference in their entirety to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

## FIELD

The present invention relates to methods and apparatus for management and correction of spinal deformities, such as scoliosis.

## BACKGROUND

A serious deficiency presently exists with respect to conventional treatment and instrumentation for treating spinal deviation anomalies, such as scoliosis.

This circumstance presents a serious medical challenge, because scoliosis, other than mild to moderate cases, is a well-recognized health risk.

If scoliosis curvature exceeds 70 degrees, severe twisting of the spine occurs. This can cause the ribs to press against the lungs, restrict breathing, and reduce oxygen levels. The distortions may also affect the heart and possibly cause dangerous changes.

Eventually, if the curve reaches more than 100 degrees, both the lungs and the heart can be injured. Patients with this degree of severity are susceptible to lung infections and pneumonia. Curves greater than 100 degrees are associated with elevated mortality rates. A number of factors associated with scoliosis increase the risk for bone loss, which is referred to as osteopenia. People with osteopenia are at greatly increased risk of osteoporosis, a common problem in older women that can cause broken bones and is particularly dangerous for women with a history of scoliosis. Experts recommend that children with scoliosis be screened for osteopenia so that measures can be taken to help prevent osteoporosis later.

Present treatment regimens for scoliosis carry their own risks and side effects, which include:

- Spinal fusion disease. Patients who are surgically treated with fusion techniques lose flexibility and may experience weakness in back muscles due to injuries during surgery.



- Disk degeneration and low back pain. With disk degeneration, the disks between the vertebrae may become weakened and may rupture.
- Height loss.
- Lumbar flatback. This condition is most often the result of a scoliosis surgical procedure called the Harrington technique, used to eliminate lordosis (exaggeration of the inward curve in the lower back). Adult patients with flatback syndrome tend to stoop forward. They may experience fatigue and back pain and even neck pain.
- Rotational trunk shift (uneven shoulders and hips).

In some patients, years after the original surgery (particularly with the first generation of Harrington rods), the weight of the instrumentation can cause disk and joint degeneration severe enough to require surgery. Treatment may involve removal of the old instrumentation and extension of the fusion into the lower back.

Left untreated, or ineffectively treated, scoliosis carries long-term consequences.

Pain in adult-onset or untreated childhood scoliosis often develops because of posture problems that cause uneven stresses on the back, hips, shoulders, necks, and legs. Studies report, however, that patients with childhood scoliosis have the same incidence of back pain as the general population, which is very high (60% to 80%). In one study conducted 20 years after growth had stopped two-thirds of adults who had lived with curvatures of 20 to 55 degrees reported back pain. In this study, most cases were mild, although other studies have reported that adults with a history of scoliosis tend to have chronic and more back pain than the general population.

Nearly all individuals with untreated scoliosis at some point develop spondylosis, an arthritic condition in the spine. The joints become inflamed, the cartilage that cushions the disks may thin, and bone spurs may develop. If the disk degenerates or the curvature progresses to the point that the spinal vertebrae begin pressing on the nerves, pain can be very severe and may require surgery. Even surgically treated patients are at risk for spondylosis if inflammation occurs in vertebrae around the fusion site.

The consequences of scoliosis are limited to the physical realm. The emotional impact of scoliosis, particularly on young girls or boys during their most vulnerable years, should not be underestimated. Adults who have had scoliosis and its treatments often recall significant social isolation and physical pain. Follow-up studies of children with scoliosis who did not have strong family and professional support often report significant behavioral problems.

Older people with a history of scoliosis, even those whose conditions were corrected, should realize that some negative emotional events in adulthood may possibly have their roots in their early experiences with scoliosis. Many studies have reported that patients who were treated for scoliosis have limited social activities and a poorer body image in adulthood. Some patients with a history of scoliosis have reported a slight negative effect on their sexual life. Pain appears to be only a minor reason for such limitation. An early Scandinavian study reported that adults with scoliosis had fewer job opportunities and a lower marriage rate than the general population.

It is clear, then, that scoliosis treatment options are presently lacking, and untreated scoliosis (except for mild to lower-moderate cases) is not an acceptable alternative. There are many apparatus which are designed for attachment to, and positioning adjacent the spinal column, and in many instances, these apparatus are designed for use in treating spinal column anomalies, such as scoliosis. However, all

known systems are limited by their design and known implementation modes on either arresting further deleterious rotation of the involved vertebrae, or fixing individual vertebrae once, by some means, they are brought to approximate a desired orientation and position.

Significant correction of severe scoliotic curvature to the point of approximating normal spinal configuration, particularly by a single process, is simply unknown in the art. This is, it is believed, the result of focus in the field on the positioning substantially seriatim of affected vertebrae. Applying derotational force to a vertebrae in this manner cannot effect en mass spinal reconfiguration without risking vertebral fracture at the point of spinal instrumentation fixation, particularly when using conventional instrumentation. Furthermore, significant, focused force applied to any individual vertebra risks spinal cord and related injury. Thus, only force which is inadequate to effect substantial correction to the entire spinal column is thus far ever applied, and correction of scoliotic curvatures are substantially limited.

It has become clear to the present inventor that desired levels of correction of spinal column anomalies, such as scoliosis, can only be achieved if the spinal column (or an affected segment thereof) is manipulated (or "derotated") substantially as a whole into a desired configuration. To achieve such an objective, force must be applied safely to all to-be-derotated vertebrae, and the forces necessary to reconfigure all, or at least a substantial portion of the spinal column must be dispersed throughout the affected spinal segments or regions. Nothing in the prior art satisfies these requirements, either individually or in combination.

## SUMMARY OF THE DISCLOSURE

In view of the foregoing, it is an object of the present invention to provide an improved system of spinal instrumentation for use in ameliorating aberrant spinal column deviation conditions, such as scoliosis.

It is another object of the present invention to provide an improved method for ameliorating aberrant spinal column deviation conditions, such as scoliosis. It is another object of the present invention to provide an improved system of spinal instrumentation, and a method for the use thereof, for ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of significant derotational forces to individual vertebra, with substantially reduced risk for fracture thereof upon application of such forces.

It is another object of the present invention to provide an improved system of spinal instrumentation, and associated method for use thereof, in ameliorating aberrant spinal column deviation conditions, such as scoliosis, which system and method facilitates the application of forces to vertebrae of affected spinal column segments en bloc, thereby distributing otherwise potentially injurious forces in a manner for safely achieving over-all spinal column correction or derotation.

Applicant's present invention provides a system and method for use of such system which satisfy each of these objectives. Applicant's system includes bone screws which are to be implanted in the pedicle region(s) of individual to-be-derotated vertebrae. In the preferred mode of the present invention, such bone screws are also to be implanted in vertebrae to which balancing forces must be applied as the spinal column is manipulated en mass to achieve an over-all correction of the condition. The pedicle implantation provides a stable foundation for the application of significant derotational forces, but without undue risk of vertebral fracture.

The system includes a pedicle screw cluster derotation tool. This tool, in the presently preferred embodiment includes shafts or similar pedicle screw engagement members, extending from a common handle or linked handle array, which are oriented and configured to extend to and engage the heads of a number of implanted pedicle screws which will have been implanted in adjacent vertebrae to which derotational or balancing forces are to be applied during a spinal column derotation and alignment. The engagement between the pedicle screw cluster derotation tool and the individual pedicle screws is such that, as manipulative forces are applied to the handle means of pedicle screw cluster derotation tool, forces are transferred and dispersed simultaneously among the engaged vertebrae. Therefore, a practitioner may, in a single motion, simultaneously and safely derotate multiple vertebrae of an affected spinal segment (as well as likewise apply balancing forces to other group(s) of vertebrae which are lateral to the effected segment(s).

The effect of practice of the present invention is three-dimensional correction which provides, not only spinal correction to near normal configuration, but corrects "rib humps."

The system of the present invention also includes, in its preferred embodiment, pedicle screws which allow for interfacing with, and fixation relative to pre-contoured spinal rods after a satisfactory derotation.

The present inventor's approach to the problems described above is certainly simple, when viewed in hindsight, but it is equally unobvious. In investigative procedures, the presently proposed system and method has achieved measure of correction of scoliotic curvature never before seen in orthopedic practice.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be more easily understood with reference to figures, which are as follow:

FIG. **1** is a top plan view of an anatomical model of a human spinal column, with components of the system of the present invention shown engaged therewith. The event depicted is that stage of the proposed method after which derotational and balancing forces have been applied to substantially correct a scoliotic curvature.

FIG. **2** is an elevational dorsal view of the anatomical model of a human spinal column depicted in FIG. **1**, but with an unobstructed view of already-implanted pedicle screws, and configured as if preceding the derotation step of the proposed method.

FIG. **3** is an elevational side view of the anatomical model of a human spinal column depicted in FIGS. **1** and **2**, with an unobstructed view of already-implanted pedicle screws and adjacent, pre-contoured spinal rods which will be engaged with the pedicle screws through practice of the proposed method.

FIG. **4** is an example of a pedicle screw which may be used in the system of the present invention.

FIG. **5** is a depiction of the complimentary forces applied to multiple spinal column segments to achieve an over-all spinal column correction.

FIG. **6** is a three frame x-ray view showing "before and after" views of a scoliosis patient who was treated in an investigational procedure in the development of the systems

and methods of the present disclosure. The curvature correction was substantially to normal, and lumbar motion was preserved notwithstanding.

FIG. **7** is a 4-frame, progressive animation of the stages of correction of scoliosis according to the embodiments of the present invention.

## DETAILED DESCRIPTION

With reference to FIGS. **1-4** and **7**, the spinal deviation correction system of the present invention includes a number of pedicle screws **10**, each implanted in respective vertebrae to which rotative forces will be applied in a spinal anomaly correction.

Pedicle screws **10** may be of a variety of designs, such as, for example, are generally depicted in U.S. Pat. No. 6,743,237 (Gray, et al), U.S. Pat. No. 6,827,719 (Ralph, et al), U.S. Pat. No. 6,652,526 (Arafiles), U.S. Pat. No. 6,375,657 (Doubler, et al), the disclosures of which are incorporated herein by reference.

With particular reference to FIG. **4**, pedicle screws **10** will include a threaded shank segment **12** and a head segment **14**. Head segment will be configured with a spinal rod conduit (or channel) **16** or interfacing with a spinal rod **18** (shown in FIG. **3**). Spinal rod engagement means **20** serve to fix pedicle screw **10** and spinal rod **18** in relative position and orientation, once a spinal column derotation is complete.

Referring again, generally to FIGS. **1-4**, and **7**, the system of the present invention further includes a pedicle screw cluster derotation tool **30**. As depicted in FIG. **1**, each pedicle screw cluster derotation tool **30** is configured from a grouping of pedicle screw wrenches **32**, by a pedicle screw wrench linking member **42** joined together to act in unison during use.

Each pedicle screw wrench **32** includes a handle **34**, a shaft **36**, and a distal end **38** which is configured to reversibly engage the head segment **14** of a pedicle screw **10** such that, as shaft **36** is moved while shaft distal end **38** is engaged with head segment **14**, manipulative forces are transferred to the pedicle screw **10** and, in turn, to the vertebra in which such pedicle screw **10** is implanted.

Significant variations of pedicle screw cluster derotation tool **30** are contemplated by the present invention. For example, the multiple wrenches **32**, linked by wrench cross linking members **40**, depicted in FIG. **1** may be replaced by a single handle member from which extend the functional equivalent of the multiple shafts **36** and shaft distal ends **38** for simultaneously engaging multiple pedicle screws **10**, as depicted. However configured, the object and design of pedicle screw cluster derotation tool **30** is to facilitate simultaneous application of manipulative forces to multiple pedicle screws **10** which are implanted in a like number of vertebra. This has the effect of permitting the gross, en bloc application of sufficient derotative forces to affected segments of the spinal column in a sufficiently dispersed manner as to avoid injury to any one vertebra or isolated spinal column segment. This, in turn, facilitates a successful entire-spine, 3D derotation of a scoliosis patient to near normal parameters.

With reference to FIGS. **1-3**, **5** and **7** the preferred mode of the present method usually involves application of forces to multiple spinal column segments, to achieve an over-all spinal column correction. For example, as depicted in FIGS. **5** and **7** in the case of a single curvature case of scoliosis, both derotative forces (illustrated by the central force vector arrow of FIG. **5**) to vertebrae involved in scoliotic curvatures, as well as of balancing, or offsetting forces to lateral spinal segments (illustrated by the lateral arrows of FIG. **5**) are applied.



The preferred mode of the present method involves pre-contouring spinal rods member **18**, as shown in FIG. **3** and frame **2** of FIG. **7**. Such a contouring operation involves bending spinal rods member **18** such that, in along two axes (analogous to yaw and pitch in aviation terms), the spinal rods member **18** will substantially define, in one plane, a desired post-operative correction of the affected spinal column in reference to such two axes.

The spinal rod(s) member **18** are loosely engaged with pedicle screws **10**, and in one of the embodiments of the present invention the pre-contoured spinal rod member **18** are rotated from a first orientation, through approximately 90 degree to a second orientation, using hex wrenches **50** (see frame **3** of FIG. **7**), to achieve a substantial correction of the scoliosis in the first two of three axes which will be corrected according to one of the embodiments of the present methodology, through use of the present system.

The next phase, after 2-D correction as just described, involves applying manipulative forces to pedicle screw clusters in reference to a third axis (a "roll axis", again using aviation terms) using pedicle screw clusters derotation tool(s) **30** (see, inter alia, frame **4** of FIG. **7**). After this final correction, spinal rod engagement member **20** is tightened to fix pedicle screw **10** and spinal rod **18** in relative position and orientation to secure the corrected spinal column configuration (now corrected with reference to all three relevant axes).

Spinal rod engagement member **20** of pedicle screws **10** are tightened, using an anti-torque feature of wrenches **32** (or of their equivalent in an alternative embodiment). This feature, as is well known in the art, allows tightening of nuts and the like, without imparting undue torque to the underlying apparatus or structure.

As shown in FIG. **6**, investigative practice of at least one of the present methods disclosed herein achieves efficacy never before seen in the orthopedic field. The "before picture" is the left hand image of FIG. **6**, and the two remaining images are sagittal and dorsal views of the corrected spinal column.

Although the invention has been described with reference to specific embodiments, this description is not meant to be construed in a limited sense. Various modifications of the disclosed embodiments, as well as alternative embodiments of the inventions will become apparent to persons skilled in the art upon reference to the description of the invention. It is, therefore, contemplated that the appended claims will cover such modifications that fall within the scope of the invention.

What is claimed is:

**1**. A system for applying a manipulative force to a target region of a spinal column during a surgical procedure, the system comprising:

- a first pedicle screw having a proximal portion and a distal portion, the distal portion of the first pedicle screw being configured to be implanted into a first pedicle of a first vertebra;
- a second pedicle screw having a proximal portion and a distal portion, the distal portion of the second pedicle screw being configured to be implanted into a second pedicle of the first vertebra;
- a third pedicle screw having a proximal portion and a distal portion, the distal portion of the third pedicle screw being configured to be implanted into a first pedicle of a second vertebra;

a fourth pedicle screw having a proximal portion and a distal portion, the distal portion of the fourth pedicle screw being configured to be implanted into a second pedicle of the second vertebra;

a first elongated lever having a proximal portion and a distal portion, the distal portion of the first elongated lever being configured to temporarily engage with and provide leverage itself to the proximal portion of the first pedicle screw;

a second elongated lever having a proximal portion and a distal portion, the distal portion of the second elongated lever being configured to temporarily engage with and provide leverage itself to the proximal portion of the second pedicle screw;

a third elongated lever having a proximal portion and a distal portion, the distal portion of the third elongated lever being configured to temporarily engage with and provide leverage itself to the proximal portion of the third pedicle screw;

a fourth elongated lever having a proximal portion and a distal portion, the distal portion of the fourth elongated lever being configured to temporarily engage with and provide leverage itself to the proximal portion of the fourth pedicle screw;

a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison; and

a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison,

wherein the system, when assembled, permits an operator to move the first, second, third and fourth elongated levers in unison to simultaneously rotate the first, second, third and fourth pedicle screws about a spinal column roll axis.

**2**. The system of claim **1**, further comprising:

a fifth pedicle screw having a proximal portion and a distal portion, the distal portion of the fifth pedicle screw being configured to be implanted into a first pedicle of a third vertebra;

a sixth pedicle screw having a proximal portion and a distal portion, the distal portion of the sixth pedicle screw being configured to be implanted into a second pedicle of the third vertebra;

a fifth elongated lever having a proximal portion and a distal portion, the distal portion of the fifth elongated lever being configured to temporarily engage with the proximal portion of the fifth pedicle screw; and

a sixth elongated lever having a proximal portion and a distal portion, the distal portion of the sixth elongated lever being configured to temporarily engage with the proximal portion of the sixth pedicle screw,

wherein the system, when assembled, permits an operator to move the first, second, third, fourth, fifth and sixth elongated levers in unison to simultaneously rotate the first, second, third, fourth, fifth and sixth pedicle screws about a spinal column roll axis.

**3**. A system for applying a manipulative force to a target region of a spinal column during a surgical procedure, the system comprising:

a first pedicle screw having a proximal portion and a distal portion, the distal portion of the first pedicle screw being configured to be implanted into a first pedicle of a first vertebra;

a second pedicle screw having a proximal portion and a distal portion, the distal portion of the second pedicle screw being configured to be implanted into a second pedicle of the first vertebra;

a third pedicle screw having a proximal portion and a distal portion, the distal portion of the third pedicle screw being configured to be implanted into a first pedicle of a second vertebra;

a fourth pedicle screw having a proximal portion and a distal portion, the distal portion of the fourth pedicle screw being configured to be implanted into a second pedicle of the second vertebra;

a first elongated lever having a proximal portion and a distal portion, the distal portion of the first elongated lever being configured to temporarily engage with the proximal portion of the first pedicle screw;

a second elongated lever having a proximal portion and a distal portion, the distal portion of the second elongated lever being configured to temporarily engage with the proximal portion of the second pedicle screw;

a third elongated lever having a proximal portion and a distal portion, the distal portion of the third elongated lever being configured to temporarily engage with the proximal portion of the third pedicle screw;

a fourth elongated lever having a proximal portion and a distal portion, the distal portion of the fourth elongated lever being configured to temporarily engage with the proximal portion of the fourth pedicle screw;

a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison; and

a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison,

wherein the system, when assembled, permits an operator to move the first, second, third and fourth elongated levers in unison to simultaneously rotate the first, second, third and fourth pedicle screws about a spinal column roll axis,

wherein the first, second, third and fourth pedicle screws each comprise a channel configured to receive a spinal rod.

**4**. A system for applying a manipulative force to a target region of a spinal column during a surgical procedure, the system comprising:

a first pedicle screw having a proximal portion and a distal portion, the distal portion of the first pedicle screw being configured to be implanted into a first pedicle of a first vertebra;

a second pedicle screw having a proximal portion and a distal portion, the distal portion of the second pedicle screw being configured to be implanted into a second pedicle of the first vertebra;

a third pedicle screw having a proximal portion and a distal portion, the distal portion of the third pedicle screw being configured to be implanted into a first pedicle of a second vertebra;

a fourth pedicle screw having a proximal portion and a distal portion, the distal portion of the fourth pedicle screw being configured to be implanted into a second pedicle of the second vertebra;

a first elongated lever having a proximal portion and a distal portion, the distal portion of the first elongated lever being configured to temporarily engage with the proximal portion of the first pedicle screw;

a second elongated lever having a proximal portion and a distal portion, the distal portion of the second elongated lever being configured to temporarily engage with the proximal portion of the second pedicle screw;

a third elongated lever having a proximal portion and a distal portion, the distal portion of the third elongated lever being configured to temporarily engage with the proximal portion of the third pedicle screw;

a fourth elongated lever having a proximal portion and a distal portion, the distal portion of the fourth elongated lever being configured to temporarily engage with the proximal portion of the fourth pedicle screw;

a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison;

a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison,

wherein the system, when assembled, permits an operator to move the first, second, third and fourth elongated levers in unison to simultaneously rotate the first, second, third and fourth pedicle screws about a spinal column roll axis,

a spinal rod configured to extend in an axial direction between at least the first pedicle screw and the third pedicle screw; and

spinal rod engagement mechanisms provided on the proximal portions of the first and third pedicle screws configured to secure the spinal rod to the proximal portions of the first and third pedicle screws.

**5**. A system for applying a manipulative force to a target region of a spinal column during a surgical procedure, the system comprising:

a first pedicle screw having a proximal portion and a distal portion, the distal portion of the first pedicle screw being configured to be implanted into a first pedicle of a first vertebra;

a second pedicle screw having a proximal portion and a distal portion, the distal portion of the second pedicle screw being configured to be implanted into a second pedicle of the first vertebra;

a third pedicle screw having a proximal portion and a distal portion, the distal portion of the third pedicle screw being configured to be implanted into a first pedicle of a second vertebra;

a fourth pedicle screw having a proximal portion and a distal portion, the distal portion of the fourth pedicle screw being configured to be implanted into a second pedicle of the second vertebra;

a first elongated lever having a proximal portion and a distal portion, the distal portion of the first elongated lever being configured to temporarily engage with the proximal portion of the first pedicle screw;

a second elongated lever having a proximal portion and a distal portion, the distal portion of the second elongated lever being configured to temporarily engage with the proximal portion of the second pedicle screw;

a third elongated lever having a proximal portion and a distal portion, the distal portion of the third elongated lever being configured to temporarily engage with the proximal portion of the third pedicle screw;

a fourth elongated lever having a proximal portion and a distal portion, the distal portion of the fourth elongated lever being configured to temporarily engage with the proximal portion of the fourth pedicle screw;

a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison; and



a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison,

wherein the system, when assembled, permits an operator to move the first, second, third and fourth elongated levers in unison to simultaneously rotate the first, second, third and fourth pedicle screws about a spinal column roll axis,

wherein the first, second, third and fourth elongated levers are each configured to extend away from their respective pedicle screws along a longitudinal axis of the respective pedicle screw.

**6**. A system for applying a manipulative force to a target region of a spinal column during a surgical procedure, the system comprising:

a first pedicle screw having a proximal portion and a distal portion, the distal portion of the first pedicle screw being configured to be implanted into a first pedicle of a first vertebra;

a second pedicle screw having a proximal portion and a distal portion, the distal portion of the second pedicle screw being configured to be implanted into a second pedicle of the first vertebra;

a third pedicle screw having a proximal portion and a distal portion, the distal portion of the third pedicle screw being configured to be implanted into a first pedicle of a second vertebra;

a fourth pedicle screw having a proximal portion and a distal portion, the distal portion of the fourth pedicle screw being configured to be implanted into a second pedicle of the second vertebra;

a first elongated lever having a proximal portion and a distal portion, the distal portion of the first elongated lever being configured to temporarily engage with the proximal portion of the first pedicle screw;

a second elongated lever having a proximal portion and a distal portion, the distal portion of the second elongated lever being configured to temporarily engage with the proximal portion of the second pedicle screw;

a third elongated lever having a proximal portion and a distal portion, the distal portion of the third elongated lever being configured to temporarily engage with the proximal portion of the third pedicle screw;

a fourth elongated lever having a proximal portion and a distal portion, the distal portion of the fourth elongated lever being configured to temporarily engage with the proximal portion of the fourth pedicle screw;

a linking member configured to link at least two of the elongated levers in a axial direction such that they move in unison;

a cross-linking member configured to link at least two of the elongated levers in a transverse direction such that they move in unison,

wherein the system, when assembled, permits an operator to move the first, second, third and fourth elongated levers in unison to simultaneously rotate the first, second, third and fourth pedicle screws about a spinal column roll axis, and

multiple handles located on a construct formed by the first, second, third and fourth elongated levers linked together by the linking member and the cross-linking member, such that a manipulative force can be applied to the multiple handles individually or simultaneously.

* * * * *