Nos. 23-2226, 23-2234

# United States Court of Appeals for the Federal Circuit

MARK A. BARRY,

*Plaintiff-Appellant*,

v.

DEPUY SYNTHES COMPANIES,

*Defendant,*

DEPUY SYNTHES SALES, INC., trading as DePuy Synthes Spine, MEDICAL DEVICE BUSINESS SERVICES, INC., DEPUY SYNTHES PRODUCTS, INC.,

*Defendants-Appellees.*

**Appeals from the United States District Court for the Eastern District of Pennsylvania in No. 2:17-cv-03003-PD, Judge Paul S. Diamond**

## BRIEF FOR DEFENDANTS-APPELLEES

Calvin P. Griffith
Patrick J. Norton
Kenneth Luchesi
Thomas S. Koglman
T. Kaitlin Crowder
JONES DAY
901 Lakeside Avenue
North Point
Cleveland, OH 44114
(216) 586-3939

Gregory A. Castanias
Tracy A. Stitt
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

Kevin V. McCarthy
JONES DAY
250 Vesey Street, 31st Floor
New York, NY 10281
(212) 326-3939

## CLAIMS AT ISSUE

Claims 4 and 5 (dependent from claim 1) of U.S. Patent No. 7,670,358; claim 2 of U.S. Patent No. 8,361,121; and claim 6 of U.S. Patent No. 9,668,787 are at issue. The claims at issue, as well as the claims from which they depend, are reproduced below. The claims at issue appear in bold font.

’358 Patent

1. A method for aligning vertebrae in the amelioration of aberrant spinal column deviation conditions comprising the steps of:

selecting a first set of pedicle screws, said pedicle screws each having a threaded shank segment and a head segment;

selecting a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having first handle means and a first group of pedicle screw engagement members which are mechanically linked with said first handle means, each pedicle screw engagement member being configured for engaging with, and transmitting manipulative forces applied to said first handle means to said head segment of each pedicle screw of said first set of pedicle screws,

implanting a each pedicle screw in a pedicle region of each of a first group of multiple vertebrae of a spinal column which exhibits an aberrant spinal column deviation condition;

engaging each pedicle screw engagement member respectively with said head segment of each pedicle screw of said first set of pedicle screws; and

applying manipulative force to said first handle means in a manner for simultaneously engaging said first group of pedicle screw engagement members and first set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said first group of multiple vertebrae in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition;

selecting a first length of a spinal rod member; wherein one or more of said pedicle screws of said first set of pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and

spinal rod engagement means for securing said pedicle screw and said spinal rod member, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation;

extending said first length of said spinal rod member through said spinal rod conduits of one or more of said pedicle screws of said first set of pedicle screws; and

after applying said manipulative force to said first handle means, actuating said spinal rod engagement means to secure said vertebrae in their respective and relative positions and orientations as achieved through application of said manipulative force thereto.

2. The method of claim 1 further comprising the steps of:

selecting a second set of pedicle screws;

selecting a second pedicle cluster derotation tool, said second pedicle screw cluster derotation tool having second handle means and a second group of pedicle screw engagement members which are mechanically linked with said second handle means, each pedicle screw engagement member being configured for engaging with, and transmitting manipulative forces applied to said second handle means to said head segment of each pedicle screw of said second set of pedicle screws,

implanting each pedicle screw in a pedicle region of each of a second group of multiple vertebrae of a spinal column which exhibits an aberrant spinal column deviation condition;

engaging each pedicle screw engagement member respectively with said head segment of each pedicle screw of said second set of pedicle screws; and

applying manipulative force to said second handle means in a manner for simultaneously engaging said second group of pedicle screw engagement members and said second set of pedicle screws and thereby in a single motion simultaneously rotating said vertebrae of said second group of multiple vertebrae in which said pedicle screws are implanted to achieve an amelioration of an aberrant spinal column deviation condition.

3. The method of claim 2 further comprising the steps of:

selecting a second length of a spinal rod member, wherein one or more of said pedicle screws of said second set of pedicle screws each includes:

a spinal rod conduit formed substantially transverse of the length of each said pedicle screw and sized and shaped for receiving passage of said spinal rod member therethrough; and

spinal rod engagement means for securing said pedicle screw and said second spinal rod member, when extending through said spinal rod conduit, in a substantially fixed relative position and orientation;

extending said second length of said spinal rod member through said spinal rod conduits of one or more of said pedicle screws of said second set of pedicle screws; and

after applying said manipulative force to said second handle means, actuating said spinal rod engagement means to secure said vertebrae of said second group of multiple vertebrae in their respective and relative positions and orientations as achieved through application of said manipulative force thereto.

**4. The method of claim 3 wherein the steps of applying manipulative force to said first handle means and applying manipulative force to said second handle means are carried out substantially simultaneously to cooperatively achieve an amelioration of an aberrant spinal column deviation condition.**

**5. The method of claim 2 wherein the steps of applying manipulative force to said first handle means and applying manipulative force to said second handle means are carried out substantially simultaneously to cooperatively achieve an amelioration of an aberrant spinal column deviation condition.**

’121 Patent

**2. A system for aligning vertebrae in the amelioration of aberrant spinal column deviation conditions comprising:**

**a first set of pedicle screws, each pedicle screw having a threaded shank segment and a head segment; and**

**a first pedicle screw cluster derotation tool, said first pedicle screw cluster derotation tool having a first handle means for facilitating simultaneous application of manipulative forces to said first set of pedicle screws and a first group of three or more pedicle screw engagement members which are mechanically linked with said first handle means, said first handle means having a handle linked to each pedicle screw engagement member of the first group of three or more pedicle screw engagement members and a linking member to join together the handles linked to the pedicle screw engagement members, wherein the handle means is configured to move simultaneously each pedicle screw engagement member; wherein each pedicle screw engagement member is configured to engage respectively with said head segment of each pedicle screw of said first set of pedicle screws; and wherein each pedicle screw engagement member is configured to transmit manipulative forces applied to said first handle means to said head segment of each pedicle screw of said first set of pedicle screws;**

**a second set of pedicle screws, each pedicle screw having a threaded shank segment and a head segment;**

**a second pedicle screw cluster derotation tool, said second pedicle screw cluster derotation tool having a second handle means for facilitating simultaneous application of manipulative forces to said second set of pedicle screws and a second group of three or more pedicle screw engagement members which are mechanically linked with said second handle means, said second handle means having a handle linked to each pedicle screw engagement member of the second group of three or more pedicle screw engagement members and a handle linking member to join together the handles linked to the pedicle screw engagement members, wherein the handle means is configured to move simultaneously each pedicle screw engagement member; wherein each pedicle screw engagement member is configured to engage respectively with said head segment of each pedicle screw of said second set of pedicle screws; and wherein each pedicle screw engagement member is configured to transmit manipulative forces applied to said second handle means to said head segment of each pedicle screw of said second set of pedicle screws;**

**a cross-linking member that links the first handle means to the second handle means.**

’787 Patent

**6. A method of applying a manipulative force to a target region of a spinal column during a surgical procedure, the method comprising:**

**implanting a first pedicle screw into a first pedicle of a first vertebra;**

**implanting a second pedicle screw into a second pedicle of the first vertebra;**

**implanting a third pedicle screw into a first pedicle of a second vertebra;**

**implanting a fourth pedicle screw into a second pedicle of the second vertebra;**

**temporarily engaging a first elongated lever with the first pedicle screw;**

**temporarily engaging a second elongated lever with the second pedicle screw;**

**temporarily engaging a third elongated lever with the third pedicle screw;**

**temporarily engaging a fourth elongated lever with the fourth pedicle screw;**

**linking together the first, second, third and fourth elongated levers in both a craniocaudal direction and a transverse direction such that the first, second, third and fourth elongated levers move together in unison;**

**moving the linked together first, second, third and fourth elongated levers in unison to simultaneously rotate the first and the second vertebrae through the pedicle screws about a craniocaudal roll axis; and**

**disengaging the first, second, third and fourth elongated levers from their respective pedicle screws before concluding the surgical procedure,**

**installing a spinal rod that extends in a craniocaudal direction between at least the first pedicle screw and the third pedicle screw; and**

**between the moving and disengaging steps, tightening spinal rod engagement mechanisms on the first and third pedicle screws to secure the spinal rod to the first and third pedicle screws.**

# CERTIFICATE OF INTEREST

**Case Number:** 23-2226, -2234

**Short Case Caption:** *Mark A. Barry v. DePuy Synthes Companies*

**Filing Party/Entity:** DePuy Synthes Products, Inc.; DePuy Synthes Sales, Inc.; Medical Device Business Services, Inc.

I certify the following information and any attached sheets is accurate and complete to the best of my knowledge.

Date: March 11, 2024 Signature: /s/ *Gregory A. Castanias*
Gregory A. Castanias

1. **Represented Entities:** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   DePuy Synthes Products, Inc.
   DePuy Synthes Sales, Inc.
   Medical Device Business Services, Inc.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   Johnson & Johnson

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Akin Gump Strauss Hauer & Field LLP:** Steven D. Maslowski; Jonathan J. Underwood

**Morrison Foerster:** Mark L. Whitaker; Joshua A. Hartman; Kevin T. Kwon; Eugene Marder; Corinna Alanis; Barbara N. Barath

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   Yes. See separate Notice of Related Case Information at page xvi.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   None/Not Applicable.

# TABLE OF CONTENTS

**Page**


CLAIMS AT ISSUE ........ i
CERTIFICATE OF INTEREST ........ vi
TABLE OF AUTHORITIES ........ x
TABLE OF ABBREVIATIONS ........ xiv
STATEMENT OF RELATED CASES ........ xvi
INTRODUCTION ........ 1
COUNTER-STATEMENT OF THE ISSUES ........ 4
COUNTER-STATEMENT OF THE CASE ........ 5
A. Scoliosis Surgery—Segmental And *En Bloc* Derotation ........ 6
B. Barry's Early Development Work And Surgeries ........ 7
C. The Barry Patents ........ 9
D. DePuy's Independent Development ........ 12
E. Barry's *Medtronic* Suit And Medtronic's IPR ........ 14
F. The Neal Surveys ........ 15
1. The 2018 DePuy Survey ........ 15
2. The 2016 *Medtronic* Survey ........ 20
G. Procedural History ........ 21
1. Claim Construction ........ 21
2. DePuy's Summary-Judgment Motion ........ 22
3. The Pre-Trial *Daubert* Motions ........ 23
H. Trial And JMOL ........ 24
I. Post-Trial Motions ........ 32
SUMMARY OF ARGUMENT ........ 33
STANDARDS OF REVIEW ........ 36
ARGUMENT ........ 39
I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING BARRY'S EXPERTS ........ 39

**TABLE OF CONTENTS**
(continued)


**Page**

A. Yassir's Testimony Was Properly Excluded As Contradicting The Court's Construction of The "Handle Means" Terms ....39

B. Neal's 2018 Survey Was Properly Excluded As The Product Of Unreliable Methodology ....44

1. Neal's Sample Was Not Representative Of Any Target Universe ....46

a The District Court Did Not Abuse Its Discretion By Holding That Neal Failed To Establish That His Sample Of 164 Surgeons Was Representative Of Any Target Universe ....48

b Barry's Proffered "Evidence" Did Not Establish Representativeness ....54

2. Neal's Flawed Question Design Rendered His Results Meaningless ....57

3. The Court's Renewed Consideration Of *Daubert* At Trial Was Not Error ....60

II. THE DISTRICT COURT PROPERLY GRANTED JMOL OF NONINFRINGMENT ....62

CONCLUSION ....69

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allied Colloids Inc. v. Am. Cyanamid Co.*,
64 F.3d 1570 (Fed. Cir. 1995) ....................38

*Aspex Eyewear, Inc. v. Concepts in Optics, Inc.*,
111 F. App'x 582 (Fed. Cir. 2004) ....................65

*Automated Irrigation Controls, LLC v. Watt Stopper, Inc.*,
407 F. Supp. 3d 274 (S.D.N.Y. 2019) ....................65

*Barry v. Medtronic, Inc.*,
914 F.3d 1310 (Fed. Cir. 2019) ....................5

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) ....................38

*Black v. Rhone-Poulenc, Inc.*,
19 F. Supp. 2d 592 (S.D. W. Va. 1998)....................37

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) ....................44

*Cordis Corp. v. Boston Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011) ....................40, 64

*Crown Packaging Tech., Inc. v. Belvac Prod. Mach., Inc.*,
No. 6:18-CV-70, 2022 WL 821440 (W.D. Va. Mar. 17, 2022)....................40

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................1

*Duffee By & Through Thornton v. Murray Ohio Mfg. Co.*,
91 F.3d 1410 (10th Cir. 1996) ....................37

*EMC Corp. v. Pure Storage, Inc.*,
154 F. Supp. 3d 81 (D. Del. 2016)....................................................................39

*Exergen Corp., v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ............................................................39, 40, 64

*Fraser v. Wyeth, Inc.*,
992 F. Supp. 2d 68 (D. Conn. 2014)..................................................................61

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...................................................................1, 2, 34, 36, 37, 44

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
29 F.4th 1365 (Fed. Cir. 2022) ..........................................................................39

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*,
No. 14-877-LPS-CJB, 2017 WL 8948975 (D. Del. May 30, 2017) ..................52

*Henry v. St. Croix Alumina, LLC*,
572 F. App'x 114 (3d Cir. 2014) ........................................................................62

*Hostetler v. Johnson Controls, Inc.*,
No. 15-cv-226 JD, 2017 WL 3700345 (N.D. Ind. Aug. 28, 2017) .............51, 52

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ...........................................................................2, 36, 37

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) .........................................................................40

*Ironburg Inventions Ltd. v. Valve Corp.*,
64 F.4th 1274 (Fed. Cir. 2023) ...................................................................65, 66

*Joiner v. Gen. Elec. Co.*,
78 F.3d 524 (11th Cir. 1996) ..........................................................................2, 36

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).............................................................................................1

*Lee v. Mike's Novelties, Inc.*,
543 F. App'x 1010 (Fed. Cir. 2013) ....................65, 66

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) ....................38

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006) ....................39

*Manuli Stretch USA, Inc. v. Pinnacle Films, Inc.*,
749 F. Supp. 2d 764 (E.D. Tenn. 2010)....................65

*Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*,
362 F. App'x 332 (3d Cir. 2010) ....................36

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986) ....................65, 66

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) ....................38

*Pharmacia Corp. v. Alcon Lab'ys, Inc.*,
201 F. Supp. 2d 335 (D.N.J. 2002)....................55

*Pittsburgh Press Club v. United States*,
579 F.2d 751 (3d Cir. 1978) ....................45, 46, 49, 53

*Pugh v. Cmty. Health Sys., Inc.*,
No. 5:20-CV-00630-JMG, 2023 WL 4408481 (E.D. Pa. July 7, 2023) ....................62

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC.*,
No. 17-189-LPS-CJB, 2019 WL 5310220 (D. Del. Oct. 21, 2019) ....................52

*Schloss v. Sears Roebuck & Co.*,
No. 04-CV-2423, 2006 WL 8459575 (E.D. Pa. Sept. 27, 2006)....................62

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ....................39

*Wittekamp v. Gulf & W., Inc.*,
991 F.2d 1137 (3d Cir. 1993) ....................................................................38

**STATUTES**

35 U.S.C.
§ 112........................................................................................................ 22
§ 285.........................................................................................................32

**RULES**

Fed. R. Civ. P. 50(a).........................................................................1, 2, 29

Fed. R. Evid. 614(b) and 614(c) ...................................................................28

Fed. R. Evid. 702 ...............................................................................1, 4, 34, 49

**OTHER AUTHORITIES**

David H. Kaye & David A. Freedman, "Reference Guide on
Statistics," in *Reference Manual on Scientific Evidence*, 211, 226-
27 (Fed. Judicial Ctr., 3d ed. 2011) .....................................................47, 49, 51

Shari S. Diamond, National Research Council/Federal Judicial Center,
*Reference Manual on Scientific Evidence*, *Reference Guide on
Survey Research*, 2011 WL 7724258, at *11, *13 (3d ed. 2011)................47, 60

## TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief. Emphasis throughout the brief is added by Defendants-Appellants unless otherwise noted.

| Abbreviation | Term |
|---|---|
| (__:__) | patent column and line numbers, or transcript page and line numbers |
| Asserted Patents | U.S. Patent No. 7,670,358, U.S. Patent No. 8,361,121, and U.S. Patent No. 9,668,787, collectively |
| ’358 patent | U.S. Patent No. 7,670,358 (Appx113-124) |
| ’121 patent | U.S. Patent No. 8,361,121 (Appx125-136) |
| ’787 patent | U.S. Patent No. 9,668,787 (Appx149-161) |
| Barry, or Plaintiff | Dr. Mark A. Barry, plaintiff in this civil action |
| Betz | Dr. Randall Betz, one of the surgeons who, along with Dr. Peter Newton, helped develop DePuy’s Monarch system |
| Br. | Brief for Plaintiff-Appellant (Dkt. No. 15) |
| court, or district court | United States District Court for the Eastern District of Pennsylvania |
| Court | United States Court of Appeals for the Federal Circuit |
| DePuy | Defendants-Appellees DePuy Synthes Products, Inc. and DePuy Synthes Sales, Inc., collectively |
| JMOL | judgment as a matter of law |
| MDBS | Defendant-Appellee Medical Device Business Services, Inc. |
| Neal | David Neal, Ph.D., survey expert for Plaintiff |
| Newton | Dr. Peter Newton, one of the surgeons who, along with Dr. Randall Betz, helped develop DePuy’s Monarch system |

| | |
|---|---|
| NPE | non-practicing entity |
| POSA | person of ordinary skill in the art |
| Schenk | Kimberly Schenk, damages expert for Plaintiff |
| Yassir | Dr. Walid K. Yassir, technical expert for Plaintiff |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, no other appeal in or from this civil action was previously before this or any other appellate court. Other than *Barry v. Seaspine*, No. 1:20-cv-01787-RGA-SRF-consolidated (D. Del.), set forth in Plaintiff-Appellant's Statement of Related Cases (Br.1), Defendants-Appellees are not aware of any case pending in this or any other court or agency that will directly affect or be directly affected by the Court's decision in this case.

## INTRODUCTION

Under Rule 702 of the Federal Rules of Evidence, district judges are vested with discretion in their assigned role of "gatekeeper" to keep unreliable scientific and technical expert evidence out of the hands of juries. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-53 (1999).

Rule 50(a)(1) of the Federal Rules of Civil Procedure imposes a similar obligation upon district judges. According to the Advisory Committee's 1991 Notes to that Rule, it is the judge's "duty to enter judgment as a matter of law at any time during the trial, as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case."

Judge Diamond carried out each of these judicial obligations with great care and sound judgment. He first exercised his gatekeeping discretion to exclude certain evidence proffered by plaintiff—that of Barry's technical expert, Yassir, for contradicting the claim construction of "handle means" that Barry himself successfully urged the court to adopt (Appx19-20); and that of Barry's survey expert, Neal, because his "methodology is so flawed that both his survey and testimony—which he bases on that survey—must be excluded as unreliable." Appx16; *see also* Appx20-21 (indicating that the court would also exclude Neal's survey and testimony on the "second, independent ground" that he "relied entirely

on Dr. Yassir's infringement analysis, which . . . impermissibly contradicted my claim construction").

With that evidence properly excluded in the exercise of his discretion, Judge Diamond then performed the "duty" assigned to him by Rule 50(a)(1)—to enter JMOL for DePuy, because with Yassir's and Neal's testimony excluded, "there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff on direct infringement"—a necessary predicate for Plaintiff's indirect-infringement claims against DePuy. Appx21.

Barry pays lip service to the abuse-of-discretion standard of review, insisting that this Court, applying Third Circuit law, must apply a special, "more stringent" "hard look" standard for the dispositive exclusion of expert evidence, grounding that insistence in a 1994 Third Circuit decision, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749-50 (3d Cir. 1994). But the Supreme Court scuttled any such notion in its 1997 decision in *Joiner*, when it reversed the Eleventh Circuit for applying an overly "stringent" standard of review—a standard it had divined from *In re Paoli*; *see Joiner v. Gen. Elec. Co.,* 78 F.3d 524, 529 (11th Cir. 1996) (citing the very page of *Paoli* where the Third Circuit had announced the "hard look" standard, 35 F.3d at 750)—to the trial judge's exclusion of expert testimony. 522 U.S. at 143.

When the proper, deferential, abuse-of-discretion standard is applied to Judge Diamond's exclusion of Yassir's claim-construction-contradicting testimony, and Neal's flawed, unreliable survey evidence, the judge's duty to grant JMOL was clear and unmistakable.

These decisions reflected the exemplary conduct of a patent trial. They should be affirmed.

**COUNTER-STATEMENT OF THE ISSUES**

1. Whether the district court abused its discretion in exercising its gatekeeping obligation under Fed. R. Evid. 702 and *Daubert* to exclude—

(a) the testimony of Yassir, where Yassir not only failed to follow, but contradicted, the court's construction of the "handle means" terms; and

(b) Neal's survey and testimony, as the product of an unreliable methodology, where (i) Neal failed to establish that the survey sample was representative of any target universe, and (ii) flaws in Neal's survey design, including (but hardly limited to) a basic logical flaw in his questions and his use of closed-ended questions with non-exhaustive categories of surgical assemblies, rendered his results meaningless.

2. Whether the district court properly granted JMOL of non-infringement because no reasonable juror could find infringement in the absence of Neal and Yassir's inadmissible testimony.

## COUNTER-STATEMENT OF THE CASE

Barry, a retired spine surgeon, is the named inventor on a family of patents directed to a surgical technique and tools for treating spinal deformities such as scoliosis. The initial patents in the family all require a "handle means." Barry successfully asserted those patents against Medtronic in a case tried in the Eastern District of Texas in 2016 and affirmed by this Court in 2019. *Barry v. Medtronic, Inc.*, 914 F.3d 1310 (Fed. Cir. 2019). While *Medtronic* was pending, Barry obtained additional continuation patents that omitted the "handle means" terms, one of which he asserted in this case.

Emboldened by his *Medtronic* victory, Barry set his sights on several other spinal-implant companies, DePuy included. But DePuy's product is unlike Medtronic's—in particular, it has no handle means. This led to Barry's expert, Yassir, contradicting the court's claim construction in an effort to assert infringement.

Further, because Barry's infringement theory required proof of how many surgeons performed particular types of surgeries using particular tools configured in particular ways using particular steps, his case—like his *Medtronic* case—depended on a survey expert and a particular survey. *See Medtronic*, 914 F.3d at 1334-36. Barry used Neal as his expert both here and in *Medtronic*, but here, Neal used a different and far more complicated survey, in an effort to prove and quantify

DePuy's alleged infringement. Neal himself touted the differences—the survey here asked different questions using six newly-drafted categories of surgical assemblies to account for the additional patents asserted against DePuy. Additionally, he used a new source to obtain more respondents (internet searches done by his assistant). The court cited both differences in holding that the survey utilized unreliable methodology.

Both experts were excluded in the exercise of district-court discretion, leading to the court's grant of JMOL of non-infringement.

### A. Scoliosis Surgery—Segmental And *En Bloc* Derotation

Scoliosis is a three-dimensional deformity in which the spine is both misaligned and twisted, as illustrated below:



Appx6184.

To correct the deformity, the surgeon straightens the spine, and also untwists, or "derotates," the vertebra using a technique called "vertebral body derotation." Vertebral body rotation was pioneered by Dr. Se-Il Suk, a Korean

surgeon, in the late 1990s and early 2000s. The technique involves attaching elongated tubes (or derotators) to the vertebrae and manipulating them back to their normal rotational alignment. Some surgeons derotate a *single* vertebra at a time; this is called "segmental derotation." Appx1330 (154:24-155:9); Appx1374-1375 (20:17-21:2). Others prefer "*en bloc* derotation," where the surgeon simultaneously derotates *multiple* vertebrae. Both segmental and *en bloc* derotation techniques were known long before Barry's patents. Appx1330 (153:9-24); Appx1375 (22:4-24:9).

### B. Barry's Early Development Work And Surgeries

In Spring 2003, Barry began working to develop a tool for *en bloc* derotation. Appx1036 (141:4-142:24). At the time, he was using DePuy's Monarch system to perform scoliosis surgeries, and he instructed his DePuy sales representative, Robert Pfefferkorn, to modify an existing DePuy instrument called a rod stabilizer to create a prototype for what became his invention. Appx1036 (144:3-25). Barry selected the Monarch rod stabilizer because it had a polymer handle he could drill holes through to facilitate linking multiple instruments. Appx1036-1037 (141:22-148:19). Eventually, Barry had three slots machined into the handles, and a spinal rod was inserted through the slots to link the handles. A photograph of Barry's prototype device appears below:




Appx5441.

Barry used these modified Monarch instruments in at least three surgeries—two in August 2003 and one in October 2003. Barry was able to link the handles and derotate multiple vertebrae along the spine; all three surgeries were successful. Barry testified that he knew the instruments would work even before he performed the first surgery, Appx1085-1087 (76:17-84:9), and, according to his patient records, Barry obtained excellent results in all three surgeries. Appx1095-1096 (113:12-120:25); *see also* Appx1114 (190:24-191:9) (Pfefferkorn testifying that Barry had successfully used linked *en bloc* instruments in surgeries prior to July 2003).

During this time period, Barry contacted several companies, including DePuy, to try to commercialize his idea. Appx1084 (71:23-72:12). DePuy informed Barry that it was already working on a new system to replace Monarch

and was not interested in pursuing his design. Appx9267-9268. Barry did, however, enter into an agreement with another spinal-implant company, Biomet, and together they introduced a commercial embodiment of his invention.




Appx6432; Appx1081 (59:25-60:2). The Biomet instrument, like the modified Monarch prototypes, used a rod to link handles.

### C. The Barry Patents

Barry filed his initial application in December 2004, well over a year after he used his prototype instruments in surgery. Appx113; Appx1085-1086 (76:19-77:1). Barry eventually obtained a number of patents claiming priority (as continuations-in-part) to this initial application, five of which he asserted in this case. Prior to trial, Barry dropped two of the five, and the case proceeded on the ’358, ’121 and ’787 patents.

The Asserted Patents share a common specification. They describe a tool, called a "pedicle screw cluster derotation tool," for achieving *en bloc* derotation of multiple vertebrae by using a handle means linked to multiple derotator shafts. Appx119-120 (4:65-5:23). For the embodiment shown in Figure 1 below, the pedicle screw cluster derotation tool (**30**) includes a grouping of handles (**34**) (which Barry now calls "handle regions," Br.5) connected by a linking member (**42**). The group of linked handles is linked to multiple shafts (**36**), which engage with pedicle screws at their distal ends (**38**). Appx114 (Fig. 1); Appx120 (5:1-18). A cross-linking member (**40**) connects two cluster tools.




*FIG. 1*

The specification does not include any disclosure of a handle-less design. Appx118-120. The patent figures include a handle means, and the specification

uniformly describes the invention as having handles. Appx114-120. No other embodiment of the alleged invention is shown. Appx114-117. While the specification states that "[s]ignificant variations of pedicle screw cluster derotation tool 30" are contemplated (Appx120 (5:19-29)), even the one explicitly contemplated "variation" set forth in the specification had a handle:

> For example, the linked, multiple wrenches 32 depicted in FIG. 1 ***may be replaced by a single handle member*** *from which extend the functional equivalent of the multiple shafts* 36 and shaft distal ends 38 for simultaneously engaging multiple pedicle screws 10, as depicted.

Appx120 (5:20-25).

The asserted claims of the '358 and '121 patents require, *inter alia*, a "first pedicle screw cluster derotation tool" and a "second pedicle screw cluster derotation tool," a "first group of pedicle screw engagement members" and a "second group of pedicle screw engagement members," and a "first handle means" and a "second handle means." Appx120-121 (6:8-7:15); Appx135 (7:57-8:45). The '121 patent's claims further require a "linking member" to join together the handles, and a "cross-linking member" that links the "first handle means" to the "second handle means." Appx135 (8:10, 8:44-45). The third asserted patent, the '787 patent, which was filed years after DePuy's accused system was launched, does not recite a "handle means," but requires at least four "levers" linked on each side of the spine, and further requires that the levers be linked across the spine. Appx160 (8:14-50).

**D. DePuy's Independent Development**

The development work that led to DePuy's accused products began in the early 2000s with the Monarch system, long before DePuy met with Barry. Drs. Betz and Newton, two of the surgeons who helped develop DePuy's Monarch system, explained that surgeons were using an instrument called a "cap stabilizer"—a different instrument from the one Barry later modified—to perform segmental and *en bloc* derotation with DePuy's Monarch system. Appx1333 (165:10-166:19); Appx1377-1378 (31:21-33:2). The cap stabilizer is shown below.



Appx5572. The Monarch cap stabilizer attached to the top of the pedicle screw, and Betz and Newton had DePuy make a custom version of the device with a longer shaft to make derotation easier. Appx1333 (166:25-167:23); Appx1378 (33:3-34:24).

Later, Betz and Newton worked with Ron Sacher, a DePuy product manager, on mechanically linking two or more derotators to perform derotation. They discussed this concept with DePuy at several meetings, including a meeting in Whistler, British Columbia in January 2003. Appx1334 (169:6-171:14); Appx1380-1381 (44:3-45:15); Appx8943; Appx9277-9278. Shortly thereafter,

DePuy decided to develop a completely new system to replace Monarch. That new system was called "Expedium," and the linked-derotator concept became part of it. Appx1334 (171:16-25). Both Betz and Newton worked with DePuy to develop that system, including derotation instruments. The initial Expedium derotation instruments, which were not accused of infringement, were commercialized in 2005, before Barry commercialized his invention with Biomet. DePuy obtained patents on its instruments. Appx7363-7390.

DePuy subsequently re-designed the derotation instruments to improve the connection between the derotators (which DePuy called "Quick Sticks") and screws, and to increase the ability of surgeons to connect Quick Sticks to the screws more easily. Appx1403-1404 (136:9-139:10). DePuy obtained additional patents on these redesigned instruments. Appx8662-8687. During the development process, DePuy and its engineers reviewed other systems on the market, including the Barry/Biomet design, asking surgeons whether they believed DePuy's or Barry/Biomet's instruments were better. The surgeons resoundingly favored DePuy's; the Barry/Biomet device was "too big" and "clunky," and limited to *en bloc* derotation. Appx8698; Appx1335-1336 (176:23-178:18); Appx1384 (59:10-60:11).

DePuy's instruments can be used to perform either *en bloc* or segmental derotation, and can be configured in countless different ways, many of which

Barry concedes do not infringe the asserted claims (even when used for linked *en bloc* derotation). An example of DePuy's accused vertebral body derotation instruments (configured for segmental derotation) are shown below.



Appx5677.

The Quick Sticks are not themselves handles, nor do they include a handle. No portion of them is knurled, nor do they have any particular portion specially designed to be grabbed. The frames can be attached at any point along the Quick Stick, and can be used for both segmental and *en bloc* derotation at the surgeon's election. The instrument set does include a handle, called a "frame handle," but the evidence was undisputed that this part is not used. Appx1239 (132:4-21).

### E. Barry's *Medtronic* Suit And Medtronic's IPR

Barry sued Medtronic in 2014, alleging that Medtronic's VCM instruments infringed the '358 and '121 patents. Medtronic responded by seeking *inter partes*

review of Barry's patents. In both the IPRs and the district-court litigation, the parties agreed that "handle means" should be construed to mean "a part that is designed especially to be grasped by the hand." Both the PTAB and the district court adopted that construction, and the PTAB further clarified that this construction did not encompass any part of the instrument that merely "may" be grasped by the hand. Appx11085 ("We construe the 'handle means' to mean a part that is designed especially to be grasped by the hand, *but do not agree that the handle means includes any part that may be grasped by the hand.*").

### F. The Neal Surveys

Barry used the same survey expert, Dr. David Neal, in the *Medtronic* case and here, but he did not proffer the same survey in both. Rather, the survey in this case was completely redesigned by Neal and Yassir, working in conjunction with Barry's counsel. Appx1217-1218 (44:11-22, 47:5-11). The DePuy survey asked different questions, and covered additional products and patents. Appx1165-1166 (64:21-65:8); Appx1220 (53:4-7, 54:12-24).

#### 1. The 2018 DePuy Survey

Neal did not know how many surgeons he invited to participate in his survey, but he estimated sending it to "about 4,000" surgeons. Appx1166-1167 (68:22-69:18). The recipients were generated from multiple sources. Neal first purchased an unquantified list of email addresses for "orthopedic surgeons,

orthopedic spine surgeons, and neurosurgeons" from market research firm IQVIA. Appx1166 (67:18-23); Appx1222 (63:23-25); Appx15704 (179:6-15). Next, he added 522 members of the Scoliosis Research Society from a list Barry's counsel compiled in 2016. Appx1180-1181 (124:17-125:24); Appx15711 (¶ 3.5). He then had his personal assistant do Google searches for the terms "orthopedic surgeon, scoliosis surgery" and "orthopedic surgery email address," yielding an additional 77 names. Appx1180 (122:15-124:16). From these "about 4,000" surveys, Neal received 164 responses (Appx1181 (127:6-11))—a response rate of 4.1%, assuming exactly 4,000 (instead of "about 4,000") recipients.

Neal's survey posed a series of questions asking surgeons to recall precise details about all of the surgeries they had performed over the past two years—the total number of spinal-deformity surgeries they performed; the total number of those surgeries that involved pedicle screw and rod systems; the total number of surgeries using each different commercial pedicle screw and rod system (*e.g.*, DePuy's Expedium and Viper systems); and the total number of surgeries using each particular system that involved "simultaneous derotation of two or more vertebral bodies in the axial plane." Appx1183 (133:12-135:13 (Q8-Q14)); Appx7828-7852; Appx8174-8206.

The last question in that series—Question 14—was an "anchor question," asking surgeons to quantify the number of surgeries that involved "*simultaneous*

derotation of *two or more* vertebral bodies in the axial plane." Appx7833. That is, it asked surgeons to quantify the total number of *en bloc* surgeries performed—to the exclusion of segmental procedures. The comparable question in the *Medtronic* survey, by contrast, asked the number of surgeries involving "correcting rotation of vertebral bodies in the axial plane"—an anchor question that encompassed both *en bloc* and segmental derotation. Appx9147 (Q13).

Question 14 thus "anchored" respondents into a total number of *en bloc* surgeries used for the next set of questions. Those questions introduced six "types" of surgical constructs that respondents had never seen before, and forced them to categorize every one of their prior surgeries into one—and only one—of those types. Appx1217 (43:11-44:10). Neal included pictures for the different categories but, despite instructing surgeons to put each surgery into only one type, Neal used identical pictures for multiple types—for example, the image below appeared as an example of a surgical construct that fell within types 4, 5, and 6. Appx7838-7840.



Surgeons were not given the option to answer "other," "I don't know," or "I'm not sure" at any point during their categorizing of past surgeries. Appx1183 (134:22-135:3); Appx1217 (43:18-44:10). Instead, they were forced to identify a number of surgeries for type 6, then a number for type 5, 4, 3, 2, and 1—always in that order. Appx1218 (45:23-46:9); Appx7840-7844.

Further, the total number of surgeries in types 1-6 had to add up to the number of *en bloc* surgeries that surgeons had previously reported in anchor Question 14 (Appx1174 (97:14-100:11)), and surgeons could not "go back" while taking the survey if they at this point wished to correct the number of surgeries that they had reported doing. Appx1183 (135:4-136:8). Despite using closed-ended questions, Neal never instructed Yassir or Barry's counsel that the six "types" of surgeries they created for the survey should be exhaustive of all surgeries.

Appx1217-1218 (44:23-45:22). Yassir conceded they were not exhaustive. Appx1297 (23:6-24:13).

Yassir informed Neal that surgery types 2-6 infringed one or more of the asserted patents, but that type 1 did not. Appx1169 (78:13-79:8); Appx1175 (102:9-20). But type 1 was expressly limited to surgeries involving "segmental derotation"—which is not *en bloc* derotation or "simultaneously rotating" vertebrae. Appx7835; *see also* Appx1039-1040 (156:19-157:5); Appx1330 (155:1-9). So, since "anchor" Question 14 had asked for a total number of *en bloc* surgeries, every responding surgeon should have answered "zero" for non-*en bloc*, type 1 surgeries. However, nearly half of the responding surgeons reported type 1 surgeries. Appx15712.

Barry's damages expert, Schenk, used Neal's survey results to concoct a hefty damages claim. She extrapolated the Neal survey's results to the larger population of all surgeons who perform spinal-deformity procedures in the United States—taking the percentage of infringing procedures allegedly performed by the 164 respondents in Neal's survey and applying that percentage to the total number of spinal-deformity procedures performed in the United States per year, which she claimed to have obtained from third-party market-research reports. Appx1325 (135:20-136:22); Appx1326-1328 (138:13-145:6). She further extrapolated those

results—which were only for the two years 2016-2018—to the entire twelve-year damages period 2011-2023. Appx1326 (139:12-140:1).

### 2. The 2016 *Medtronic* Survey

In this Court, Medtronic unsuccessfully challenged the 2016 Neal survey as evidentially insufficient to prove direct infringement, and inadmissible on a single ground—that "it did not specifically name the accused Medtronic VCM kit in asking doctors what they did." 914 F.3d at 1334-35.

As Judge Diamond noted, "the *Medtronic* litigation involved a ***different*** Neal survey, which, in any event, did not suffer from the same design flaws that I discuss here." Appx33 (emphasis in original). There are indeed significant differences between the DePuy survey and the *Medtronic* survey, even though both were purportedly used to quantify infringing uses.

*First* are the anchor questions. The Medtronic survey asked surgeons for the total number of surgeries using each particular system that involved "correcting rotation of vertebral bodies in the axial plane." Appx9147 (Q13). But the DePuy survey's anchor question asked only about "simultaneously derotating two or more vertebral bodies in the axial plane"—*en bloc* procedures. Appx7833 (Q14).

*Second*, the *Medtronic* survey covered only the '121 and '358 patents, but not the '787 patent, and thus provided surgeons with only three types of surgical constructs to choose from following the anchor question, as opposed to the six

different types drafted by Yassir and Barry's counsel for the DePuy survey. Appx9148-9150. The *Medtronic* survey also did not include pictures. *Id*.

*Third*, the *Medtronic* survey included only one of the two accused DePuy products—Expedium, but not Viper. And the *Medtronic* survey results showed a much lower percentage of infringing uses of the Expedium system than Neal found in the DePuy survey. Appx1220-1221 (55:21-59:19); Appx1222 (61:4-15); Appx1224 (70:25-72:13).

### G. Procedural History

#### 1. Claim Construction

During claim construction, Barry proposed that "handle means" be construed as "a part that is designed especially to be grasped by the hand." Appx15162. The Court adopted that construction. Appx15165. This was exactly the construction Barry offered and obtained in *Medtronic*, and it does not include any part that *may* be grasped by the hand, but only those "part[s]" that are "designed especially" to be so grasped. The Court directly engaged Barry's counsel on the "part" and "designed especially" portions at the claim-construction hearing:

> THE COURT: What is a handle?
>
> MR. HOLLOWAY: Something you can grasp with your hand. The Miriam Webster [*sic*] dictionary says, "A part designed to be grasped by the hand."
>
> THE COURT: So that [is] design[ed] to be grasped by the hand or can be grasped by the hand?

> MR. HOLLOWAY: The construction from the Me[d]tronic litigation, *which Dr. Barry is sticking with* is a part especially designed to be grasped by the hand.

Appx16139 (86:16-24).

The same issue arose in the PTAB regarding the '358 patent and other related patents. There, the Board used the same construction of "handle means": "a part that is designed especially to be grasped by the hand." Appx11085. The PTAB expressly noted that not everything that *may* be grasped by the hand is a part *designed especially* for this purpose:

> We construe the "handle means" to mean *a part that is designed especially to be grasped by the hand*, but do not agree that the handle means includes any part that *may* be grasped by the hand.

*Id*.

With regard to the fact that the claims required "first" and "second" "pedicle screw cluster derotation tools" with "first" and "second" "handle means," the Court adopted the parties' agreement that "[c]laim terms that recite a number of elements represent numerical counts of structure." Appx15158.

### 2. DePuy's Summary-Judgment Motion

After the conclusion of expert discovery, DePuy moved for summary judgment of invalidity on the asserted claims that do not recite a handle or handle means, urging that they lacked enablement and written-description support under 35 U.S.C. § 112. Appx15197-15226. The court denied DePuy's motion, but recognized, "[t]o be sure, [Barry's] expansive understanding of 'handle' is in

tension with his presentation to the Patent and Trial Appeal Board." Appx15644. The court noted that, at the PTAB, Barry's attorney and Yassir had argued that "'posts'—which a surgeon 'pushes' but does not grasp—'are not handles.'" *Id.*; *see also* Appx16563; Appx16568; Appx11483-11484. Far from rejecting DePuy's argument, the court expressly allowed that "DePuy may raise [Barry's] shifting (perhaps even contradictory) positions" at trial. Appx15644.

### 3. The Pre-Trial *Daubert* Motions

DePuy also filed two *Daubert* motions—one seeking to exclude Yassir's testimony, and another seeking to exclude Neal's and Schenk's. The court denied both motions at the time, expressly noting that "[b]ecause I am being asked to make evidentiary trial rulings when trial has not yet begun, my decisions are necessarily tentative," and "I am prepared to revisit them during trial should any Party ask me to do so." Appx15647.

The Court's "tentative" rulings did not bless Yassir's testimony regarding the "handle means" limitations. To the contrary, the Court acknowledged that Yassir's deposition testimony "implies that his opinion is that a single 'handle means' can function as both the 'first handle means' and the "second handle means.'" Appx15651-15652. The court opted not to exclude Yassir's testimony *at that time*, but cautioned that "Yassir may not present testimony that is contrary to the stipulated construction of terms reciting a number of elements." Appx15652.

DePuy's *Daubert* challenge to Neal's unreliable survey methodology had two main grounds: (1) Neal's failure to demonstrate his sample was representative of his target universe; and (2) Neal's questions violated accepted survey principles, including his use of closed-ended questions with non-exhaustive categories. Appx15290-15292. Given the tentative nature of the court's ruling, DePuy reiterated its methodological challenges in the pretrial memorandum. Appx13677, 13679.

### H. Trial And JMOL

Trial began on June 13, 2023. In opening statements, Barry's counsel stated that "D[e]Puy's tools are designed to be grasped by the hand," Appx1020 (79:18-19), omitting the claims' requirements that the handle has to be a particular "part" of the system, not the entire "tool," and that the part has to have been "designed *especially* to be grasped by the hand."

Plaintiff's first witness, Barry himself, continued this theme, testifying that the "handle means" was "anything that acts as a lever." Appx1103 (147:23-24). On cross-examination, Barry testified that the "handle means" of his patent included not just the part actually marked in the drawings as a "handle" (Appx114 (Fig. 1, reference no. 34)), but also some parts of the shaft (separately denominated with reference no. 36 in Fig. 1)—but not others. Appx1102-1104 (144:6-150:3). Barry originally made the claim that "the whole thing," "the entire construct" of

Figure 1 was a "handle means" (Appx1103 (146:19-147:2)), but then backtracked, suggesting that "the bottom part of the shaft" was not part of the handle means. Appx1103 (147:17-19). When asked where the "handle means" ended along the shaft, Barry could not delineate where the "handle means" ended and "the bottom part of the shaft" began. Appx1103 (147:19-24; 148:7-14).

Yassir similarly testified that everything in a surgical construct is a "handle means." Appx1255 (195:11-20). He admitted that it would be "very difficult" to design something to be "grasped by the hand but not especially designed to be grasped by the hand," and that he "equated the two" things, thus affording the word "especially" in the court's construction of "handle means" no meaning. Appx1256 (200:5-10). Asked about Figure 1 of the patent, Yassir testified that every component of the construct was a handle, and handle means, because "[t]hey are parts that cannot be assembled without grasping them by the hand." Appx1255-1257 (196:16-197:19, 201:5-203:4).

On day 4 of trial, Yassir was shown this slide and questioned about it:




He testified as follows:

> Q. On Slide 4 I have the Court's construction of handle means, "A part that is designed especially to be grasped by the hand."
>
> And on the right, I believe I have what you said was your rational[e] for why everything in Figure 1 is a handle means. "They are parts that cannot be assembled without grasping them by the hand."
>
> A. That's correct.
>
> Q. So those two, in your mind and in doing your analysis, you equated those two things. Am I right?
>
> A. Yes.

Appx1256 (198:14-24). *See also* Appx1256 (197:1-19 (cross-linker, linking rod, and pedicle-screw engagement member are all "handle means" because they "cannot be applied without grasping them by the hand").

When Yassir was shown a construct and asked to identify which was the "first handle means" and which was the "second handle means," he identified the entire construct as being both the "first" and the "second" handle means.

Appx1255 (195:8-196:7); Appx1257-1259 (203:22-211:21). On the issue of the "first" and "second" "pedicle screw cluster derotation tools," Yassir testified that "once they're linked together like they're supposed to be, you don't have two pedicle screw cluster derotation tools, you have one." Appx1259 (211:11-17 (his answers: "Okay" and "Correct")).

DePuy's prior *Daubert* challenge to Neal came up multiple times during trial. Before he provided any opinion testimony, the Court questioned Neal's qualifications in a sidebar, and DePuy responded that while it did not object to him being qualified as a survey expert generally, it did object to the admissibility of his testimony based on its *Daubert* challenge to his methodology. Appx1162 (49:21-51:1). The court allowed Neal to testify but previewed that "if I ultimately determine that I shouldn't have allowed him to testify, then I will direct the jury to disregard his testimony." Appx1162 (51:2-25). Before Neal left the stand, the Court referenced its tentative ruling and asked DePuy whether it still had "an objection on *Daubert* grounds to the methodology [Neal] has used"; DePuy confirmed that it did. Appx1185 (143:25-144:7).

When Neal's testimony was complete, the court again asked DePuy about its objection to his methodology, noting "that seems to me to be a very substantial objection" and stating that he would take it under advisement and permit the

parties to provide briefing "in light of his actual testimony." Appx1225 (74:8-20).[1] In response to a question from the court about the impact of excluding Neal, counsel for Barry suggested that the case could still go to the jury, but counsel for DePuy disagreed, stating that it would "for all practical purposes, end the trial." Appx1225 (74:21-76:17). The court subsequently ordered staggered briefing to allow Barry time to respond to any additional arguments in DePuy's renewed *Daubert* challenge. Appx1262 (221:20-223:17).

DePuy submitted a renewed *Daubert* motion as requested by the court on June 19, 2023, raising the same challenges to Neal's survey based on failure to establish representativeness and fatal flaws in the question design, bolstering those challenges with additional facts and arguments based on Neal's trial testimony. Appx15660-15691. For example, Neal had never provided DePuy with the total number of survey invitations sent prior to trial, but during trial he identified that number as "around 4,000," demonstrating a response rate of barely more than 4%. Based on that testimony, DePuy showed that Neal's failure to address non-response bias further warranted exclusion. Appx15683.

[1] Barry takes veiled shots at the Court's questioning of Neal with respect to his survey methodology (Br.20-22), including representativeness. "The court may examine a witness regardless of who calls the witness," Fed. R. Evid. 614(b), and "[a] party may object" thereto, *id.* 614(c), but Barry never objected to the Court's questioning of Neal, nor does he assign error on this point. *See* Br.3-4.

DePuy also provided additional detail regarding the design flaws in Neal's methodology, including why the phrasing of the anchor question to include only *en bloc* surgeries, coupled with the use of a closed-ended question with six non-exhaustive categories, rendered the methodology unreliable and the results nonsensical. Appx15686-15688. None of these arguments came as a surprise to Barry: Neal was cross-examined on each topic, and DePuy's survey expert, Dr. Rossi, addressed those flaws in his pre-trial report and trial testimony. Appx1183 (134:22-135:3); Appx1217-1218 (43:11-45:22); Appx1451-1452 (41:10-43:12, 45:8-46:10). Barry submitted his opposition two days later. Appx13959.

At the close of Barry's case, DePuy orally moved for JMOL under Rule 50(a), and advised the court that it would be filing a written submission that evening more fully explaining the bases for its motion. Appx1328-1329 (148:6-149:1. The court indicated that it would take the motion under advisement, and would be considering it in conjunction with DePuy's *Daubert* motion, "particularly as it reflects on whether or not there's proof of direct infringement and whether or not there is proof of damages." Appx1329 (149:16-23). As promised, DePuy filed its written papers that evening. Appx15813-15856.

The following morning, before trial resumed, the court told Barry's counsel that it would be "helpful" to have a written opposition to DePuy's motion and asked when Barry might be able to submit a response, noting that "the document

that [DePuy] submitted, in some respects at least, they're persuasive." Appx1371 (6:11-24). Counsel for Barry unsuccessfully proposed filing a "summary response" and deferring a more complete one until "post-trial," stating his concern that Barry's response would "probably not be as polished as what the defendants put in." Appx1371 (6:25-8:11). The court pressed Barry as to when he would be able to file a full response; counsel requested two days. The court agreed. Appx1371 (8:12-21). Following Barry's written opposition (Appx15919), the court ordered DePuy to file a reply "limit[ed] . . . to a discussion of whether Dr. Yassir's testimony respecting 'handle means' contradicted the claim construction in my Markman Order." Appx14565. DePuy submitted its reply the next day. Appx14566-Appx14582.

The court subsequently granted DePuy's motion to exclude Neal (Appx16-17) and its Rule 50(a) JMOL motion, finding that Yassir contradicted the court's claim construction (Appx19), and that "there is no legally sufficient evidentiary basis for a reasonable jury to find for [Barry] on direct infringement." Appx21. The court more fully explained the bases for its decisions in later orders. Appx23-44.

Regarding Neal, the court concluded "[a]fter considering Neal's testimony and reviewing the submissions, it was apparent that Neal's methodology was

flawed and that no reliable conclusions could be drawn from his survey." Appx30.

The court explained:

> His stated goal notwithstanding, Neal failed to interrogate "a large representative cross section of surgeons." Further, the survey's design flaws ensured that any results would be meaningless. Either of these failings was sufficiently serious to preclude the survey's admission at trial. Added to these were the repeated circularity of Neal's definitions and reasoning, and his failure to perform a pretest, consider non-responsive bias, follow up with those who did respond, or allow respondents to check their surgical records. Considering all these flaws, I ruled that Barry had failed to show by an evidentiary preponderance that the survey and Neal's expert opinion were reliable, and so barred their admission.

Appx32 (internal citations omitted).

Regarding Yassir, the court found that he "repeatedly varied from and contradicted" (Appx62) the claim-construction order:

> Although Yassir paid lip service to testifying in accordance with my Claim Construction Order, in fact, he contradicted it. As I have discussed, Yassir improperly based his opinion and trial testimony respecting direct infringement of "handle means" on his construction: "parts that cannot be assembled without grasping them by the hand." I did not construe—and Dr. Barry did not ask me to construe—"handle means" as a part that "can" or "must" be grasped by the hand. The "handle means," which includes a handle, is a part *especially designed* to be grasped by the hand.

Appx61 (emphasis in original) (internal citations omitted).

The court further concluded that, absent Yassir's testimony and the Neal survey evidence, both of which were excluded, there was not sufficient evidence to support a finding that DePuy's accused products met the "handle means" limitation

of the ’358 and ’121 patent, or that any surgeons actually performed the cross-linking step of claim 6 of the ’787 patent. Appx63-65. In making this determination, the court considered the remaining evidence and found it insufficient, and in many cases, actually proved non-infringement. Appx65. The court concluded by noting that “[a]lthough DePuy’s other grounds for JMOL appear to be quite substantial, in light of my determination that [Barry] did not make out direct infringement, I will not discuss them further.” Appx66.

### I. Post-Trial Motions

On August 14, 2023, DePuy filed a motion seeking an exceptional-case finding under 35 U.S.C. § 285, and holding Barry liable for the attorneys’ fees, costs, and non-taxable expenses DePuy was forced to incur in this action. Appx14583-14618. Barry opposed. That motion remains pending.

## **SUMMARY OF ARGUMENT**

Following his successful infringement case against Medtronic, Barry sought to replicate that victory against DePuy. A major flaw in Barry's plan, however, was the fact that DePuy's instruments differ from Medtronic's—the Medtronic instruments have handles; DePuy's do not. This led Barry, his lawyers, and his experts down a path that ultimately proved fatal to his case.

*First*, Barry's technical expert, Yassir, had to engage in linguistic distortion of the court's construction in order to assert infringement of the "handle means" limitation against DePuy's handle-less instruments. As Judge Diamond observed, Yassir paid only "lip service" to the court's construction, admitting at trial that he was applying a quite different construction in conducting his infringement analysis. This Court's cases are legion in holding that expert testimony may not be used to vary or contradict claim language, and Judge Diamond faithfully enforced that rule by exercising his discretion to exclude Yassir's contradictory testimony.

*Second*, Judge Diamond also acted well within his discretion in excluding Neal's survey and testimony as methodologically flawed. Barry suggests that the survey here is just like the one this Court encountered in *Medtronic*. Br.12-13. It is not—it differed in several critical, dispositive respects, which introduced methodological flaws not presented or argued to this Court in *Medtronic*—and Judge Diamond recognized this. Further, this Court's *Medtronic* opinion

demonstrates that the only "admissibility" challenge to Neal's very different survey there was its asserted failure to explicitly mention the accused Medtronic instrument; there was no *Daubert* challenge before this Court presenting the fundamental, methodological challenges that led Judge Diamond here to exclude the Neal survey and testimony as unreliable under Rule 702 and *Daubert*. Judge Diamond acted well within his broad discretion in excluding Neal's survey and testimony on grounds of representativeness, design flaws, logic errors, non-response bias, and the absence of valid pre-tests.

Faced with Judge Diamond's thorough treatment of Neal's flawed survey and testimony, Barry suggests that this Court is obligated to review the exclusion not for abuse of discretion, but under some sort of muscular, plenary, "hard look" standard. In fact, Barry's second issue presented (Br.4) is limited to asking whether the court's exclusion of Neal's survey and testimony "survives a 'hard look.'" The Supreme Court overruled the Third Circuit's "hard look" standard in *Joiner*, 522 U.S. at 143, when it confirmed that the Eleventh Circuit, which had relied on the Third Circuit's *In re Paoli* hard-look precedent, "erred in its review of the exclusion of Joiner's experts' testimony. In applying an overly 'stringent' review to that ruling, it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review." *Id.* at 143. While Judge Diamond's detailed treatment of Neal's flawed methodology would survive even the Third

Circuit's now-scuttled "hard look" review, it was unquestionably within his discretion to exclude Neal's testimony and survey.

With Yassir's and Neal's evidence excluded via the proper exercise of trial-court discretion, the die was cast. JMOL of noninfringement under Rule 50(a) was compelled, and, indeed, was the court's duty. The judgment should be affirmed.

## **STANDARDS OF REVIEW**

Rulings excluding expert evidence are reviewed for abuse of discretion. *Joiner*, 522 U.S. at 141-43; *Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*, 362 F. App'x 332, 334 (3d Cir. 2010) ("A district court's ruling as to the admissibility of evidence is reviewed under an abuse of discretion standard.") (citing *Joiner*).

Barry asserts that the "Third Circuit prescribes a ***less*** deferential abuse of discretion review known as a 'hard look'" standard of review for exclusion of experts under *Daubert*. Br.25 (emphasis in original). This is flatly wrong. While the Third Circuit in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 749-50, held that it would review dispositive exclusions of an expert witness (*i.e.*, resulting in summary or directed judgment) under a "more stringent," "hard look" standard, the Supreme Court abrogated that holding in *Joiner*. Indeed, the holding of the Eleventh Circuit that was reversed by the Supreme Court was this:

> Because the Federal Rules of Evidence governing expert testimony display a preference for admissibility, we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony. *See, e.g.*, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, ---, 113 S. Ct. 2786, 2794, 125 L.Ed.2d 469 (1993); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 750 (3d Cir.1994). To the extent that the district court's ruling turns on an interpretation of a Federal Rule of Evidence, our review is plenary. *Id.* at 749.

*Joiner v. Gen. Elec. Co.*, 78 F.3d 524, 529 (11th Cir. 1996).

The Supreme Court's *Joiner* opinion took aim at this exact paragraph, rejecting the claim that decisions excluding expert evidence under *Daubert*—even when case-dispositive—should be reviewed under a "particularly stringent standard of review." 522 U.S. at 140-43. As the Supreme Court explained: "We likewise reject respondent's argument that because the granting of summary judgment in this case was 'outcome determinative,' it should have been subjected to a more searching standard of review. On a motion for summary judgment, disputed issues of fact are resolved against the moving party—here, petitioners. But the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse-of-discretion standard." *Id.* at 142-43.

The *Joiner* Court concluded: "[T]he Court of Appeals erred in its review of the exclusion of Joiner's experts' testimony. In applying an overly 'stringent' review to that ruling, it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review." *Id.* at 143. *See also Duffee By & Through Thornton v. Murray Ohio Mfg. Co.*, 91 F.3d 1410, 1411 (10th Cir. 1996) (rejecting *In re Paoli*'s and the Eleventh Circuit *Joiner* decision's more stringent standard as inconsistent with standard abuse-of-discretion review); *Black v. Rhone-Poulenc, Inc.*, 19 F. Supp. 2d 592, 596 & n.11 (S.D. W. Va. 1998) (noting that the Fourth Circuit had been "prescient" in rejecting the "plenary-review approach" of the Third Circuit's *In re Paoli* and Eleventh Circuit's *Joiner* decisions, as the

Supreme Court had also rejected it "in favor of the less restrictive standard employed by the Fourth Circuit").

Rulings granting JMOL under Rule 50(a) are given plenary review under Third Circuit law. *Wittekamp v. Gulf & W., Inc.*, 991 F.2d 1137, 1141 (3d Cir. 1993) (collecting cases). In the Third Circuit, when deciding whether to grant JMOL, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1253 (Fed. Cir. 2010) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). The "verdict may be directed after the plaintiff's case is presented, when it is clear that completion of the trial is unnecessary in that the only sustainable verdict could be in favor of the defendant." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed. Cir. 1998) (quoting *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1573 (Fed. Cir. 1995)).

# ARGUMENT

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING BARRY'S EXPERTS

### A. Yassir's Testimony Was Properly Excluded As Contradicting The Court's Construction of The "Handle Means" Terms

Barry and Yassir flouted the very construction they successfully asked the court to adopt—"a part that is designed especially to be grasped by the hand"—arguing instead that a "handle means" was "parts that cannot be assembled without grasping them by the hand." Appx61. This was ample ground for exclusion of Yassir's expert testimony: As this Court has repeatedly held, expert testimony "may not be used to vary or contradict the claim language." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). Accordingly, "[n]o party may contradict the court's construction to a jury." *Exergen Corp., v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). "As expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact," it should be excluded under *Daubert*. *EMC Corp. v. Pure Storage, Inc.,* 154 F. Supp. 3d 81, 109 (D. Del. 2016) (citation omitted); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006). Testimony which flouts the court's claim construction would not in any event be substantial evidence that would allow a reasonable jury to conclude that DePuy's

accused instruments have "handles" or "handle means." *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357-58 (Fed. Cir. 2011) ("testimony [that] was based on an incorrect understanding of the claim construction" is not substantial evidence that can "support the jury's verdict"); *Exergen*, 575 F.3d at 1324 & n.2.

In an effort to minimize Yassir's failure, Barry contends that "[e]xperts may elaborate on a court's claim construction." Br.34. "Elaborate" does not mean "change." Barry's cited cases are therefore inapposite. Yassir did not attempt to apply the court's construction in "good faith" like the expert in *Crown Packaging Tech., Inc. v. Belvac Prod. Mach., Inc.*, No. 6:18-CV-70, 2022 WL 821440, at *3 (W.D. Va. Mar. 17, 2022). Nor was his testimony excluded because of semantics, or because he failed to use the exact words of the construction as in *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1377-78 (Fed. Cir. 2008). As the court expressly found, Yassir paid but "lip service" to the court's construction of "handle means"—in fact, he contradicted it. Appx61. As became evident at trial, Yassir based his opinion and trial testimony on his own newfound construction of that term: "parts that cannot be assembled without grasping them by the hand." Appx1256 (198:14-24).

**Handle Means/Member Requirement**

| Term | Court's Construction |
|---|---|
| **handle means / handle member** | A part that is designed especially to be grasped by the hand |

= A part that cannot be assembled without grasping it by the hand

DDX23.4

A "handle means" is not a part that "can" or even "must" be grasped by the hand—Barry specifically disavowed asking for such a construction at the *Markman* hearing. Rather, a "handle means" is a part *designed especially* to be grasped by the hand. Appx61. Yassir repeatedly varied from and contradicted the court's claim-construction order during his trial testimony. Appx1239-1240 (131:12-132:3, 133:9-16); Appx1255-1256 (195:17-200:10); Appx1257 (204:9-25).

The issues with Yassir's so-called analysis are illustrated by his testimony that *everything* in Figure 1 is a handle means—even the cross-linking member. Appx1255-1256 (195:17-20, 197:4-8). His rationale—"the surgeon has to grab [the cross-linking member] by their hand"—contradicts the court's construction, which requires a part specially designed as a handle, not just a part that can be conveniently handled. Further, Yassir never explained which *part* of Figure 1 has

a *special design* for grasping by the hand. Appx1256 (197:4-8). Even more problematic, Yassir had already testified that the cross-linking member *connects the first handle means to the second handle means*. Appx1249 (169:3-11); Appx1251 (178:11-15). His testimony was contradictory, unhelpful, and unreliable.

Barry focuses his argument on the court's holding that a "handle means" need not be "separate and distinct" from the shaft. Br.15-17. True, but irrelevant. The issue is not whether the accused products have a "separate and distinct" handle. It is, as the court's construction requires, whether the accused products have a "part"—be it separate or a portion of a larger structure—"designed especially" to be grasped by the hand. This is where Yassir went astray, relying on his own, different and contradictory construction to opine that the entirety of every component in a surgical construct is a "handle means."

Barry asserts that "[f]or the first time in its JMOL order, the court modified its construction of 'handle means,' adding the requirement that it be a part with a 'special design' for grasping." Br.44. That's untrue. The construction Barry himself proposed was "designed especially to be grasped by the hand." "Designed especially" and "special design" are two ways of saying the same thing. The court simply applied the words of Barry's own construction. As the court explained:

> I did not construe—and Dr. Barry did not ask me to construe—"handle means" as a part that "can" or "must" be grasped by the hand. The

> "handle means," which includes a handle, is a part *especially designed* to be grasped by the hand.

Appx61 (emphasis in original).

Attempting to revise Yassir's testimony after the fact, Barry argues that, "[i]n applying the court's construction, Yassir explained why—as a surgeon and mechanical engineer—the top portion of DePuy's Quick Sticks, when linked with DePuy's derotation frame, were 'handle means.'" Br.34-35, citing Appx1239 (131:12-21) and Appx1238 (126:2-127:6). The cited testimony says no such thing. In the latter, Yassir testified that a surgeon can get more leverage by grasping higher on the derotator—an undisputed matter of physics (Appx1238 (126:2-127:6)), and a nod to Barry's improper "lever" construction of handle means. Appx1103 (147:23-24). As the court explained, "where a surgeon *might want* to place her hands has nothing to do with my construction of 'handle means.'" Appx64.

And in the former lines of cited testimony, Yassir did not testify that "the top portion," but rather the *entire* Quick Stick (and the frame, and "quite a few" other parts), was a "handle means":

> Q. Dr. Yassir, what are the specific parts that are designed to be grasped by the hand here?
>
> A. Sure. So there's quite a few, obviously. *So the derotation Quick Stick which we talked about is especially designed to be grasped by the hand to put on the pedicle screw.* The Quick Stick derotation frame also is designed to be grasped by the hand. You clip it onto those tubes,

> and then you have to tighten those little nuts with your finger to get them to engage, and so that has to be done with your hand.

Appx1239 (131:12-21). In neither instance did Yassir testify that only the "top" portion of the Quick Stick is the "handle means," and Barry is not accurately portraying the record by making that claim. *See also* Appx1257 (201:2-204:25). Even so, merely identifying "the top portion" still would not demonstrate "a part designed especially to be grasped by the hand."

### B. Neal's 2018 Survey Was Properly Excluded As The Product Of Unreliable Methodology

Barry's analysis of the district court's numerous reasons for excluding Neal's survey starts off on the wrong foot by arguing those reasons fail to survive a "hard look"—a plenary standard the Supreme Court abrogated over twenty years ago. *Joiner*, 522 U.S. at 142-43. As noted above, abuse of discretion—and its "hallmark" of "deference"—supplies the proper standard of review.

What is more, survey evidence is especially susceptible to discretionary *Daubert* exclusion for methodological unreliability. Courts in the Third Circuit do not hesitate to exercise their gatekeeping role to exclude survey evidence. *See, e.g., Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 120 (3d Cir. 2004). The Third Circuit further holds that the proponent of a consumer survey has the burden of establishing that it was conducted in accordance with

accepted principles of survey research. *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978).

Barry proceeds to mischaracterize the court's ruling as a list of "inapplicable criticisms" and mere disagreements with Neal's methodology that should have been left to the jury to weigh. Br.55-64. Not so. A review of the court's detailed, meticulous opinion demonstrates that there was no abuse of discretion, even if the defunct "hard look" standard still held sway. The district court held that Neal's survey "suffers from several defects," including two separate and independent "failings" each "sufficiently serious to preclude the survey's admission at trial": (1) failure to establish representativeness of the sample, and (2) design flaws in the survey questions that "ensured that any results would be meaningless." Appx32. That was not all: The court identified numerous additional defects in the survey exacerbating those two fatal defects, and "[c]onsidering all these flaws . . . ruled that Barry failed to show by an evidentiary preponderance that the survey and Neal's expert opinion were reliable." Appx32.

Barry's opening brief simply rehashes arguments and "evidence" the district court already considered and correctly rejected:

*First*, Barry points to no evidence that the 164 surgeons (out of roughly 4,000 surveyed) who actually responded to his survey are *representative* of any larger target population of surgeons, which he admits is a requirement for

extrapolation of his survey data. Br.49. Instead, Barry asserts that Neal's explanation of how his methodology led to *relevant* respondents who were members of a target population of surgeons should be sufficient to establish representativeness. Barry is incorrect. The mere fact that all respondents in a sample are *members* of a target population does not establish that the sample is *representative* of that population.

*Second*, Barry does not dispute that it is within the court's discretion to conclude that flaws in a survey's questions are fatal because they render any results meaningless. Br.64. That is exactly what the court did here, and in so ruling, the court considered and rejected Barry's arguments, reprised here, that those flaws should go to weight, not admissibility. The significant methodological flaws the court identified led to nonsensical results and render the survey inadmissible.

*Third*, Barry's waiver argument is both substantively and legally incorrect. None of the arguments in DePuy's renewed *Daubert* motion were new to Barry; even if they had been, the district court did not commit error by considering them.

**1. Neal's Sample Was Not Representative Of Any Target Universe**

Barry acknowledges (Br.49) that a bedrock principle of survey research is that a "proper universe must be examined and a *representative* sample must be chosen." *Pittsburgh Press Club*, 579 F.2d at 758. As the Federal Judicial Center's *Reference Manual on Scientific Evidence* explains: "One of the first steps in

designing a survey … is to identify the target population (or universe)," and "[i]dentification of a survey population must be followed by *selection of a sample that accurately represents that population*." Shari S. Diamond, National Research Council/Federal Judicial Center, *Reference Manual on Scientific Evidence*, *Reference Guide on Survey Research*, 2011 WL 7724258, at *11, *13 (3d ed. 2011).

Barry does not—and indeed cannot—dispute that to reliably extrapolate the results of Neal's survey to any larger target universe, the sampling frame had to be representative of that target universe. Appx34 (citing David H. Kaye & David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, 211, 226-27 (Fed. Judicial Ctr., 3d ed. 2011). Barry's only evidence to support his claim of representativeness was the testimony of Neal himself. As the court noted, this was pure *ipse dixit*:

> Q. The only support that we have for your statement that this is a representative sample is the fact that you said it, correct?
>
> A. [Neal:] That's correct.

Appx36; Appx1179 (119:17-20). Barry complains the court "incorrectly labeled" this critical testimony as *ipse dixit*. Br.58. Yet the only "support" Barry cites is Neal's testimony itself—the very definition of "*ipse dixit*" (Latin for "he himself said it"). Neal asserted that his methodology would result in a representative sample, but he conceded that he did no analysis to support that conclusion.

Appx1165 (62:6-10); Appx1179 (118:7-13). The court's "*ipse dixit*" label was exactly right.

**a The District Court Did Not Abuse Its Discretion By Holding That Neal Failed To Establish That His Sample Of 164 Surgeons Was Representative Of Any Target Universe**

The district court began its analysis of representativeness with Neal's purported target universe, finding, "[u]nfortunately, the target population of Neal's survey was a moving target." Appx34. At trial, Neal was asked if his target population was the approximately 50,000 spine surgeons in the United States, and he responded: "Ultimately, the universe of my survey is the spine surgeons who are performing *pedicle screw surgeries involving simultaneous derotation*. So it's actually a much narrower pool. That's the ultimate universe that I'm trying to draw conclusions about." Appx1164 (57:15-25); *see also* Appx1179 (117:2-6), Appx1180 (122:9-14). Yet, as the court noted, Barry identified a broader universe in response to DePuy's renewed *Daubert* motion, arguing that Dr. Neal's methodology leaves "no doubt" about the target population of his survey: "surgeons who perform spinal deformity surgeries in the United States." Appx35.

Barry takes issue with the court's omission of the second part of that sentence, which adds "with additional conclusions drawn as to the cohorts that use pedicle screws and rods in performing simultaneous derotation procedures. Br.57. That does not help his cause. Rather, it supports the court's conclusion that the

target universe was never clearly defined. And one cannot establish representativeness for purposes of extrapolation without first defining a target universe. *See* Kaye & Freedman, *supra*, at 226-27.

Inconsistencies in Neal's purported definition of the target universe aside, to assess reliability one need only look at what Schenk, Barry's damages expert, actually did with the survey results—she extrapolated them to the larger population of *all spinal-deformity surgeries* performed in the United States over a 12-year period. For that extrapolation to have been reliable, Neal would have had to establish that his sample of 164 surgeons was representative of the larger population of all surgeons who performed spinal-deformity surgeries in the United States—not only during the timeframe covered by the survey (2016-2018), but also during the rest of the 12-year period. Neal never even tried. Appx1165 (62:6-25); Appx1179 (117:7-16); *see Pittsburgh Press Club*, 579 F.2d at 759 (excluding survey because the sample "was not designed to be representative").

As the court accurately observed, Barry—who, as Neal's "proponent," bore the burden of establishing the admissibility of his expert's testimony, *see* Fed. R. Evid. 702—failed to carry his burden. Neal's sample of 164 surgeons is not representative of Schenk's universe of all surgeons who perform spinal-deformity surgeries, or any other universe that Neal purported to target, including the universe of spine surgeons performing pedicle-screw surgeries involving

simultaneous derotation. Appx34-37. Neal conceded that he did not conduct *any* analysis comparing the characteristics of his sample to those of any larger population of surgeons in the United States. Appx1165 (62:6-25); Appx1179 (117:7-16). He testified that he had data breaking down the respondents in his survey by state, but never compared the distribution of his respondents by state to the larger sample of surgeons in the United States. Appx1179-1180 (120:14-18, 121:1-12). A review of his respondents indicates that 13 states were not represented in his sample, and another 12 states had only one respondent each. Appx36. Neal also claimed to have broken down his sample by age, and gender (Appx1167 (71:5-12))—but he never did anything with that data to check the representativeness of his survey. Appx1180 (121:16-20). He didn't even ask survey respondents their age—Barry's counsel asked him, after the fact, to estimate the respondents' ages by guessing their medical-school graduation years and translating that into an age. Appx1179 (120:1-13). Yet he did nothing with that data to check the representativeness of his results.

The court went on to discuss additional flaws in Neal's methodology that undermined his unsupported assertion of representativeness and further supported exclusion. For example, the court found that the representativeness problems were "compounded by the way he chose his survey recipients." Appx35. Barry says this critique is based simply on Neal's use of a so-called "nonprobability sample."

Br.57-58. That's wrong: The court expressly recognized that such samples could be useful with additional proof of representativeness—proof that Neal failed to provide. Appx34 (citing Kaye & Freedman, *supra*, at 217, 226-27). Neal sent around 4,000 invitations to email addresses he obtained from three different sources. Appx36. But, as the court noted, Neal's only support for his conclusion that his use of those three different sources automatically resulted in a representative sample was *his own testimony*. Appx36.

Additionally, the court found that "[g]iven that representativeness was thus suspect, it would have been important for Neal to determine if non-response bias tainted his survey." Appx37. Neal failed to do so, and instead summarily dismissed the fact that almost 96% of surgeons invited did not respond because—again citing himself—"nonresponse bias" has been shown to be "not a major contributor to the quality of survey results." Appx37; Appx1181 (127:12-21).

Barry claims that the need to address nonresponse bias is limited to probability surveys. Br.59-60. That's also wrong. Barry mischaracterizes *Hostetler v. Johnson Controls, Inc.*, a case relied upon by the court, as involving a probability survey. No. 15-cv-226 JD, 2017 WL 3700345, at *2 (N.D. Ind. Aug. 28, 2017). In *Hostetler,* the plaintiff did not conduct a random sample, but "surveyed only those individuals whose phone numbers they could locate, [] without even considering whether this sample would be representative of the class

or evaluating whether this method would inject a bias into their results." *Id*. The survey had a response rate of 10%, but the plaintiff "neglected to even consider whether there was any non-response bias." *Id*. The court granted a motion to strike that survey, because it could not be used to reliably extrapolate to the larger class. *Id*. Even Barry's own cases confirm the need to address nonresponse bias in nonprobability surveys. *See GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, No. 14-877-LPS-CJB, 2017 WL 8948975, at *11 (D. Del. May 30, 2017); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC.*, No. 17-189-LPS-CJB, 2019 WL 5310220, at *3 (D. Del. Oct. 21, 2019).

The court also found that the "representativeness issue was further compounded by Neal's failure to conduct a follow-up with any of the survey's respondents." Appx38. The court noted that follow-up "would not have been burdensome," and could have allayed some of the court's concerns. Appx38. But Neal did none. Worse, Neal's sole method of communicating with his busy potential pool of respondents was via email. Appx1180 (122:15-17). He admitted that he would have no way of knowing—or checking—if someone other than the surgeon filled out the survey using the surgeon's email address. Appx1181-1182 (128:7-130:16).

Nor did he follow up with the actual invitees after the survey to verify that they actually took the survey, Appx1182 (130:24-131:5), or to verify the accuracy

of the results. Appx1182 (131:6-10). Neal claimed that follow-ups are "not a standard survey practice," *id.*, but they were compelled in the circumstances of *this* survey: At least three of the surgeons whom he reported as having responded to his survey submitted sworn declarations in another case brought by Barry stating, with respect to the same 2018 DePuy Survey, that (1) they did not specifically recall taking this survey, and (2) the results that Neal reported were inconsistent with their actual practices. Appx13903-13918.

Finally, the court found that Neal could have conducted a pretest, and rejected Neal's claims that a proper pretest had been done, including his argument that the earlier *Medtronic* survey itself constituted a pretest, noting that "that survey—with different respondents and different questions—could hardly serve as an actual pretest" for this one. Appx38.

In sum: Neal simply declared, *ipse dixit*, that his sample of 164 surgeons was representative of some universe. That was inadequate to establish representativeness. Under governing Third Circuit law, an expert is required to demonstrate representativeness; where the expert does not, courts will exclude the survey. *Pittsburgh Press Club*, 579 F.2d at 759 (excluding survey because the sample "was not designed to be representative"). The court acted well within its discretion to reach the same result here—and, perhaps most importantly, Barry

offers no good reason why this appellate court should now micromanage the district court's careful analysis of the expert's methodology.

#### b Barry's Proffered "Evidence" Did Not Establish Representativeness

Barry does not dispute Neal's failure to demonstrate that his sample of 164 surgeons was, in fact, representative of any target population. Instead, he rehashes arguments already rejected by the district court that his "method for obtaining representative responses was reliable." Br.49-55. The "evidence" Barry now offers does not establish the representativeness of Neal's sample, either.

At trial, Neal claimed that the task of demonstrating representativeness would be "literally impossible" (Appx1179 (118:7-16)), and "useless" (Appx1180 (121:25-122:8)), a sweeping, unreasoned generalization that Judge Diamond quite rightly identified as raising "reliability issues" with Neal's survey. Appx35. Barry sensibly does not embrace Neal's claims of impossibility or uselessness on appeal, but the evidence he does argue comes nowhere close to showing an abuse of the district court's broad gatekeeping discretion in managing the admissibility of expert evidence.

*First*, Barry argues that Neal's "multi-method" approach to recruiting surgeon respondents using the IQVIA panel, the list of surgeons in the Scoliosis Research Society, and the email list generated by his assistant's internet searches established representativeness of the resulting sample. Br.50. The district court

correctly found this to be pure *ipse dixit*. Appx36. The evidence in fact showed the sample to be unrepresentative and likely biased—Neal's importation of a list of surgeons from the Scoliosis Research Society into his list likely injected bias into his sample. Neal's survey never screened for survey respondents' years of experience, nor the size or composition of their practices in terms of surgery types. There is good reason to believe that Society members would perform a significantly greater volume of the surveyed derotation procedures than the larger population of all surgeons who perform any type of spinal-deformity surgery: As Yassir testified, the Scoliosis Research Society is "the top organization in the world, basically dedicated to research and treatment of scoliosis as a disease. It takes about five years to become a member. You have to submit all your case logs. *Your practice has to be dedicated at least 20 percent to the treatment of spinal deformity or scoliosis*." Appx1228 (86:14-22). Far from showing an abuse of discretion, Neal's "multi-method" approach supported its exclusion. *See Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 363 (D.N.J. 2002) (faulting survey expert for doing "nothing to screen for respondents' years of experience or the size of their practices").

*Second*, Barry claims that Neal got a "representative cross section" of relevant surgeons simply because his sample included "a mix of neurosurgeons, pediatric orthopedic surgeons, orthopedic spine surgeons, [and] general orthopedic

surgeons, which Yassir confirmed are specialists performing the relevant procedures." Br.53. This is another "one of his many *ipse dixit* conclusions." Appx36. Neal did not know what the proper "mix" of those specialties should have been to be representative of his target universe—he never tried to find out. *See* Appx36-37.

*Third*, Barry asserts that Neal's use of various "accepted mechanisms" of survey research, including double-blind format, neutral non-leading questions, randomized response options, and memory checks, was sufficient to establish representativeness. Br.51-52. As the court noted, "[n]ot surprisingly, Neal failed to show, except by his own *ipse dixit* conclusions, that the survey comported with 'accepted quality controls and … scientific rigor.'" Appx38-39. And Barry's argument is a *non sequitur*—the "mechanisms" Barry cites all relate to the format of the questions he asked the respondents; those questions had no effect on the representativeness of the group of surgeons selected to answer those questions in the first place.

*Fourth*, Barry argues that third-party reports of DePuy's market share in the spinal-deformity market support representativeness. Br.54-55. But Neal did not rely upon those reports as evidence of representativeness; he only referred to them in response to a critique by DePuy's survey expert. Appx1171 (86:19-87:8). Moreover, those reports did not measure DePuy's market share based on the

number of surgeries or surgeons using DePuy instruments, and they do not break down the spinal-deformity market to surgeries performed using simultaneous derotation. Neal himself dismissed data that did not identify the specific spinal-deformity procedures in his survey as "useless" to determine representativeness of his target universe. Appx1180 (121:22-122:8). Barry now claims that it was Neal's expert opinion that the sample size of 13% of yearly spinal-deformity procedures reported "sufficiently represented the target population and extrapolation." Br.55. But Neal never offered that opinion—not once did he mention a 13% sample size. The testimony Barry cites is from damages expert Schenk, and she never opined on the sample's representativeness—nor could she.

The district court properly rejected all of this "evidence." It committed no abuse of discretion.

#### 2. Neal's Flawed Question Design Rendered His Results Meaningless

The court also held that the structure and substance of Neal's questions suffered from multiple flaws which "ensured that any results would be meaningless." Appx32. This conclusion, too, amply supported the district court's discretionary decision to exclude Neal's survey and testimony.

*First*, Neal's anchor question—Question 14—asked surgeons to quantify all *en bloc* derotation surgeries, *i.e.*, surgeries that involved "simultaneously rotating 2 or more vertebral bodies in the axial plane." Appx7883. Importantly, surgeons

were later asked how many of those *en bloc* surgeries involved "segmental derotation" and classified those as "type 1" surgeries. Appx7835-7844. As the court noted, "a survey participant asked to categorize her *en bloc* procedures accurately would necessarily report zero Type 1 surgeries," and the fact that *nearly half of the responding surgeons* put surgeries in category 1 "made no sense." Appx40. The outcome was absurd and suggested that those surgeons were either confused or not paying attention—and the results were therefore unreliable and subject to exclusion on that ground. But the *reason* the outcome was absurd and unreliable was that the *methodology* was absurd and unreliable: It was as though a grocer was first asked how many apples he had in stock, and then was asked how many of those apples were oranges.

Barry argues that the court's exclusion was based on "impermissible fact findings" regarding the definition of "segmental derotation." Br.63-64. But, as the court noted, "the trial evidence presented by Barry—including his own testimony—uniformly refutes" Barry's contention that surgeons manipulating multiple unlinked vertebrae simultaneously are performing segmental derotation. Appx40-43. Both Barry and Yassir referred to such procedures as "unlinked *en bloc*" during trial. Appx42 (citing Appx1038 (149:21-23, 152:22-23)); Appx1232 (104:1-10). Barry cites his own testimony describing segmental derotation, which the district court considered and correctly concluded described "segmental" as

"distinct from procedures allowing derotation of multiple vertebrae at the same time." Appx42. The testimony from DePuy's witness, Dr. Newton, that when the concepts were being developed back in 2003 "we might argue over terminology" (Br.66), does not support Barry's contention, either, and Dr. Newton also testified that he was "not aware" of "a question as to whether rotating multiple vertebrae at the same time was considered en bloc or segmental." Appx1339 (192:16-20). Finally, Barry points to a page in his opposition to DePuy's renewed *Daubert* motion citing deposition testimony from his expert witness, Dr. Sharma, using the term "simultaneous segmental" to describe such surgeries. Br.66. Sharma testified at trial, and never used that term. In fact, "simultaneous segmental" was never mentioned by anyone at trial. The court was correct—"[i]t was thus uncontroverted at trial that segmental derotation referred only to procedures by which vertebrae are manipulated one at a time." Appx43.

*Second*, after surgeons entered a total number of surgeries in response to Question 14, Neal presented them with *closed-ended* questions requiring them to put each of those surgeries into one—but only one—of the six categories drafted by Yassir and counsel for Barry. Appx1217 (43:11-44:10). Neal admits that surgeons did not have an "other" or "I don't understand" option to choose from when putting their total number of surgeries into the six categories. Appx1217 (43:11-44:10); Appx1183 (134:22-135:3). Neal further admitted that he did not

provide either Yassir or counsel for Barry with any instruction as to whether those six categories were to be exhaustive of all spinal-deformity surgeries involving simultaneously rotating two or more vertebral bodies in the axial plane. Appx1217-1218 (44:22-45:22). As the court noted, Yassir conceded that unlinked *en bloc* procedures do not infringe, yet there is no category for those. Surgeons must either categorize them inaccurately as segmental, or inaccurately as infringing. Appx44. The court was correct that "[t]his structural defect stripped the survey responses of any probative value." Appx44 (citing Diamond, 2011 WL 7724258, at *23 ("If the respondent is asked to choose one response from among several choices, the response chosen will be meaningful only if the list of choices is exhaustive—that is, if the choices cover all possible answers a respondent might give to the question.")).

### 3. The Court's Renewed Consideration Of *Daubert* At Trial Was Not Error

Barry ends his brief by claiming that the Court should not have considered "new grounds" raised by DePuy in its renewed *Daubert* motion. Br.70-71. Barry's arguments lack merit.

To start, DePuy's initial *Daubert* motion against Neal was made pre-trial, *in limine*, and Judge Diamond denied it, noting that his denial was "necessarily tentative" without prejudice to renewal at trial as the testimony was developed. Appx16; Appx15647. That tentative ruling did not freeze DePuy's arguments

made as of that time, or prevent DePuy from either renewing or making even entirely new objections when Neal's unreliable testimony was offered at trial. Nothing in Barry's cases is to the contrary.

Barry's suggestion of "trial by ambush" (Br.70) is absurd. At every stage, DePuy consistently challenged Neal's survey, submitted multiple expert reports detailing its criticisms of Neal and his survey, and made clear its intention to challenge Neal's testimony and renew its *Daubert* motion first in its pretrial memorandum (Appx13677), then when Neal took the stand (Appx1162 (49:21-51:1)), and again during Neal's cross-examination (Appx1185 (143:25-144:7)). DePuy's pre-trial motion challenged the reliability of Neal's survey methodology on two principal grounds: (1) failure to demonstrate representativeness; and (2) violation of accepted survey principles. Appx15290-15292. DePuy's trial *Daubert* motion appropriately expanded on its earlier motion, further illuminated and informed by his trial testimony. *See* pp.23-29, *supra*.

The court considered Barry's "waiver" argument and properly rejected it, finding that "Barry had ample opportunity to respond to any new reasoning DePuy offered and so could articulate no prejudice." Appx33. The court cited *Fraser v. Wyeth, Inc.*, 992 F. Supp. 2d 68, 97 (D. Conn. 2014) for the proposition that a "trial judge's obligation to act as a gatekeeper" is "of such obvious and transcendent importance that judges can act even *sua sponte* to prohibit testimony that does not

pass muster under *Daubert*." Appx33. Other courts in the Third Circuit have also noted a trial court's ability to exclude impermissible expert testimony under *Daubert*, even absent a motion. *See Pugh v. Cmty. Health Sys., Inc.*, No. 5:20-CV-00630-JMG, 2023 WL 4408481, at *2, *11 (E.D. Pa. July 7, 2023); *see also Schloss v. Sears Roebuck & Co.*, No. 04-CV-2423, 2006 WL 8459575, at *3 (E.D. Pa. Sept. 27, 2006) (collecting cases).

Barry's contention that the court "failed to conduct a hearing" is peculiar given that the court actually permitted Neal to testify in full at trial, and further given that Barry never requested a "hearing." Tellingly, Barry does not even attempt to articulate how he was prejudiced or what additional information Neal (or Barry) might have offered in such a "hearing." *See Henry v. St. Croix Alumina, LLC*, 572 F. App'x 114, 119 (3d Cir. 2014) ("Appellants do not explain how a hearing would have benefited them, except to say that the Court should have given the 'experts an opportunity to address its concerns.'"). Barry had ample notice and opportunity to be heard; there was no "ambush." Here, too, the court acted well within its discretion.

## II. THE DISTRICT COURT PROPERLY GRANTED JMOL OF NONINFRINGMENT

Barry concedes that DePuy does not directly infringe the asserted patents because DePuy does not perform surgery and does not configure the instruments used in surgery. Likewise, Barry does not accuse DePuy of contributory

infringement, because DePuy's instruments can be configured in numerous different ways (many of which, including linked *en bloc* assemblies, Barry concedes do not infringe his patents), and thus have substantial non-infringing uses. Barry's only claim is one of active inducement.

In order to prove that claim, Barry needed to prove, *inter alia*, that (1) the accused instruments met all requirements of the claims, and (2) surgeons actually configured DePuy's instruments in the ways required by the claims. In an effort to satisfy these burdens, Barry sought to introduce testimony from Yassir that DePuy's instruments met the claims' requirements, and from Neal via survey evidence that surgeons actually configured them in infringing ways. Neal's survey also relied on Yassir's underlying testimony. Absent their unreliable, inadmissible testimony, Barry had no evidence from which a reasonable jury could have found infringement.

Barry argues that, even without Yassir's excluded testimony, the jury could have found infringement based on the jurors' own "examination" of the accused instruments. Br.41. Barry further asserts that "DePuy even recognized" that the "handle means" term was readily understandable to a lay juror based on its comparison of a drinking glass and a coffee mug. Br.43. Barry misses the point entirely. The asserted claims of the '358 and '121 patents require, *inter alia*, a "first handle means" and a "second handle means." The "first handle means" must

be "mechanically linked" to a "first group of pedicle screw engagement members", and the "second handle means" must be "mechanically linked" to a "second group of pedicle screw engagement members." Appx120-121 (6:8-7:15); Appx135 (7:57-8:45). The '121 patent's claims further require a "linking member" to join together the handles, and a "cross-linking member" that links the "first handle means" to the "second handle means." Appx135 (8:10, 8:44-45). Absent Yassir's excluded testimony, the jury could not have found these limitations present in the accused products. (Even with it, that testimony would not have been substantial evidence of the presence of a "handle means," as it countermanded the claim construction. *See Cordis*, 658 F.3d at 1358; *Exergen*, 575 F.3d at 1324 & n.2.)

Barry asserts that the court "disregard[ed]" the other evidence submitted by Barry and "wrongly decided expert testimony was the only vehicle for Barry to show DePuy's products had 'a part that is designed especially to be grasped by the hand.'" Br.42. This is untrue. The court did not "disregard" anything; it expressly considered *all* of the evidence submitted by Barry—including the product brochures and lay testimony—and found that, absent the expert testimony of Yassir and Neal, it was not sufficient for a reasonable jury to find infringement.

Expert testimony is typically necessary in patent-infringement cases, especially those involving complex technologies. Appx62. Barry implies that expert testimony is only required in cases "involving invalidity," and attempts to

distinguish the cases cited by the district court, suggesting that expert testimony was required in those cases "to provide evidence on a person of skill's motivation to combine." Br.42 (emphasis omitted). But only one of the cases cited by the court involved an invalidity challenge where an expert was required, and that case dealt with anticipation, not motivation to combine. *See Aspex Eyewear, Inc. v. Concepts in Optics, Inc.*, 111 F. App'x 582, 588 (Fed. Cir. 2004) (expert testimony required for anticipation); *Automated Irrigation Controls, LLC v. Watt Stopper, Inc.*, 407 F. Supp. 3d 274, 294 (S.D.N.Y. 2019) (expert testimony required for construing the licensing agreement term "functionally equivalent successor products" to devices); and *Manuli Stretch USA, Inc. v. Pinnacle Films, Inc.*, 749 F. Supp. 2d 764, 771 (E.D. Tenn. 2010) (expert testimony required for summary judgment of noninfringement).

The court properly found that the technology at issue here—"methods and systems for correcting spinal deformity by derotating the spine"—is complex, noting that both parties offered expert testimony on the subject of infringement. Appx62-63. By contrast, in the *Ironburg*, *Moleculon*, and *Mike's Novelties* cases cited by Barry, the technology at issue was "easily understandable"—video game controllers (*Ironburg*), a Rubik's cube (*Moleculon*), and a tobacco pipe (*Mike's Novelties*). *See Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1292 (Fed. Cir. 2023); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir.

1986); *Lee v. Mike's Novelties, Inc.*, 543 F. App'x 1010, 1015-16 (Fed. Cir. 2013). Perhaps for this reason, the plaintiffs in *Moleculon* and *Mike's Novelties* did not even offer expert testimony on infringement.

Barry cites *Ironburg* for the proposition that the jury could have found infringement based on its own inspection of the accused products. Br.41-42. But that case does not support such a broad proposition. For starters, the plaintiff in *Ironburg* did offer expert testimony, and the jury found infringement. 64 F.4th at 1292. Following the verdict, the accused infringer sought JMOL, arguing that the jury's findings lacked substantial-evidence support. With regard to the expert's testimony, the accused infringer argued that it was insufficient because the expert testified that the back members on the controllers were "elongated," but not "elongate members." The court denied JMOL, finding that expert testimony was unnecessary because the technology was "easily understandable," further noting that the jury could reasonably have credited the expert's testimony despite defendant's attempts to highlight flaws in his analysis. *Id.* at 1292-93.

There was no dispute in *Ironburg* regarding what part of the accused device was alleged to meet the "elongate member" limitation. So the jury was free to look at the accused device and evaluate whether that part of the product met the "elongated" requirement. Here, Barry (and Yassir) failed to identify any particular "part that is designed especially to be grasped by the hand," instead identifying the

entire device as not only a "first handle means" but also a "second handle means." *See, e.g.*, Appx1103 (146:19-147:2); Appx1258 (205:21-208:17). There was no fact issue for the jury to resolve here from observing the accused instruments, as no reasonable factfinder could have concluded that they possessed a part especially designed to be grasped by the hand.

Moreover, the '358 and '121 patent claims also require "applying manipulative force" to both the first handle means and the second handle means "simultaneously." The jury could not have found these limitations met without (1) identifying the "first handle means," (2) identifying the "second handle means," and (3) finding that any surgeon applied manipulative force to both handle means simultaneously. Absent Yassir and Neal's testimony, the record is void of any such evidence. Indeed, as even Yassir conceded, none of the product brochures shows manipulative force being applied simultaneously to two different handle means as the claims require. Appx1293-1294 (5:8-6:11, 7:5-13, 9:12-15).

Barry's own brief demonstrates that the issues here are not so simple, and could not have been decided by the jury absent expert testimony. For example, in a section entitled "Barry's Invention," Barry includes an image of DePuy's Expedium product, contending that "this is Barry's invention." Br.7.[2] But Barry's

[2] Barry reproduces this image in his argument section, suggesting that it constitutes evidence of infringement. Br.28.

own expert conceded that the construct depicted *does not infringe* any of the asserted claims because, at minimum, it does not show simultaneous manipulative force ('358 patent) or a cross-linking member ('121 and '787 patents). Appx1293 (5:4-6:11); Appx1294 (11:18-12:16).

The third asserted patent, the '787 patent, does not recite a "handle means," but requires at least four "levers" linked on each side of the spine, and further requires that the levers be linked across the spine. Appx160 (8:14-50). Barry asserts that constructs made by Drs. Betz and O'Brien met all the limitations of the '787 patent. Br.32. This is untrue. As the court expressly found, Barry's cited evidence "shows *non-infringement* of claim 6 of the '787 Patent." Appx65 (emphasis in original). Dr. O'Brien testified that he has *not* performed surgery in which he (1) linked at least two Expedium derotation tubes on the right side of the spine, (2) linked at least two Expedium derotation tubes on the left side of the spine, (3) cross-linked those two sets of tubes, and (4) performed derotation. Appx8602 (42:17-43:01). The testimony Barry cites from Dr. Betz does not demonstrate infringement either: Dr. Betz testified that he "rarely" created constructs where he linked three or more vertebrae on each side of the spine, and he stopped using Expedium instruments in 2014—two years before the '787 patent issued. Appx1375 (24:10-21); Appx1401 (126:11-14).

## CONCLUSION

The judgment should be affirmed.

Dated: March 11, 2024

Respectfully submitted,

/s/ Gregory A. Castanias
Gregory A. Castanias
Tracy A. Stitt
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

Kevin V. McCarthy
JONES DAY
250 Vesey Street, 31st Floor
New York, NY 10281
(212) 326-3939

Calvin P. Griffith
Patrick J. Norton
Kenneth Luchesi
Thomas S. Koglman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-3939

*Counsel for Defendants-Appellees DePuy Synthes Products, Inc., DePuy Synthes Sales, Inc., and Medical Device Business Services, Inc*

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(b).

1. Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,975 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: March 11, 2024

*/s/ Gregory A. Castanias*
Gregory A. Castanias

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2024, I caused the foregoing OPENING BRIEF FOR DEFENDANTS-APPELLEES to be electronically filed via CM/ECF with the U.S. Court of Appeals for the Federal Circuit, which electronically served the brief on all counsel of record.

Dated: March 11, 2024

*/s/ Gregory A. Castanias*
Gregory A. Castanias