# United States Court of Appeals
# for the Federal Circuit

---

**MARK A. BARRY,**
*Plaintiff-Appellant*

**v.**

**DEPUY SYNTHES COMPANIES,**
*Defendant*

**DEPUY SYNTHES SALES, INC., TRADING AS DEPUY SYNTHES SPINE, MEDICAL DEVICE BUSINESS SERVICES, INC., DEPUY SYNTHES PRODUCTS, INC.,**
*Defendants-Appellees*

---

2023-2226, 2023-2234

---

Appeals from the United States District Court for the Eastern District of Pennsylvania in No. 2:17-cv-03003-PD, Judge Paul S. Diamond.

---

Decided:  January 20, 2026

---

DAVID CLAY HOLLOWAY, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, argued for plaintiff-appellant.  Also represented by COURTNEY DABBIERE, MITCHELL G. STOCKWELL; KATHLEEN GEYER, DARIO ALEXANDER MACHLEIDT, Seattle, WA; ANDREW WILLIAM RINEHART, Winston-Salem, NC; JONATHAN L. COCHRAN, Stapleton

Segal Cochran LLC, Philadelphia, PA.

GREGORY A. CASTANIAS, Jones Day, Washington, DC, argued for defendants-appellees. Also represented by TRACY A. STITT; T. KAITLIN CROWDER, THOMAS KOGLMAN, KENNETH LUCHESI, PATRICK NORTON, Cleveland, OH; KEVIN VINCENT MCCARTHY, New York, NY.

————————————

Before PROST, TARANTO, and STARK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STARK.

Dissenting Opinion filed by *Circuit Judge* PROST.

STARK, *Circuit Judge*.

Dr. Mark A. Barry sued DePuy Synthes Sales, Inc., Medical Device Business Services, Inc., and DePuy Synthes Products, Inc. (together, "DePuy") in the United States District Court for the Eastern District of Pennsylvania, alleging that DePuy induced surgeons to infringe certain claims of Barry's U.S. Patent Nos. 7,670,358 (the "'358 patent"), 8,361,121 (the "'121 patent"), and 9,668,787 (the "'787 patent") (collectively, "the Asserted Patents"). At trial, DePuy moved to exclude two of Barry's experts, Dr. Walid Yassir and Dr. David Neal, and the district court granted these motions. It further granted judgment as a matter of law ("JMOL") to DePuy.

Barry now appeals. We conclude that the district court abused its discretion in excluding the expert testimony and erred in granting JMOL. We therefore reverse the judgment for DePuy and remand for a new trial at which both Drs. Yassir and Neal may testify.

I

A

The Asserted Patents cover surgical techniques and tools for treating spinal deformities, such as scoliosis, that

cause vertebrae, which are the small bones forming the backbone, to twist out of alignment. J.A. 24, 47. Each vertebra has two pedicles, within which surgeons can place "pedicle screws." J.A. 24. "Derotation tools" (e.g., levers) are then mounted upon the pedicle screws, allowing an orthopedic surgeon to apply force to the vertebrae, thereby realigning the spinal column. *Id.* Depending on how the derotation tools are arranged, surgeons can manipulate misaligned vertebrae either one at a time or in groups. J.A. 24, 47.

The Asserted Patents teach techniques for linking derotation tools in order to facilitate the administration of simultaneous force on multiple vertebrae, adjusting multiple misaligned vertebrae en masse. '358 pat. at Abstract; '121 pat. at Abstract; '787 pat. at Abstract. This method of correcting more than one misaligned vertebra at once is referred to as "en bloc derotation." J.A. 24-25.

Of the Asserted Patents, the '358 and '121 patents (the "Handle Means Patents") require the tools used in their en bloc derotation techniques to have one or more "handle means." '358 pat. at 6:13-21; '121 pat. at 6:34-52. The asserted claim of the '787 patent does not require a "handle means"; it requires "a cross-linking member configured to link at least two of the elongated levers in a transverse direction [across, not along, the spine] such that they move in unison." '787 pat. at Abstract.

Prior to trial, the parties, in the words of the district court, "hotly contested the meaning of the claim term 'handle means.'" J.A. 15649. The court "adopted Barry's propos[ed] construction of 'handle means' to mean 'a part that is designed especially to be grasped by the hand,'" adding that the term "includes 'both a single handle and the linked handle array contemplated.'" *Id.* (emphasis omitted). It further explained that, under its construction, the en bloc derotation device's "shaft and handle [need not] be 'separate' or 'distinct' objects." J.A. 15163. In adopting

Barry's proposed construction of "handle means" and rejecting DePuy's, the district court acknowledged DePuy's argument that Barry's construction "could theoretically encompass every element of the accused products because in DePuy's accused products, practically every part is grasped by hand." *Id.* (internal quotation marks and alterations omitted).

B

Barry's complaint alleged that DePuy manufactures derotation devices (the "Accused Tools") that, when used by surgeons in certain configurations, infringe the Asserted Patents. J.A. 47-49. During discovery, Barry produced an expert report on infringement from Dr. Yassir, a clinical professor of orthopedic surgery. J.A. 55, 1228. Dr. Yassir opined that the Accused Tools can be assembled and used in a manner that meets every limitation of the asserted claims and, in those instances, which he called infringing "constructs," use of the Accused Tools infringes the Asserted Patents. J.A. 55, 1237-38. Barry also produced an expert report from Dr. Neal, a survey expert. Dr. Neal, with assistance from Yassir, developed and administered a survey to determine whether – and, if so, how often – surgeons actually use DePuy's Accused Tools in one of Yassir's infringing constructs. J.A. 55-56.

Prior to trial, DePuy filed *Daubert* motions seeking to exclude portions of Dr. Yassir's opinions and Dr. Neal's survey and intended testimony. J.A. 15227-59, 15263-92. DePuy argued that Yassir, when deposed, contradicted both his expert report and the court's construction of "handle means." J.A. 15246-52. According to DePuy, Yassir "did not apply the court's construction" because he "asserted that anything that *may be* grasped is a handle means, and entire constructs are handle means." J.A. 15248. The district court denied the motion. J.A. 15652. In doing so, it observed that in his expert report, "Yassir acknowledged [the court's] construction of 'handle

means,' and opine[d] that the 'QuickSticks' of DePuy's derotation tool 'are designed to be grasped by the hand.'" J.A. 15650. The court analyzed portions of Yassir's deposition testimony that DePuy contended contradicted its construction and noted that the criticized testimony came "only from the hypotheticals presented by DePuy's counsel." *Id.* It ultimately concluded that, because DePuy was focused on Yassir's *application* of the court's construction, "DePuy's arguments thus involve[d] Yassir's conclusions, which are not the proper subject of a *Daubert* motion." J.A. 15651. The court went on to rule that, "[a]ny argument[] that, contrary to Yassir's opinions, DePuy's derotation tools do not have a 'part that is designed especially to be grasped by the hand' goes to the weight of Yassir's testimony, not its admissibility." *Id.*

As to Dr. Neal, DePuy argued that his survey "violates accepted survey principles," J.A. 15291 n.4; that the "flawed structure [of Neal's survey questions] renders the results meaningless," J.A. 15688; and that Neal did not "survey the proper universe" of surgeons, J.A. 15273. The court rejected these contentions and denied the motion. J.A. 15659. With respect to DePuy's criticisms of the survey's format, the court explained that "any alleged defects in the [format] go to the weight, not the admissibility, of the survey." J.A. 15657. In choosing not to exclude Neal or his survey, the court pointed out that, at trial, DePuy would be "free to cross examine Neal." J.A. 15658.

C

At trial, Barry called Dr. Yassir and Dr. Neal as part of his case-in-chief on infringement and damages. During Dr. Yassir's direct examination, he recited the court's construction of "handle means," telling the jury that "handle means is construed as a part that is designed especially to be grasped by the hand." J.A. 1237 (Trial Day 4 at 122:17-22). He then explained that he applied this construction when he performed his infringement analysis. J.A. 1238 (Trial

Day 4 at 127:20-24, 128:14-18) (testifying that "handle means" "can do something else as well, but it has to be especially designed to be grasped by the hand"). He opined that the Accused Tools infringe the Handle Means Patents specifically because they have parts "intend[ed] for you to use . . . with your hand." J.A. 1239 (Trial Day 4 at 129:12-23); *see also id.* (Trial Day 4 at 131:14-17) ("[T]he derotation Quick Stick which we talked about is especially designed to be grasped by the hand to put on the pedicle screw.").

On cross-examination, counsel for DePuy drew Dr. Yassir's attention to multiple parts of the Accused Tools and asked if each such part constituted a "handle means." *See, e.g.*, J.A. 1256 (Trial Day 4 at 197:1-20). Yassir answered that various parts of the tools – including the "cross-linker," the "linking rod," and the "pedicle screw engagement member" – qualified as a "handle means," *id.*, and agreed that "everything is a handle means" in "a linked system," such as in the Accused Products, because "everything is linked" together, J.A. 1255 (Trial Day 4 at 195:17-20). Dr. Yassir also agreed with DePuy's counsel that "handle means" refers to "parts that cannot be assembled without grasping them by the hand." J.A. 1256 (Trial Day 4 at 198:17-21); *see also* J.A. 19.

When Dr. Neal testified, he explained how he had consulted with Dr. Yassir and learned from him of the different constructs in which a surgeon might use the Accused Tools and which of them would, in Dr. Yassir's view, infringe the Asserted Patents. J.A. 1169 (Trial Day 3 at 78:17-79:11). Neal then described the survey he designed and administered to assess whether, and how often, surgeons use the Accused Tools in an infringing construct. J.A. 1168 (Trial Day 3 at 73:20-74:19). Neal discussed his methodology, the target universe he was studying, and the results of the survey. *Id.*

More particularly, Dr. Neal testified that he used screening questions to ensure that respondents were

qualified and representative of the target population.  J.A. 1166 (Trial Day 3 at 67:12-68:9).  Dr. Neal identified the target universe of his study as surgeons performing pedicle screw surgeries involving simultaneous derotation.  J.A. 1164 (Trial Day 3 at 57:20-25).  To sample this universe in a reliable manner, Neal sent approximately 4,000 invitations to potential respondents based on three industry sources.  J.A. 1166-67 (Trial Day 3 at 67:19-68:4, 69:5-18).  In total, 164 surgeons completed the survey.  J.A. 1167 (Trial Day 3 at 69:19-21).  Neal explained that he did not use randomization to select survey participants and also why such an approach, known as probability sampling, would not be appropriate in this case.  J.A. 1167 (Trial Day 3 at 69:22-72:10); J.A. 1218 (Trial Day 4 at 45:23-46:6).

Dr. Neal further explained how the survey he administered was a double-blind, randomized, multi-method survey that asked neutral questions.  J.A. 1164-65 (Trial Day 3 at 60:23-61:16, 63:4-20); J.A. 1218 (Trial Day 4 at 45:23-46:6).  Based on the results of Neal's survey, Barry's damages expert estimated that at least 610,000 infringing surgeries had been performed during the pertinent damages period.  J.A. 1314 (Trial Day 5 at 89:18-24).

D

After Dr. Barry rested his case, DePuy renewed its *Daubert* motions to exclude the portion of Dr. Yassir's testimony relating to the "handle means" limitation of the Handle Means Patents and to exclude all of Dr. Neal's testimony.  J.A. 16-18, 13794, 15842-43.  DePuy also moved for judgment as a matter of law.  J.A. 18-21, 15817.  Several days later, after receiving briefing and while trial was still ongoing, the district court granted DePuy's motions in full.  J.A. 16-21.

The court ruled that Dr. Yassir's testimony with respect to whether the Accused Tools contained the required "handle means" was inadmissible because it "varied from and contradicted" the court's construction of "handle

means," thereby rendering it improper and unhelpful to the jury as the trier of fact. J.A. 19 ("I will . . . exclude Dr. Yassir's testimony because he impermissibly contradicted my Claim Construction Order on the 'handle means' claim limitation."); J.A. 62 ("Yassir repeatedly varied from and contradicted my Claim Construction Order."). The court also concluded that Dr. Neal's survey methodology and results did not meet the standards of reliability required under *Daubert*, Federal Rule of Evidence 702(a), and Federal Rule of Evidence 403. J.A. 34-39 (faulting Neal for allegedly failing to define the survey universe, conduct a probability survey, represent geographic diversity, analyze age or gender of respondents, analyze rates of non-response bias, follow-up with respondents, or perform a pre-test); *see also* J.A. 30 ("After considering Neal's testimony and reviewing the submissions, it was apparent that Neal's methodology was flawed and that no reliable conclusions could be drawn from his survey."). Having excluded both experts, the court further determined that Dr. Barry could not prove infringement of the Handle Means Patents due to the lack of expert support from Yassir; nor could he prove infringement of the '787 patent because of the exclusion of the Neal survey evidence. J.A. 60-66. Thus, the court granted DePuy's motion for judgment as a matter of law. *Id*; *see also* J.A. 18-21.

Barry timely appealed. The district court had jurisdiction under 28 U.S.C. § 1338(a) and we have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II

We review a district court's grant of a motion to exclude evidence, and its decision to grant a motion for judgment as a matter of law, according to the law of the applicable regional circuit, which here is the Third Circuit. *See Clear-Value, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012); *see also Siemens Med. Sols. USA, Inc.*

*v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1284 (Fed. Cir. 2011).

The Third Circuit reviews rulings on motions to exclude evidence for abuse of discretion.[1] *See Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1370 (Fed. Cir. 2021); *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009). "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (internal quotation marks omitted).

The Third Circuit reviews rulings on motions for judgment as a matter of law de novo. *See Rodriquez v. Se. Pennsylvania Transp. Auth.*, 119 F.4th 296, 298 (3d Cir. 2024). Judgment as a matter of law is appropriate when a district court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on [an] issue." Fed. R. Civ. P. 50(a)(1); *see also Washington v. Gilmore*, 124 F.4th 178, 185 (3d Cir. 2024) ("Judgment as a matter of law is proper only if the record is critically deficient of the minimum quantum of evidence needed to support the verdict.") (internal quotation marks omitted).

## III

Dr. Barry argues the district court abused its discretion by excluding the "handle means" portion of Dr. Yassir's

---

[1]    Barry argues the Third Circuit applies a "hard look" to decisions to exclude evidence that result in a grant of summary judgment or JMOL. *See* Open Br. at 25-26, 55-56. DePuy disagrees. *See* Depuy Resp. Br. at 34-35. Because we find the district court abused its discretion, even without applying a more stringent "hard look" standard, we need not resolve this dispute.

testimony and all of Dr. Neal's testimony and survey.  He further contends that the court erred by granting DePuy judgment as a matter of law.  We agree with Barry.

## A

The district court excluded the "handle means" portion of Dr. Yassir's testimony pursuant to Federal Rule of Evidence 702 because it found this testimony "contradictory, unhelpful, and unreliable."  J.A. 62.  Expert opinion that contradicts the court's claim construction is not helpful to the jury and, hence, should be excluded as unreliable under Rule 702(a).  *See, e.g.*, *Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*, 127 F.4th 1340, 1349-50 (Fed. Cir. 2025) (quoting Rule 702 and finding district court abused its discretion in allowing expert to offer testimony "untethered from the district court's claim constructions," which resulted in "methodological[ly] unsound[]" opinion); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("No party may contradict the court's construction to a jury."); *Liquid Dynamics Corp. v. Vaughn Co., Inc.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming striking of "expert opinion evidence as irrelevant because it was based on an impermissible claim construction").

However, as we detail below, Dr. Yassir's testimony did not contradict the court's claim construction.  It was, instead, an application of that construction that a reasonable factfinder could have either accepted as persuasive or rejected as implausible.  Thus, the court abused its discretion in excluding it as unhelpful and unreliable.[2]

---

[2]    While we have recently reiterated that "an expert's self-contradictory testimony" may be insufficient evidence to sustain a judgment, Dr. Yassir applied the court's construction; he neither contradicted it nor himself.  *Finesse Wireless v. AT&T*, 156 F.4th 1221, 1227 (Fed. Cir. 2025);

1

During his direct testimony, Dr. Yassir repeatedly told the jury that the court's claim construction was that "handle means is construed as a part that is designed especially to be grasped by the hand." J.A. 1237 (Trial Day 4 at 122:19-22); *see also* J.A. 56 (district court recognizing "Yassir began his testimony respecting the 'handle means' limitation by reciting my claim construction"). He then specifically testified that his opinions were rendered pursuant to that construction. *See, e.g.*, J.A. 1238 (Trial Day 4 at 128:16-18) ("Q: And did you apply the court's construction of handle means when you did this? A: I did."); *see also id.* (Trial Day 4 at 127:20-24) (explaining derotation tubes are mechanical levers and thus have "parts designed especially to be grasped by the hand," notwithstanding that they also "can do something else as well"); J.A. 1239 (Trial Day 4 at 131:14-17) ("So the derotation Quick Stick which we talked about *is especially designed to be grasped by the hand* to put on the pedicle screw.") (emphasis added).

DePuy did not object to any portion of Yassir's direct examination as contradictory of the court's construction or inadmissible.[3] This is despite the fact that DePuy had

---

*see also Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1349 (Fed. Cir. 2008) ("[N]o reasonable jury could have found that the [accused] device literally met this limitation based on [the expert's] opinion, given his contradictory testimony.").

[3]     Dr. Yassir's direct testimony stretches over more than 120 pages of trial transcript, *see* J.A. 1228-59 (Trial Day 4 at 85-212), during which counsel for DePuy objected three times. Each objection was overruled and none posited that Yassir had contradicted the court's construction. *See* J.A. 1239 (Trial Day 4 at 129:12-16) ("Q: Where is the

obtained a pretrial *in limine* ruling making inadmissible any evidence inconsistent with the court's claim construction. J.A. 4-6 ("DePuy asks me to exclude the testimony of Barry's expert, Dr. Yassir, insofar as it is based on or applies a claim construction inconsistent with my July 1, 2019, <u>Markman</u> Order. . . . I will grant DePuy's request to exclude testimony based on or applying a claim construction inconsistent with my <u>Markman</u> Order."). DePuy's lack of any effort to enforce this *in limine* order at any point during Yassir's examination – direct, cross, and redirect – reflects the fact that Yassir did not contradict the court's construction.

Nonetheless, in its order excluding Dr. Yassir, the district court found that the challenged testimony "impermissibly contradicted my Claim Construction Order on the 'handle means' limitation." J.A. 19; *see also* J.A. 62 ("Yassir repeatedly varied from and contradicted my Claim Construction Order during his trial testimony."); J.A. 56. To show such purported contradictions, the district court cited to two statements Dr. Yassir made in his direct examination, as well as three responses he gave to questions asked of him on cross-examination. J.A. 62 (citing J.A. 1239-40 (Trial Day 4 at 131:12-132:3, 133:9-16) and J.A. 1255-57 (Trial Day 4 at 195:17-19, 197:4-8, 204:9-25)). We reproduce, and discuss, all of this testimony below.

---

first handle means of the first tool? A: So it's the upper portion. [Depuy's counsel] Mr. Griffith: Objection."); J.A. 1249 (Trial Day 4 at 171:24-172:2) ("Q: Would [the configuration in Figure 1] work? A: Yeah, I didn't agree with – Mr. Griffith: Objection."); J.A. 1251 (Trial Day 4 at 177:4-9) ("Q: Okay, remind the jury where there's one and two tools in this picture. A: Yeah, so remember these are – Mr. Griffith: Objection.").

The direct testimony that troubled the district court begins with, and expressly applies, the court's construction:

Q.  Dr. Yassir, what are the specific parts that are *designed to be grasped by the hand* here?

A.  Sure.  So there's quite a few, obviously.  So the derotation Quick Stick which we talked about is *especially designed to be grasped by the hand* to put on the pedicle screw.  The Quick Stick derotation frame also is *designed to be grasped by the hand.* You clip it onto those tubes, and then you have to tighten those little nuts with your finger to get them to engage, and *so that has to be done with your hand.*

They actually have a part in the set called the derotation frame handle, and then there's additional derotation clamps that are disassembled that you can clip onto that frame.  Again, *also has to be done by hand* to get them to go onto the frame and then to go onto the pedicle screw engagement member or tube or the Quick Stick.

. . .

Q.  . . .  [H]ow does the shaft of one derotator become the handle means for a group of derotators?

A.  Sure.  So once they get linked together, the upper portion becomes a handle means because each one of those little, sort of, upper portions becomes a handle and the whole thing is a handle means.

J.A. 1239-40 (Trial Day 4 at 131:12-132:3, 133:9-16) (emphasis added).

In these two excerpts from the direct examination, Yassir is opining that multiple parts, or even the "whole" of an Accused Tool, could be a handle means, *because* such items, in Yassir's opinion, were designed to be grasped by the hand.  That is an *application* of the court's construction,

not a *contradiction* of it. And disputes over the application of the court's construction are fact disputes to be resolved by the factfinder, not evidentiary issues to be decided by the court in its role as gatekeeper. *See Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 869 (Fed. Cir. 2024) ("Application of the construed claim limitations to the accused products or processes presents an issue of fact."); *see also Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1351 (Fed. Cir. 2022) ("Whether an allegedly infringing act includes all the steps of the properly construed claim is a question of fact.").

2

Even on cross-examination, Dr. Yassir continued to demonstrate that he was applying the court's construction. For instance, the following colloquy occurred on cross:

Q. . . . [S]o I believe it's your testimony that of course the handles are designed especially to be grasped by the hand?

A. Correct.

Q. That's your opinion? And –

A. Well, that's the Court – that's the Court construction.

Q. It's the Court's construction on handle means, right?

A. Yes.

Q. And your opinion is that the handles are designed especially to be grasped by the hand?

A. Correct.

J.A. 1255 (Trial Day 4 at 196:16-197:3); *see also* J.A. 1256 (Day 4 Trial at 198:14-200:08) ("[S]urgical instruments in my mind have to be able to do what the patient needs, and the surgeon has to be able to use them to do what the

patient needs. So the ability of the surgeon to grasp them by hand is actually an integral feature, a very important feature. And so they have to be *especially designed for that because all spine surgery is done by hand.*") (emphasis added).

The district court cited the following cross-examination testimony as improper:

Q. And so everything is a handle means in Figure 1 [of the '358 patent], in your opinion?

A. Yeah. *In a linked system like that where everything is linked, they are.*

. . .

Q. The cross-linker is designed especially to be grasped by the hand?

A. Yes. There is no other way to put it into the patient, so the surgeon has to grab it by their hand to put it in.

. . .

Q. And you said all of this is handle means?

A. Yes.

Q. Everything in this is a handle means?

A. Well, *once it's connected, yes. The parts that are designed especially to be grasped by the hand.*

Q. And including all the way to the bottom of the shaft, you said was handle means –

A. Yeah. Those are not the places that you generally would want to grab it, so – the handle means – *you have created a handle means once you've connected everything together.*

Q. But you did tell me even the bottom of the shaft is handle means?

A. Well, sure. *The entire structure now has become a handle means* for performing the derotation.

Q. And it's become one handle means, right?

A. Yup.

J.A. 1255-57 (Trial Day 4 at 195:17-20, 197:4-8, 204:9-25) (emphasis added).

Rather than contradicting the court's construction, these excerpts show Dr. Yassir continuing to apply the court's construction of "handle means." Indeed, as the district court had itself explained in its claim construction order, "it is clear that 'handle means' *encompasses* both a single handle and *the linked handle array* contemplated by the presently preferred embodiment shown in Fig[ure] 1 of both patents." J.A. 15165 (emphasis added); *see also* J.A. 15164 ("The specification also describes 'shafts, extending from *a common handle or linked handle array*,' indicating that the linked handle array and common handle are different embodiments that both fall under the term 'handle means.'") (emphasis in original).[4] Yassir's testimony excerpted above repeatedly caveats his answers in terms of the total linked structure, which is consistent with his

---

[4] In connection with claim construction, DePuy had argued against Barry's proposed construction – the one the court ultimately adopted – in part on the grounds that it "could theoretically encompass every element of the accused products because in DePuy's accused products, practically every part is grasped by hand." *Id.* (internal quotation marks and alterations omitted). DePuy, thus, all along understood (and feared) that the opinion it eventually elicited from Yassir on cross-examination, that all parts of an accused device might infringe because all parts are "designed especially to be grasped by the hand," is *consistent* with the court's construction, not *contradictory* of it.

opinions on direct, and does not contradict the court's construction. *See, e.g.*, J.A. 1240 (Trial Day 4 at 133:9-16) ("[O]nce they get linked together, the upper portion becomes a handle means."). The district court thus erred by seizing on the testimony that "everything" is a handle means without crediting Dr. Yassir's qualifying refrain that such is the case only "in a linked system" and "once it's connected." J.A. 1255-57 (Trial Day 4 at 195:17-20, 197:4-8, 204:9-25) ("The entire structure *now has become* a handle means for performing the derotation.") (emphasis added). Dr. Yassir's testimony on that point was therefore consistent with the claim construction, not a contradiction of it.

The court additionally relied on the following exchange from Yassir's cross:

> Q. On Slide 4 I have the Court's construction of handle means, "A part that is designed especially to be grasped by the hand."
>
> And on the right, I believe I have what you said was your rational[e] for why everything in Figure 1 is a handle means. "They are parts that cannot be assembled without grasping them by hand."
>
> A. That's correct.
>
> Q. So those two, in your mind and in doing your analysis, you equated those two things. Am I right?
>
> A. Yes.

J.A. 19 (quoting J.A. 1256) (Day 4 Trial at 198:14-24). From the three words constituting Dr. Yassir's answers ("That's correct" "Yes") to two questions, the court concluded that "Yassir acknowledged that in conducting his infringement analysis *he* defined 'handle means' as 'parts that cannot be assembled without grasping them by the hand.'" J.A. 57 (quoting J.A. 1256) (Trial Day 4 at 198:14-24). In a similar vein, the court relied on a third portion of

the cross-examination: Yassir's statement that the "Quick Stick derotation frame also is *designed to be grasped by the hand . . .* you have to tighten those little nuts with your finger to get them to engage, and *so that has to be done with your hand.*"   J.A. 56 (quoting J.A. 1239) (Day 4 Trial at 131:12-133:3).   In the court's view, this meant that Yassir "equate[d] something 'designed to be grasped by the hand' with something 'that has to be done with your hand' – thus contradicting [the court's] construction."   J.A. 56; *see also* J.A. 20 ("Dr. Yassir improperly based his trial testimony respecting direct infringement of 'handle means' on *his* construction – 'parts that cannot be assembled without grasping them by the hand.'").

Even these selective excerpts of Yassir's testimony do not actually contradict the court's construction of "handle means."   The court's construction – "a part that is designed especially to be grasped by hand" – contains nothing to distinguish between grasping during post-assembly use and grasping during assembly of what will thereafter be used for manipulation.   Perhaps DePuy could have sought an elaboration of the claim construction to make the assembly testimony (as opposed to the totality of Dr. Yassir's "handle means" testimony) strikable, and it certainly could cite the testimony in arguing against crediting Dr. Yassir's opinion. But on the record as it stood, this testimony does not contradict anything about the court's claim construction.   Notably, the court's construction does not preclude multiple portions of a device from each being handle means.   *See, e.g.*, J.A. 15164 (claim construction order stating that "the patent claims support different embodiments for a 'handle means' that includes both a single handle from which multiple shafts extend or multiple handles (each attached to individual shafts) linked together").

This case is therefore unlike the one on which the district court relied.   *See* J.A. 62. There, in *Barry v. Medtronic, Inc.*, 230 F. Supp. 3d 630, 643 & n.10 (E.D. Tex. 2017), *aff'd on other grounds*, 914 F.3d 1301 (Fed. Cir. 2019), the

district court excluded the opinion of an expert who had opined that an accused product lacked a "mechanical link" because the alleged link was a screw, even though "the court had [explicitly] stated in its claim construction order [that a screw] could constitute a mechanical linkage." That kind of clear contradiction between an expert's opinion and the court's claim construction is missing here. *Cf. Trudell*, 127 F.4th at 1349-50 (excluding expert testimony "untethered from the district court's claim constructions" where expert opined infringement "requires more than one vane" rather than court's construction of "one or more vanes"); *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 715 (Fed. Cir. 2022) (affirming exclusion of expert testimony as contradictory where expert "undisputedly applied the 'plain and ordinary meaning' of the [relevant] limitation, not the parties' agreed-upon construction").

At most, what the cross-examination revealed was a dispute as to the credibility of Yassir's repeated insistence that he did, in fact, apply the court's construction. The cross-examination also provided reasons the jury could have found Yassir's opinion unpersuasive. But questions of credibility, and disputes as to the probative value of an expert's application of the court's claim construction, are matters for the jury, not the court. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[W]hether [an] expert is credible or the opinion [he offers] is correct is generally a question for the fact finder, not the court."); *see also EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025) (en banc) ("Determinations of admissibility, which fall within the gatekeeping role of the court, are separate from determinations of weight and credibility, which are within the province of the jury in a jury case."); *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 792 (3d Cir. 2017) ("In general, courts serve as gatekeepers for expert witness testimony. . . . [But a] court should not, however, usurp the role of the fact-finder.").

Indeed, an effective cross-examination will almost always reveal the type of tensions and ambiguities the Dissent characterizes, wrongly in our view, as contradictions. Hence, adopting the Dissent's approach – allowing a district court to treat arguable inconsistencies revealed only on cross-examination as a basis to *exclude the entirety of an infringement expert's opinion and analysis on a disputed issue*, notwithstanding that the expert's opinions survived a pre-trial *Daubert* challenge and were not objected to at trial as contradicting the court's construction – could broadly undermine fair and orderly pretrial preparation and trial conduct. The Dissent's approach would not simply encourage district courts "to carry out their important gatekeeping responsibility." Dissent at 12. It would, we fear, inadvertently invite district courts to dismantle parties' cases at trial based on ordinary evidentiary imperfections.

3

As the Supreme Court has made clear, rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). Here, consistent with that guidance, the district court properly permitted DePuy to have its non-infringement expert criticize Yassir's application of the court's construction and explain how the jury could choose not to credit that testimony. J.A. 1466 (Trial Day 7 at 102:25-104:25) ("Dr. Yassir seemed to indicate that a part that cannot be assembled without grasping is a handle. I think, in fact, he said, if he has to grab it to assemble and use it, that's a handle means. . . . [T]hat's not the Court's interpretation."). The district court also properly permitted DePuy to elicit testimony from three witnesses that the Accused Tools had *no portion* especially designed to be grasped by hand and, therefore, did not infringe. J.A. 1341 (Trial Day 5 at 200:7-13); J.A. 1384

(Trial Day 6 at 58:9-15); J.A. 1406 (Trial Day 5 at 145:7-22). Yassir's testimony was thus fully "tested by the adversary process." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (internal quotation marks omitted).

Our conclusions, then, match those the district court itself reached prior to trial when it denied DePuy's original *Daubert* motion. At that point, the district court rejected DePuy's contention that Dr. Yassir failed to apply the court's construction by "assert[ing] that anything that *may be* grasped is a handle means, and entire constructs are handle means." J.A. 15248. The district court observed that DePuy's arguments were grounded in testimony given "only [in response to] . . . hypotheticals presented by DePuy's counsel." J.A. 15650. It further explained that DePuy's real objection was to how Yassir applied the court's construction, which "goes to the weight of Yassir's testimony, not its admissibility." J.A. 15651.

To be sure, the district court described its pretrial rulings as "necessarily tentative," and expressly offered "to revisit them during trial should any Party ask me to do so." J.A. 1, 15647. In doing so, the court acted within its discretion. Where it abused its discretion was not in the act of later changing its mind, but, rather, in the fact that its admissibility ruling at trial rested on a clearly erroneous determination that Yassir's testimony contradicted the court's construction of "handle means."

4

As our dissenting colleague points out, the question of whether an expert's opinion contradicts the court's construction – and is, therefore, inadmissible – is squarely within the court's gatekeeping function. *See* Dissent at 4. In making that determination, a district court must not lose sight that "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

If, nonetheless, the court finds a genuine contradiction between the expert's opinion and the court's claim construction, the court must exclude the expert's opinion. *See, e.g.,* *Exergen*, 575 F.3d at 1321. But contradiction does not mean mere tension, arguable inconsistency, or lack of persuasiveness.

To be clear, we do not hold, as the Dissent suggests, that an expert who contradicts the court's claim construction can evade the consequences of that legal error, and "escape a court's gatekeeping function," by simply insisting he actually applied the court's construction. Dissent at 6. Nor does our holding today "place[] the ultimate admissibility question before the jury." *Id.* at 4. We agree with our dissenting colleague that the issue of whether Yassir's opinion contradicted the court's construction of "handle means" was a question of admissibility and, thus, was for the district court and not the jury to decide. Here, however, as we have demonstrated, Yassir did not contradict the court's construction, either on direct or cross-examination. The district court's finding to the contrary was clearly erroneous and, hence, its decision to exclude Yassir's testimony on this basis was an abuse of discretion.

5

On remand, Dr. Yassir must be permitted to testify as to this issue; though, of course, he must again testify consistent with, and not in contradiction to, the court's claim construction. Both parties should be permitted to object to questions or answers that contradict that construction.

B

As with the challenge directed to Dr. Yassir, the district court denied DePuy's pretrial *Daubert* motion to exclude Dr. Neal and his survey, finding the purported design flaws DePuy identified "go to the weight, not the admissibility, of the survey." J.A. 15657. Then, at trial, as also occurred with respect to Yassir, the district court found,

after Neal testified, that his opinions and all the evidence regarding his survey had to be excluded.  J.A. 16 ("It is plain that Neal's methodology is so flawed that both his survey and testimony – which he bases on that survey – must be excluded as unreliable.").  We conclude, as we did with Yassir, that the district court's original reasoning denying the pretrial motion was correct and it later abused its discretion by granting the renewed motion during trial.[5]

1

On appeal, DePuy insists its renewed motion to exclude Neal was properly granted on two grounds: (1) Neal's failure to establish the representativeness of his sample, and (2) design flaws in the survey questions themselves.  With respect to the sample, the district court found that Neal did not identify how the 164 survey respondents (out of at least 4,000 solicited respondents) were representative of any larger target population of surgeons.  J.A. 34-39.  The court relied on Third Circuit authority holding that, for a survey and its results to be reliable, "a proper universe must be examined and a representative sample must be chosen."  J.A. 33 (quoting *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)).  As for the design and

---

[5]   At trial DePuy offered new arguments contesting the reliability of Neal's survey, even though the contents of the survey, and Neal's opinions regarding them, remained consistent throughout the litigation.  *Compare* J.A. 15686-89 (alleging, during trial, error in Neal's survey's definition of "Type 1" surgery), *with* J.A. 15290-92 (failing to allege same in pretrial motion).  The district court relied on DePuy's new arguments when it excluded Neal's survey during trial.  *See* J.A. 43.  Barry argues this was improper.  *See* Open. Br. at 70-71.  Because we are reversing the exclusion of Neal on other grounds, we need not decide whether it was improper to permit DePuy to raise new *Daubert* contentions at trial.

24                          BARRY v. DEPUY SYNTHES COMPANIES

structure of the survey, the district court found such sub-
stantial flaws as to render the results meaningless. J.A.
32. It specifically emphasized errors it found with termi-
nology and anchoring question 14. J.A. 39-44.

While the many criticisms the district court had of Neal
and his survey may well have persuaded a reasonable jury
not to place any substantial weight on his testimony, they
do not justify excluding it. The standards for admissibility
and persuasiveness are not the same. Importantly, more-
over, the district court failed to cite any actual *evidence*,
either particularized or introduced at trial, to support its
conclusion that the flaws it found in Neal's survey, meth-
ods, and opinions render his testimony unhelpful to the
trier of fact under Rule 702(a) or inadmissible under Rule
104(a).[6] The Third Circuit has cautioned that a "judge
should not exclude evidence simply because he or she
*thinks* that there is a flaw in the expert's investigative pro-
cess which renders the expert's conclusions incorrect." *In
re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) (emphasis

---

[6]    The district court cited two secondary sources in its
order: (1) Shari S. Diamond, *Reference Manual on Scientific
Evidence, Reference Guide on Survey Research*, 359, 380 (3d
ed. 2011) ("Diamond"); and (2) David H. Kaye & David A.
Freedman, *Reference Manual on Scientific Evidence, Refer-
ence Guide on Statistics*, 211, 226-27 (3d ed. 2011) ("Kaye").
J.A. 35, 44. Both sides used Diamond (which in turn cites
Kaye) prior to trial; Dr. Neal in his expert report and
DePuy in its pre-trial *Daubert* motion, which the district
court denied. *See* J.A. 15290-91, 16336-66. The district
court did not rely on any evidence tying Diamond and
Kaye, which are general reference manuals, to Neal's spe-
cific analysis, or any evidence as to how generic survey
principles rendered Neal's approach so flawed as to be in-
admissible.

added; internal quotation marks omitted); *see also Paoli*, 35 F.3d at 744; *cf. Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1240 (3d Cir. 1993) (in related contexts, stressing need for evidence on expert views of data). We do not deny that there may be cases in which a methodological error is so clear that the court can identify the error on its own, whether through judicial notice or otherwise. But what the district court in this case explained does not come within such a category. Here, the district court's non-record-based reasoning as to methodological flaws does not, on its own, justify exclusion of Neal's expert opinion.

In setting out the faults it perceived in Neal's design and administration of his survey, the district court cited only to Neal's trial testimony, much of it given in response to the court's own questions.[7] J.A. 26-29, 32-44. According

---

[7] The district court questioned Neal during trial in front of the jury. While judges are free to question witnesses, *see* Fed. R. Evid. 614(b) ("Where the interest of justice so requires, the court may examine a witness regardless of who calls the witness."), a court pursuing a skeptical line of questioning, into for instance the expert's qualifications (which here DePuy did not even challenge) or the reliability of his methodology, should consider doing so outside the presence of the jury, to eliminate the risk of inadvertently influencing the jury's resolution of disputed facts. *See generally Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999) (noting Third Circuit has "long stressed the importance of in limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and *Daubert*"); *Petruzzi's IGA*, 998 F.2d at 1240 ("[I]f the court were concerned about the accuracy of the data, then it should have held an *in limine* hearing to assess the admissibility of the testimony."); *see also* Fed. R.

to the district court, "Dr. Neal's survey suffers from several defects," including that: it "failed to interrogate a large representative cross section of surgeons," "the survey's design flaws ensured that any results would be meaningless," it contained "circular[] . . . definitions and reasoning," and was otherwise incomplete because Neal "fail[ed] to perform a pretest, consider non-responsive bias, follow up with those who did respond, or allow respondents to check their surgical records." J.A. 32. But we cannot discern how the district court could know, as opposed to speculate, that any of these matters would be of concern to an expert in the field of surveys, much less render the entire project unreliable. *See, e.g.*, *Cohen v. Cohen*, 125 F.4th 454, 463 (3d Cir. 2025) ("[T]here is no one-size-fits-all for study sizes under *Daubert*'s reliability prong."). Although DePuy's survey expert, Dr. Peter Rossi, testified later at trial, his testimony was not cited in DePuy's briefs supporting its renewed motion, nor was it relied on by the district court as a basis for its ruling.[8]

Dr. Neal testified to the scientific merits of his survey. He explained that he labored to eliminate various biases and inaccuracies by employing a double-blind approach, cabining the temporal sample to recent surgeries, and posing neutral, randomized questions to respondents. J.A. 1164-65 (Trial Day 3 at 60:23-61:16, 63:4-20); J.A. 1218 (Trial Day 4 at 45:23-46:6). Once Dr. Barry established, by a preponderance of the evidence, that Neal had "good

Evid. 104(c)(3) ("The court must conduct any hearing on a preliminary question [of admissibility] so that the jury cannot hear it if: . . . justice so requires.").

[8]    To the contrary, it was Dr. Barry who cited Dr. Rossi in his opposition to DePuy's renewed motion, pointing out where Rossi agreed with aspects of Neal's testimony. J.A. 15886, 15904.

grounds" for his methodology, the jury should have been allowed to hear his testimony. *See Karlo*, 849 F.3d at 83 ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactor[ily] weigh its inadequacies.") (internal quotation marks, ellipses, and brackets omitted); *see also Zoloft*, 858 F.3d at 792-93 ("[A]n expert should only be excluded if [a methodological] flaw is large enough that the expert lacks the 'good grounds' for his or her conclusions.") (internal quotation marks omitted).

DePuy's challenges, and the purported flaws the district court found in Neal's survey and methodology, go to the weight the jury might accord to that evidence and not to its admissibility. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *see also Sec'y United States Dep't of Lab. v. E. Penn Mfg. Co., Inc.*, 123 F.4th 643, 651 (3d Cir. 2024) ("[D]espite any methodological flaws, Dr. Radwin's testimony was admissible . . . [because the] challenges [to] how he calculated and interpreted the results . . . ordinarily go[] to the weight of the evidence, not to its admissibility.") (internal quotation marks omitted); *Karlo*, 849 F.3d at 83 ("The question of whether a study's results were properly calculated or interpreted ordinarily goes to the weight of the evidence, not to its admissibility."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("[A]ny failure on the part of [the] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."). Accordingly, "[t]he limitations of [Neal's] survey may impact the persuasiveness of his testimony, but they do not render the results of the survey wholly inadmissible." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009).

2

All of this is, again, precisely as the district court had itself explained prior to trial. *See* J.A. 15657 ("DePuy asks me to exclude Neal's opinions and testimony, arguing the survey is unreliable because: (1) it violates accepted survey principles; and (2) Neal did not survey the proper universe. . . . Because any alleged defects go to the weight, not the admissibility, of the survey, I will deny DePuy's request."). We reiterate: the district court was not unalterably bound to adhere to its pretrial decision to admit Neal's testimony. Here, however, its pretrial admissibility decision was correct while its contrary ruling during trial was incorrect.

In granting DePuy's renewed motion to strike Neal during trial, the district court recognized that "a survey's methodological deficiencies *generally* go to its evidentiary weight rather than to its admissibility." J.A. 33 (emphasis added); *see also* J.A. 44 ("[F]laws in an expert's methodology *usually* go to the weight, not the admissibility of the expert's evidence.") (emphasis added). The court provided no persuasive reasons for finding this case to be an exception. The district court abused its discretion. Accordingly, we reverse the district court's grant of DePuy's renewed motion to exclude Neal's testimony.[9]

C

We also reverse the district court's grant of JMOL, which was predicated on the lack of evidence remaining in the record after the court excluded Dr. Yassir's and Dr.

---

[9]   Neal was offered to support Barry's infringement and damages case. *See* J.A. 15652; *see also* J.A. 44 ("Dr. Neal's methodology was so flawed that any damages calculation based on that methodology was necessarily speculative."). Our reversal of the decision to strike Neal thus applies to both liability and damages.

Neal's opinions.  J.A. 60-66.  On appeal, Dr. Barry argues that even if we affirm the exclusion of his experts, he presented sufficient non-expert evidence to permit a reasonable jury, taking that evidence in the light most favorable to Barry, to find infringement.[10]  Because we have reversed the exclusion rulings, and the jury at the new trial will hear from Dr. Yassir and Dr. Neal, we need not decide whether Dr. Barry's non-expert evidence would have been enough to sustain a judgment of infringement.

## IV

We have considered DePuy's remaining arguments and do not find them persuasive.  Accordingly, we reverse the district court's exclusion of Drs. Yassir and Neal, reverse its grant of judgment as a matter of law, and remand for a new trial at which both experts may testify.

**REVERSED AND REMANDED**

COSTS

Costs to Appellant.

---

[10]  For example, the jury heard testimony from DePuy's surgeon-designers that the Accused Products "have a long handle . . . which you can grab" and "give[] you a nice handle to try and derotate the spine."  J.A. 1338 (Trial Day 5 at 188:18-21); J.A. 8601.  The jury also saw DePuy instruction manuals, technique guides, and brochures with images of surgeons grabbing the Accused Tools with their hands, J.A. 55, 6358, 7071, and held the Accused Tools in their own hands, J.A. 1408.

# United States Court of Appeals
# for the Federal Circuit

---

**MARK A. BARRY,**
*Plaintiff-Appellant*

**v.**

**DEPUY SYNTHES COMPANIES,**
*Defendant*

**DEPUY SYNTHES SALES, INC., TRADING AS DEPUY SYNTHES SPINE, MEDICAL DEVICE BUSINESS SERVICES, INC., DEPUY SYNTHES PRODUCTS, INC.,**
*Defendants-Appellees*

---

2023-2226, 2023-2234

---

Appeals from the United States District Court for the Eastern District of Pennsylvania in No. 2:17-cv-03003-PD, Judge Paul S. Diamond.

---

PROST, *Circuit Judge*, dissenting.

The district court properly excluded Barry's expert testimony because it was unreliable. Dr. Yassir, Barry's technical expert, contradicted the court's claim construction. And Dr. Neal's testimony regarding his survey was riddled with methodological flaws, specifically concerning the representativeness of his sample and the design of his questions.

The majority reverses the district court's ample discretion on these issues; it announces that *all* of these contradictions and flaws were matters of fact or weight, properly left to the jury to sort out.  I disagree.  We just recently convened en banc to reassert the "essential prerequisite" of a court's reliability determination for expert testimony to be considered by a jury.  *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1340 (Fed. Cir. 2025) (en banc).  As the 2023 amendments to the Federal Rules of Evidence now make abundantly clear, the proponent of evidence must "demonstrate[] *to the court*" its reliability.  Fed. R. Evid. 702 (emphasis added).  The Advisory Committee explicitly criticized district courts for treating the "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" as "questions of weight and not admissibility."  Fed. R. Evid. 702 advisory committee's note to 2023 amendments.  The majority's approach— where everything's a fact or weight issue for the jury—contravenes the principles embraced in *EcoFactor* and the 2023 amendments, and in my view will undermine district courts' abilities to exercise their important gatekeeping function.  I respectfully dissent.

I

The district court excluded Dr. Yassir's testimony as unreliable under Rule 702 because it contradicted the court's claim construction (an issue that, itself, is firmly within the province of the court).  The majority, despite acknowledging that our precedent requires exclusion in these circumstances, *see* Maj. 10 (collecting cases), nonetheless treats all of Dr. Yassir's testimony as presenting fact issues that should have been left for the jury.  As explained below, the majority not only legally errs, it also makes no genuine attempt to explain how the district court abused its discretion in finding a contradiction of its claim construction.

### A

The clearest example of Dr. Yassir's contradiction of the claim construction was when he *agreed* that he equated the court's construction of "handle means"—i.e., "a part that is designed especially to be grasped by the hand"—with "parts that cannot be *assembled* without grasping them by hand." J.A. 1256 (Trial Day 4 at 198:14–24 (emphasis added)). Those are plainly different things. As the district court noted, just because a given part has to be grasped during assembly doesn't mean that the part was *designed especially* to be grasped. *See* J.A. 61. Many parts have to be grasped during assembly. That doesn't make them all handles, or "handle means." Dr. Yassir's construction of "handle means," therefore, encompassed something broader than the court's construction.

Similarly, Dr. Yassir testified that "everything" in Figure 1 of the '358 patent is a "handle means." J.A. 1255 (Trial Day 4 at 195:17–19). The problem with this view, as the district court noted, is that for everything to be a handle means, there could be no part that is "designed especially" to be grasped by hand. *See* J.A. 62. After all, a part is "special" (i.e., designed especially) only if it has some *distinguishing* quality from among the whole. And Dr. Yassir's opinion that a "handle means" is only created upon linking components together, Maj. 16–17, conflicts with his explanation that an individual component is a handle means simply because "the surgeon has to grab it by their hand to put it in [the patient]," J.A. 1256 at 197:6–8.

Dr. Yassir also expanded his view of the court's construction to things that one *wouldn't* want to grab. For example, he testified that, although certain parts of the accused surgical constructs "are not the places that you generally would want to grab," those parts, too, would be "handle means." J.A. 1257 (Trial Day 4 at 204:14–19). It is not clear to me how parts that one "generally would [not]

4                                BARRY v. DEPUY SYNTHES COMPANIES

want to grab" could be parts designed *especially* to be grabbed.

B

The majority, in analyzing the exclusion of Dr. Yassir's "handle means" testimony, legally errs by conflating admissibility with whether evidence is sufficient to sustain a verdict. The former is viewed through the lens of the district court and is reviewed for abuse of discretion; the latter is viewed through the lens of a reasonable jury and is reviewed de novo. These are different issues. By conflating them, the majority essentially bars district courts from carrying out their gatekeeping obligation and places the ultimate admissibility question before the jury.

Specifically, the majority's core holding is that Dr. Yassir did not contradict the court's claim construction because "a reasonable factfinder could have either accepted" his infringement opinion as persuasive "or rejected [it] as implausible." Maj. 10. Even though the majority appears to acknowledge the "tension" between Dr. Yassir's testimony and the court's construction, *see* Maj. 22, it nonetheless declines to find a contradiction, only going so far as to say that Dr. Yassir's testimony presents "a dispute as to the credibility" of whether he "did, in fact, apply the court's construction." Maj. 19.

The majority asks the wrong questions and focuses on the wrong actor. By asking whether a reasonable jury could have "accepted" Dr. Yassir's testimony as persuasive, the majority effectively applies a JMOL standard, not an admissibility one. *E.g.*, *C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1378 (Fed. Cir. 2020) ("A court may grant JMOL during a jury trial only when . . . the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."). And by repeatedly labeling Dr. Yassir's testimony as an "application" of the court's claim construction that implicated a mere "credibility" dispute, Maj. 10, 14, 19–21, the

majority presupposes that the evidence should have been admitted (which is the very question we're confronted with). By approaching the issue like this, the majority sidesteps the role of the district court in determining whether Dr. Yassir's testimony was indeed faithful to the district court's construction.

Instead of asking what the *jury* might have thought about the evidence if it had been admitted, we ask whether the *district court* abused its discretion in excluding the evidence. Again, the focus is on the district court, and whether its exclusion was "arbitrary, fanciful, or clearly unreasonable," such that "no reasonable person would adopt the district court's view." *United States v. Tomko*, 562 F.3d 558, 565 (3d Cir. 2009) (cleaned up). Expert testimony contradicting the court's claim construction is properly excludible as unreliable. *Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*, 127 F.4th 1340, 1349–50 (Fed. Cir. 2025). So, the question here is whether the district court was arbitrary, fanciful, or clearly unreasonable in viewing Dr. Yassir's testimony as having contradicted its claim construction (and thus excluding that testimony as unreliable under Rule 702).

Whatever the majority might have thought of Dr. Yassir's testimony had it been ruling on this issue as a trial judge in the first instance, I find it exceedingly difficult to characterize the district court's finding that Dr. Yassir contradicted its claim construction as *clearly unreasonable*. Indeed, our standard of review should be decisive here, as demonstrated by the majority's own difficulty in explaining away what the district court found (correctly, in my view) to be a contradiction.

In this regard, the majority mostly just features Dr. Yassir's testimony on direct examination. There, it says, Dr. Yassir "repeatedly" recited the court's claim construction to the jury. Maj. 11. The majority also views DePuy as not having objected to Dr. Yassir's testimony on

direct for contradicting the claim construction.  Maj. 11–12 & n.3.[1]

The problem here, however, is that the most concerning testimony came out on cross-examination.  Thus, characterizing Dr. Yassir's direct testimony as unobjectionable (or unobjected-to) regarding contradicting the claim construction does little to answer whether, as a whole, his testimony was properly excluded as unreliable.

As to Dr. Yassir's testimony on cross, the majority cherry picks portions of Dr. Yassir's testimony where he echoed the court's construction; it then concludes that Dr. Yassir was "continuing to apply" the construction.  *See* Maj. 15–16.  This, too, fails to respond to the particular contradictions that so concerned the district court and this dissent.  If an expert can escape a court's gatekeeping function simply by parroting, at times, the court's construction—or by *insisting* that, really, he or she is applying that construction—little will remain of that important function.

The majority also considers Dr. Yassir not to have contradicted the court's claim construction because the court's construction "contains nothing to distinguish between grasping during post-assembly use and grasping during assembly."  Maj. 18.  That's true, but irrelevant.  What matters is that a part have been "designed especially" to be grasped by hand.  While that feature can certainly be apparent whether during assembly or thereafter, the problem

---

[1]    I disagree with the majority that "DePuy did not object" during Yassir's direct examination.  DePuy made several objections during Dr. Yassir's direct examination when he began testifying about the "handle means," which were immediately overruled by the district court without argument.  At the conclusion of Dr. Yassir's testimony, DePuy explained that it would file a motion on "the handle means issue."  J.A. 1261 (Trial Day 4 at 217:8–218:12).

with Dr. Yassir's testimony is that he equated "designed especially" with *anything* that has to be grasped by hand during assembly. Again, these are not the same thing. Thus the contradiction.

Because the district court correctly determined that Dr. Yassir's testimony contradicted the claim construction of "handle means" and was therefore unreliable under Rule 702—or, at the very least, did not *abuse its discretion* in so determining—I would affirm that exclusion.

## II

Regarding Dr. Neal, Barry's survey expert, the majority again treats the district court's admissibility concerns as only involving jury issues, not matters for the court. Maj. 27 (characterizing the survey's flaws as "go[ing] to the weight the jury might accord to that evidence and not to its admissibility"). This blanket—and incorrect—characterization harkens back to the very approach that prompted recent amendments to Rule 702. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendments (noting that courts have "incorrectly appli[ed]" Rule 702 by treating "the critical questions" relating to reliability as "questions of weight and not admissibility").

## A

The district court excluded Dr. Neal's survey and accompanying testimony under Rule 702 as being unreliable for two independent bases—lack of representativeness and flawed survey question design.

As to representativeness, the district court found that Dr. Neal's failure to demonstrate representativeness of his survey population "rendered his conclusions unreliable and any resulting damages calculation speculative." J.A. 34; *see* J.A. 35–39. The primary flaw (among several others) was that the target population shifted between (1) surgeons performing "spinal deformity surgeries in the United States" (a population that Dr. Neal acknowledged

encompassed some 50,000 surgeons) and (2) surgeons specifically performing pedicle screw surgeries involving simultaneous derotation (a much narrower pool). J.A. 34–35. At trial, Dr. Neal testified that he used the narrower pool (with the results being extrapolated to the larger population), while admitting that he did not even attempt to demonstrate that his sample was representative of the larger population. J.A. 1165 (Trial Day 3 at 62:6–25); J.A. 1179 (Trial Day 3 at 117:7–16). Indeed, he candidly admitted that the only support for the representativeness of the population was his say-so. *See* J.A. 1179 (Trial Day 3 at 119:17–20) (Q: "The only support that we have for your statement that this is a representative sample is the fact that you said it, correct? A: "That's correct.").

The district court also found Dr. Neal's representativeness problems were "compounded by the way he chose his survey recipients." J.A. 35. Dr. Neal's survey used "nonprobability sampling," a technique where respondents are not selected randomly from the relevant population. *Id.*; Appellant's Br. 50. These techniques have drawn criticism from courts and scholars alike. J.A. 35 (citing the Federal Judicial Center's Reference Manual on Scientific Evidence)[2]; *see also Boehringer Ingelheim G.m.b.H. v. Pharmadyne Labs.*, 532 F. Supp. 1040, 1054 (D.N.J. 1980) ("Because the survey was not a probability sample, the results cannot be statistically extrapolated to the universe.").

Further, the district court found that Dr. Neal failed to address nonresponse bias, despite the response rate of his

---

[2]    *See, e.g.*, David H. Kaye & David A. Freedman, *Reference Manual on Scientific Evidence, Reference Guide on Statistics*, 211, 226–27 (3d ed. 2011); Shari S. Diamond, *Reference Manual on Scientific Evidence, Reference Guide on Survey Research*, 359, 380 (3d ed. 2011); J.A. 16336–66. Contrary to the majority's assertion, these materials were part of the record before the district court. Maj. 25.

4,000 invitations being only 4.1% (164 respondents).  J.A. 36–37.  With the numerous flaws identified, including low response rate, rendering the survey's representativeness suspect, the district court reasonably considered it "important for Neal to determine if non-response bias tainted his survey."  J.A. 37.  But Dr. Neal dismissed these concerns in relatively conclusory fashion.  *See id.*

Overall, on the issue of representativeness, the district court found that these flaws, along with others the court catalogued in further detail, were collectively so fundamental as to render the survey unreliable.  J.A. 34–39.

As to the survey's flawed question design, the district court concluded that the survey's "anchoring question," which set the pool from which respondents would later classify their surgeries, was incompatible with the later questions. J.A. 32, 39.  The court found this incompatibility rendered the survey responses "senseless," or at the very least, severely undermined the survey's reliability.  J.A. 43.  The district court also found the use of non-exhaustive questions as to the surgery types to be a "structural defect" that stripped any meaning from the responses.  J.A. 44.

## B

The majority simply announces that these well-reasoned criticisms of Dr. Neal's survey were "weight"-related; it does not meaningfully engage with them.  To be sure, the majority faults the district court for failing to "cite any actual *evidence* to support its conclusion that the flaws it found in Neal's survey, methods, and opinions render his testimony" inadmissible.  Maj. 24 (emphasis in original).  Yet, I am unaware of any requirement that a district court cite evidence to support its determination of inadmissibility in the context of exercising its gatekeeping function.

Moreover, although the majority acknowledges that it was *Barry's* burden to demonstrate "good grounds" by a preponderance of evidence, Maj. 27, it does not explain how

Barry established these "good grounds," particularly given Dr. Neal's uninspiring responses regarding the various flaws.[3] More generally, the majority does not explain how the district court abused its considerable discretion in finding such "good grounds" lacking here.

In my view, the district court acted reasonably in determining that Barry failed to demonstrate that Dr. Neal's opinion rested on "good grounds" and in excluding his testimony—for a few reasons.

First, courts routinely exclude expert testimony for having one or more flaws akin to what the district court identified. *See, e.g.*, *In re Autozone, Inc.*, No. 3:10-md-2159, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016) (excluding survey under Rule 702 because, among other flaws, the expert "did not adequately account for the possibility of nonresponse bias"); *M2M Sols. LLC v. Motorola Sols., Inc.*, No. 1:12-cv-33, 2016 WL 767900, at *6 (D. Del. Feb. 25, 2016) (excluding expert who "extrapolate[d] from a survey unrelated to the patented invention to calculate how many customers use the patented features of the accused products"); *Chavez v. IBP, Inc.*, No. 2:01-cv-5093, 2004 WL 5520002, at *8–11 (E.D. Wash. Dec. 8, 2004) (excluding non-representative survey for sampling deficiencies, including non-probability sampling and nonresponse bias).

None of the cases the majority quotes support its blanket characterization of all these flaws as "weight" issues. For example, in *ActiveVideo*, the trial court had *declined* to exclude challenged testimony, and in reviewing that determination (for abuse of discretion), we concluded that the flaws there—failure "to control for certain variables"—did

---

[3]    To the extent the majority criticizes the district court for questioning Dr. Neal directly at trial, *see* Maj. 25 & n.7, doing so is permissible, Fed. R. Evid. 614(b), and Barry does not develop a challenge on this basis on appeal.

not go to the underlying methodology. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). Here, not only is the posture different (we are reviewing a decision to *exclude*), but also, the district court's concerns in this case went to the survey's methodology. *Secretary, United States Department of Labor v. East Penn Manufacturing Co.* is similarly distinguishable. 123 F.4th 643, 651 (3d Cir. 2024). And in *Vita-Mix*, the trial court had excluded survey testimony as irrelevant under Rule 402 (not as unreliable under Rule 702), and nothing there suggested a quantity and quality of methodological flaws akin to what the district court identified here. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1325–26 (Fed. Cir. 2009). Moreover, the cases acknowledge that although some flaws might "normally" or "ordinarily" be considered matters of weight, there are situations where they can, on their own, amount to inadmissibility. *Basemore v. Friday*, 478 U.S. 385, 400 n.10 (1986); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017).

Second, in determining non-representativeness, the district court did not rely on a single flaw in the survey's methodology that, in isolation, might have been properly considered a matter of weight. Instead, it was the *cumulative* effect of the flaws, each of them compounding with the last, that the district court found to render the survey unreliable. J.A. 34–39. That finding is sufficient under the law of the Third Circuit. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516–17 n.14 (3d Cir. 1998) ("We conclude that the cumulative effect of these, and other, methodological errors render it impossible to say that this survey was 'conducted in accordance with generally accepted survey principles,' and thus it should not have been admitted." (quoting *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978))).

Finally, the district court also acted reasonably in determining the anchoring and subsequent questions

incompatible and non-exhaustive, casting significant doubt on the reliability of the survey. These are not the type of mere "technical" matters that "generally" go to the weight accorded to a survey, rather, they are central to the type of fundamental flaw that renders the survey's results useless and its reliability suspect. *See Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004).

## III

Admissibility of expert testimony is a question for courts, not juries. Dr. Yassir contradicted the court's construction of "handle means," and Dr. Neal prepared a survey having such numerous and significant flaws that the district court concluded it lacked reliability. The majority, by simply denoting these problems as issues of "fact" or "weight," seriously undermines district courts' abilities to carry out their important gatekeeping responsibility. I respectfully dissent.